### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net



FILED
JUN 06 2022
KAW
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

22  03283

---

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

CASE NO: _____

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a
Conspiracy) (Conspiracy) (Unreasonable
Restraint on Trade) (The Clayton Act)
(Unjust Enrichment) (Contributory
Infringement).**

June 03, 2022



## COMPLAINT FOR ANTITRUST LAW VIOLATIONS AND PATENT INFRINGEMENT

This is a civil action brought under Antitrust Law violations commencing from
competitor collaborations, conspiracy to restrain trade, and "tying" teaming agreements that
likely resulted in a secret conspiracy and the anticompetitive practices recognized by this Court
in *Federal Trade Commission v. Qualcomm Inc.* **Exhibit A: "Finding of Fact…"**

This action is also brought under Contributory Infringement commencing from the
"manufacture, combination or composition; or, a material or an apparatus for use in practicing a

patented process, constituting a material part of the invention". This action is for damages and injunctive relief on behalf of the Plaintiff, against the defendant Qualcomm Inc. ("Qualcomm"); demanding a trial by jury, complains and alleges as follows:

## NATURE OF THE CASE

1.      This enforcement action challenges Qualcomm's unlawful maintenance of a monopoly in Qualcomm's Snapdragon chipsets that processes functional and operational instructions; and, enable cellular communications in new and improved cell phones and other products.

2.      Qualcomm has engaged in exclusionary conduct that reduces competitors' ability and incentive to innovate, and raises prices paid by consumers for the new and improved cell phones. Qualcomm is both a dominant supplier of Snapdragon chipsets (processors) and a licensor of patents that Qualcomm has declared essential to widely adopted cellular standards.

3.      The new and improved cell phones sold by Qualcomm's customers must comply with these standards, even when they incorporate processors supplied by Qualcomm's competitors.

4.      Qualcomm has excluded competitors and harmed competition through interrelated policies and practices that includes withholding its Snapdragon chipsets (processors) unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm.

5.      Qualcomm elevates royalties that the customer must pay when using competitors' processors ("no license-no chips"); and, without a patent(s) for the new and improved cell

COMPLAINT

phones, or a licensing agreement for the new and improved cell phones, collects a royalty on each new and improved cell phones (handset) sold.

6.       Qualcomm's behavior is especially problematic when it comes to bargaining over licenses for patents recognized as a "standard" or deemed to be "essential" to a particular industry. "No license, No chip" policy.

7.       Qualcomm is being hypocritical in that regard, because of Qualcomm's unauthorized use of a patented CPU(s) that the company "ties" to its cellular modems; the unauthorized use of a patented new and improve cell phone(s) that the company collects a royalty on the sale of each handset; and, the unauthorized use of a patented driver assistance system for the driverless, self-drive, and autonomous vehicle.

8.       Qualcomm's conduct has harmed competition and the competitive process. At a time when cellular technologies are expanding to new and varied applications, Qualcomm's practices threaten further consumer harm in an industry in which competition and innovation are vitally important.

## **JURISDICTION AND VENUE**

9.       This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover triple damages, injunctive relief, and costs of suit; for violation of Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2; conspiracy in the restraint of trade and single-firm violations).

10.      This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

11.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

12.     For patent litigation cases, the venue statute, 28 U.S.C. §1400(b), provides "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

13.     The activities of the Defendant, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

**Intradistrict Assignment**

14.     Assignment to the San Jose Division is proper. The actions arose in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Qualcomm has offices in Santa Clara and San Jose. Third parties that have information relevant to this action, including leading cell phone manufacturers (also known as "original equipment manufacturers" or "OEMs") and Qualcomm competitors, also have offices in Santa Clara County.

**Related Case Dismissed "Without Prejudice"—Antitrust Law Violations**

15.     UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT No. 21-2160 *Larry Golden*, on behalf of himself and all others similarly situated, Plaintiff - Appellant, *v. Apple, Inc.; Samsung Electronics USA; Lg Electronics USA, Inc.; Qualcomm Inc.; Ford Global Technologies LLC; General Motors Company; FCA US, LLC*, Defendants - Appellees. USCA4 Appeal: 21-2160 Doc: 7 Filed: 03/31/2022

COMPLAINT

16.     "PER CURIAM: Larry Golden appeals the district court's order accepting the recommendation of the magistrate judge and <u>dismissing without prejudice</u> Golden's civil complaint. We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's order." *Golden v. Apple, Inc.*, No. 6:20-cv-02270-JD (D.S.C. Sept. 20, 2021) ...

**Related Case Dismissed "Without Prejudice"—Patent Infringement**

17.     IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA GREENVILLE DIVISION *Larry Golden, Plaintiff, vs. Apple Inc.; Samsung Electronics USA; LG Electronics USA, Inc.; Qualcomm Inc., Motorola Solutions, Inc.; Panasonic Corporation; AT&T Inc.; Verizon Corporation Service Group; Sprint Corporation; T-Mobile USA, Inc.; Ford Global Technologies, LLC; Fairway Ford Lincoln of Greenville; General Motors Company; Kevin Whitaker Chevrolet; FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram, Defendants.* Case No.: 6:20-cv-04353-JD-KFM Date Filed 11/02/21 Entry No. 26.

18.     "Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein. IT IS, THEREFORE, ORDERED that Plaintiff's Complaint is <u>dismissed without prejudice</u> and without the issuance of service of process."

**Dismissal "Without Prejudice"**

19.     When a court dismisses a claim but leaves the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim. *In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the main features of dismissal without prejudice is that it does not prevent refiling of the claim… "a case that is dismissed "without prejudice" is only dismissed temporarily. This temporary dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to another court."

COMPLAINT

# THE PARTIES

20.     Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e., Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Central Processing Units (CPUs) for New and Improved Cell Phones; and, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS). **Exhibits B-H; '497, '752, '189, '439, '287, '619, '891 patents**

21.     On information and belief, Qualcomm is a California corporation with a principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 and does business in this judicial district. Qualcomm has offices in Santa Clara, CA and San Jose, CA. Qualcomm's unjust enrichment of profits, resulting from a violation of antitrust laws; anticompetitive practices; conspiracy in restraint of trade; direct infringement; and contributory infringement, give rise to this complaint. Qualcomm's monopolization and attempted monopolization violations require no agreement as Section 1 violations do. *E.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993) (explaining that "while § 1 . . . forbids contracts or conspiracies . . ., § 2 addresses the actions of single firms that monopolize or attempt to monopolize"). They are "single-firm" violations.

22.     Qualcomm's total revenue between the years 2013 and 2021 = $226.56B. Qualcomm may be served at its principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 [or] Qualcomm, Inc., c/o Prentice-Hall, Corporation System, Inc., 251 Little Falls Drive, Wilmington, DE 19808 (302)-636-5400.

COMPLAINT

## STATEMENT OF FACTS:

## QUALCOMM'S MOTIVE TO FORM A CONSPIRACY, AND CONSPIRACY IN RESTRAINT OF TRADE

23.     Qualcomm's motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion.

24.     Upon information and belief, Qualcomm has conspired with Apple, Samsung, & LG; who participated as co-conspirators with Qualcomm in violating certain antitrust laws, and laws governing the unauthorized use of Plaintiff's patented inventions.

25.     While performing work for the government, Qualcomm has engaged in assembling Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device [new and improved cell phone; handset], and has managed to avoid prosecution by shielding itself under the protection of the Government.

26.     Plaintiff has alleged, Qualcomm and its co-conspirators (Apple, Samsung, & LG), was aware that if they form a conspiracy, while under an agreement or contract with the Government to control the development, manufacture, commercialization, and pricing of Plaintiff's alleged infringing product(s), there would not be any reasonable substitute for the alleged infringing product or service.

27.     The acts charged in this complaint were done by Qualcomm and its co-conspirators, or were authorized, ordered or done by their respective officers, employees, representatives, or agents while actively engaged in management of Qualcomm and its co-conspirators business or affairs. Each of the co-conspirators named herein acted as the agent or representative of, or for Qualcomm with respect to the acts, violations and common course of conduct alleged herein.

COMPLAINT

28.     Upon information and belief, Qualcomm colluded and conspired under the protection of a Government [1] contract to develop Plaintiff's "new and improved cell phone" (i.e., smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across multiple industries, agencies, groups, demographics, races, ages, and genders to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

29.     In 2007, Qualcomm and the Plaintiff was competing for the same government contract. The Department of Homeland Security (DHS) issued a 'request for proposal' [DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing*]. DHS was seeking proposals for a new and improved cell phone capable of biological and chemical sensing.

30.     Qualcomm's collusion, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC (handset) devices and Plaintiff's patented CPUs. The OEMs are already paying royalties to Qualcomm on every handset sold; and, the OEMs are already paying an increased royalty rate for Qualcomm's chipsets that include Plaintiff's patented CPUs.

---

[1] In the United States Court of Appeals for the Ninth Circuit, *Federal Trade Commission, Plaintiff-Appellee, V. Qualcomm Incorporated, Defendant-Appellant.* Case No. 19-16122. [Declaration of Under Secretary of Defense for Acquisition and Sustainment]; Ellen M. Lord writes, "Qualcomm is a global leader in the development and commercialization of foundational technologies and products used in mobile devices and other wireless products, including network equipment, broadband gateway equipment, and consumer electronic devices" ... "DoD firmly believes that any measure that inappropriately limits Qualcomm's technological leadership, ability to invest in research and development (R&D), and market competitiveness, even in the short-term, could harm national security. The risks to national security include the disruption of DoD's supply chain and unsure U.S. leadership in 5G" ...

COMPLAINT

31.     For the program's initial phase in 2007, DHS released a call for proposals inviting the private sector to develop a proof of concept for the "*Cell-All Ubiquitous Biological and Chemical Sensing*" project (U.S. Department of Homeland Security, 2007). Cell-All Ubiquitous Biological and Chemical Sensing. <https://http://www.fbo.gov/index?s=opportunity&mode= form&id =f292c1fdbd46777a3ff8ca64ef96658f&tab=core&_cview=1> (accessed 17.09.12).

32.     DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung— **Exhibit I** with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010, Cell-All: Super Smartphones Sniff Out Suspicious Substances <http://www.dhs.gov/cell-all-super-smartphones-sniff-out-suspicious-substances> (accessed 17.09.12)).

33.     Upon information and belief, it has always been Qualcomm's goal to monopolized the smartphone industry. According to Mr. Hoffman, "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: *'Let's take advantage of the 300 million cell phones that are out there today*. They're always with us'" (Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28 <http://cellall.webcaston.tv/ home/homepage.php> (accessed 17.09.12)).

34.     It is the belief of the Plaintiff, that throughout the relevant period, Qualcomm and its co-conspirators Apple, Samsung, & LG, unlawful activities as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

COMPLAINT

35.     It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Central Processing units (CPUs) and the Communicating, Monitoring, Detecting, and Controlling (CMDC) devices.

36.     It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, act together in ways that limit competition by hindering Plaintiff's patented products from entering the market, while exercising an unreasonable horizontal restraint of trade.

37.     Qualcomm and its co-conspirators Apple, Samsung, & LG, agreements are considered unreasonable because their interaction is to such a degree that they were no longer acting independently, and the collaboration gave them the ability to wield market power together.

38.     It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, have engaged in a contract, combination, trust or conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiff's Central Processing units (CPUs) and Communicating, Monitoring, Detecting, and Controlling (CMDC) devices without paying royalty compensation.

39.     It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, through their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or conspiracy between themselves and their co-conspirators.

40.     In a related COFC case no 13-307C, *Larry Golden v. The United States*, Qualcomm [2019] and its co-conspirators Apple, Samsung, & LG [2021 respectfully], were all summoned to appear to protect any interested they may have had in the case.

COMPLAINT

41.    Qualcomm and its co-conspirators Apple, Samsung, & LG, made the decisions

not to appear. **Exhibit J**. By default, Qualcomm is barred from entering a defense in this Court

for non-infringement or that any of the following patent claims are invalided: Claim 1 of the '497

patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439

patent; and, claims 4-6 of the '287 patent.

42.    After a 10 year "teaming arrangement" [2] to commercialize the Plaintiff's new and

improved cell phones, and Plaintiff's new and improved CPUs developed and assembled under

the *Cell-All* initiative, Verto Analytics looked at the numbers. "Apple, Samsung, and LG

(CMDC devices) smartphones owned by U.S. consumers, is equivalent to 88% market share.

43.    January 2018, Apple led the pack, with 45% market share (representing nearly 84

million smartphones), while Samsung claims 33% of the market (61.5 million smartphones).

These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender,

had 10% market share, while all other brands combined account for 12% of the devices on the

U.S. smartphone market."

---

[2] "On October 13, 2021, the American Bar Association's Section of Public Contract Law held its
annual public procurement symposium to discuss important issues related to federal, state, and
local government contracting. Daniel Glad, Director of the Department of Justice ("DOJ")
Antitrust Division's Procurement Collusion Strike Force ("PCSF"), delivered the keynote
address outlining the growing importance of PCSF's work ... PCSF will scrutinize joint
ventures, teaming arrangements, and other competitor collaborations to ensure that such
agreements are not shams for collusive conduct ... PCSF's mission is to deter and prevent
collusion before it takes place. To that end, the PCSF has trained over 17,000 special agents,
attorneys and prosecutors, investigators, analysts, auditors, data scientists, and procurement
officials across more than 500 agencies regarding how to spot red flags of potential procurement
collusion..." https://www.jdsupra.com/legalnews/procurement-collusion-strike-force-4152293/

## QUALCOMM'S KNOWLEDGE OF PLAINTIFF'S
## CENTRAL PROCESSING UNITS (CPUs)

44.     Qualcomm fail to disclose to the OEMs (the handset and smartphone manufactures); its knowledge of Plaintiff's patented central processing unit (CPU) designed for Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device (i.e., handset; new and improved cell phone; smartphone).

45.     Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices.

46.     On November 4, 2010, Plaintiff emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC—Smartphone—device; central processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and unmanned electric, autonomous, and driverless vehicles).

47.     Plaintiff asked if Qualcomm would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff). Subject: "Patented Technology for Qualcomm's Review (copy available upon request).

48.     Plaintiff mailed out letters dated December 7, 2010 addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, (copies of the letters and return receipts are available upon request) informing the Executives of the Patent Owner's (Plaintiff) patented technology and asked if they would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff).

49.     After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

50.     On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

51.     On October 11, 2011, the Patent Owner (Plaintiff) returned via e-mail, the answered Patent Information Request form to Ms. Lane. The Patent Owner (Plaintiff) made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

52.     Upon information and belief, Plaintiff believes Qualcomm has formed or created its monopoly for chipsets by "tying" Plaintiff's CPUs to its wireless cellular modems. A "tying," "tie-in," or "tied sale" arrangement has been defined as "an agreement by a party to sell one product . . . on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that [tied] product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992).

53.     Conditioning the ability of a licensee to license one or more items of intellectual property on the licensee's purchase of another item of intellectual property or a good or a service has been held in some cases to constitute illegal tying. See, e.g., *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156-58 (1948) (copyrights); *Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) (patent and related product), abrogated in part by *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

COMPLAINT

54.     Qualcomm's anticompetitive practices of its cellular-modem patents harm competitors. Qualcomm's "hold out" strategy of "no license, no chip", was used to force the co-conspirators OEMs to purchase Plaintiff's patented CPU that Qualcomm "tied" to its modem. "Tying" under U.S. law is defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."

55.     Plaintiff also believes the OEMs were misled and misinformed into believing the CPUs tied to Qualcomm's chipsets [3] was not a patented product Qualcomm had received prior knowledge on. Plaintiff believes Qualcomm threaten the OEMs to purchase what was marketed as an unpatented product [CPU], tied to Qualcomm's patented product (wireless cellular modem), in a "no license, no chip[set]", policy contract.

56.     According to Doug Hoffman, program manager at Qualcomm, the [network] gateway authenticates the sensor and phone to determine whether they are authorized to be on the network ... (Hoffman, D., 2011. Qualcomm Project Presentation. *Cell-All Live Demonstration for Environmental Sensing (Webcast)*, September 28 <http://cellall.webcaston.tv/ home/homepage.php> (accessed 17.09.12)).

---

[3] The Snapdragon® 8+ Gen 1 Mobile Platform is our latest premium-tier powerhouse ... while the Qualcomm® Kryo™ CPU provides 10% better CPU performance and 30% CPU improved power efficiency. The Snapdragon® 888+ 5G Mobile Platform—is a 4nm chipset that features a beefy octa-core CPU—boasts improvements in both processing and AI since the predecessor*, with our 6th gen Qualcomm® Artificial Intelligence (AI) Engine and Qualcomm® Kryo™ 680 CPU... The octa-core Qualcomm® Kryo™ 490 CPU provides up to 25% faster single- and multi-threaded performance ... Revealed in early 2021, the Snapdragon 870 is literally a tiny upgrade over 2020's Snapdragon 865 and 865 Plus flagship processors. All three of these chipsets sport a tri-cluster CPU arrangement, featuring one powerful Cortex-A77 core ... Retrieved from Qualcomm's websites.

COMPLAINT

57.     Plaintiff is challenging the tying arrangement because: (1) Qualcomm has market power in the tying product, *Cf.* 35 U.S.C. § 271(d) (2012) (requiring market power in patent misuse cases involving tying). (2) the arrangement has an adverse effect on competition in the relevant market for the tying product or the tied product, and (3) efficiency justifications for the arrangement do not outweigh the anticompetitive effects.

58.     "Qualcomm's Snapdragon CPU [*added*: that copies the functions of Plaintiff's CPU] is the 'brain' of your smartphone. The CPU receives commands, makes instant calculations, and sends signals throughout your device. There are multiple ways to gauge the performance of a CPU besides checking the Gigahertz (GHz) speed or the number of CPU cores (aka dual-core and quad-core). https://www.qualcomm.com/news/onq/2013/06/13/mobile-processors-101-why-smartphones-are-smarter-all-one-processor

59.     In 2014, Qualcomm's licensing practice of "No License, No Chips" was attacked by the antitrust authorities in China. This matter resulted in a settlement in which Qualcomm reduced its royalty rates charged for cellphones made and sold in China by 35%. Qualcomm was able to avoid deeper cuts by making a contribution of $150 million to the Chinese government. Antitrust investigations and penalties against Qualcomm have also occurred in Japan, Korea, Taiwan and Europe.

60.     Qualcomm, has a 90% share in the market for chipsets, and by withholding knowledge of "tying" a Plaintiff's patented CPU, coerced cellular telephone manufacturers (OEMs) to purchase only Qualcomm-manufactured chipsets. These actions are alleged to be part of Qualcomm's strategy to maintain a monopoly in the chipset market.

61.     The Federal Trade Commission began an investigation of Qualcomm in 2014, leading to its 2017 suit against Qualcomm for violations of section 5 of the Federal Trade

Commission Act, and sections 1 and 2 of the Sherman Act, the general antitrust laws of the United States.

62.     In the opinion of the U. S. District Court for the District of Northern California; "Qualcomm leveraged its monopoly position in chips to secure unreasonably high rates for its SEPs. Qualcomm, for example, refused to provide must-have chips unless customers took the unreasonable IP licenses—the "no license, no chip" model.

63.     Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision in *United States v. Microsoft Corp.*, held it sufficient that Qualcomm engaged in "anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43 (citations and internal quotation marks omitted)."

64.     As noted above, Qualcomm's, licensing practice of "No License, No Chips" was attacked by the antitrust authorities in China, Japan, Korea, Taiwan and Europe, that created penalties against Qualcomm.

65.     Qualcomm's anticompetitive practices violations intensifies when we add Qualcomm's failure to alert its OEM customers and the Securities Exchange Commission responsible for protecting investors; that for years, Qualcomm has sold a patented product (CPU), that Qualcomm "tied" to its chipsets (Snapdragon); with the knowledge that the CPUs for the new and improved cell phones (i.e., handsets) are the patented products of the Plaintiff.

66.     In the related case no. 13-307C, *Larry Golden v. The United States*, Qualcomm was summoned to show non-infringement of Plaintiff's patented CPUs for CMDC devices.

COMPLAINT

67.    Qualcomm had an opportunity to show at least independent claims 4-6 of Plaintiff's '287 patent [**Exhibit K: Samsung chart: pgs. 191-219; pgs. 409-437; and, pgs. 627-655**] were invalided. Qualcomm fail to appear. Claims 4-6 of the '287 patent. [4]

---

[4] 4.    A communication device comprising:

at least one central processing unit (***CPU***) ...

at least one or more detectors in communication with the art least one ***CPU*** for detecting at least one of a chemical, biological, radiological, or explosive agents ...

at least one of a transmitter or a transceiver in communication with the at least one ***CPU*** configured to send signals ... to detect at least one of a chemical biological, radiological, or explosive agent such that ***the communication device is capable of communicating, monitoring, detecting, and controlling.***

5.    A monitoring device, comprising:

at least one central processing unit (***CPU***) ...

at least one sensor for chemical, biological, or human detection in communication with the at least one ***CPU*** ...

one or more detectors in communication with the at least one ***CPU*** for detecting at least one of chemical, biological, radiological, or explosive agents ...

at least one of a transmitter or a transceiver in communication with the at least one ***CPU*** configured to send signals ... to detect at least one of a chemical biological, radiological, ...

6.    A monitoring equipment, comprising:

at least one central processing unit (***CPU***) ...

at least one or more detectors in communication with the art least one ***CPU*** for detecting at least one of a chemical, biological, radiological, or explosive agents; ...

at least one of a transmitter or a transceiver in communication with the at least one ***CPU*** configured to send signals ... to detect at least one of a chemical biological, radiological, ...

COMPLAINT

68.     Plaintiff has two more independent claims 1 & 11 of Plaintiff's 619 patent [5] for

the central processing unit that was not included in the related case no. 13-307C, *Golden v. US*

---

[5] 1.     A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least *a central processing unit (CPU)*, capable of ...

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent ... (WMDs) ...

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission ...

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, ...

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory ...

11.     A *central processing unit (CPU)* of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs) ...

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission ...

whereupon, *the central processing unit (CPU)* of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

COMPLAINT

## QUALCOMM'S KNOWLEDGE OF PLAINTIFF'S COMMUNICATING, MONITORING, DETECTING, & CONTROLLING (CMDC) DEVICES

69.     As stated earlier in this document, Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices [see ¶¶ 45-51]. Paragraph 45 states, "Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices."

70.     Upon information and belief, Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of the phone, i.e., handset; smartphone, etc. The elements of unjust enrichment exist because: 1) Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff.

71.     Upon information retrieved from this Court: The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices:

72.     "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5% running royalty on the price of each handset sold*. These licenses are called Subscriber Unit License Agreements ("SULA") ..."

73.     "Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio... LG Electronics (LGE) paid Qualcomm a 5%

COMPLAINT

running royalty on handsets containing Qualcomm modem chips and a 5.75% running royalty on handsets containing non-Qualcomm [] chips… "

74.    "Qualcomm and LG signed … Subscriber Unit License … Steve Altman (Qualcomm President) sent to Irwin Jacobs (Qualcomm Co-Founder and former CEO): "They currently pay 5% when they use our chip and 5.75% when they don't. We have agreed to take their rate to 5% regardless of whose chip they use."

75.    Plaintiff believes Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition.  The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

76.    Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold…

- [O]n May 3, 2012, Sony and Qualcomm entered into a Subscriber Unit Patent License Agreement, effective February 16, 2012 through September 30, 2012 ("May 2012 Sony Interim License"). ECF No. 1326 at 9. Under the May 2012 Sony Interim License, Sony agreed to provisionally pay Qualcomm a 5% royalty on CDMA handsets."

- Under the [] SULA amendment, Samsung paid a 5% running royalty rate on CDMA handsets containing Qualcomm chips, subject to a $20 royalty cap."

COMPLAINT

- BenQ and Qualcomm signed a new patent license agreement. JX0030. Under the license agreement, BenQ owed Qualcomm's standard 5% running royalty rate, with the handset as royalty base. See JX0030-007 (defining the royalty base as "the Selling Price charged by LICENSEE for Subscriber Units Sold to such Purchaser."

- Apple does not manufacture handsets itself but instead uses contract manufacturers, including Pegatron and Wistron, to manufacture handsets. ECF No. 1326 at 4. These contract manufacturers pay Qualcomm a 5% running royalty rate on the manufacturers' handset selling price.

77.     Judge Koh determined, "Qualcomm's anticompetitive conduct is conduct that 'harms the competitive process and thereby harms consumers.'" 6ER1208 (quoting *Microsoft*, 253 F.3d at 58) … "[A]pplying that standard, the district court agreed with the FTC that Qualcomm's practices were anticompetitive."

78.     The Judge's decision severely chastised Qualcomm for basing its royalty on the price of the device (e.g., a handset). Significantly, the Judge framed this criticism based on principles of ***competition law and patent law***, not contract law. Judge Lucy Koh of the US District Court of the Northern District of California in her decision in *Federal Trade Commission v Qualcomm Incorporated* (5:17-cv-0220); determined that charging royalties based on the price of a handset was unreasonable and contrary to US law.

79.     If Qualcomm loses this case, Qualcomm will have to license its patent to competitors and renegotiate its licensing agreements with all its customers. No longer will Qualcomm be able to charge the 5% royalty rate per the price of the phone.

80.     Plaintiff believes his patents grant him the right to charge a royalty on the price of each phone sold, and is asking this Court to order Qualcomm to pay Plaintiff all royalties Qualcomm has received that was based on the sale of each handset (CMDC device).

81.     Plaintiff claims that Qualcomm's wrongdoing caused the OEMs to pay inflated prices for cellular modems, and that it would be unjust for Qualcomm to be permitted to retain the profits gained from its unfair and deceptive practices.

82.     Plaintiff has the right to exclude Qualcomm from "using" Plaintiff's CMDC devices—handsets to unjustly enrich itself.

83.     Plaintiff is entitled to stop Qualcomm's use of the Plaintiff's inventions to generate profits by seeking a legal injunction in Federal court. Qualcomm's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages for any unlicensed use of his inventions. Damages are generally calculated based on lost profits Plaintiff suffered as a result of the use.

84.     In the related COFC case no. 13-307C, *Larry Golden v. The United States*, Qualcomm was summoned [2019] to show non-infringement of Plaintiff's patented CMDC devices. **Exhibit K: Samsung chart; 9 alleged infringing products; 25 Ind. patent claims**

85.     Qualcomm had an opportunity to show at least independent claim 1 of Plaintiff's '497 patent; claim 10 of Plaintiff's '752 patent; claims 1-9 of Plaintiff's '189 patent; claims 13-23 of Plaintiff's '439 patent; and, claims 4-6 of Plaintiff's '287 patent [25 independent patent claims asserted in the case no. 13-307C, *Larry Golden v. The United States* for the CMDC device; new and improved cell phone; smartphone], were invalided. Qualcomm fail to appear.

86.     Plaintiff will illustrate only 2 of the 25 independent patent claims asserted in the related COFC case no. 13-307C, *Larry Golden v. The United States*.

COMPLAINT

87.    Claim 22 of Plaintiff's '439 patent is an illustration of how Plaintiff's cell phone, smartphone, and handheld [handset] are grouped together by design similarities. Claim 23 of Plaintiff's '439 patent is an illustration of Plaintiff's new and improved cell phone.

Claim 22.    *A communication device* of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising:

*at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;* that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

*at least one of a central processing unit (CPU), a network processor,* or a front-end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, *cellular connection*, long and/or short-range radio frequency (RF) connection, or GPS connection;

the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans;

the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks;

the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use;

the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device;

COMPLAINT

whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, *a cellular connection*, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; and

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, *cellular connection*, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, *or the central processing unit (CPU)*.

Claim 23.     *A cell phone comprising*:

*a central processing unit (CPU)* for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, *cellular connection*, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed

COMPLAINT

within, on, upon or adjacent the cell phone;

       wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, *cellular connection*, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

       wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

       whereupon a signal sent to the receiver of *the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor*, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

88.     Qualcomm, and its co-conspirators waived their rights for later argument on patent invalidity and noninfringement for not participating in the § 1498 litigation, "[w]hile a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed." As the USCFC held in *Bowser, Inc. v. United States*:

> We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him. 420 F.2d 1057, 1060 (Ct. Cl. 1970). **Exhibit L**

COMPLAINT

## QUALCOMM WILLFULLY CONTRIBUTED TO THE INFRINGEMENT OF PLAINTIFF'S CPUs; CMDC DEVICES; STALL, STOP, & VEHICLE SLOWDOWN SYSTEMS

89.     Qualcomm and ASUS made a phone for Snapdragon Insiders. ASUS and Qualcomm have teamed up to make a smartphone. The "Smartphone for Snapdragon Insiders" harnesses Qualcomm's Snapdragon 888 5G chipset.  https://www.engadget.com/ qualcomm-asus-smartphone-snapdragon-insiders-150023369.html?guccounter...

90.     Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States ... a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, ... shall be liable as a contributory infringer."

91.     The threshold requirement for a claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972).  There must also be a showing that the alleged contributory infringer knew of the patent and that his or her actions would lead to infringement of the patent. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

92.     Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices [see ¶¶ 45-51]. Paragraph 45 states, "Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices."

93.     Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes actions that contribute (or potentially contribute) to someone

COMPLAINT

else infringing a patent, even if those actions do not directly infringe the patent. An example of contributory infringement include:

> The supply of Component A (i.e., Qualcomm's Snapdragon chipset that includes Plaintiff's central processing unit (CPU), with instructions to connect it to an available Component B (i.e., Qualcomm/Asus smartphone that Plaintiff claims as his patented CMDC device; smartphone); where A+B (Plaintiff's patented CPU (Qualcomm's Snapdragon) + Plaintiff's CMDC device (Qualcomm/Asus smartphone is a patented product. *See Ind. claims 4-6 of Plaintiff's '287 patent. See also Ind. claims 1 & 11, Dep. claims 2-10 & 12-20 of Plaintiff's '619 patent that covers Plaintiff's CPU. See Ind. claims 1-9 of Plaintiff's '189 patent; and, Ind. claims 13-23 of Plaintiff's '439 patent that covers Plaintiff's CMDC device.*

94.     Upon information and belief, Qualcomm continues to "tie" Plaintiff's central processing units (CPUs) to its system-on-a chip (Snapdragon by Qualcomm); and, continues to use Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices i.e., handsets, new and improved cell phones, smartphones, to generate profits, without a license or authorization to do so.

95.     Plaintiff's "tying" clams involving intellectual property are brought under Section 1 and Section 2 of the Sherman Act, Section 3 of the Clayton Act, and Section 5 of the Federal Trade Commission (FTC) Act.

96.     A chipset is the motherboard in a phone that is designed to accept all the components to sit upon it, and connect with each other. It is made of ICs (integrated circuits) and provides all the inter communication channels (buses) to connect for e.g., camera, Bluetooth, Wi-Fi, touch screen with CPU/Flash storage/Ram.

COMPLAINT

97.     The CPU is the Central Processing Unit which is responsible for carrying out the instructions of a computer program [operating systems (android), contain and manage all the programs and applications that a computer or mobile device is able to run, which means managing the device's software and hardware functions], by performing the basic arithmetical, logical, and input/output operations of the system.

98.     In a mobile phone, combination of chipset and CPU is called a SoC (System on Chip) which integrates all the components on a single chip. Unlike in computers, CPU is soldered on the chipset inside a mobile device which tends to improve the performance, and saves lot of space. The most popular SoCs (also referred to as processors, chipsets, CPUs), are Snapdragons by Qualcomm.

99.     GM completely redesigned the compute architecture that powers its "hands-free" driving system that is integrated with the "Snapdragon Ride Platform" of Qualcomm. GM has the first advanced driver assist system (ADAS) to use Qualcomm's new Snapdragon Ride Platform. https://www. theverge.com/2022/1/6/22870416/gm-ultra-cruise-qualcomm-snapdragon-compute-adas

100.    The Snapdragon Ride Platform is built on scalable and modular heterogenous high-performance multi-core CPUs. It is intended to address the needs of complex self-driving technology and Advanced Driver Assistance Systems (ADAS) with high performance and power efficiency.

101.    Genaral Motors had prior knowledge of Plaintiff's Stall, Stop, and Vehicle Slowdown System before conspiring with Qualcomm to combine the two alleged infringing products—GM's ADAS system and Qualcomm's Snapdragon Ride.

COMPLAINT

102.   Plaintiff first contacted GM/OnStar during the summer months of 2007 to ask if they would like to participate with Plaintiff in responding to a Department of Homeland Security (DHS) solicitation: (Broad Agency Announcement; BAA 07-02A).

103.   Plaintiff's primary contact person at GM/OnStar was Mr. Jim Culbertson. The Plaintiff asked Mr. Culbertson if GM/OnStar has the capability of bringing a moving vehicle to a stall, stop, or slowdown. Mr. Culbertson's response to me was, "I need time to find out if we have those capabilities and if there is interest from upper management".

104.   After several conversations and several failed attempts to reach Mr. Culbertson, Plaintiff never heard back from GM/OnStar. Plaintiff noticed while watching TV, an announcement made by GM/OnStar on October 9, 2007 of a new, "Stolen vehicle slow down system" that was being offered by GM/OnStar beginning the following year on the 2009 models.

105.   GM/OnStar's "Stolen vehicle slow down system" is substantially the same as the Plaintiff's "stall, stop, and vehicle slowdown systems (SSVSS)" that Plaintiff had discussed earlier with GM/OnStar's Mr. Culbertson during the summer months of 2007. Plaintiff called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791. Mr. Culbertson referred Plaintiff to Angie Miller at 313-665-1485. When Plaintiff dialed Ms. Miller's number, the answering machine for a Michelle came on; therefore, Plaintiff did not leave a message.

106.   On April 14, 2008, Plaintiff faxed a letter of interest to the General Motors Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several members of the General Motors leadership team, to include, Mr. Frederick A. Henderson, President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel.

COMPLAINT

107.    Below are illustrative charts to show GM's Advanced Driver Assistance System

(ADAS)) reads on Ind. claim 44, and Dep. claims 47, 48, 49, 50, 51, & 53 of the '891 patent:

| GM's Advanced Driver Assistance System (ADAS) | Patent Owner's CMDC Device Patent #: RES#,891; Independent Claim 44 |
|---|---|
| GM Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Chrysler, Dodge, Jeep, and Ram vehicles (i.e., Advanced Driver Assistance System (ADAS)) | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |

COMPLAINT

| GM's Advanced Driver Assistance System (ADAS) | Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 47, 48, 49, 50, 51, & 53 |
|---|---|
| Enhanced Smart Pedal Technology: Known as brake override, reduces power to the engine in cases where the brake and accelerator pedal are being simultaneously depressed. | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |
| Front Automatic Braking: Helps a driver avoid a forward crash or reduce the severity of crashing into a vehicle in front of it, whether it is moving or has come to a stop. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Rear Automatic Braking: Helps the driver avoid a crash or to mitigate the impact into objects directly behind their vehicle by bringing the vehicle to a stop. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |
| Electronic Stability Control (ESC): Detects loss of steering control, it automatically applies the brakes to help "steer" the vehicle. Braking is automatically applied. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| Lane Keep Assist: Represents an upgrade of Lane Departure Warning. The feature is listed as "Lane Keep Assist with Lane Departure Warning". | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Adaptive Cruise Control: The technology automatically accelerates and brakes the vehicle up to moderate levels to maintain a driver-selected following gap (distance). | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

108.    After the doctrine of contributory infringement developed in the courts,

Qualcomm found ways to use it to extend their patent monopolies beyond the scope of their

COMPLAINT

patents. This was accomplished primarily through the use of "tying arrangements", which required purchasers of patented products to also purchase unpatented goods.

109.    Congress responded by enacting a special antitrust law, the Clayton Act, which included prohibiting the use of "tying arrangements" to create a monopoly in unpatented goods, 15 U.S.C. § 14 (2000). In addition, the Supreme Court developed the doctrine of patent misuse to bar a patentee from extending a patent monopoly beyond the scope of the patent, See *Carbice Corp. of Am. v. American Patents Dev. Corp.*, 283 U.S. 27 (1931).

110.    Upon information and belief, Qualcomm misled the public by marketing Plaintiff's CPUs (tied to its cellular modems—SoC) as an unpatented product, and GM misled the public by marketing Plaintiff's Stall, Stop, and Vehicle Slowdown Systems (tied to its autonomous, driverless, self-drive vehicles) as an unpatented product. [6]

111.    American courts first encountered "tying arrangements" in the course of patent infringement litigation. *See, e.g., Heaton-Peninsular Button-Fastening Co. v. Eureka Specialty Co.*, 77 F. 288 (CA6 1896). Such a case came before the Supreme Court in *Henry v. A. B. Dick Co.*, 224 U. S. 1 (1912).

---

[6] Contributory infringement originated in case law as a way to enable a patentee to enforce a patent when it was being infringed by a large number of persons whom it was impractical to sue together. The doctrine of contributory infringement permitted the patentee to sue an entity that had instigated the collective infringement either by selling a product that had no use other than to infringe the patent, or using other means to encourage infringement, such as providing instructions on how to infringe the patent. Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States ... a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, ... shall be liable as a contributory infringer."

COMPLAINT

112.    Although not required, Plaintiff included the above illustrative charts to ensure Plaintiff is providing "enough factual allegations, accepted as true, to "state a claim to relief that is plausible on its face".

113.    In *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), the Federal Circuit expressly stated: "'the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met.'" *Id. at 1350* (quoting *In re Bill of Lading,* 681 F.3d 1323, 1339 (Fed. Cir. 2012) (emphasis added). *Nalco* appears to hold that element-by-element allegations are unnecessary.

114.    Plaintiff reserves the right to enter claim 1 of Plaintiff's pending patent application [17/300230]. The claim is in furtherance of Plaintiff's right to exclude Qualcomm from making or using, selling or offering to sell, Plaintiff's CPUs for carrying out the operational and functional instructions for at least that of the driverless vehicle.

115.    Claim 1 of the 17/300230 patent claims a "stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of ... processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle ..."

116.    To date, the only outstanding office action requirement before allowance is the "terminal disclaimer". What is claimed in claim 1 of Plaintiff's 17/300230 patent application:

1.      A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of:
        processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

COMPLAINT

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure;

processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has been reported as stolen;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;

processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,

Wherein, when the central processing unit (CPU) processes instructions to stall, stop, or slow-down a vehicle, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

117.    The DOJ intervene in the appealed case to the Nineth Circuit in *FTC v. Qualcomm*, declaring Qualcomm should not be penalized for its anticompetitive because of their work for the Gov't in providing national security.

118.    Plaintiff's patented technology was conceived in the wake of 9/11 that includes technology to mitigate terrorist attacks. Plaintiff's inventions are the "technical rational" for the three economic stimulus packages Plaintiff submitting to members of Congress shortly after 9/11

119.    The Clayton Act also authorizes private parties to sue for triple damages when they have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

# Relief

A. Temporary injunctive relief for Qualcomm to discontinue the sale of all Snapdragon processors where Plaintiff's patented CPUs (i.e., chipsets; systems-on-a-chip) are "tied" to Qualcomm's wireless cellular modems.

B. Temporary injunctive relief for Qualcomm to discontinue the sale of all Snapdragon "Ride" processors where Plaintiff's patented Stall, Stop, and Vehicle Slowdown Systems (i.e., Advanced Driver Assistance Systems (ADAS)) are "tied" to Qualcomm's Snapdragon "Ride" processors for autonomous and driverless vehicles.

C. Temporary injunctive relief for Qualcomm to discontinue the sale of all Snapdragon processors where Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e., new and improved cell phones; smartphones) are being used, without authorization, by Qualcomm and Asus (i.e., Smartphone for Snapdragon Insiders) to generate revenues.

D. Temporary injunctive relief for Qualcomm to discontinue charging a royalty on the entire handset. First, the handsets (i.e., Smartphones) are the patented inventions of Plaintiff; and second, the CPUs that are tied to Qualcomm's Snapdragon processors, for the unjust enrichment of Qualcomm, are the patented inventions of Plaintiff.

E. Summary judgement on the merits of the case for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents*.

F. Damages found or assessed for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents*.

G. Damages up to three times the amount found or assessed for willful infringement.

H. Summary judgement on the merits of the case for Qualcomm's single-firm anticompetitive conduct (under section 2 of the Sherman Act), and unjust enrichment (charging a 5% royalty rate per the price of the patented phone(s) for which Qualcomm has no authorization to receive), that 'harms the competitive process and thereby harms consumers.

I. Damages found or assessed for Qualcomm's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), and unjust enrichment (charging a 5% royalty rate per the price of Plaintiff's patented phone(s) for which Qualcomm has no authorization to receive), that harms the competitive process and thereby harms consumers.

J. Trible damages for the injury imposed by Qualcomm for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

K. The Court orders Qualcomm to establish, at minimum, a $20 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Qualcomm if found not liable.

**Qualcomm Inc.**

As of May 2022, **QUALCOMM** has a market cap of **$156.45 Billion**. This makes QUALCOMM the world's **69th** most valuable company by market cap according to our data. https://companiesmarketcap.com/qualcomm/marketcap/

| Year | Market cap | Change |
|------|-----------|--------|
| 2022 | $156.45 B | -23.95% |
| 2021 | $205.72 B | 19.4% |
| 2020 | $172.29 B | 70.85% |

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

COMPLAINT

# SERVICE OF PROCESS

Qualcomm Inc.,

5775 Morehouse Drive,

San Diego, CA 92121


Qualcomm, Inc.,

c/o Prentice-Hall,

Corporation System, Inc.,

251 Little Falls Drive,

Wilmington, DE 19808

(302)-636-5400