# EXHIBIT 2

Case 4 Complaint

Complaint, *Larry Golden v. Apple Inc., et al.*,

No. 6:20-cv-02270-HMH-KFM, ECF No. 1 (D.S.C. June 16, 2020).

RECEIVED
USDC CLERK, GREENVILLE, SC

2020 JUN 16 PM 12: 03

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

LARRY GOLDEN, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

**-against-**

SEE ATTACHED LIST

_____

_____

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

**Complaint for a Civil Case**

Case No. _____

*(to be filled in by the Clerk's Office)*

Jury Trial:     ☑ Yes     ☐ No
*(check one)*

**Plaintiff's List of Companies: Federal District Court / Greenville, SC**

Apple Inc.

Attn: Vice President & Chief IP Counsel

1 Infinite Loop

Cupertino, CA 95014

Incorporated Under the Laws of the State of California


Samsung Electronics, USA

Attn: Senior VP & Head of Silicon Valley IP Office, US IP Center

85 Challenger Rd.

Ridgefield Park, New Jersey 07660

Incorporated Under the Laws of the State of New York


LG Electronics, USA, Inc.

Attn: General Counsel (IP) at LG Electronics

1000 Sylvan Avenue

Englewood Cliffs, New Jersey 07632

Foreign corporation organized and existing under the laws of South Korea


Qualcomm Inc.

Attn: Executive VP, General Counsel Intellectual Property

5775 Morehouse Drive

San Diego, CA 92121

Incorporated Under the Laws of the State of Delaware

Ford Global Technologies, LLC

Attn: Edward J. Benz III, Chief Intellectual Property Counsel

Fairlane Plaza South, Suite 800

330 Town Center Drive

Dearborn, Michigan 48126

Incorporated Under the Laws of the State of Delaware


General Motors Company

Attn: Paul Margolis, Counsel, GM Legal Staff

300 Renaissance Center

Detroit, MI 48243

Incorporated Under the Laws of the State of Delaware


FCA US LLC

Attn: Chief Executive Officer – Michael Manley

1000 Chrysler Drive

Auburn Hills, MI 48326-2766

Foreign Corporation incorporated under the laws of the Netherlands

**I.**   **The Parties to This Complaint**

    **A.**   **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach
additional pages if needed.

| | |
|---|---|
| Name | *LARRY GOLDEN* |
| Street Address | *740 WOODRUFF RD, FF1102* |
| City and County | *GREENVILLE, SC (GREENVILLE)* |
| State and Zip Code | *SOUTH CAROLINA, 29607* |
| Telephone Number | *864-288-5605* |

    **B.**   **The Defendant(s)**

Provide the information below for each defendant named in the complaint,
whether the defendant is an individual, a government agency, an organization, or
a corporation.  For an individual defendant, include the person's job or title (if
known).  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | *SEE ATTACHED LIST* |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Defendant No. 3

| | |
|---|---|
| Name | |

2

Job or Title
(if known)                    _____

Street Address                _____

City and County               _____

State and Zip Code            _____

Telephone Number              _____

Defendant No. 4

Name                          _____

Job or Title
(if known)                    _____

Street Address                _____

City and County               _____

State and Zip Code            _____

Telephone Number              _____

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two
types of cases can be heard in federal court: cases involving a federal question and cases
involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising
under the United States Constitution or federal laws or treaties is a federal question case.
Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another
State or nation and the amount at stake is more than $75,000 is a diversity of citizenship
case.  In a diversity of citizenship case, no defendant may be a citizen of the same State
as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question        ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United
States Constitution that are at issue in this case.

SECTION 1 SHERMAN ACT  28 U.S.C. 1331 + 1337

SECTIONS 4+6 CLAYTON ACT  15 U.S.C. 15 + 26

SOUTH CAROLINA STATE LAW 1367(a) + 1332

3

**B.**    **If the Basis for Jurisdiction Is Diversity of Citizenship**

    1.    The Plaintiff(s)

        a.    If the plaintiff is an individual

                The plaintiff, *(name)* _LARRY GOLDEN_ , is a citizen of
the State of *(name)* _South Carolina_.

        b.    If the plaintiff is a corporation

                The plaintiff, *(name)* _____, is incorporated
under the laws of the State of *(name)* _____,
and has its principal place of business in the State of *(name)*
_____.

        *(If more than one plaintiff is named in the complaint, attach an additional
page providing the same information for each additional plaintiff.)*

    2.    The Defendant(s)

        a.    If the defendant is an individual

                The defendant, *(name)* _____, is a citizen of
the State of *(name)* _____. *Or* is a citizen of
*(foreign nation)* _____.

        b.    If the defendant is a corporation    *SEE ATTACHED LIST*

                The defendant, *(name)* _____, is
incorporated under the laws of the State of *(name)*
_____, and has its principal place of
business in the State of *(name)* _____. *Or* is
incorporated under the laws of *(foreign nation)*
_____, and has its principal place of
business in *(name)* _____.

        *(If more than one defendant is named in the complaint, attach an
additional page providing the same information for each additional
defendant.)*

4

3.    The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

IN EXCESS OF #10 BILLION

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

SHERMAN ACT 1 : MOTIVE TO FORM A CONSPIRACY;
CONSPIRACY; UNREASONABLE RESTRAINT ON TRADE ;
UNFAIR COMPETITION; COMBINATION; UNJUST ENRICHMENT

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

DAMAGES TO PLAINTIFF AND TO PLAINTIFF "CLASS"

V.    **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A.    **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _June 15_____, 20_20_

Signature of Plaintiff    _____

Printed Name of Plaintiff    _Larry Golden_____

B.    **For Attorneys**

Date of signing: _____, 20__.

Signature of Attorney    _____
Printed Name of Attorney    _____
Bar Number    _____
Name of Law Firm    _____
Address    _____
Telephone Number    _____
E-mail Address    _____

## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF SOUTH CAROLINA - GREENVILLE

RECEIVED
USDC CLERK. GREENVILLE. SC
2020 JUN 16  PM 12: 03

| | |
|---|---|
| LARRY GOLDEN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>V.<br><br>(1) APPLE INC.<br>(2) SAMSUNG ELECTRONICS, USA<br>(3) LG ELECTRONICS, USA, INC.<br>(4) QUALCOMM INC.<br>(5) FORD GLOBAL TECHNOLOGIES, LLC<br>(6) GENERAL MOTORS COMPANY<br>(7) FCA US LLC<br><br>Defendants. | CASE NO: _____<br><br>**(JURY TRIAL DEMANDED)**<br><br>**(The Sherman Act §1: Motive to Form a Conspiracy; Conspiracy; and Unreasonable Restraint on Trade). (Violation of South Carolina Consumer Protection and Unfair Competition Laws; Unjust Enrichment and Disgorgement of Profits)**<br><br>June 15, 2020 |

## COMPLAINT FOR ANTITRUST LAW VIOLATIONS

This is a civil action brought under Antitrust Law violations commencing from

competitor collaborations and teaming agreements that likely resulted in a secret conspiracy.

This action is for damages and injunctive relief on behalf of the Plaintiff and all others similarly

situated, against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG

Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Ford Global Technologies, LLC

("Ford"), General Motors Company ("GM"), and, FCA US LLC ("FCA"); demanding a trial by

jury, complains and alleges as follows:

## JURISDICTION AND VENUE

1.      This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover treble damages, injunctive relief, and costs of suit; recover damages under South Carolina state antitrust and common laws, for violation of Section 1 of the Sherman Act (15 U.S.C. § 1; conspiracy in the restraint of trade illegal).

2.      This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). This Court has jurisdiction under South Carolina law that are cognizable under this Court's supplemental jurisdiction, 28 U.S.C. § 1367(a). This Court also has jurisdiction over the South Carolina state law claims under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the defendants.

3.      Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

4.      The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States:

    a.  Defendants and their co-conspirators participated in a continuous and uninterrupted flow in interstate commerce to customers located in South Carolina; and/or

2

  b. Defendants and their co-conspirators sold and shipped substantial quantities of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) to customers located in South Carolina.

5. The Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority, including each other as co-conspirators) have:

  a. Transacted business in South Carolina;

  b. Contracted to supply or obtain services or goods in South Carolina;

  c. Intentionally availed themselves of the benefits of doing business in South Carolina;

  d. Produced, promoted, sold, marketed or distributed their products or services in South Carolina and, thereby, profiting from their access to the markets in South Carolina;

  e. Caused tortious damage by act or omission in South Carolina;

  f. Caused tortious damage in South Carolina by acts or omissions committed outside of South Carolina while (i) regularly doing or soliciting business in South Carolina, and/or (ii) engaging in other persistent courses of conduct within South Carolina, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in South Carolina; and,

  g. Committed acts and omissions that the Defendants knew or should have known would cause damage (and, in fact, did cause damage) in South

Carolina to Plaintiff and members of the Class while (i) regularly doing or

soliciting business in South Carolina, and/or (ii) engaging in other persistent

courses of conduct within South Carolina and/or (iii) deriving substantial

revenue from goods used or consumed or services rendered in South Carolina.

## TOLLING OF THE STATUTE OF LIMITATIONS

6.      Plaintiff had neither actual nor constructive knowledge of the facts of collusion

constituting its claim for relief and did not discover, and could not have discovered through the

exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least

March 29, 2018, when the Court of Federal Claims in *Larry Golden v. United States;* case no.

13-307C issued its "Opinion Granting the Government's Motion to Dismiss". After five (5) years

of discovery to determine jurisdiction, the Trial Court dismissed 64 of the Plaintiff's allegations

of infringing his claimed invention of a CMDC device (Case 1:13-cv-00307-SGB Document 130

Filed 03/29/18), for the following reasons:

"Regarding the "first requirement," private conduct incidentally benefitting the

Government does not constitute use "for the benefit of the Government" ... "The court

does not have jurisdiction under 28 U.S.C. § 1498(a) to adjudicate patent infringement

allegations concerning NSF and NIH grants and cooperative agreements, because any

benefit to the Government, at best, would be incidental"... "determining that the alleged

benefit to the Government of economic "stimulus, jobs, and revenue" was "merely an

incidental effect of private conduct"... "Complaint contains no factual allegations

establishing anything more than "incidental benefit" to the NSF"... *"Incidental benefit to*

*the [G]overnment is insufficient" to satisfy the requirements of 28 U.S.C. § 1498(a)"...*

4

"The Government also argues that the Fifth Amended Complaint's "allegations relating generally to smartphones and other consumer devices should be dismissed" under RCFC 12(b)(1) and 12(b)(6), because they fail to allege "actual 'use' by the [G]overnment of the various combinations of consumer devices, nor would the [G]overnment's use be plausible."... "In addition, the Fifth Amended Complaint "fails to allege that any of these various consumer devices were made for the benefit of the [G]overnment."

7.      Defendants engaged in a secret conspiracy that did not reveal facts to the public that would put Plaintiff on inquiry notice that a conspiracy to conceal and/or hide the fact that the Defendants, Apple, Samsung, LG, and Qualcomm, as private parties, were manufacturing Communicating, Monitoring, Detecting, and Controlling (CMDC) devices. In an announcement found on the Department of Homeland Security's (DHS) website: "S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes" https://www.dhs.gov/science-and-technology/cell-all-super-smartphones-sniff-out-suspicious-substances. (2007- DHS/S&T; *Cell-All* solicitation for a new cell phone, i.e. smartphone). Defendants' agreement and conspiracy was kept secret.

8.      Plaintiff and Class was unaware of Defendants' unlawful conduct alleged herein and did not know the Defendants were manufacturing Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones) as their own private property during the Relevant Period.

9.      Defendants engaged in a secret conspiracy that did not reveal facts to the public that would put Plaintiff on inquiry notice that a conspiracy to conceal and/or hide the fact that the Defendants, Ford, General Motors, and, FCA, as parties owned by the Government, were manufacturing Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV). Discovery revealed the following: "The U.S. government's $80.7 billion bailout of the auto industry lasted between December 2008 and December 2014. The U.S. Department of the Treasury used funds from the Troubled Asset Relief Program (TARP). In the end, taxpayers lost $10.2 billion" https://www.thebalance.com /auto-industry-bailout-gm-ford-chrysler-3305670.

10.     Plaintiff and Class was unaware of Defendants' unlawful conduct alleged herein and did not know the Defendants were manufacturing Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) as their own private property during the Relevant Period.

11.     Thus, Plaintiff, nor the Class, could have had either actual or constructive knowledge of the "fraudulent concealment" until March 29, 2018 when the Court of Federal Claims in *Larry Golden v. United States;* case no. 13-307C issued its "Opinion Granting the Government's Motion to Dismiss". It was on this date that the Plaintiff realized he could not bring an action of patent infringement, or patent "takings" under the Fifth Amendment Clause, against the "Government Third Party Contractors" and the "Government Owned Companies" because their use of the inventions asserted in this complaint was "purely incidental". Defendants actively mislead the public about the government contracts to manufacture Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, and what the

"Bailout" funds was actually used for (i.e. manufacture of Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV)).

12.    Defendants' "fraudulent concealment" means the Defendants Apple, Samsung, LG, Qualcomm, Ford, General Motors, and, FCA deliberately hide and/or suppress, with an intention to deceive or defraud, Plaintiff, and the Class, of material facts and/or circumstances by which the Defendants are legally bound to disclose. "Fraudulent concealment" is a common law doctrine and it can be invoked to toll a statute of limitations. The most liberal test for "fraudulent concealment" only requires a showing that the Defendants' conspiracy was carried out in a manner intended to deceive the Plaintiff, and the Class.

13.    The stature of limitation was tolled because the Plaintiff and Class was under a legal disability—the lack of legal capacity to do an act—at the time the cause of action accrues. The time limit was tolled until March 29, 2018, when the Court of Federal Claims in *Larry Golden v. United States;* case no. 13-307C issued its "Opinion Granting the Government's Motion to Dismiss" stating: "allegations relating generally to smartphones and other consumer devices should be dismissed" under RCFC 12(b )(1) and 12(b)(6), because they fail to allege actual 'use' by the [G]overnment of the various combinations of consumer devices… "incidental benefit to the [G]overnment is insufficient to satisfy the requirements of 28 U.S.C. § 1498(a)", at which time the disability was removed.

## THE PARTIES

14.    Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government

beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e. Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV). The Defendants conspired to develop the intellectual property technology as their own private property without Plaintiff's knowledge. The Plaintiff was deprived of royalty compensation as a result of the Defendants' illegal conduct. Every South Carolina tax paying citizen (the "Class") indirectly suffered as a result of Defendants' illegal conduct. For year 2019, the S.C. taxpayer burden equated to $14,500 for every state taxpayer.

15.    On information and belief, Apple is a California corporation with a principal place of business at 1 Infinite Loop, Cupertino, CA 95014 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Apple's total revenue between the years 2013 and 2019 = $1,130.8B. 25% royalty compensation for Plaintiff = $282.7B. 7.5% S.C. tax rate = $21.20B toward S.C. taxpayer debt. Apple may be served at its principal place of business at 1 Infinite Loop, Cupertino, CA 95014.

16.    On information and belief, Samsung is a New Jersey corporation with a principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey 07660 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Samsung's total revenue between the years 2013 and 2019 = $664.1B.

25% royalty compensation for Plaintiff = $166.03B. 7.5% S.C. tax rate = $12.45B toward S.C. taxpayer debt. Samsung may be served at its principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey 07660.

17.     On information and belief, LG is a New Jersey corporation with a principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. LG's total revenue between the years 2009 and 2019 = $585.87B. 25% royalty compensation for Plaintiff = $146.47B. 7.5% S.C. tax rate = $10.99B toward S.C. taxpayer debt. LG may be served at its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

18.     On information and belief, Qualcomm is a California corporation with a principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Qualcomm's total revenue between the years 2013 and 2019 = $169.48B. 25% royalty compensation for Plaintiff = $142.37B. 7.5% S.C. tax rate = $3.18B toward S.C. taxpayer debt. Qualcomm may be served at its principal place of business at 5775 Morehouse Drive, San Diego, CA 92121.

19.     On information and belief, Ford is a Michigan corporation with a principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan

48126 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Ford's total revenue between the years 2013 and 2019 = $1,065.4B. 25% royalty compensation for Plaintiff = $266.35B. 7.5% S.C. tax rate = $19.98B toward S.C. taxpayer debt. Ford may be served at its principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan 48126.

20.     On information and belief, GM is a Michigan corporation with a principal place of business at 300 Renaissance Center, Detroit, MI 48243 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. GM's total revenue between the years 2013 and 2019 = $991.5B. 25% royalty compensation for Plaintiff = $247.88B. 7.5% S.C. tax rate = $18.59B toward S.C. taxpayer debt. GM may be served at its principal place of business at 300 Renaissance Center, Detroit, MI 48243.

21.     On information and belief, FCA is a Michigan corporation with a principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. FCA's total revenue between the years 2013 and 2019 = $701.15B. 25% royalty compensation for Plaintiff = $175.29B. 7.5% S.C. tax rate = $13.15B toward S.C. taxpayer debt.

FCA may be served at its principal place of business at 1000 Chrysler Drive, Auburn Hills, MI

48326.

22.    Defendants' total damages between the years 2013 and 2019, and Qualcomm

years 2009 thru 2019 at 25% royalty compensation for Plaintiff = $1,327.09B. 7.5% S.C. tax rate

= $99.54B toward S.C. taxpayer debt (the "Class").

## Co-Conspirators

23.    The Defendants conspired with various others "known" who participated as co-

conspirators with the Defendants in the violations of law alleged in this complaint and have

engaged in conduct and made statements in furtherance thereof.

24.    The acts charged in this Complaint have been done by Defendants and their co-

conspirators, or were authorized, ordered or done by their respective officers, agents, employees

or representatives while actively engaged in management of each Defendant's business or

affairs.

25.    Each of the Defendants named herein acted as the agent or representative of or for

the other Defendants with respect to the acts, violations and common course of conduct alleged

herein.


## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this suit as a class action pursuant to Rules 23(b)(2) and 23(b)(3)

of the Federal Rules of Civil Procedure, on behalf of himself and a Plaintiff Class (the "Class")

composed of and defined as follows:

> All persons and entities residing in the United States who, during the Class period,
> purchased Communicating, Monitoring, Detecting, and Controlling (CMDC) devices,

Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) for their own use and not for resale. Specifically excluded from this class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

27.    This action has been brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

  a.  The Class is ascertainable and there is a well-defined community of interest among the members of the Class;

  b.  Based on the nature of the trade and commerce involved and the number of purchasers of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV), Plaintiff believe that the members of the Class number in the thousands, and therefore is sufficiently numerous that joinder of all Class members is not practicable;

  c.  Plaintiff claims are typical of the claims of the members of the Class because Plaintiff indirectly purchased Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise

12

to the claims of the members of the Class and the relief sought is common to the Class;

d.  The following common questions of law or fact, among others, exist as to the members of the Class:

    i.    whether Defendants formed and operated a combination or conspiracy;

    ii.    whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

    iii.    the appropriate measure of the amount of damages suffered by the Class;

    iv.    the operative time period of Defendants' combination or conspiracy;

    v.    whether Defendants' conduct violates Section 1 of the Sherman Act;

    vi.    whether Defendants conduct violates SC Code § 16-17-410 (2012)

    vii.    whether Defendants conduct violates SC Section 39-5-20

    viii.    whether Defendants' conduct violates South Carolina Consumer Protection and Unfair Competition Laws; Unjust Enrichment; and,

    ix.    the appropriate nature of class-wide equitable relief.

e.  These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class;

f.  After determination of the predominate common issues identified above, if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

g.  Plaintiff will fairly and adequately protect the interest of the Class in that
Plaintiff has no interest that are antagonistic to other members of the Class;

h.  A class action is superior to other available methods for the fair and efficient
adjudication of this litigation since individual joinder of all damaged Class
members is impractical. The damages suffered by individual Class members
are relatively small, given the expense and burden of individual prosecution of
the claims asserted in this litigation. Thus, absent the availability of class
action procedures, it would not be feasible for Class members to redress the
wrongs done to them. Even if the Class members could afford individual
litigation, the court system could not. Further, individual litigation presents
the potential for inconsistent or contradictory judgements and would greatly
magnify the delay and expense to all parties and to the court system.
Therefore, the class action device presents far fewer case management
difficulties and will provide the benefits of unitary adjudication, economy of
scale and comprehensive supervision by a single court;

i.  Defendants have acted, and refused to act, on grounds generally applicable to
the Class, thereby making appropriate final injunctive relief with respect to the
Class as a whole; and,

j.  In the absence of a class action, Defendants would be unjustly enriched
because they would be able to retain the benefits and fruits of their wrongful
conduct.

k.  Throughout the period of time covered by this Complaint, Defendants and
their Co-conspirators engaged in the business of marketing and selling

14

(CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS);

Lock Disabling Systems; and, Network Connected Vehicles (NCV)

## NATURE OF TRADE AND COMMERCE

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Devices**

28.     The Patent Owner's communicating, monitoring, detecting, and controlling

(CMDC) device is commercialized in the form of an improved cell phone, smartwatch, laptop, or

tablet. The specifications and capabilities of the CMDC device(s) developed, manufactured, and

commercialized by Apple, Samsung, LG, Qualcomm, Panasonic, and Motorola, are significantly

the same as the Patent Owner's CMDC device(s) as illustrated below:

- Communication: at least one of a satellite connection, Bluetooth connection, WiFi
  connection, internet connection, cellular connection, long and/or short-range radio
  frequency (RF) connection, or GPS connection was "taken" for the benefit of the
  Government and for Government "use".
- Monitoring: at least one of a viewing screen for monitoring in real time, viewing screen
  monitoring for CBRNE-H signal alerts, viewing screen monitoring for CBRNE-H color
  coded indicator lights, or viewing screen monitoring for tracking, alerts, and heart rate.
- Detecting: at least one of a chemical sensor, a biological sensor, an explosive sensor, a
  human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless,
  capable of being disposed within, on, upon or adjacent the CMDC device.
- Controlling: at least a fixed, portable or mobile communication device interconnected to
  a fixed, portable or mobile product, capable of wired or wireless communication
  therebetween, for sending signals to at least lock or unlock doors, stall, stop, or slowdown
  vehicles, activate or deactivate security systems, activate or deactivate multi-sensor
  detection systems, or to activate or deactivate cell phone detection systems.
- Central Processing Unit (CPU): is the programmable device capable of general-purpose
  computation. It is the engine of logic, as with the brain, and the core piece of hardware in

15

the Patent Owner's CMDC device (i.e. communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that executes instructions that make up a computer program.

- Biometrics: that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and or signature or a face recognition to at least gain access to the CMDC device or to prevent unauthorized use of the CMDC device.

- Lock, Unlock, Disabling Lock: the CMDC device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks after a certain number of failed attempts to unlock.

- Near-Field Communication: Near Field Communication or NFC is a short-range communication channel. The purposes for this technology is to simplify first-time connections to other wireless technologies, like Wi-Fi and Bluetooth. Near Field Communication in a CMDC device can be used as part of a two-factor access control system for unlocking a door. Biometric Fingerprint recognition is used for authentication and NFC is used to transmit authentication information to a computer controlling the door. NFC is preferred over RFID because RFID has a frequency vulnerable for detonating bombs.

- Location and Tracking: The CMDC tracking is a process for identifying the location of the device, whether stationary or moving. Localization may be affected by a number of technologies, such as using multi literation of radio signals between (several) cell towers of the network and the device, or simply using GPS. Some GPS CMDC devices use wireless-assisted GPS to determine the user's location. In wireless-assisted systems, the device uses the orbiting GPS satellites in conjunction with information about the device's signal. Sometimes called enhanced GPS, wireless-assisted GPS can often get a fix on the user's location faster than a GPS-only receiver. Some wireless-assisted systems can work inside buildings, under dense foliage and in city areas where traditional receivers cannot receive signals. GPS-enabled CMDC devices with view screens can often display turn-by-turn directions as well as announce them through the device's

speaker. A database of maps is used to provide the directions. The CMDC device locator provides GPS coordinates and can dial emergency CMDC device numbers. The Government, parents and caregivers can track the device's location by device or online and can receive notification if it leaves a designated "safe area."

- Example of Patent Owner's claimed invention CMDC device (i.e. smartphone). Below is claim 4 of the issued patent 10,163,287:

4. A communication device comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least

one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

### Similar Claims Covering the CMDC Device (i.e. Smartphone)

| Pat. # RE43,990* | Pat. # 9,096,189 | Pat. # 9,589,439 | Pat. # 10,163,287 | App. # 16/350,683 | Reissue App. # 16/350,874* |
|---|---|---|---|---|---|
| Claim 11 of the RE43,990 Patent | Claims 1, 2, & 3 of the '189 Patent | Claims 13, 14, 15, 22, & 23 of the '439 Patent | Claims 1, 2, 3, 4, 5, & 6 of the '287 Patent | Claims 1 & 11 of the [683] Patent Application | Claims 13, 14, 15, 22, 23, 64, 74, 75, & 76 of the [874] Reissue Patent Application |

## STALL, STOP, and VEHICLE SLOW-DOWN SYSTEM (SSVSS)

29.    The Patent Owner's stop, stall, or vehicle slowdown mean; and, the CMDC device being interconnected to the vehicle to control certain operating systems, is illustrated below:

- Stall, Stop, Slowdown: the CMDC device being equipped to send signals to vehicles (i.e. driver, driverless, autonomous, unmanned aerial, unmanned land, unmanned sea, boats, trucks, etc.) that engages the computer, electrical, fuel, and/or air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to vehicle brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

- Preprogrammed Stall, Stop, Slowdown: interconnected to the vehicle operating systems of at least one of, ignition start/stop, door lock/unlock, temperature settings and temperature on/off, vehicle brakes, foot peddle, lights, speed controls, and steering.



| GM/OnStar Stolen Vehicle Slow-down System | PO's SSVSS Pat. #: RE43,891; Independent Claim 11 | PO's SSVSS Patent #: 8,334,761; Independent Claim 1 |
|---|---|---|
| A vehicle adapted with Stolen Vehicle Slowdown: Requires paid plan, working electrical system, cell reception, GPS signal, armed GM factory-installed theft-deterrent system, contact method on file and enrollment to receive alerts. https://media.gm.com/media /us/en/gm/news.detail.html/content /Pages/news/us/en/2019/ apr/0404-onstar.html | A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: | A vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Using satellite and cellular technology, OnStar remotely slow the vehicle. OnStar activates a flashing message front of steering wheel, "engine power is reduced." The process affects the accelerator pedal. OnStar's Stolen Vehicle Slowdown System: by Jennifer Geiger; Copyright © 2012; HowStuffWorks.com, Inc. | at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; | at least one of a brake, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |

| | | |
|---|---|---|
| An OnStar Advisor can send a signal to disable the stolen vehicle's engine and gradually slow the vehicle to an idle speed to assist police in recovering the vehicle. https://media.gm.com/media/ us/en/gm/news.detail.html/content/ Pages/news/us/en/2019/apr/ 0404-onstar.html | an electrical system in electrical communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; | an electrical system in electrical communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Some form of electromagnetic pulse is already featured in OnStar-equipped vehicles though the electromagnetic signal used to disable the vehicle is beamed via satellite, and doesn't cripple the in-car computer, but rather puts it into a mode that allows police to easily catch and then stop the fleeing criminal." https://tech.slashdot.org/story /10/01/22/2339204/electromagnetic-pulse-gun-to-help-in-police-chases | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Stolen Vehicle Slowdown: Requires paid plan, working electrical system, cell reception, GPS signal, armed GM factory-installed theft-deterrent system, contact method on file and enrollment to receive alerts. https://media.gm.com/media /us/en/gm/news.detail.html/content /Pages/news/us/en/2019/apr/0404-onstar.html | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; |
| Some form of electromagnetic pulse is already featured in OnStar-equipped vehicles though the electromagnetic signal used to disable the vehicle is beamed via satellite, and doesn't cripple the in-car computer, but rather puts it into a mode that allows police to easily catch and then stop the fleeing criminal." https://tech.slashdot.org/story /10/01/22/2339204/electromagnetic-pulse-gun-to-help-in-police-chases | a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; and | a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; and |

| | | |
|---|---|---|
| OnStar, will work with the cops to locate the vehicle using GPS. When the police identify the vehicle by sight, OnStar remotely makes the lights flash to confirm its identity. When conditions are safe to stop the vehicle, OnStar remotely slows it to a crawl. https://www.wired.com/2008/04/onstars-stolen/ | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| After a member has filed a police report and once authorities have confirmed conditions are appropriate, an OnStar Advisor can send a signal to disable the stolen vehicle's engine and gradually slow the vehicle to an idle speed to assist police in recovering the vehicle. https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2019/apr/ 0404-onstar.html | wherein the at least one control signal is sent due to unauthorized use of the vehicle, and wherein an originating first signal that eventually causes the at least one control signal to be sent is generated upon initial verification of the unauthorized use of the vehicle; | X |
| Some form of electromagnetic pulse is already featured in OnStar-equipped vehicles though the electromagnetic signal used to disable the vehicle is beamed via satellite, and doesn't cripple the in-car computer, but rather puts it into a mode that allows police to easily catch and then stop the fleeing criminal." https://tech.slashdot.org/story/10/01/22/2339204/electromagnetic-pulse-gun-to-help-in-police-chases | at least one mobile, portable, or fixed device capable of sending the at least one control signal from the remote location that is of electromagnet pulse, electrostatic discharge, microwave beam or radio frequency, to disable the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and horsepower of the motor. | X |

| | | |
|---|---|---|
| Stolen Vehicle Slowdown: Requires paid plan, working electrical system, cell reception, GPS signal, armed GM factory-installed theft-deterrent system, contact method on file and enrollment to receive alerts. https://media.gm.com/media /us/en/gm/news.detail.html/content /Pages/news/us/en/2019/ apr/0404-onstar.html | X | wherein a user determines that the vehicle has been stolen and in response initiates a distress signal communication over a communication network that causes communication between the vehicle and the remote location and that then causes the at least one control signal to be sent from the remote location via the communication network that includes at least one of a cell phone tower and a satellite. |

30.    **GM:** Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control.

| GM Pre-programmed Stall, Stop, or Vehicle Slow-down System | Patent Owner's CMDC Device Patent #: RES#,891; Independent Claim 44 |
|---|---|
| GM Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Chrysler, Dodge, Jeep, and Ram vehicles | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |

| | |
|---|---|
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |
| **GM Pre-programmed Stall, Stop, or Vehicle Slow-down Systems** | **Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 47, 48, 49, 50, 51, & 53** |
| Enhanced Smart Pedal Technology: Known as brake override, reduces power to the engine in cases where the brake and accelerator pedal are being simultaneously depressed. | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |
| Front Automatic Braking: Helps a driver avoid a forward crash or reduce the severity of crashing into a vehicle in front of it, whether it is moving or has come to a stop. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Rear Automatic Braking: Helps the driver avoid a crash or to mitigate the impact into objects directly behind their vehicle by bringing the vehicle to a stop. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |

| Electronic Stability Control (ESC): Detects loss of steering control, it automatically applies the brakes to help "steer" the vehicle. Braking is automatically applied. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
|---|---|
| Lane Keep Assist: Represents an upgrade of Lane Departure Warning. The feature is listed as "Lane Keep Assist with Lane Departure Warning". | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Adaptive Cruise Control: The technology automatically accelerates and brakes the vehicle up to moderate levels to maintain a driver-selected following gap (distance). | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

31.    **FORD:** Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least, Ford's Evasive Steering Assist; Ford's Pre-Collision Assist; Ford's Reverse Brake Assist; Ford's AdvanceTrac Electronic Stability Control (ESC); Ford's Lane-Keeping system; or, Ford's Adaptive Cruise Control.

| Ford Pre-programmed Stall, Stop, or Vehicle Slow-down System | Patent Owner's CMDC Device<br>Patent #: RE$#,891; Independent Claim 44 |
|---|---|
| Ford's Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Explorer, Expedition, F-150, and Mustang vehicles | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |

24

| | |
|---|---|
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |
| **Ford Pre-programmed Stall, Stop, or Vehicle Slow-down Systems** | **Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 48, 48, 49, 50, 51, & 53** |

| | |
|---|---|
| Ford's Evasive Steering Assist comes into play, employing the camera and radar sensor technology of the available Pre-Collision Assist with Automatic Emergency Braking to detect the vehicle ahead and apply active brake | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Ford's Pre-Collision Assist feature uses camera technology to detect a potential collision with a vehicle or pedestrian directly in front of your vehicle. If you don't take corrective action and a collision is imminent, brakes can apply automatically. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Ford's reverse brake assist with automatic emergency brake (AEB) will help prevent drivers from hitting an object while backing up. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |
| Ford's AdvanceTrac Electronic Stability Control automatically detects wheel-slippage, while adjusting torque & braking to gain control & traction. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| Ford's Lane-Keeping system has three modes: Lane-Keeping Aid applies steering torque to direct you back to the center of the lane. Lane-Keeping Alert warns you through steering wheel vibrations. You can set the system to activate either the Alert or Aid mode, or both. And Driver Alert sends out warnings in the message center. | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Ford's Adaptive Cruise Control lets you set a cruising speed and distance from the vehicle in front of you, an especially helpful feature in slow traffic conditions. When traffic ahead slows down, you automatically do too | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

32.    **FCA US LLC:** Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus.

| FCA US LLC Pre-programmed Stall, Stop, or Vehicle Slow-down System | Patent Owner's CMDC Device Patent #: RE$#,891; Independent Claim 44 |
|---|---|
| FCA US LLC Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Chrysler, Dodge, Jeep, and Ram vehicles | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |

| | |
|---|---|
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |
| **FCA US LLC Pre-programmed Stall, Stop, or Vehicle Slow-down Systems** | **Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 47, 48, 49, 50, 51, & 53** |
| Brake-throttle override: Allows driver to stop the vehicle when throttle and brake inputs occur simultaneously; electronic throttle control reduces engine-power output until vehicle stops or pedal inputs cease | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |
| Forward Collision Warning-Plus: Radar and camera technology combine to determine if frontal impact with another vehicle appears imminent; if so, system pre-fills brakes; no driver response triggers brief brake application; if driver remains unresponsive, brakes are applied to slow vehicle before impact | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| ParkSense rear park assist system: The system utilizes ultrasonic sensors at low speeds in reverse to detect stationary objects. If it is determined that a collision is imminent the system will provide a momentary, autonomous brake apply/brake jerk then release. At speeds below 7 km/h the system will bring the vehicle to a stop before releasing | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |

| | |
|---|---|
| Electronic stability control (ESC): Enhances driver control and helps maintain directional stability under all conditions. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| LaneSense Departure Warning-Plus: Leverages electronic power steering (EPS) to deliver a torque input to alert and assist the driver with corrective action | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Adaptive Cruise Control-Plus: Helps to maintain distance from the vehicle ahead and under certain conditions, can bring the vehicle to a full stop without driver intervention | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

**Lock Disabling Systems**

33.    *Claim 1 of Patent No. 10/163,287.* Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising… the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

29

34.    *Claim 2 of Patent No. 10/163,287.* Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to at least one of a home lock, a building lock, or a cargo container lock for communication therebetween; the monitoring equipment comprising… the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a home lock, a building lock, or a cargo container lock whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the home lock, building lock, or cargo container lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

35.    *Claim 3 of Patent No. 10/163,287.* Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising… the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

**Network Connected Vehicles (NCV): CMDC Device (i.e. Smartphone) & Vehicle's**

**Operating Systems**

36. The Ford Sync Connect Apps are the "gateways", "integrators", or "interfaces" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Explorer, Expedition, F-150, and Mustang vehicles. The Ford Sync Connect Apps allows the CMDC device user to command the forenamed vehicles to lock and unlock; remote start, including scheduling a future start; vehicle status, including fuel, oil and battery levels, along with tire pressure readings; and, vehicle location.

37. Ford Sync Connect system Android Compatibility: You can utilize Google's Android Auto to connect your smartphone to the Ford Sync Connect system. Ford Motor Company's Explorer, Expedition, F-150, and Mustang mobile apps are downloaded from Google Play for managing Ford's vehicles remotely.

| Ford: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| The Ford Sync Connect Apps are the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Explorer, Expedition, F-150 and Mustang vehicles. | A monitoring device, comprising: |
| The performance of LG's CMDC devices: CPU that's at the core of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); |
| LG's CMDC devices has an internal temperature sensor which monitors the CPU and battery temperature of device | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| LG's CMDC devices, starting with LG G2, you can calibrate the motion sensor by going to Settings > General tab > Motion. | at least one motion sensor in communication with the at least one CPU; |
| LG's CMDC devices: Thin Q has "the brightest" screen of any smartphone, thanks to its Super Bright Display technology. | at least one viewing screen for monitoring in communication with the at least one CPU; |

31

| | |
|---|---|
| LG's CMDC devices: GPS with A-GPS, GLONASS, and BDS | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| LG's CMDC devices: Wi-Fi, Wi-Fi Direct<br><br>Ford Sync Connect system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| LG's CMDC devices: cellular connection; Bluetooth<br><br>Ford Sync Connect system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| After multiple unsuccessful attempts, LG's CMDC devices will automatically perform a factory data reset and all of the personal files will be erased. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Battery Charging Specification, is power drawn from a USB port for charging. Three different sources of power: Standard downstream port (SDP), charging downstream port (CDP), and dedicated charging port (DCP). Wireless charging | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |
| LG's CMDC devices: features include sensors for face/smile detection, iris scanner, and fingerprint recognition | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| LG's CMDC wireless, wearable, mobile, device detects and identify chemicals in the air and sends detection data to another phone or a computer<br><br>LG Watch Sport Smartwatch wireless, wearable, mobile, electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| LG's CMDC device detects and identify chemicals in the air using a "sample jet" and sends detection data to another device (e.g. LG Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |

| | |
|---|---|
| LG's CMDC device, NFC is a short-range high frequency wireless communication technology; enables the exchange of data between devices; share content between digital devices. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |
| Voice Mate (i.e. Quick Voice; Q Voice) built-in application for various LG CMDC devices (i.e. smartphone); lock and unlock doors, activate and deactivate security systems.<br><br>The Ford Sync Connect Apps allows the LG CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles' doors; remotely start and cancel start the vehicles | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

38.     Fiat Chrysler Automobiles—FCA US LLC, Uconnect Access App is the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Chrysler, Dodge, Jeep, and Ram vehicles. The Uconnect Access App allows the CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles doors; remotely start and cancel start the vehicles; sound the horn of the vehicles; or, flash the lights of the vehicles.

39.     Uconnect® system Android Compatibility: You can utilize Google's Android Auto to connect your smartphone to the Uconnect® system. Android Auto by Google will help you seamlessly integrate your Android smartphone with your vehicle. Seller: FCA US LLC (FIAT CHRYSLER AUTOMOBILES)

| Samsung: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| The FCA US LLC Uconnect Access App is the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Chrysler, Dodge, Jeep, and Ram vehicles. | A monitoring device, comprising: |

| | |
|---|---|
| The performance of Samsung's CMDC devices: CPU that's a part of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); |
| Samsung's CMDC devices has various sensors like the temperature sensor for the battery and the CPU or processor. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| Samsung's CMDC devices accelerometers handle axis-based motion sensing—reason why the smartphone can track steps without a separate wearable. | at least one motion sensor in communication with the at least one CPU; |
| Samsung's CMDC device has set the bar with the highest-rated smartphone displays. With a panel produced by Samsung, and optimized by Apple | at least one viewing screen for monitoring in communication with the at least one CPU; |
| Samsung's CMDC device: GPS with A-GPS, GLONASS, BDS, GALILEO | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| Samsung's CMDC device: Wi-Fi, dual-band, Wi-Fi Direct, hotspot<br><br>Uconnect® system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| Samsung's CMDC device: cellular connection; Bluetooth<br><br>Uconnect® system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Samsung's CMDC device: After several unsuccessful log-in attempts using a passcode or fingerprint, the Samsung CMDC device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Samsung's CMDC devices Fast Charge power bank has a capacity of 5,100mAh and can provide up to 1.5 charges for the majority of smartphones. The power bank has an LED power indicator; comes with a micro USB cable and a micro USB to USB Type-C adapter. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |

| | |
|---|---|
| Samsung's CMDC devices allows fingerprints to set-up the fingerprint scanner for easy log-in and lock-out. Face unlock uses the front-facing camera to identify the user and unlock the device. Iris scanning uses special sensors on front of phone to identify and unlock the device. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| Samsung's CMDC wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Samsung's S3 Classic electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| Samsung's CMDC device detects and identify chemicals in the air using a "sample jet" and sends detection data to another device (e.g. Samsung Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |
| Samsung's CMDC device, near-field communication (NFC) Ring can unlock the device. The NFC Ring has two NFC tag inlays inside the ring and can be used to unlock & control mobile devices | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |
| Samsung's SmartThings contains: Connects to appliances, lights, locks, cameras, thermostats, sensors. BMW Digital Key to lock/unlock; and start it up with Samsung phones only.<br><br>The FCA US LLC Uconnect Access App allows the Samsung CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles' doors; remotely start and cancel start the vehicles | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

40.     General Motors Company (GM) myChevrolet, myBuick, myGMC and myCadillac mobile apps are the "gateways", "integrators", or "interfaces" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, and LG CMDC smartphones) to the Chevrolet, Buick, GMC and Cadillac vehicles. The GM Remote Access Apps allows the CMDC

device user to command the forenamed vehicles to at least lock and unlock the vehicles doors;

remotely start and cancel start the vehicles; sound the horn of the vehicles; or, flash the lights of

the vehicles.

41.    GM Remote Access system Android Compatibility: You can utilize Google's

Android Auto to connect your smartphone to the GM Remote Access system. General Motors

Company (GM) myChevrolet, myBuick, myGMC and myCadillac mobile apps are downloaded

from Google Play for managing GM's vehicles remotely.

| Apple: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| The GM Remote Access Apps is the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Chevrolet, Buick, GMC and Cadillac vehicles. | A monitoring device, comprising: |
| The performance of Apple's CMDC devices: CPU that's a part of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); |
| Apple Files Patent for a new Temperature Sensor tied to a new Interactive Battery Indicator | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| Apple's CMDC devices: Apple M-series coprocessors are motion coprocessors used by Apple Inc. in their mobile devices. | at least one motion sensor in communication with the at least one CPU; |
| Apple's CMDC devices: Highest absolute color accuracy; full screen brightness; full screen contrast; contrast ratio; lowest screen reflectance; smallest brightness variation | at least one viewing screen for monitoring in communication with the at least one CPU; |
| Apple's CMDC device: GPS with A-GPS, GLONASS | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| Apple's CMDC device: Wi-Fi, dual-band, hotspot  GM Remote Access system iPhone Compatibility: CMDC device requires iOS 10.0 or later | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |

| | |
|---|---|
| Apple's CMDC device: cellular connection; Bluetooth<br><br>GM Remote Access system iPhone Compatibility: CMDC device requires iOS 10.0 or later | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Apple's CMDC device includes a feature on that disables and erases all of the devices data after 10 failed passcode attempts. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Apple's CMDC device batteries and wall chargers which employ USB PD have the ability to charge devices up to 100W output using a USB-C connector | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |
| Apple's CMDC device features include sensors for face/smile detection, and fingerprint recognition. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| Apple's CMDC wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Apple Watch Series 3 electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| Apple's CMDC device detects and identify chemicals in the air using a "sample jet" and sends detection data to another device (e.g. Apple Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |
| Apple's CMDC device, NFC is a short-range high frequency wireless communication technology; enables the exchange of data between devices; share content between digital devices. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |

| | |
|---|---|
| Apple's Viper SmartStart: Start, locate and control your car with your iPhone, or Apple Watch. Viper system in your car so you can start, lock and unlock your car<br><br>The GM Remote Access Apps allows the Apple CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles' doors; remotely start and cancel start the vehicles | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

42.    Qualcomm's claim on inventing the smartphone (i.e. CMDC Device) 

| Qualcomm: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| DHS; S&T "Cell-All" initiative. Develop detection device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million electronic devices (i.e. cell phones) | A monitoring device, comprising: |
| The Snapdragon central processing unit (CPU) uses a single SoC that may include multiple CPU cores, a wireless modem, and other software and hardware to support a smartphone's global positioning system (GPS), camera, gesture recognition and video. The Snapdragon system on chip (SoC) was announced in Nov. 2006. | at least one central processing unit (CPU); |
| Qualcomm® Bluetooth® Low Energy Solutions Environmental Sensor Board<br>Sensors: Accelerometer sensor, Temperature sensor, Pressure sensor, Magnetometer sensor, Humidity sensor, Gyro/angular sensor | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| Snapdragon sensor engine supports course motion classification, which determines standing, resting, walking, running, driving, or parking. | at least one motion sensor in communication with the at least one CPU; |
| Qualcomm TruPalette display tech is supported by Qualcomm Snapdragon processors | at least one viewing screen for monitoring in communication with the at least one CPU; |
| The Snapdragon central processing unit (CPU) uses a single SoC that may include multiple CPU cores, a wireless modem, and other software and hardware to support a smartphone's global positioning system (GPS), camera, gesture recognition and video | at least one global positioning system (GPS) connection in communication with the at least one CPU; |

| | |
|---|---|
| Apple iPhone 8; Qualcomm Modem Model A1663; 802.11ac Wi Fi with MIMO; Bluetooth 5.0 wireless technology; NFC with reader mode. | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| Apple iPhone 7; Qualcomm Modem Model A1660; 802.11ac Wi Fi with MIMO; Bluetooth 4.2 wireless cellular technology; NFC with reader mode. | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Qualcomm Technologies SafeSwitch is available through its Qualcomm Snapdragon processors. SafeSwitch technology - addresses mobile security threat with a kill switch solution designed to remotely disable the devices in the event they're lost or stolen - then re-enable when found. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Qualcomm Quick Charge: Qualcomm's Snapdragon SoCs is used in a number of popular smartphones and tablets, has its own fast-charging standard. Quick Charge is a technology found in Qualcomm SoCs, used in devices such as mobile phones, for managing power delivered over USB. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |
| Authenticating beyond secure fingerprint identification, a Snapdragon 835 Mobile Platform provides safety using Camera Security—a camera-based biometric solution for iris and facial recognition. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| ***Cell-All***: wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Samsung Gear S2 3G Watch & Samsung Gear S Watch (Qualcomm Snapdragon 400 Processor); LG Watch Sport & LG G Watch R & LG Watch Urban (Qualcomm Snapdragon 400 Processor) for chem / bio / human heart rate detection and monitoring | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| ***Cell-All***: The device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone (e.g. Apple, Samsung, LG, Smartphone) or a computer "How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center.<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |

| | |
|---|---|
| Qualcomm include NXP's near-field communication (NFC) solution in the Snapdragon processor platform that powers mobile devices (e.g. smartphones), wearables (e.g. smartwatches), and automobiles. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |
| Qualcomm Technologies developed the QCA4020 tri-mode connectivity system-on-chip (SoC), the IoT industry's first commercially sampling connectivity solution that integrates three major radios in one low-power, cost-optimized chip. Connecting IoT devices like Refrigerators, TVs, security systems, thermostats, door locks. The Snapdragon 820A enables the driver attention-sensing cameras and autonomous controls to fingerprint-based door locks. *Cell-All*: The device detects and identify chemicals in the air using a "sample jet" sends detection data to another phone | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

43.    All CMDC Devices: DHS; S&T "Cell-All" initiative. Develop CMDC device to
detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and
Samsung. Sensors will integrate with 261 million CMDC devices (i.e. smartphones) 

| CMDC Devices | Patent #: 10,163,287; Independent Claim 4, 5 & 6 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,589,439; Independent Claim 22 | Patent #: 9,096,189; Independent Claim 1 | Patent #: RE43,990; Independent Claim 11 | Patent #: 7,385,497; Independent Claim 1 |
|---|---|---|---|---|---|---|
| DHS; S&T "Cell-All" initiative. Develop CMDC device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million CMDC devices (i.e. smartphones) | Claim 4: A communication device, comprising:<br><br>Claim 5: A monitoring device, comprising:<br><br>Claim 6: Monitoring equipment, comprising: | Claim 23: A cell phone comprising:<br><br>*Note: This claim 23 of the '439 patent directly covers the 'new and improved' cell phone the DHS requested in its Cell-All solicitation* | Claim 22: A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | Claim 1: A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | Claim 11: A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products, interconnected to a product for communication therebetween, comprising: | Claim 1: A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: |

44.    "Network Connected Vehicles" Patent Claims

**Patent No.: 10,163,287**

3. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or ***smart phone interconnected to a vehicle lock for communication therebetween***; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular

connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and,

the *monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock*, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

**Patent No.: 8,334,761**

1. A *vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means*, comprising:

at least one of a brake, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

an electrical system in electrical communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a computer system in signal transmission communication with at least one

of the brake, the foot peddle, the light, the speed control, the ignition system, the

steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and

adapted to receive at least one control signal from a remote location to activate a

stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and

adapted to receive at least one control signal from a remote location to activate a

stall-to-stop means or vehicle slowdown means; and

wherein the at least one control signal is communicated from the receiver

to the electrical system or the computer system to control at least one of the brake,

the foot peddle, the light, the speed control, the ignition system, the steering

wheel, the transmission, the fuel system, and the motor;

wherein a user determines that the vehicle has been stolen and in response

initiates a distress signal communication over a communication network that

causes communication between the vehicle and the remote location and that then

causes the at least ***one control signal to be sent from the remote location via the***

***communication network that includes at least one of a cell phone tower and a***

***satellite.***

**Patent No.: 8,106,752**

1. A stall-to-stop disabling and slowdown system for slowing and stopping

a vehicle wherein the vehicle includes a transceiver and a stall-to-stop system that

is interconnected to the electromotive system and of the vehicle, comprising:

a stall-to-stop disabling and slowdown means that includes:

*monitoring equipment located at a determinate monitoring site;*

at least one Cellular tower and at least one satellite capable of sending and receiving signals to and from the monitoring equipment and the transceiver of the vehicle;

the Cellular tower and the satellite capable of two-way signal communication with the transceiver of the vehicle; and

whereupon a distress signal sent from a portable or fixed telecommunication device to the satellite causes a signal to be sent to the monitoring equipment followed by *communicating with the transceiver of the vehicle for exchanging information on at least one of a, mechanical problem, electrical problem, computer problem, location, and speed of the vehicle* resulting in the monitoring equipment transmitting a signal to the Cellular tower and/or satellite and the Cellular tower and/or satellite communicating with the transceiver of the vehicle for executing commands that actuate the stall-to-stop system for slowing and stopping the vehicle.



## RELATED CASES

45.    Plaintiff Larry Golden has filed an action of patent infringement on September 11, 2019, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:19-cv-2557) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O"). The case is on appeal at the Court of Appeals for the Federal Circuit (CAFC); case no. 20-1508.

## DEFENDANT'S ILLEGAL CONDUCT

### Sherman Act § 1: "Motive to Form a Conspiracy": (Apple, Samsung, LG, Qualcomm)

46.    Evidence of the Defendants' (Apple, Samsung, LG, Qualcomm), motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion. The Defendants' (Apple, Samsung, LG, Qualcomm), as government own or ran companies, and/or third-party government contractors—under contract to perform work for the Government—was aware that if they form a conspiracy, while under an agreement or contract with the Government to control the

development, manufacture, commercialization, and pricing of product(s), there would not be any

reasonable substitute for their product or service.

47.    The Defendants' "motive to form a conspiracy" accelerated after the decision in

*ZOLTEK CORP. v. UNITED STATES*; 04-5100, -5102 (Fed. Cir. 2006):

> "We conclude that under § 1498, the United States is liable for the use of a method patent
>
> only when it practices every step of the claimed method in the United States. The court
>
> therefore affirms the trial court's conclusion that § 1498 bars Zoltek's claims… The
>
> United States contracted with Lockheed Martin Corporation ("Lockheed") to design and
>
> build the F-22 fighter. *Zoltek*, 51 Fed. Cl. at 831. Lockheed subcontracted for two types
>
> of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material
>
> made from Nicalon silicon carbide fibers. These fibers are partially carbonized and
>
> manufactured into sheets in Japan, which are then imported into the United States. The
>
> second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are
>
> manufactured exclusively in Japan, but they are processed into mats in the United
>
> States. *Zoltek*, 58 Fed. Cl. at 690… Zoltek brought suit in the Court of Federal Claims
>
> under § 1498(a), alleging that the United States and Lockheed used the methods claimed
>
> in the Re '162 patent when Lockheed's subcontractors made the two silicide fiber
>
> products used in the F-22. Zoltek alleges that the mats and sheets were made, for the
>
> United States, using the claimed methods…The government moved for partial summary
>
> judgment that Zoltek's § 1498(a) claims were barred by § 1498(c) because they arose in
>
> Japan. The trial court denied the motion. Although it agreed that § 1498(c) barred
>
> Zoltek's claims under § 1498(a)… The federal government is immune from any legal
>
> action by its sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61

S. Ct. 767, 85 L. Ed. 1058 (1941) (stating that " [t]he United States, as sovereign, is immune from suit save as it consents to be sued"). The waiver of immunity can be limited and conditioned by the Congress. *See United States v. Nordic Village Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992) (stating that the government's consent to be sued must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires). A patentee's judicial recourse against the federal government, or its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C. § 1498.[2]  Section 1498(a) provides, in pertinent part: Whenever an invention described in and covered by a patent of the United States *is used. . . by or for the United States* without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture… This court has held that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 768 n. 3 (Fed. Cir. 1984)). We have further held that "a process cannot be used `within' the United States as required by section 271(a) unless each of the steps is performed within this country." *Id.* at 1318. Consequently, where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a). We affirm the trial court's conclusion that § 1498(a) bars Zoltek's claims."

**The Conspiracy: (Apple, Samsung, LG, Qualcomm)**

48.     After the events of 9/11 the Plaintiff introduced to the United States

("government") three economic stimulus and terrorism prevention packages: The packages were

titled: the "ATPG" project; the "SafeRack" project; and the "V-Tection" project. The Plaintiff

submitted the packages to President Bush and his administration, the U.S. Senators and U.S.

Congressmen that was in office during the Bush administration beginning in the year 2003.

Beginning in year 2004, the Government began enforcing and administering the Plaintiff's

intellectual property subject matter strategies. The packages outlined how the Government could

stimulate the economy following the 9/11 attacks and provide protection against future terrorist

activities. Because the Plaintiff's residence is in South Carolina, and the Plaintiff's business is in

South Carolina, the stimulus packages would have benefited the Plaintiff and the Plaintiff's Class

through royalty compensation for the Plaintiff, new jobs growth, low unemployment, increase

S.C. tax revenue, and a decrease, if not totally eliminate, South Carolina's debt. The Defendants'

(Apple, Samsung, LG, and Qualcomm) collusion, and conspiracy to hinder trade, destroyed all

possibilities for the Plaintiff to receive royalty compensation and for the Class to eliminate its

South Carolina taxpayer debt.

49.     The Plaintiff's CMDC device is, designed for integration with any of the products

grouped under the "ATPG" project, the "SafeRack" project, and the "V-Tection" project. The

CMDC device was designed to be mass developed, mass manufactured, mass marketed, and

mass commercialized across all industries, agencies, groups, demographics, race, ages, and

gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

The Defendants (Apple, Samsung, LG, and Qualcomm) colluded and conspired under the

protection of a Government contract to develop a "new and improved cell phone" (i.e.

smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and

mass commercialized across all industries, agencies, groups, demographics, race, ages, and

gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

    50.    The US Department of Homeland Security (DHS), NASA's Ames Research

Center, (the United States), entered into cooperative agreements (contracts) with Qualcomm Inc.,

LG Electronics, Apple Inc., and the Samsung Group for the development of a new and improved

cell phone (i.e. smartphone) that is capable of detection for chemical and biological agents. The

agreements were entered into after Defendants' receive notices of the Plaintiff's intent to develop

his own CMDC device for commercialization. The Defendants (Apple, Samsung, LG, and

Qualcomm) colluded and conspired under the protection of a Government contract to develop a

"new and improved cell phone" (i.e. smartphone). The motive to form a conspiracy for the

Defendants, was to avoid being sued for infringement because the Defendants (Apple, Samsung,

LG, and Qualcomm) was performing the work under a Government contract. The Defendants

(Apple, Samsung, LG, and Qualcomm) also conspired not to perform all of the Plaintiff's

patented process within the United States. By not performing all of the Plaintiff's patented

process in the United States, "government liability does not exist pursuant to section 1498(a) for

patent infringement", See *Zoltek,* 2006.

    51.    It is the belief of the Plaintiff, that the Defendants (Apple, Samsung, LG, and

Qualcomm) have been unjustly enriched through the non-payment of royalty compensation to

the Plaintiff that should have been paid as a percentage of the Defendants gross annual revenue

for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices. "Verto

Analytics looked at the numbers of Apple, Samsung, and LG (CMDC devices) smartphones

currently owned by U.S. consumers, and the equivalent market share. January 2018, Apple leads

the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung

claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the

U.S. smartphone market; LG, the third-place contender, has 10% market share, while all other

brands combined account for 12% of the devices on the U.S. smartphone market."

52.    It is the belief of the Plaintiff, that throughout the Relevant Period, Defendants'

(Apple, Samsung, LG, and Qualcomm) unlawful activities, as described herein, took place

within and substantially affected the flow of interstate commerce and had a direct, substantial,

and reasonably foreseeable effect upon commerce in the United States.

53.    It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and

Qualcomm) are in violation of Section 1 of the Sherman Act, which prohibits every

contract, combination or conspiracy that restrains interstate trade; because the restraints are

unreasonably restrictive of competition in a relevant market for the Communicating, Monitoring,

Detecting, and Controlling (CMDC) devices.

54.    It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and

Qualcomm) act together in ways that limit competition by hindering Plaintiff's businesses from

entering the market, while exercising an unreasonable horizontal restraint of trade. The

Defendants' (Apple, Samsung, LG, and Qualcomm) agreements are considered unreasonable

because the Defendants interact to such a degree that they were no longer acting independently,

and the collaboration gave the Defendants the ability to wield market power together.

55.    It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and

Qualcomm) and their co-conspirators have engaged in a contract, combination, trust or

conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiff's

Communicating, Monitoring, Detecting, and Controlling (CMDC) devices without paying

royalty compensation.

56.    It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and

Qualcomm), through their officers, directors and employees, effectuated the aforesaid contract,

combination, thrust or conspiracy between themselves and their co-conspirators.

**Sherman Act § 1: "Motive to Form a Conspiracy": (GM, FCA, and Ford)**

57.    Evidence of the Defendants' (GM, FCA, and Ford), motive to conspire means that

the relevant market was conducive to "collusion" due to the presence of oligarchic sellers,

diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are,

by nature, more conducive to collusion. The Defendants' (GM, FCA, and Ford), as government

own or ran companies, and/or third-party government contractors—under contract to perform

work for the Government—was aware that if they form a conspiracy, while under an agreement

or contract with the Government to control the development, manufacture, commercialization,

and pricing of product(s), there would not be any reasonable substitute for their product or

service.

58.    The Defendants' "motive to form a conspiracy" accelerated after the decision in

*ZOLTEK CORP. v. UNITED STATES*; 04-5100, -5102 (Fed. Cir. 2006):

"We conclude that under § 1498, the United States is liable for the use of a method patent

only when it practices every step of the claimed method in the United States. The court

therefore affirms the trial court's conclusion that § 1498 bars Zoltek's claims... The

United States contracted with Lockheed Martin Corporation ("Lockheed") to design and

build the F-22 fighter. *Zoltek*, 51 Fed. Cl. at 831. Lockheed subcontracted for two types

of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material

made from Nicalon silicon carbide fibers. These fibers are partially carbonized and

manufactured into sheets in Japan, which are then imported into the United States. The

51

second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are manufactured exclusively in Japan, but they are processed into mats in the United States. *Zoltek*, 58 Fed. Cl. at 690… Zoltek brought suit in the Court of Federal Claims under § 1498(a), alleging that the United States and Lockheed used the methods claimed in the Re '162 patent when Lockheed's subcontractors made the two silicide fiber products used in the F-22. Zoltek alleges that the mats and sheets were made, for the United States, using the claimed methods…The government moved for partial summary judgment that Zoltek's § 1498(a) claims were barred by § 1498(c) because they arose in Japan. The trial court denied the motion. Although it agreed that § 1498(c) barred Zoltek's claims under § 1498(a)… The federal government is immune from any legal action by its sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61 S. Ct. 767, 85 L. Ed. 1058 (1941) (stating that " [t]he United States, as sovereign, is immune from suit save as it consents to be sued"). The waiver of immunity can be limited and conditioned by the Congress. *See United States v. Nordic Village Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992) (stating that the government's consent to be sued must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires). A patentee's judicial recourse against the federal government, or its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C. § 1498.[2] Section 1498(a) provides, in pertinent part: Whenever an invention described in and covered by a patent of the United States *is used. . . by or for the United States* without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for

such use and manufacture... This court has held that "direct infringement under section

271(a) is a necessary predicate for government liability under section 1498." *NTP, Inc. v.*

*Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing *Motorola, Inc. v.*

*United States*, 729 F.2d 765, 768 n. 3 (Fed. Cir. 1984)). We have further held that "a

process cannot be used `within' the United States as required by section 271(a) unless

each of the steps is performed within this country." *Id.* at 1318. Consequently, where, as

here, not all steps of a patented process have been performed in the United States,

government liability does not exist pursuant to section 1498(a). We affirm the trial court's

conclusion that § 1498(a) bars Zoltek's claims."

**The Conspiracy: (GM, FCA, and Ford)**

59.    Plaintiff first contacted GM/OnStar during the summer months of 2007 to ask if

they would like to participate with Plaintiff in responding to a Department of Homeland Security

(DHS) solicitation: (Broad Agency Announcement; BAA 07-02A).  The Plaintiff's primary

contact person at GM/OnStar was Mr. Jim Culbertson. The Plaintiff asked Mr. Culbertson if

GM/OnStar has the capability of bringing a moving vehicle to a stall, stop, or slowdown.  Mr.

Culbertson's response to me was, "I need time to find out if we have those capabilities and if

there is interest from upper management". After several conversations and several failed

attempts to reach Mr. Culbertson, Plaintiff never heard back from GM/OnStar. Plaintiff noticed

while watching TV, an announcement made by GM/OnStar on October 9, 2007 of a new,

"Stolen vehicle slow down system" that was being offered by GM/OnStar beginning the

following year on their 2009 models. GM/OnStar's "Stolen vehicle slow down system" is

substantially the same as the Plaintiff's "stall, stop, and vehicle slowdown systems (SSVSS)"

that Plaintiff had discussed earlier with GM/OnStar's Mr. Culbertson during the summer months

of 2007. Plaintiff called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791.

Mr. Culbertson referred Plaintiff to Angie Miller at 313-665-1485. When Plaintiff dialed Ms.

Miller's number, the answering machine for a Michelle came on; therefore, Plaintiff did not

leave a message. On April 14, 2008, Plaintiff faxed a letter of interest to the General Motors

Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several

members of the General Motors leadership team, to include, Mr. Frederick A. Henderson,

President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief

Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel.

     60.     "The federal government took over GM... in March 2009. The Government fired

GM CEO Rick Wagoner. GM entered bankruptcy on June 1, 2009. By the end of July, GM

emerged from bankruptcy reorganization, became two separate companies and spun off GMAC

into Allied Financial. The Treasury Department began selling off its ownership of GM in 2010.

The Obama administration used the take-over to set new auto efficiency standards design to

improved air quality and forced U.S. automakers to be more competitive against Japanese and

German firms. On December 18, 2014, the Treasury Department ended the bailout. That's when

it sold its last remaining shares of Ally Financial, formerly known as General Motors Acceptance

Corporation. It had bought them for $17.2 billion to infuse cash into the failing GM subsidiary.

The Treasury Department sold the shares for $19.6 billion, making a $2.4 billion profit for

taxpayers. On June 1, 2009, GM entered bankruptcy. It had $82 billion in assets and $172.8

billion in liabilities. That month, sales hit their low point of 9.545 million cars and trucks.

The government lent GM $30.1 billion to fund operations through June and July while it went

through bankruptcy reorganization. It also guaranteed GM's extended warranties. In return, it

bought 60 percent of the company in warrants for common stock and preferred stock.

The Canadian government bought 12 percent. A union health trust received 17.5 percent stock ownership. That was in lieu of the $20 billion needed to cover benefits for 650,000 retirees. Bondholders received 10 percent stock ownership in lieu of $27 billion in bonds. Stockholders lost all their investment. GM promised to repay the $30 billion loan by 2012 when it planned to break even. The company pledged to cut its debt by $30 billion by converting debt ownership for equity. It agreed to pay union health care benefits to retirees by 2010. It promised to sell its Saab, Saturn, and Hummer divisions, reducing the number of models for sale to 40. It shut down 11 factories, closed 40 percent of its 6,000 dealerships, and cut more than 20,000 jobs. Government funding also provided the following incentives for new car buyers: The government backed all new car warranties; the economic stimulus bill allowed new car buyers to deduct all car sales and excise taxes; Congress approved TARP-funded subsidies of zero percent financing for some Chrysler vehicles. The government intended to make GM more efficient. That would allow it to become profitable when sales returned to 10 million vehicles a year. That happened in July 2009, when sales hit 10.758 million. GM emerged from bankruptcy on July 10, 2009, as two separate companies. Old GM held most of the debt. New GM held the assets, $17 billion in debt, the contract with unions, and its underfunded pension funds. This allowed it to move forward as a profitable company. The new company only has four brands: Chevrolet, Cadillac, GMC, and Buick. The company sold Saab and discontinued Saturn and Hummer. In April 2010, New GM repaid its $6.7 billion TARP loan. In November 2010, Treasury revealed it would sell half its ownership of GM. That sale allowed an initial public offering on the stock market of $33 a share. It had already gotten back $37.2 billion by selling its ownership in GM. In November 2013, the Treasury Department announced it would sell its remaining 31.1 million shares in GM. In

December 2014, Treasury sold its remaining shares in Ally Financial."

https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

61.    "The federal government took over Chrysler in March 2009. The Government

required Chrysler to merge with Italy's Fiat S.p.A. Chrysler entered bankruptcy on April 3, 2009.

By the end of July, Chrysler emerged from bankruptcy reorganization and became a brand

owned mostly by Fiat. Chrysler paid off the last of its loans by 2011. On January 16, 2009, the

Treasury Department approved a $1.5 billion loan for Chrysler Financial. The interest rate for the

loans was one point above Libor. In return, Chrysler Financial promised to pay the government

$75 million in notes and reduce executive bonuses by 40 percent. As a result, car buyers got zero

percent financing for five years on some models. Chrysler received $4 billion of the $7 billion

bridge loan it originally requested. In return, its owner Cerberus vowed to convert its debt to

equity. Chrysler had also asked for $6 billion from the Energy Department to retool for more

energy efficient vehicles. Chrysler wanted the Big Three to partner with the federal government

in a joint venture to develop alternative energy vehicles. That didn't happen, and Chrysler didn't

get the loan from the Energy Department. Instead, it pledged to debut an electric vehicle in 2010

and ramp up its production to 500,000 by 2013. On April 30, 2009, Chrysler filed for

bankruptcy. Treasury Secretary Tim Geithner agreed to lend it $6 billion to fund operations

while in bankruptcy. It emerged as a new company; 58.5 percent of which automaker Fiat S.p.A.

of Italy now partly owned. This Fiat-Chrysler merger created the world's sixth largest

automaker. The rest was owned by the United Auto Workers Retiree Medical Benefits

Trust. Chrysler closed underperforming dealerships as part of its bankruptcy proceedings. In

May 2011, Chrysler repaid $11.2 billion of its outstanding $12.5 billion in TARP loans six years

ahead of schedule. Total cost to taxpayers was $1.3 billion. In 2013, Fiat CEO Sergio

Marchionne announced plans to take Chrysler public on the New York Stock Exchange. This allowed Fiat to purchase the rest of the company and merge the two into a more competitive global automaker. In October 2014, it was listed under the ticker symbol "FCAU." The new company was called Fiat Chrysler Auto Company N.V. Its 2017 market capitalization was $17 billion." https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

62.    "Ford Credit received its bailout from the Term Asset-Backed Securities Loan Facility, not TARP. That was a government program for auto, student, and other consumer loans. Although Ford did not receive TARP funds, it did receive government loans. These were critical because banks were not lending during the financial crisis. It requested a $9 billion line-of-credit from the government. In return, it pledged to spend $14 billion on new technologies. On June 23, 2009, Ford received a $5.9 billion loan from the Energy Department's Advanced Technology Vehicles Manufacturing program. In return, it pledged to accelerate development of both hybrid and battery-powered vehicles, close dealerships, and sell Volvo. It upgraded factories in Illinois, Kentucky, Michigan, Missouri, and Ohio to produce hybrid vehicles. Ford used the funds to switch its focus to commercial electric vehicles. In 2016, CEO Mark Fields said, "We want to become a top player in electrified solutions. The company wants to lead…we can win such as with our commercial vehicles." Eighty-one percent of the funds went to create new efficiency technologies for gas-powered vehicles. For example, they helped fund Ford's aluminum bodies in the F-series pickups. The Congressional Research Service estimated the loans saved 33,000 jobs. Ford will repay this loan by 2022. Many argue that Ford needed the funds to sustain its cash flow during the recession. Ford says it was in better shape than the other two (e.g. GM and FCA) because it had mortgaged its assets in 2006 to raise $23.6 billion. It used the loans to retool its product lineup to focus on smaller, energy efficient vehicles. It got the United Automobile

Workers to agree it could finance half of a new retiree health care trust with company stock. By

April 2009, it retired $9.9 billion of the debt it had taken out in 2006."

https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

63.    It is the belief of the Plaintiff, that the Defendants (GM, FCA and Ford) have been

unjustly enriched through the non-payment of royalty compensation to the Plaintiff that should

have been paid as a percentage of the Defendants gross annual revenue for Plaintiff's Stall, Stop,

and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected

Vehicles (NCV). GM's total revenue between the years 2013 and 2019; FCA's total revenue

between the years 2013 and 2019 = $701.15B; and, Ford's total revenue between the years 2013

and 2019 = $1,065.4B.

64.    It is the belief of the Plaintiff, that throughout the Relevant Period, Defendants'

(GM, FCA and Ford) unlawful activities, as described herein, took place within and substantially

affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable

effect upon commerce in the United States.

65.    It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) are in

violation of Section 1 of the Sherman Act, which prohibits every contract, combination or

conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of

competition in a relevant market for the Stall, Stop, and Vehicle Slow-Down Systems (SSVSS);

Lock Disabling Systems; and, Network Connected Vehicles (NCV).

66.    It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) act

together in ways that limit competition by hindering Plaintiff's businesses from entering the

market, while exercising an unreasonable horizontal restraint of trade. The Defendants' (GM,

FCA and Ford) agreements are considered unreasonable because the Defendants interact to such

58

a degree that they were no longer acting independently, and the collaboration gave the

Defendants the ability to wield market power together.

68.    It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) and their

co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which

was to develop, manufacture, and commercialize Plaintiff's Stall, Stop, and Vehicle Slow-Down

Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

68.    It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford), through

their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or

conspiracy between themselves and their co-conspirators.


## ACTIVE CONCEALMENT

69.    Throughout and beyond the conspiracy, Defendants and their co-conspirators

affirmatively and actively concealed their unlawful conduct from Plaintiffs. Defendants and their

co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of

their higher-level executives. Defendants and their co-conspirators publicly provided pre-textual

and false justifications regarding the intellectual property rights of the Communicating,

Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and

Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected

Vehicles (NCV). Defendants and their co-conspirators conducted their conspiracy in secret,

concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively

concealed their activities through various other means and methods to avoid detection. Plaintiffs

did not discover, and could not have discovered through the exercise of reasonable diligence, that

Defendants and their co-conspirators were violating the antitrust laws as alleged herein until the

Court of Federal Claims filed on March 29, 2018 its opinion in *Larry Golden v. United States*,

case no. 13-307C. In the opinion, the Judge found that the Government could not be held liability

under §1498(a) for the "use" of private parties' private property, when the "use" was incidental.

70.     As a result of the active concealment of the conspiracy by the Defendants and

their co-conspirators to hide the fact that they were acting independently, apart from the

performing work under contract for the Government, any and all applicable statures of

limitations otherwise applicable to the allegations herein have been tolled.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

71.     Plaintiffs incorporate and reallege, as through fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

72.     Beginning at a time presently unknown to Plaintiffs, but at least as early as the

year 2008 and continuing through the present, the exact dates being unknown to Plaintiffs,

Defendants and their co-conspirators entered into continuing agreements, and conspiracy in

restraint of trade for the Plaintiff's Communicating, Monitoring, Detecting, and Controlling

(CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS);

Lock Disabling Systems; and, Network Connected Vehicles (NCV), in the United States, in

violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

73.     In formulating and carrying out the alleged agreements, understandings, and

conspiracies, the Defendants and their co-conspirators did those things that they combined and

conspired to do, including but not limited to the acts, practices, and course of conduct set forth

above, and the following, among others:

    a.   To allocate markets for Communicating, Monitoring, Detecting, and

        Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle

        Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network

        Connected Vehicles (NCV);

    b.   To submit rigged bids for the award and performance of certain

        Communicating, Monitoring, Detecting, and Controlling (CMDC) devices

        (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS);

        Lock Disabling Systems; and, Network Connected Vehicles (NCV); and,

    c.   To allocate among themselves the production of Communicating, Monitoring,

        Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop,

        and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and,

        Network Connected Vehicles (NCV).

    74.    Plaintiff and the Class are entitled to an injunction against Defendants, preventing

and restraining the violations alleged herein.

## Second Claim for Relief

**(Violation of the South Carolina Consumer Protection and Unfair Competition Laws)**

    75.    Plaintiffs incorporate and reallege, as through fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

    76.    By reason of the foregoing, Defendants have engaged in unfair competition or

unfair and deceptive acts or practices in violation of South Carolina Code Laws §§ 39-5-10 and

39-5-20.

77.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property by Defendants' conspiracies, and restraint of trade for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

### Third Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

78.     Plaintiffs incorporate and reallege, as through fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

79.     Defendants have been unjustly enriched through non-payment of royalty compensation for Plaintiff and Class members for: Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

80.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain benefits conferred via non-payment of royalty compensation for Plaintiff and Class members for: Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

81.     Plaintiff seek disgorgement of all profits resulting from such non-payment and establishment of a constructive trust from which Plaintiff and Class members may seek restitution. South Carolina should be experiencing a $95B dollar surplus in tax revenue instead of a $21.8B dollar deficit (shortfall to paying off the State's debt), and a "D" grade rating. The State should also be experiencing a 0% unemployment rate.

## SOUTH CAROLINA FINANCIALS

82.    September 2019 (truthinaccounting.org). South Carolina ranks no. 36 for its fiscal health. South Carolina has a debt burden of $21.8B. That burden equates to $14,500 for every state taxpayer. South Carolina's financial problems stem mostly from unfunded retirement obligations that have accumulated over the years. Of the $43B in retirement benefits promised, the state has not funded $14B in pension and $11.1B in retiree health care benefits.



### THE FINANCIAL STATE OF SOUTH CAROLINA

A new analysis of the latest available audited financial reports found South Carolina has a Taxpayer Burden™ of $14,500, earning it a "D" grade from Truth in Accounting. South Carolina's overall financial condition improved by 17 percent from the previous fiscal year.

South Carolina's elected officials have made repeated financial decisions that have left the state with a debt burden of $21.8 billion. That burden equates to $14,500 for every state taxpayer. South Carolina's financial problems stem mostly from unfunded retirement obligations that have accumulated over the years. Of the $43 billion in retirement benefits promised, the state has not funded $14 billion in pension and $11.1 billion in retiree health care benefits.

South Carolina and other states have become more transparent over the last few years, thanks to the Generally Accepted Accounting Principles (GAAP) set by the Governmental Accounting Standards Board (GASB), which now require governments to disclose pension (GASB 68) and other post-employment (GASB 75) benefits on their balance sheets.

### THE TRUTH:



| 36 Rank | -$21.8 billion Money needed to pay bills | -$14,500 Taxpayer Burden | D Financial grade |

Data included in this report is derived from the state of South Carolina's 2018 audited Comprehensive Annual Financial Report and retirement plans' reports.

98

---

### SOUTH CAROLINA FINANCIAL BREAKDOWN

#### FAST FACTS

• South Carolina has $20.4 billion available to pay $42.1 billion worth of bills.

• The outcome is a $21.8 billion shortfall, which breaks down to a burden of $14,500 per taxpayer.

• South Carolina's reported net position is inflated by $1.4 billion, largely because the state defers recognizing losses incurred when the net pension liability increases.

| THE STATE'S BILLS EXCEED ITS ASSETS | |
| --- | --- |
| Total assets | $61,023,562,000 |
| Minus: Capital assets | -$30,095,590,000 |
| Restricted assets | -$10,554,155,000 |
| Assets available to pay bills | $20,373,817,000 |
| Minus: Total bills | -$42,134,522,000 |
| Money available (needed) to pay future bills | -$21,760,705,000 |
| Each taxpayer's share of this debt | -$14,500 |

| BILLS THE STATE HAS ACCUMULATED | |
| --- | --- |
| Bonds | $13,392,509,000 |
| Other liabilities | $12,566,431,000 |
| Minus: Debt related to capital assets | -$8,969,765,000 |
| Unfunded pension benefits | $14,011,861,000 |
| Unfunded retiree health care benefits | $11,133,486,000 |
| Total bills | $42,134,522,000 |

### GRADE: D

Bottom line: South Carolina would need $14,500 from each of its taxpayers to pay all of its bills, so it has received a "D" for its finances. According to Truth in Accounting's grading scale, any government with a Taxpayer Burden between $5,000 and $20,000 receives a "D."

Truth in Accounting is a 501(c)(3) committed to educating and empowering citizens with understandable, reliable and transparent government financial information. To be knowledgeable participants in their government and its budget process, citizens need truthful and transparent financial information.

99

**Damage to Class: "Every South Carolina State Taxpayer and Unemployed**



Collusion and conspiracy (chart above illustrate the integration of technology) in violation of the

Sherman Act; Section 1. Agreements made in restraint of trade between the defendants: Apple,

Samsung, Lg, Qualcomm, Gm, Ford, and FCA US LLC. The conspirators "had a conscious

commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v.*

*Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)

# DAMAGE ESTIMATES: CMDC DEVICE

Apple sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $125.9B

Year 2014 - $148.5B

Year 2015 - $176.8B

Year 2016 - $158.5B

Year 2017 - $167.5B

Year 2018 - $176.8B

Year 2019 - $176.8B (est.)

TOTAL -- $1,130.8B X 25% = **$282.7B** X 7.5% = **$21.20B**

Samsung's sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $128.2B

Year 2014 - $98.4B

Year 2015 - $85.4B

Year 2016 - $80.9B

Year 2017 - $97.4B

Year 2018 - $86.9B

Year 2019 - $86.9B (est.)

TOTAL -- $664.1B X 25% = **$166.03B** X 7.5% = **$12.45B**

LG Electronics total worldwide revenue 2009 to 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2009 - $52.16B

Year 2010 - $52.41B

Year 2011 - $51B

Year 2012 - $47.9B

Year 2013 - $53.37B

Year 2014 - $55.5B

Year 2015 - $53.12B

Year 2016 - $52.04B

Year 2017 - $57.71B

Year 2018 - $54.9B

Year 2019 - $55.76B

TOTAL -- $585.87B X 25% = **$146.47B** X 7.5% = **$10.99B**

Qualcomm's sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $24.866B

Year 2014 - $26.487B

Year 2015 - $25.281B

Year 2016 - $23.554B

Year 2017 - $22.291B

Year 2018 - $22.732B

Year 2019 - $24.273B

TOTAL -- $169.484B X 25% = **$42.37B** X 7.5% = **$3.18B**

*Total sales/revenue for the above Companies was retrieved from **STATISTA.COM***

Apple, Samsung, LG, and Qualcomm conspired and colluded under a cooperative agreement to develop and commercialize a new and improve cell phone (i.e. CMDC device, smartphone). The laws of South Carolina prohibit contracts or agreements in restraint of trade (S.C. Code Ann. §§ 39-3-10, et seq.) and unfair trade practices (S.C. Code Ann. §§ 39-5-10, et seq.).

*Verto Analytics* looked at the numbers of Apple, Samsung, and LG smartphones currently owned by U.S. consumers, and the equivalent market share. January 2018, Apple leads the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, has 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market.



## DAMAGE ESTIMATES: CMDC DEVICE/STALL, STOP, VEHICLE SLOWDOWN SYSTEM

General Motors Company sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $138.79B

Year 2014 - $137.96B

Year 2015 - $135.73B

Year 2016 - $149.18B

Year 2017 - $145.59B

Year 2018 - $147.05B

Year 2019 - $137.2B

TOTAL -- $991.5B X 25% = **$247.88B** X 7.5% = **$18.59B**

Ford's sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $146.9B

Year 2014 - $144.1B

Year 2015 - $149.6B

Year 2016 - $151.8B

Year 2017 - $156.8B

Year 2018 - $160.3B

Year 2019 - $155.9B

TOTAL -- $1,065.4B X 25% = **$266.35B** X 7.5% = **$19.98B**

Fiat Chrysler Automobiles (FCA)'s sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $72.14B

Year 2014 - $83.06B

Year 2015 - $110.60B

Year 2016 - $111.02B

Year 2017 - $105.73B

Year 2018 - $110.41B

Year 2019 - $108.19B

TOTAL -- $701.15B X 25% = **$175.29B** X 7.5% = **$13.15B**

*Total sales/revenue for the above Companies was retrieved from **STATISTA.COM***

### *Estimated South Carolina Tax Revenue (Class Damage)*

Apple ($21.20B) + Samsung ($12.45B) + LG ($10.99B) + Qualcomm ($3.18B) + GM ($18.59B) + Ford ($19.98B) + FCA ($13.15B) = **$99.54B**

***Estimated Damage to Private Litigant***

Apple ($282.7B) + Samsung ($166.03B) + LG ($146.47B) + Qualcomm ($42.37B) + GM ($247.88B) + Ford ($266.35B) + FCA ($175.29B) = **$1,327.09B**

In *Apani Southwest, Inc. v. Coca-Cola Enterprises*, the Fifth Circuit explained the Supreme Court's analysis in *Tampa*:

> "When assessing whether an exclusive-dealing arrangement has the probable effect of substantially lessening competition, the Supreme Court has identified a three-part inquiry. *Tampa Elec*. First, the relevant product market must be identified by considering interchangeability and cross-elasticity of demand. Second, the relevant geographic market must be identified, "by careful selection of the market area in which the seller operates and to which the purchaser can practicably turn for supplies." Id. Finally, a plaintiff must show that the "competition foreclosed by the arrangement constitutes a 'substantial share of the relevant market.'" Id. That is, 'the opportunities for other traders to enter into or remain in that market must be significantly limited'."

It is the belief of the Plaintiff, that the exclusive-dealing agreement occurred when the seller (Qualcomm) agreed to sell all or substantially all of its output of a particular product (CPUs, modems, chipsets) to a particular buyer (Apple, Samsung, LG); or, when the buyer (Apple, Samsung, LG) agreed to buy all or substantially all of its needs (CPUs, modems, chipsets) for a particular product (CMDC device, smartphone) from a particular seller (Qualcomm).

Competitor collaborations facilitates explicit or tacit collusion through facilitating practices such as the exchange or disclosure of competitively sensitive information (the consumer device manufactures of Apple, Samsung, Qualcomm and LG, and the automobile manufactures of GM, Ford and FCA US, was at least informed by the Government and/or the Plaintiff of the competitively sensitive information that is the subject matter of Plaintiff's claimed inventions), or through increased market concentration. Such collusion may involve the relevant market in which the collaboration operates or another market in which the participants in the collaboration are actual or potential competitors.

## DAMAGE ESTIMATES: LOSS OF S.C. MANUFACTURING and DISTRIBUTION FACILITIES; LOSS OF WAGES; and, LOSS OF TAXABLE REVENUE FOR EVERY S.C. TAXPAYER (the "CLASS")

*Horizontal Conduct:* "It is illegal for businesses to act together in ways that can limit competition, lead to higher prices, or hinder other businesses from entering the market. The FTC challenges unreasonable horizontal restraints of trade. Such agreements may be considered unreasonable when competitors interact to such a degree that they are no longer acting independently, or when collaborating gives competitors, the ability to wield market power together. Certain acts are considered so harmful to competition that they are almost always illegal. These include arrangements to fix prices, divide markets, or rig bids."

It is the belief of the Plaintiff that Apple, Samsung, Qualcomm, LG, GM, Ford, and FCA US agreements with the Government and among themselves are considered unreasonable because their interaction has risen to such a degree that they are no longer acting independently, and has given rise to Apple, Samsung, Qualcomm, LG, GM, Ford, and FCA US's ability to manipulate market power together.

It is further the belief of the Plaintiff that because Apple, Samsung, Qualcomm, LG, GM, Ford, and FCA US refused to license the Plaintiff's CMDC Device/Stall, Stop, Vehicle Slowdown System patents; the results are dramatic to the "Class" (i.e. recognized here to include South Carolina's unemployed), in loss job opportunities and wages. S. C. statistics for 2010 – 2020:



70

### employment



### unemployment



### unemployment rate



*Estimated Labor Force Damages to the "Class": South Carolina*

Apple: 2019 (Worldwide) total number of employees – 137,000 rounded

Samsung: 2019 (Worldwide) total number of employees – 310,000 rounded

LG: 2019 (Worldwide) total number of employees – 72,000 rounded

Qualcomm: 2019 (Worldwide) total number of employees – 37,000 rounded

GM: 2019 (Worldwide) total number of employees – 164,000 rounded

Ford: 2019 (Worldwide) total number of employees – 190,000 rounded

FCA US: 2019 (Worldwide) total number of employees – 199,000 rounded

Total Number of worldwide employees combined – 1,109,000 rounded

9.02% of 1,109,000 employees = 100,000 unemployed in the state of South Carolina

100,000 unemployed @ $40,000/yr = $4B in taxable revenue, (gross, not net)

7.5% is South Carolina income tax rate

7.5% of $4B = $300M; cumulative over a 10-year period = $3B dollars

Estimated South Carolina Tax Revenue (Class Damage) = **$3B dollars***

***Estimated Damage to Private Litigant***

Example: (Revenue vs. Income). Apple Inc. posted a top-line revenue number of $260,174 billion for 2019.  Apple posted $55.26 billion in net income for the same period. Calculated: $55.26 is what percent of $260,174 = 21.24%

Therefore, 21.24% of what number = $4B dollars, (employee's salaries)

        21.24% of $18.8B = $4B dollars

7.5% of $18.8B = $1.4B; cumulative over a 10-year period = $14B dollars

Estimated South Carolina Tax Revenue = **$14B dollars***

\* South Carolina should be experiencing a $95B dollar surplus in tax revenue instead of a $21.8B dollar deficit (shortfall to paying off the State's debt), and a "D" grade rating. The State should also be experiencing a 0% unemployment rate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

A.      That the Court determine that the Sherman Act, state antitrust law, and common law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.    That the unlawful conduct, contract, conspiracy or combination alleged herein be

adjudged and decreed to be:

    a.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act,

        as alleged in the First Claim for Relief);

    b.    A violation of the South Carolina state consumer protection law identified in

        the Second Claim for Relief herein; and,

    c.    Acts of unjust enrichment as set forth in the Third Claim for Relief herein.

C.    That Plaintiffs and the Class recover damages, as provided by federal and state

Antitrust laws, and that a joint and severe judgement in favor of Plaintiffs and the Class be

entered against the Defendants in an amount to be trebled in accordance with such laws;

D.    That Defendants, their affiliates, successors, transferees, assignees, and the

officers, directors, partners, agents, and employees thereof, and all other persons acting or

claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1)

continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged

herein, or from entering into any other conspiracy alleged herein, or from entering into any other

contract, conspiracy or combination having a similar purpose or effect, and from adopting or

following any practice, plan, program, or devices having a similar purpose or effect; and ; (2)

communicating or causing to be communicated to any other person engaged in the sale of

Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones),

Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network

Connected Vehicles (NCV), information concerning bids of competitors;

E.    That Plaintiffs be awarded restitution, including disgorgement of profits obtained

by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

F.      That Plaintiffs and members of the Class be awarded pre- and post-judgement interest, and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.      That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) and 38(b) of the Federal Rules of Civil Procedure; Plaintiff's right of trial by jury as declared by the Seventh Amendment to the Constitution and Plaintiff's demand a trial by jury for issues so triable.

Respectfully submitted,

S/ _Larry Golden_                Date: 06 /15 /2020

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net