# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

F I L E D

JUL 26 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

CASE NO: <u>4:22-cv-03283-KAW</u>

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

July 25, 2022

## PLAINTIFF'S MOTION FOR DEFAULT JUDGEMENT

Defendant Qualcomm failed to file an answer or otherwise defend this action, and the Clerk entered the default date of July 19, 2022 as the last day for Qualcomm to submit a response. See Dkt. No. 5.

Plaintiff is filing its Motion for Default Judgment and Order for Permanent Injunction and Other Equitable Relief Against the defendant, Qualcomm Inc.

The Complaint states a claim upon which relief may be granted against Qualcomm. Qualcomm has been properly served with the Summons and Complaint, as required by Federal Rule of Civil Procedure 4, on June 28, 2022 (Dkt. 5). Qualcomm has failed to answer or otherwise defend this action either on or before July 19, 2022.

The Clerk of the Court properly entered the default date of July 19, 2022 against Qualcomm on July 19, 2022. Dkt. #5: "SUMMONS Returned Executed by Larry Golden. Qualcomm, Inc. served on 6/28/2022, answer due 7/19/2022. (Attachments: # 1 Envelope) (sfb, COURT STAFF) (Filed on 7/19/2022) (Entered: 07/20/2022)"

The Clerk's entry of Qualcomm's default date of July 19, 2022 simply means that Qualcomm is thereafter barred from defending against the lawsuit. Because of Qualcomm's default, the allegations in the Complaint filed in this action are taken as true.

Pursuant to the Court's authorization of service on June 10, 2022 (Dkt. 4), Plaintiff files with the Court its return of service on Qualcomm, indicating completion of the required service.

With the "Summons in a Civil Action", Plaintiff also served on Qualcomm, on June 28, 2022, the Complaint; Order Setting Initial Case Management Conference; Civil Cover Sheet; and Consent or Declination. Callahan Attorney Services delivered the documents to Qualcomm at 5775 Morehouse Dr., San Diego, CA 92121.

If the vacates a default judgment, it would result in a substantial hardship to the plaintiff. Plaintiff tried in 2007-08 to negotiate a sub-contractor's agreement for Plaintiff's intellectual property in a DHS "Cell-All" initiative. In 2010 Plaintiff sent Qualcomm a licensing proposal. In 2011 Qualcomm cease the negotiations. In 2019 Qualcomm was sent notice to appear in a related COFC case no. 13-307C, *Golden v. US*, where Qualcomm was given the opportunity to defend against allegations of patent infringement; Qualcomm fail to appear. Please, do not vacate.

2

## ANTITRUST INJURY

**Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of the phone, i.e., Plaintiff's CMDC device; handset; smartphone, etc. Plaintiff has the right to exclude Qualcomm from "using" Plaintiff's CMDC devices—handsets to unjustly enrich itself.**

| QUALCOMM Forward Look at Estimated Annual Revenues | |
|---|---|
| 2026 | $33.566B |
| 2025 | $33.566B |
| 2024 | $33.566B |
| 2023 | $33.566B |
| 2022 | $33.566B |

| QUALCOMM Annual Revenue | |
|---|---|
| 2021 | $33.566B |
| 2020 | $23.531B |
| 2019 | $24.273B |
| 2018 | $22.611B |
| 2017 | $22.258B |
| 2016 | $23.554B |
| 2015 | $25.281B |
| 2014 | $26.487B |
| 2013 | $24.866B |
| 2012 | $19.121B |
| 2011 | $14.957B |
| 2010 | $10.982B |
| **Total Revenue** | **$439.317B** |

https://www.macrotrends.net/stocks/charts/QCOM/qualcomm/revenue#:~:text=QUALCOMM%20revenue%20for%20the%20twelve,a%203.06%25%20decline%20from%202019.

3

In 2007, Qualcomm and the Plaintiff was competing for the same government contract. The Department of Homeland Security (DHS) issued a 'request for proposal' [DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing*]. DHS was seeking proposals for a new and improved cell phone capable of biological and chemical sensing.

Three of the four main components that makes up the cell-all detection device are the patented inventions of the Plaintiff: 1) the sensors-detectors for CBRNE-H detection; 2) the host CMDC device that includes such safety features as biometric fingerprint identification and a disabling locking mechanism that locks the device after multiple failed attempts to open the device; and, 3) the central processing unit (CPU) designed specifically for the CMDC device(s) for carrying out operational and functional instructions.

## Antitrust Injury:

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of each phone sold, i.e., handset; smartphone, etc. The elements of unjust enrichment exist because: 1) Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff.

The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices: "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5% running royalty on the price of each handset sold*. These licenses are called Subscriber Unit License Agreements ("SULA") …"

4

"Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio.

Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition. The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold…

Qualcomm's collusion, exclusive arrangements, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC (handset) devices and Plaintiff's patented CPUs. The OEMs are already paying royalties to Qualcomm on every handset sold; and, the OEMs are already paying an increased royalty rate for Qualcomm's chipsets that include Plaintiff's patented CPUs. This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful.

Plaintiff is entitled to stop Qualcomm's use of the Plaintiff's inventions to generate profits by seeking a legal injunction in Federal court. Qualcomm's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages for any unlicensed use of his inventions. Damages are generally calculated based on lost profits Plaintiff suffered as a result of the use.

5

## Qualcomm's Monopoly Power: Qualcomm Dominates the Baseband Market with 800+ Million Shipments in 2021



**CY2021 Cellular Baseband Processor Revenue Share: $31.4 B**

**STRATEGY** ANALYTICS

Qualcomm: 55.7%
MediaTek: 27.6%
Samsung LSI: 7.4%
Others: 9.3%

Source: Strategy Analytics' HCT Service (April 2022)

## Antitrust Injury:

The global cellular baseband processor market posted 19.5 percent to $31.4 billion in 2021, according to Strategy Analytics' Handset Component Technologies (HCT) service report. View the full release here: https://www.businesswire.com/news/home/20220412005085/en/

> *A baseband processor is a chip in a smartphone, tablet or other device that helps convert digital data into radio frequency signals (and vice-versa) which can then be transmitted over a RAN (Radio Access Network). Why do you need it? A baseband processor manages all the wireless radio functions of a cellular device.*

CY 2021 Cellular Baseband Processor Revenue Share: $31.4B, Source: Strategy Analytics' HCT Service (April 2022). CY 2021 Cellular Baseband Processor Revenue Share: $31.4B, Source: Strategy. Analytics' HCT Service (April 2022). According to this Strategy Analytics' Handset Component Technologies (HCT) research report, "Baseband Market Share Tracker Q4 2021: Qualcomm and MediaTek Together Capture 95 Percent Share in 5G",

6

Qualcomm, MediaTek, Samsung LSI, Unisoc and Intel captured the top-five revenue share rankings in the baseband market in 2021.

Qualcomm led the baseband market with a 56 percent revenue share, followed by MediaTek with 28 percent and Samsung LSI with 7 percent. MediaTek, Qualcomm and Unisoc gained market share while Intel, HiSilicon and Samsung LSI lost share. 5G baseband revenues grew 71 percent year-over-year, accounting for 66 percent of total baseband revenue in 2021.

The Federal Trade Commission began an investigation of Qualcomm in 2014, leading to its 2017 suit against Qualcomm for violations of section 5 of the Federal Trade Commission Act, and sections 1 and 2 of the Sherman Act, the general antitrust laws of the United States.

In the opinion of the U. S. District Court for the District of Northern California; "Qualcomm leveraged its monopoly position in chips to secure unreasonably high rates for its SEPs. Qualcomm, for example, refused to provide must-have chips unless customers took the unreasonable IP licenses—the "no license, no chip" model.

Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision in *United States v. Microsoft Corp.*, held it sufficient that Qualcomm engaged in "anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Qualcomm's "no license, no chip" policy is designed to force sell the unauthorized patented CPUs of the Plaintiff that's tied to Qualcomm's cellular modem. Qualcomm's "no license, no chip" policy is only made possible by Qualcomm's unauthorized use of Plaintiff's patented CMDC devices (i.e., the alleged infringing smartphones-handsets of the OEM's).

7

**Snapdragon Processors are Plaintiff's Patented CPUs *"tied"* to Qualcomm's 'SEP' Cellular Modems—Qualcomm's Unauthorized *"use"* of Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Devices i.e., New and Improved Cell Phones/Smartphones, for Snapdragon Processors**

## Snapdragon 865/865+ 5G (2020) and 870 5G (2021)

| Model number | Sampling availability | Devices |
|---|---|---|
| SM8250 (865) | Q1 2020 | <ul><li>Asus ZenFone 7 / Asus ROG Phone 3 Strix</li><li>FCNT Arrows 5G</li><li>Huawei MatePad 11</li><li>LG V60 ThinQ</li><li>Motorola Edge+</li><li>Meizu 17 / Meizu 17 Pro</li><li>Oppo Find X2 / Oppo Find X2 Pro</li><li>Oppo Ace2 / Oppo Reno5 Pro+</li><li>OnePlus 8 / OnePlus 8 Pro / OnePlus 8T</li><li>Realme X50 Pro / Realme X50 Pro Play</li><li>Redmi K30 Pro / Redmi K30 Pro Zoom</li><li>Royole FlexPai 2</li><li>Samsung Galaxy S20 (North America/)</li><li>Samsung Galaxy S20 Plus (North America/)</li><li>Samsung Gal. S20 Ultra (North America/)</li><li>Samsung Galaxy S20 FE LTE</li><li>Samsung Gal. S20 FE 5G (North America/)</li><li>Sharp Aquos R5G</li><li>Smartisan R2</li><li>Sony Xperia 1 II / Sony Xperia 5 II</li><li>Sony Xperia PRO</li><li>Vivo iQOO 3 (4G/5G) / Vivo iQOO Neo3</li><li>Vivo iQOO 5 / Vivo iQOO 5 Pro</li><li>Vivo NEX 3S 5G / Vivo X50 Pro+</li><li>Xiaomi Mi 10 / Xiaomi Mi 10 Pro</li><li>Xiaomi Mi 10 Ultra / Xiaomi Mi 10T (Redmi)</li><li>Xiaomi Mi 10T Pro / Xiaomi Black Shark 3</li><li>Xiaomi Black Shark 3S / Xiaomi Shark 3 Pro</li><li>ZTE Axon 10s Pro / ZTE Nubia Red 5G</li><li>ZTE Nubia Red Magic 5S</li></ul> |
| SM8250-AB (865+) | Q2 2020 | <ul><li>Asus ZenFone 7 Pro / Asus ROG Phone 3</li><li>Lenovo Legion Duel/Legion Phone Pro</li><li>Samsung Galaxy Note 20 (North America/China/Korea/)</li><li>Samsung Galaxy Note 20 Ultra (North America/China/Korea/)</li></ul> |

| | | | |
|---|---|---|---|
| | | | • Samsung Gal. Tab S7 / Samsung Gal. S7+<br>• Samsung Galaxy Z Flip 5G<br>• Samsung Gal. Z Fold2 5G / Samsung W21 |
| SM8250-AC (870) | Q1 2021 | | • Huawei MatePad Pro 10.8 (2021)<br>• Lenovo Legion Y700 / Lenovo Pad Pro<br>• Lenovo Yoga Pad Pro / Lenovo Tab P12<br>• Meizu 18x<br>• Motorola Edge S / Motorola Edge 20 Pro<br>• Motorola Edge S Pro<br>• Oppo Find X3 / Oppo Pad / Oppo Reno6 Pro 5G (Snapdragon) / Oppo Reno6 Pro+<br>• OnePlus 9R<br>• Realme GT Master Explorer Edition<br>• Realme GT Neo2 / Realme Q5 Pro<br>• Redmi K40 / Redmi K40S<br>• Xiaomi Mi 10S / Xiaomi Poco F4<br>• Xiaomi 12X / Xiaomi Black Shark 4<br>• Xiaomi Black Shark 4S<br>• Xiaomi Black Shark 5 / Xiaomi Pad 5 Pro<br>• Vivo iQOO Neo5 (iQOO 7 in India)<br>• Vivo iQOO Neo5 Lite / Vivo iQOO Neo5 SE<br>• Vivo iQOO Neo6 SE / Vivo Pad / Vivo X60 (Out-China) / Vivo X60 Pro (Out-China)<br>• ZTE Axon 30 / ZTE Axon 40 Pro |

## Snapdragon 888/888+ 5G (2021)

| Model number | Sampling availability | | Devices |
|---|---|---|---|
| SM8350 (888) | Q1 2021 | | • Asus ROG Phone 5/Pro/Ultimate<br>• Asus ZenFone 8 / Asus ZenFone 8 Flip<br>• Honor Magic3<br>• Huawei P50 (4G) / Huawei P50 Pro (4G Post Dec. 2021) / Huawei P50 Pocket (4G)<br>• LG Velvet 2 Pro (Unreleased) / LG Rollable<br>• Lenovo Legion Dual 2 (Legion Phone 2 Pro)<br>• Meizu 18 / Meizu 18 Pro<br>• OnePlus 9 / OnePlus 9 Pro / OnePlus 9RT<br>• Oppo Find X3 Pro<br>• Oppo Find X5 / Oppo Find N<br>• Realme GT / Realme GT2<br>• Redmi K40 Pro / Redmi K40 Pro+ (Xiaomi Mi 11i/Mi 11X Pro)<br>• Smartphone for Snapdragon Insiders |

| Model number | Sampling availability | Devices |
|---|---|---|
| | | • Samsung Galaxy S21 / Samsung Galaxy S21+ / Samsung Galaxy S21 Ultra / Samsung Galaxy S21 FE / Samsung Galaxy Z Fold 3 / Samsung Galaxy Z Flip 3 / Samsung W22<br>• Sony Xperia 1 III / Sony Xperia 5 III<br>• Sony Xperia PRO-I<br>• Sharp Aquos R6<br>• Leitz Phone 1<br>• Vivo X60 Pro+ / Vivo X60t Pro+ / Vivo iQOO 7 (China) / Vivo iQOO 7 Legend / Vivo iQOO 8 / Vivo iQOO Neo5s<br>• Xiaomi Mi 11 / Xiaomi Mi 11 Pro / Xiaomi Mi 11 Ultra / Xiaomi 11T Pro / Xiaomi MIX Fold / Xiaomi Shark 4 Pro / Xiaomi Shark 5 RS<br>• ZTE Axon 30 Pro 5G / ZTE Axon 30 Ultra 5G / ZTE Nubia Z30 Pro / ZTE Nubia Red Magic 6 / ZTE Nubia Red Magic 6 Pro / ZTE Nubia Red Magic 6R<br>• Surface Duo 2 |
| SM8350-AC (888+) | Q3 2021 | • Asus ROG Phone 5s / Asus ROG 5s Pro<br>• Xiaomi MIX 4<br>• Honor Magic3 Pro / Honor Magic3 Pro+<br>• Meizu 18s / Meizu 18s Pro<br>• Moto G200 5G / Motorola Edge S30<br>• Vivo iQOO 9 / Vivo X70 Pro+ / Vivo iQOO 8<br>• Xiaomi Black Shark 4S Pro<br>• ZTE Nubia Red Magic 6s Pro |

## Snapdragon 8/8+ Gen 1 (2022)

| Model number | Sampling availability | Devices |
|---|---|---|
| SM8450 (8 Gen 1) | Q1 2022 | • Honor Magic4 / Honor Magic4 Pro<br>• Honor Magic V<br>• Lenovo Legion Y90<br>• Motorola Edge X30 / Edge 30 Pro / Edge+<br>• OnePlus 10 Pro<br>• Oppo Find X5 Pro<br>• Realme GT2 Pro<br>• Redmi K50 Gaming<br>• Samsung Galaxy S22 / Samsung Galaxy S22+ / Samsung Galaxy S22 Ultra / Samsung Galaxy Tab S8 / Samsung Galaxy Tab S8+ / Samsung Galaxy Tab S8 Ultra<br>• Sharp Aquos R7 |

| | | |
|---|---|---|
| | | • Sony Xperia 1 IV<br>• Xiaomi 12 / Xiaomi 12 Pro / Xiaomi Black Shark 5 Pro / Xiaomi Poco F4 GT<br>• Vivo iQOO Neo6 / Vivo iQOO 9 / Vivo iQOO 9 Pro / Vivo X80 Pro / Vivo X Fold<br>• Vivo X Note<br>• ZTE Axon 40 Ultra / ZTE Nubia Red Magic 7 / ZTE Nubia Red Magic 7 Pro / ZTE Nubia Z40 Pro |
| SM8475 (8+ Gen 1) | Q3 2022 | • Asus ROG Phone 6 / Asus ROG 6 Pro<br>• Realme GT2 Explorer Master<br>• Vivo iQOO 10 / Vivo iQOO 10 Pro<br>• Xiaomi 12S / Xiaomi 12S Pro / Xiaomi 12S Ultra<br>• ZTE Nubia Red Magic 7S / ZTE Nubia Red Magic 7S Pro / ZTE Nubia Z40S Pro |

**Antitrust Injury:**

Above, are charts of patented CMDC devices (i.e., smartphones) that uses the Qualcomm Snapdragon SM8250 (865); SM8250-AB (865+); SM8250-AC (870); SM8350 (888); SM8350-AC (888+); SM8450 (8 Gen 1); and, SM8475 (8+ Gen 1). Each one of Qualcomm Snapdragon chipsets, "ties" at least one of Plaintiff's patented central processing units (CPUs) for carrying out operational and functional instructions.

*The Snapdragon® 8+ Gen 1 Mobile Platform is our latest premium-tier powerhouse ... while the Qualcomm® Kryo™ CPU provides 10% better CPU performance and 30% CPU improved power efficiency. The Snapdragon® 888+ 5G Mobile Platform—is a 4nm chipset that features a beefy octa-core CPU—boasts improvements in both processing and AI since the predecessor\*, with our 6th gen Qualcomm® Artificial Intelligence (AI) Engine and Qualcomm® Kryo™ 680 CPU... The octa-core Qualcomm® Kryo™ 490 CPU provides up to 25% faster single- and multi-threaded performance ... Revealed in early 2021, the Snapdragon 870 is literally a tiny upgrade over 2020's Snapdragon 865 and 865 Plus flagship processors. All three of these chipsets sport a tri-cluster CPU arrangement, featuring one powerful Cortex-A77 core ... Retrieved from Qualcomm's websites.*

11

Therefore, for each smartphone named in the above charts, Qualcomm is allegedly infringing two of Plaintiff's inventions: 1) by using Plaintiff's patented CMDC device (smartphone), and 2) by using Plaintiff's patented CPU that is "tied" to Qualcomm's SEP cellular modem, to form the Snapdragon processor [systems-on-a-chip].

Tying under U.S. law has been defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier" *Northern Pacific Railway Co. et al. v. United States*, 356 U.S. 1, 5-6 (1958). Establishing "separate products" is not enough, however. A key element of tying "is the forced purchase of a second distinct commodity;" in other words, what distinguishes illegal tying from legal bundling is the "seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all or might have preferred to purchase elsewhere on different terms" *Jefferson Parish Hospital Dist. No. 2 et al. v. Hyde*, 466 U.S. 2, 12 (1984).

Ever since the late 1940s, when the Supreme Court stated in *International Salt Co. v. United States* 332 U.S. at 396, that "it is unreasonable, per se, to foreclose competitors from any substantial market," and in *Standard Oil Co. v. United States* 337 U.S. 293, 305-06 (1949), that "[t]ying agreements serve hardly any purpose beyond the suppression of competition," U.S. courts have found tying to be per se unlawful; Antitrust Law Developments at 177-79 *(Chapter 5: Antitrust Issues In The Tying And Bundling Of Intellectual Property Rights—The Department of Justice)*

## CONTRIBUTORY INFRINGEMENT

Qualcomm's liability for contributory infringement of Plaintiff's patent(s) are defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States … a material or

an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer."

The threshold requirement for a claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972).  There must also be a showing that the alleged contributory infringer knew of the patent and that his or her actions would lead to infringement of the patent. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices. Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices."

- On November 4, 2010, Plaintiff emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC—Smartphone—device; central processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and unmanned electric, autonomous, and driverless vehicles).

- Plaintiff asked if Qualcomm would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff). Subject: "Patented Technology for Qualcomm's Review (copy available upon request).

- Plaintiff mailed out letters dated December 7, 2010 addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, (copies of the letters and return receipts are available upon request)

informing the Executives of the Patent Owner's (Plaintiff) patented technology and asked if they would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff).

- After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

- On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

- On October 11, 2011, the Patent Owner (Plaintiff) returned via e-mail, the answered Patent Information Request form to Ms. Lane. The Patent Owner (Plaintiff) made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes actions that contribute (or potentially contribute) to someone else infringing a patent, even if those actions do not directly infringe the patent.

If Qualcomm imports, sells or offers to sell a component or part [Qualcomm's Snapdragon CPU/Chipset/Processor/SoC] that's used exclusively for a patented item [Plaintiff's CMDC device/new and improved Cell Phone/Smartphone/Smartwatch] or process is likely contributorily liable. Qualcomm do not have to be involved in the sale, manufacture or use themselves to be liable.

The supply of Component A (i.e., Qualcomm's Snapdragon chipset that includes Plaintiff's central processing unit (CPU), with instructions to connect it to an available Component B (i.e., Samsung's smartphone that Plaintiff claims as his patented CMDC device; smartphone); where A+B (Plaintiff's patented CPU (Qualcomm's Snapdragon) + Plaintiff's CMDC device (Samsung's smartphone is a patented product). An example of contributory infringement was submitted by Plaintiff in this case at:

# Samsung Electronics

▶ **Patent Owner's Claim Charts for:**

- ▶ Claim 1 of the '497 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)
- ▶ Claim 10 of the '752 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)
- ▶ Claims 1-9 of the '189 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)
- ▶ Claims 13-23 of the '439 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)
- ▶ Claims 4-6 of the '287 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)
- ▶ Representative Chart for Samsung Gear S3 Classic, Galaxy Watch Active 2, & Galaxy Watch 3

Plaintiff submitted at Dkt. #1, Exhibit #5 K-1; Exhibit #6 K-2; and, Exhibit #7 K-3 of this case, an illustrative claim chart of six of Samsung Electronics alleged infringing smartphones

that Plaintiff believes directly infringes at least Ind. claim 1 of Plaintiff's '497 patent; Ind. claim 10 of Plaintiff's '752 patent; Ind. claims 1-9 of Plaintiff's '189 patent; Ind. claims 13-23 of Plaintiff's '439 patent; and, Ind. claims 4-6 of Plaintiff's '287 patent. The threshold requirement for a claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972).

Qualcomm was granted the opportunity to appear to protect any interest it may have in COFC case no. 13-307C, *Golden v. US*, and dispute or challenge Plaintiff's claim of having invented the new and improved cell phone or smartphone, but Qualcomm fail to appear.

Qualcomm first introduced a "built-in, embedded" chemical sensor for the cell phone / smartphone in the DHS S&T Cell-All initiative. Qualcomm's chemical sensor was referenced 114 times throughout the illustrative claim chart for Samsung Electronics). According to 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States … a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer". Plaintiff believes Qualcomm is liable of contributory infringement.

The CPU, [for each of the Samsung devices asserted in the illustrative claim chart Dkt. #1, Exhibit #5 K-1; Exhibit #6 K-2; Exhibit #7 K-3], which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs

16

the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. (The function of Qualcomm's Chipset / CPU is referenced 117 times in the illustrative claim Dkt. #1, Exhibit #5 K-1; Exhibit #6 K-2; Exhibit #7 K-3).

Qualcomm, Inc. Snapdragon Processors: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm's chipsets / CPUs for the alleged infringing Samsung smartphones are:

Samsung Galaxy Note 8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
Samsung Galaxy Note 8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

Samsung Galaxy S8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
Samsung Galaxy 8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

Samsung Galaxy S9 Series Chipset: Qualcomm SDM845 Snapdragon 845 (10 nm) – USA/China
Samsung Galaxy S9 Series CPU: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver)- USA/China

Samsung Galaxy S10 Series Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm) - USA/China
Samsung Galaxy S10 Series CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)-USA/China

Samsung Galaxy S20 Series chipset: Qualcomm SM8250 Snapdragon 865 5G (7 nm+) – USA
Samsung Galaxy S20 Series CPU: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585)-USA

Samsung Galaxy S21 Series chipset: Qualcomm SM8350 Snapdragon 888 5G (5 nm)
Samsung Galaxy S21 Series CPU: Octa-core (1x2.84 GHz Kryo 680 & 3x2.42 GHz Kryo 680 & 4x1.8 GHz Kryo 680)-USA

## Contributory Infringement – Qualcomm's chipsets for Driverless or Self-Drive Cars

GM completely redesigned the compute architecture that powers its "hands-free" driving system that is integrated with the "Snapdragon Ride Platform" of Qualcomm. GM has the first advanced driver assist system (ADAS) to use Qualcomm's new Snapdragon Ride Platform. https://www. theverge.com/2022/1/6/22870416/gm-ultra-cruise-qualcomm-snapdragon-compute-adas

17

The Snapdragon Ride Platform is built on scalable and modular heterogenous high-performance multi-core CPUs. It is intended to address the needs of complex self-driving technology and Advanced Driver Assistance Systems (ADAS) with high performance and power efficiency. "*As the San Diego wireless giant looks to diversity beyond smartphones, automakers have become a key target for expansion.*" By Mike Freeman; April 4, 2022 6:30 AM PT

Qualcomm wrapped up its acquisition of Veoneer's advanced driver assistance/self-driving vehicle software arm on Monday, highlighting the San Diego company's bid to become a key technology supplier to automakers as it diversifies beyond smartphones… The acquisition of Veoneer's Arriver software division positions Qualcomm to compete head-to-head … in the camera-based autonomous driving and vehicle safety technologies market.



"This market is now getting to the point where the attach rate for this technology is going to be 100 percent," said Nakul Duggal, senior vice president and general manager of Qualcomm's automotive business. "You will start to see this technology being needed for anything that moves. Everything is going to need a higher level of automated safety."

Qualcomm already is a significant silicon supplier to automakers, with sales topping $1 billion last year. The company has a $13 billion backlog of pending orders.

https://www.sandiegouniontribune.com/business/story/2022-04-04/qualcomm-completes-arriver-acquisition-to-bulk-up-software-prowess-in-adas-self-driving-vehicles

Without authorization or license, Qualcomm is making chipsets for Plaintiff's stall, stop, or vehicle slowdown systems (i.e., Advanced Driver Assistance Systems (ADAS)).

This case involves stolen intellectual properties and three separate loss categories: lost royalties, lost profits, and unjust enrichment. 1) Lost Royalties: A review of legal and financial literature showed throughout most of the second half of the twentieth century, academics and financial experts relied on a "25 percent rule" as the rule of thumb of royalties. This royalty was 25 percent of profits (although whether gross, operating, or net profits was ill defined). An article by Robert Goldscheider in the Duke Law and Technology Review provided an academic foundation for this using "25 percent of profits" as a reasonable royalty rate. 2) Lost Profits: "In computing lost profits, net profits are the appropriate measure of the loss, but the definition of net profits that is used may not correspond to the net profits that appear at the bottom of an income statement. It may be equal to or lower than the gross margin but often higher than the net margin. However, when such net profits do not eventually equate to cash flow, then the focus of the damage measurement process may shift to cash flows and away from net income." 3) Unjust Enrichment: This calculation was based on financial literature citing laws which allow "for the recovery of any profits that the defendant made resulting from infringement. This measure of damages is called 'unjust enrichment' and focuses on the gain the defendant earned from the infringing activity, rather than the loss the plaintiff suffered."

"As of May 2022, QUALCOMM has a market cap of $156.45 Billion. This makes QUALCOMM the world's 69th most valuable company by market cap according to our data." https://companiesmarketcap.com/qualcomm/marketcap/

# RELIEF

The Clayton Act also authorizes private parties to sue for triple damages when they have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

The Supreme Court has heard different cases on patent infringement damages. In *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, the court ruled that enhanced damages are appropriate when a defendant deliberately infringes on a patent. The court also lowered the burden of proof from clear evidence to preponderance of evidence. With this ruling, the court hopes to properly punish those who purposely try to infringe on patents.

Qualcomm's annual revenues beginning in year 2009 thru year 2021, plus projected annual revenues beginning in year 2022 thru year 2026, is $439.32B. $10B of the $439.32B represents only 2.28%.

A. Plaintiff is asking the Court to award Plaintiff $10 billion dollars for injuries sustained as a result of Qualcomm's anticompetitive conduct, practices, and behavior that not only harm Plaintiff personally, but also harm competition. Payment is to be made within 30 days following the date of the order.

B. Plaintiff is asking the Court to award Plaintiff $10 billion dollars for damages sustained as a result of Qualcomm's contributory infringement. Payment is to be made within 30 days following the date of the order.

C. Plaintiff is asking the Court to award Plaintiff an additional $10 billion dollars (Clayton Act) for injuries sustained as a result of Qualcomm's anticompetitive conduct, practices, and behavior that not only harm Plaintiff personally, but also harm competition, should Qualcomm default on making the $10B payment within 30 days following the date of the order. Payment of $20 billion dollars (4.56% of $439.32B) is to be made within 30 days following the ending date of the first 30-day period.

D. Plaintiff is asking the Court to award Plaintiff an additional $10 billion dollars for damages sustained as a result of Qualcomm's willful infringement, should Qualcomm default on making the $10B payment within 30 days following the date of the order. Payment of $20 billion dollars (4.56% of $439.32B) is to be made within 30 days following the ending date of the first 30-day period.

E. If Qualcomm default on making the $20B payment within 60 days following the date of the order. Plaintiff is asking the Court to grant Plaintiff injunctive relief by doing the following:

- Discontinue Qualcomm's program of collecting 5%, or any other percentage of royalties based on the price of each handset (smartphone) sold.
- Discontinue the making, selling, offering for sale, of all CPUs that are integrated with Qualcomm cellular modems to form its system-on-a-chip platform that is made for the Plaintiff's patented smartphones, smartwatches, and self-driving cars.
- Discontinue the making, selling, offering for sale, of all CPUs that are made for the Plaintiff's patented smartphones, smartwatches, and self-driving cars.
- Discontinue using all CMDC devices (i.e., new and improved cell phones; smartphones) to generate any revenue beyond Qualcomm's cellular modems.

F. If Qualcomm default on making the $20B payment within 60 days following the date of the order. Plaintiff is asking the Court to order Qualcomm to establish, at minimum, a $20 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Qualcomm if found not liable.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 25th day of July, 2022, a true and correct copy of the foregoing "Plaintiff's Motion for Default Judgement", was served upon the following Defendant by priority "express" mail:

> PATTERSON + SHERIDAN, LLP
> Attn: Joseph John Stevens
> 50 W. San Fernando Street,
> Suite 250
> San Jose, CA 95113
> Tel: 650-384-4418
> Fax: 650-330-2314
> Email: jstevens@pattersonsheridan.com

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

22