## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**F I L E D**

AUG 0 1 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

CASE NO: 4:22-cv-03283-HSG

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

July 29, 2022

## PLAINTIFF'S RESPONSE TO QUALCOMM'S MOTION TO DISMISS AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGEMENT

Plaintiff is asking the Court to strike Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim, and Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order, # 3 Certificate/Proof of Service, # 4 Declaration, # 5 Declaration, # 6 Exhibit 1, # 7 Exhibit 2, # 8 Exhibit 3) Filed as (Dkt. 6) on 7/22/2022, for the following two reasons:

*First*, the Defendant's response in the form of a motion to dismiss under 12(b)(1) & 12(b)(6) was filed beyond the date of default of 07/19/2022; and, the accompanying Declaration of Elizabeth Ann Crowe (Dkt. 6-4) lacks sufficient reliable facts to be taken as true.

Defendant Qualcomm failed to file an answer or otherwise defend this action, and the Clerk entered default date of July 19, 2022 as the last day for Qualcomm to submit a response. See Dkt. No. 5.

The Complaint states a claim upon which relief may be granted against Qualcomm. Qualcomm has been properly served with the Summons and Complaint, as required by Federal Rule of Civil Procedure 4, on June 28, 2022 (Dkt. 5). On or before July 19, 2022, Qualcomm has failed to answer or otherwise defend this action.

The Clerk of the Court properly entered the default date of July 19, 2022 against Qualcomm on July 19, 2022. Dkt. #5: "SUMMONS Returned Executed by Larry Golden. Qualcomm, Inc. served on 6/28/2022, answer due 7/19/2022. (Attachments: # 1 Envelope) (sfb, COURT STAFF) (Filed on 7/19/2022) (Entered: 07/20/2022)"

The Clerk's entry of Qualcomm's default date of July 19, 2022 simply means that Qualcomm is thereafter barred from defending against the lawsuit. Because of Qualcomm's default, the allegations in the Complaint filed in this action are taken as true.

Pursuant to the Court's authorization of service on June 10, 2022 (Dkt. 4), Plaintiff filed with the Court its return of service on Qualcomm, indicating completion of the required service on July 19, 2022.

With the "Summons in a Civil Action", Plaintiff also served on Qualcomm, on June 28, 2022, the Complaint; Order Setting Initial Case Management Conference; Civil Cover Sheet; and

Consent or Declination. Callahan Attorney Services delivered the documents to Qualcomm at 5775 Morehouse Dr., San Diego, CA 92121.

The accompanying Declaration of Elizabeth Ann Crowe (Dkt. 6-4) lacks sufficient reliable facts to be taken as true. Ms. Crowe declares under penalty of perjury that, "[a]mong my other duties, I am one of the employees responsible for receiving and processing the service of process of legal documents". Ms. Crowe admits that she is one, not the only one, but only one of employees responsible for receiving and processing the service of process of legal documents".

Yet, Ms. Crowe will have this Court to believe that somewhere on the return of service documents, Plaintiff claims that personal service of Plaintiff's documents was made on her, in which Ms. Crowe writes, "[t]hat cannot be the case, as I was not present in the office that day."

Callahan Attorney Services declares under penalty of perjury that "Successful Attempt: June 28, 2022, 1:15 pm PDT at Company: 5775 Morehouse Dr, San Diego, CA 92121 received by Jane Doe - Legal Department and Authorized to Accept." We must accept as fact, Jane Doe is one of the other "employees responsible for receiving and processing the service of process of legal documents", who received the documents in Ms. Crowe's absence.

Neither I, or Callahan Attorney Services ever said the documents was received by Ms. Elizabeth Ann Crowe. It appears the receptionist [the female individual] held the documents for Ms. Crowe until her return. When the receptionist met Ms. Crowe in the lobby, Ms. Crowe was given a set of documents [not necessarily the documents of Golden] that "include[ed] Golden's Complaint and Summons filed in this action". **Exhibit A**

In Qualcomm's efforts to continuously manipulate the judicial process of this Court, Qualcomm entered a "[Proposed] Order Granting Defendant Qualcomm Incorporated's Motion to Dismiss the Complaint Under Fed. R. Civ. P. 12(B)(1) and (6), Case 4:22-cv-03283-KAW,

3

Document 6-2, Filed 07/22/22", that requires the signature of the Honorable Kandis A.
Westmore. Qualcomm is obviously trying to get a favorable decision without officially filing a
"consent or declination" form. An unfavorable decision means Qualcomm can deny ever
authorizing the Magistrate Judge to make that decision because they never signed a "consent or
declination" form. Qualcomm has impliedly consented to the Magistrate Judge when Qualcomm
asked Magistrate Judge Westmore to dismiss Plaintiff's case.

> "Pending before the Court is Defendant Qualcomm Incorporated's Motion to Dismiss Plaintiff
> Larry Golden's Complaint for Antitrust Law Violations, Patent Infringement, and Unjust
> Enrichment … Upon consideration of the motion to dismiss filed by Defendant Qualcomm
> Incorporated ("Qualcomm"), … IT IS HEREBY ORDERED this ___ day of _____, 2022,
> that Qualcomm's Motion to Dismiss Plaintiff's Antitrust Law Violations, Patent Infringement,
> and Unjust Enrichment claims pursuant to FED. R. CIV. P. 12 (b)(1) and (6) is GRANTED, and
> that Plaintiff's Complaint against Qualcomm is DISMISSED with prejudice."

DATED: _____, 2022    _____
                                     HONORABLE KANDIS A. WESTMORE
                                     UNITED STATES DISTRICT JUDGE

If the Court vacates on striking the Defendant's motion to dismiss, it would result in a
substantial hardship to the Plaintiff. Fifteen years of trying to negotiate with Qualcomm has been
very stressful.

- Plaintiff tried in 2007-08 to negotiate a sub-contractor's agreement for Plaintiff's
  intellectual property in a DHS "Cell-All" initiative that would allow Plaintiff to receive
  royalties for his patented new and improved cell-phone; Qualcomm conspired with others
  [Apple, Samsung, & LG] to restrain Plaintiff from the market.

- In 2010 Plaintiff sent Qualcomm a licensing proposal. Plaintiff presented Qualcomm with
  a licensing proposal for Plaintiff's CMDC devices (new and improved cell phones;
  smartphones); Plaintiff's multi-sensor detection devices; Plaintiff's new and improved
  central processing units (CPUs); and, Plaintiff's stall, stop, vehicle slow-down systems.

4

- In 2011 Qualcomm ceased negotiations. Qualcomm negotiated up to the point of receiving information on Plaintiff's intellectual property subject matter. Plaintiff made several attempts at contacting Qualcomm afterward, but fail.

- In 2019 Qualcomm was sent notice to appear in a related COFC case no. 13-307C, *Golden v. US*, where Qualcomm was given the opportunity to defend against allegations of patent infringement; Qualcomm fail to appear.

- In this current NDC case no. 4:22-cv-03283-KAW, *Golden v. Qualcomm Inc.* Qualcomm fail to file an answer or response before or on the default date of July 19, 2022.

Plaintiff has filed its Motion for Default Judgment and Order for Permanent Injunction and Other Equitable Relief Against the defendant, Qualcomm Inc.

*Second*, despite Plaintiff's constitutional guarantees, Qualcomm writes and submits into record [defendant's motion to dismiss] a memorandum in support of the civil liberties violations (i.e., the right to a fair court trial), and civil rights violations (i.e., discrimination on the basis of race) the federal judicial system has committed against Plaintiff. Qualcomm is moving forward with the expectation that this Court is complicit and will follow suit.

The reason Plaintiff filed Case #: 1:13-cv-00307C, *GOLDEN v. USA*; filed on 05/01/2013 in the Court of Federal Claims, is: "[n]othing in this history suggests that personal property was any less protected against physical appropriation than real property, [a]s the Supreme Court summed up in *James v. Campbell*, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government":

"[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any

more than it can appropriate or use without compensation land which has been patented to a private purchaser."

After consulting with the Clerk at the Court of Federal Claims [before the filing date of 05/01/2013] on how to file a "Government Takings" of a patent, the Clerk asked if there was infringement. When Plaintiff replied yes, the Clerk said to file it under patent infringement.

Plaintiff's Case #: 1:13-cv-00307C, *GOLDEN v. USA* was filed by the Clerk as a "Government Takings" of a patent case. The Clerk docketed the cause of action as "28:1491 Tucker Act": "28 U.S. Code § 1491 - Claims against United States generally; (a) (2) The Court of Federal Claims shall have jurisdiction to render judgment upon any claim ... including a dispute concerning termination of a contract, rights in tangible or ***intangible property***" [patents are intangible property]

The DOJ, in 2013 [Case #: 1:13-cv-00307C, *GOLDEN v. USA*] twice petitioned the Court for Plaintiff to file a "more definite statement" because Plaintiff refused to drop the "Government Takings" claim. The Court counts the orders as Plaintiff's amendments 1 & 2.

The Court forced Plaintiff to defend patent infringement allegations that was docketed as a "Government Takings" of a patent. Patent infringement against the Government has its own independent cause of action "28:1498 Government Infringement" CASE #: 1:13-cv-00307-EGB (Dkt. 38), filed 03/31/2014 "ORDER – "The parties will therefore proceed with plaintiff's claims only as they relate to the alleged patent infringement by the United States. Signed by Judge Susan G. Braden."

Plaintiff's "Government Takings" of a patent claim under "28 U.S. Code § 1491" was later dismissed because the Claims Court stated it was Plaintiff who was trying to litigate a patent infringement claim as a Government Takings claim.

6

The complaint **Exhibit B** filed on 05/01/2013 Case #: 1:13-cv-00307C, *GOLDEN v. USA* names Qualcomm and its co-conspirators Apple, Samsung, and LG as defendants in the case and thoroughly describes how they were contracted to develop a "new and improved cell phone". Qualcomm has had nine (9) years to show non-infringement and/or patent invalidity.

The DOJ / DHS; government agencies "not persons" authorized to petition the PTAB for *Inter Partes Review* (IPR), petitioned the Court as representatives of Qualcomm and others. Case No. IPR2014-00714, *Department of Homeland Security v. Larry Golden*, filed 04/29/2014 "On June 10, 2019, the Supreme Court issued a 6-3 decision in *Return Mail Inc. v. United States Postal Service*, No. 17-1594, holding that—the U.S. Government is not a "person" with standing to bring petitions for AIA post-grant review proceedings."

The DHS petitioned for review under 101, 102, 112, & 120. Under AIA guidelines only 102 and 103 is allowed.

DHS petitioned with three non-qualified references of Astrin, Breed, and Mostov [the references did not antedate Plaintiff's patents priority date disclosure]; eighteen publications and three expert declarations. Plaintiff lost 3 independent claims and 80 dependent claims.

Plaintiff sent the three references of Astrin, Breed, and Mostov; the eighteen publications; and, three expert declarations for examination by the USPTO during the IPR proceedings. The USPTO disqualified the references, publications, and declarations as valid prior art.

The PTAB dropped the Mostov reference as being redundant. In the final written decision, the PTAB dropped the Astrin and Breed because they did not antedate Plaintiff's priority date.

The PTAB picked back up the Mostov reference. The Plaintiff submitted a USPTO disclosure document that proved the Mostov reference did not antedate Plaintiff's patent.

On Nov. 30, 2016, the COFC court dismissed the Government's motion to dismiss under 12(b)(1) and 12(b)(6). Two days after that, in a telephone conference on 12/30/2016, the Court, without explanation, motion, or request, said it will give the Government another chance.

On 03/29/2018 (Dkt. 130), the Court dismissed 39 of Plaintiff's claims of infringement because the Court started the consumer devices [cell phones; smartphones] are the private property of the manufacturers [Qualcomm; Apple, Samsung, and LG]. The private property of the manufacturers has nothing to do with whether the private property infringes a patent(s).

On 04/22/19, (Dkt. 169); Qualcomm was issued a notice to appear to defend against the allegations of infringement. Because Qualcomm failed to appear, Qualcomm is barred from defending the same infringement allegations in another Court. That is, this Court.

On 11/10/21 (Dkt. 249); in the Court's reported opinion, the Court never addressed the allegations of infringement against Qualcomm. Qualcomm was the primary contractor in the Cell-All initiative.

Because Qualcomm allegations of infringement was never addressed in the COFC, Plaintiff has brought this action in the Northern District of California.

Plaintiff tried to bring this action against Qualcomm in the S.C. District Court but was victimized in the following ways:

- The Fifth Amendment of the U.S. Constitution provides, "No person shall be … deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

- The Seventh Amendment of the U.S. Constitution provides, "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved …"

- Plaintiff's civil liberties are guarantees and freedoms that governments commit not to abridge, remove, or withhold from Plaintiff, either by legislation or judicial interpretation, without due process.

- Meanwhile, Plaintiff's civil rights are government policies and laws that have been created to protect Plaintiff from discrimination. Plaintiff's civil rights guarantee equal opportunities and protection under the law, regardless of race.

**Pursuant to Rule 3.3, 4.1, and 8.4 of the ABA's Model Rules of Professional Conduct, Plaintiff hereby Move to Strike Defendant's July 22, 2022 Motion to Dismiss, (Dkt. 6).**

Rule 3.3: Candor Toward the Tribunal—*Advocate*: (a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; "[f]alse statements made by the Gov't Attorney that he fail to correct: '*Mr. Golden repeatedly failed to satisfy the requirements of Patent Rule 4 and to present a plausible case of infringement for any accused product, or plausible claim that such a product was used or manufactured by or for the United States*" … "*Mr. Golden did as he has done for so many years now, simply brought in another party and device*" … "*The trial court did not overlook a device or component manufactured by Rhevision*" … "*he is unable to find a sensing component in the accused devices (Apple, Samsung, and LG smartphones*") **Not true**. Plaintiff satisfied the requirements for proving direct infringement under Section 1498(a) and direct infringement under Section 271(a).

Rule 3.3: Candor Toward the Tribunal—*Advocate*: (a) A lawyer shall not knowingly: (3) offer evidence that the lawyer knows to be false … has offered material evidence … the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. "[t]he Gov't Attorney continued offering false evidence:

9

The first Fifth Amendment "Takings" Claim is for the years of 2002-2010. Promises were made and many implied-in-fact contracts was entered into and then breached by the Government for the recovery strategies that included the technical rational for new technology. A complaint for alleged government infringement was filed in 2013. The Gov't continued to argue that Plaintiff was trying to make an "infringement" claim, a "takings" claim. **That's not true**. Plaintiff's Fifth Amendment "Takings" Claim is for the years of 2002-2010 when the "money mandating" substantive right was a violation of a constitutional provision (taking of property without paying just compensation); and, violation of several implied-in-fact contracts. Not infringement.

Rule 4.1: Truthfulness in Statements to Others—*Transactions with Persons other than Clients:* In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person: "[o]n Dec. 2, 2016 during a COFC telephone conference between Plaintiff, the Judge, 3 Attorneys from DOJ, & 3 Attorneys from DHS. The DOJ who was representing the DHS made this statement to the Court, "if the Gov't (DHS) is found liable, it could cost the Gov't (DHS) dozens of billions of dollars". **Not true**. According to the indemnification provision: "if the Gov't (DHS) is found liable, the infringing third-party contractors [Qualcomm] shall indemnify the Gov't for the damages". The COFC immediately decided to give the Gov't another chance at filing a motion to dismiss under 12(b)(1) and (6).

Rule 8.4: Misconduct—*Maintaining the Integrity of the Profession*: It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct … or do so through the acts of another; The Gov't attempted to introduced the unqualified prior art of Astrin, Breed, and Mostov, when the USPTO had already examined the references (during and after IPR) and allowed 23 independent patent claims of 3 patents asserted in this case. The

Gov't's Attorney (Johnson), a former patent examiner at USPTO, knew, or should have known, the patents did not antedate the asserted patents in this case; did not anticipate; was not obvious.

Rule 8.4: Misconduct—*Maintaining the Integrity of the Profession*: It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; The Gov't argued, and the Trial Court agreed, that the case was enlarged when the CPU was identified to satisfy the claim(s) elements; enlarged when the Cell-All contractor NASA, subcontracted for the Node+ detection device—Section 1498 states: "contractor, subcontractor"; and, further enlarged because of the Cell-All contractor Rhevision, the company contracted to develop the Cell-All mobile device C/B/R camera sensor. Qualcomm's CPU, NASA's Node+, and Rhevision's C/B/R camera sensors have all been a part of the case from the beginning (05/01/2013). The Gov't Attorney was being dishonest and deceitful.

Rule 8.4: Misconduct—*Maintaining the Integrity of the Profession*: It is professional misconduct for a lawyer to: (d) engage in conduct that is prejudicial to the administration of justice; The Gov't was bent on mentioning the results of the related cases without mentioning how the SCDC changed a cause of action from Antitrust to Infringement; how the SCDC dismissed a case as duplicative (overturned); how the SCDC wouldn't reopen a case when the CAFC dismissed without prejudice; how the SCDC dismissed a case as frivolous, but refuse to state what makes the case frivolous; and how the SCDC wrote a report and recommendation to dismiss base on the page count (SCDC Judge overturned the page count requirement but dismissed as frivolous without explanation). According to the United States District Court District of South Carolina, "if the prose plaintiff fails to procedurally state a claim, it is the responsibility of the Judges of this court [to] outline proper procedure so that the pro se party will not be deprived of a fair opportunity to present his or her case", *See Roseboro v. Garrison*,

528 F.2d 309, 310 (4th Cir. 1975)". Never once did the Judges outline proper procedure; is something the Gov't Attorney fail to mention.

Rule 8.4: Misconduct—*Maintaining the Integrity of the Profession*: It is professional misconduct for a lawyer to: (f) knowingly assist a judge … in conduct that is a violation of applicable rules of judicial conduct or other law; The Trial Court Judge (case no. 13-307C) dismissed the case based on deficient preliminary infringement contentions charts of the alleged infringing products. The Judge struck the charts of Apple and Samsung, and never entered the LG chart into record. According to the appellate rules of procedure, the docket files are to be made available to the Appellate Court. The DOJ Attorney fail to produce the records to the Appellate Court. Upon information, the Judge made several false statements pertaining to the preliminary infringement contentions charts in the order to dismiss that can easily be verified if the charts were made available to the Appellate Court. Plaintiff can't produce to the Appellate Court the original numbered contentions charts because the Gov't blocked the documents.

Rule 8.4: Misconduct—*Maintaining the Integrity of the Profession*: It is professional misconduct for a lawyer to: (g) engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, … ethnicity … or socioeconomic status in conduct related to the practice of law … Racial profiling is the act of suspecting, targeting or discriminating against a person on the basis of their ethnicity (African American or Black). Racial profiling involves discrimination against minority populations and often builds on the negative. The racial stereotypes of early American history had a significant role in shaping attitudes toward African-Americans Inventors. Images of the Sambo, Jim Crow, the Savage, Mammy, Aunt Jemimah, Sapphire, and Jezebel were instrumental in shaping opinion, that Blacks are less than human, ignorant and uneducated, and are incapable of inventing, or

advancing their ideas. Those images are still alive in the American Judicial System. Upon

information and belief, no-where in American History has a "White Inventor" been treated so

unfairly by the Government (DOJ, DHS, & PTAB), and the Courts (COFC, SCDC; CAFC; &

SCOTUS). After nine years, the Courts still haven't decided if the Defendants' have actually

"taken" property under the Fifth Amendment clause of the Constitution; Gov't infringement;

Private entity infringement; violated Antitrust Laws; or violated any other money mandating

substantial right. But like many African-American Inventors before me, Plaintiff have been

discriminated against, barred, blamed, and framed.

The American Civil Liberties Union of Southern California (ACLU SoCal) asked the full

Ninth Circuit to rehear a case in which "the government repeatedly lied to a federal district

judge" … Only when U.S. District Judge Cormac Carney discovered the lies did the government

reveal the whole truth … Courts have the power to impose sanctions for lies, and Judge Carney

did so, fining the government for deceiving him." https://www.aclu.org/blog/national-

security/privacy-and-surveillance/should-government-be-punished-when-it-lies-courts. Plaintiff

has never lied or mislead the Courts or "Government".

Because the Defendant omitted the above relevant information in its 'motion to dismiss'

that describes how Plaintiff's civil liberties and civil rights were violated, Plaintiff is asking the

Court to dismiss and strike Defendant's 'motion to dismiss' from the docket.

## SUMMARY JUDGEMENT FOR QUALCOMM'S UNJUST ENRICHMENT

The Federal Trade Commission began an investigation of Qualcomm in 2014, leading to

its 2017 suit against Qualcomm for violations of section 5 of the Federal Trade Commission Act,

and sections 1 and 2 of the Sherman Act, the general antitrust laws of the United States.

In the opinion of the U. S. District Court for the District of Northern California;
"Qualcomm leveraged its monopoly position in chips to secure unreasonably high rates for its
SEPs. Qualcomm, for example, refused to provide must-have chips unless customers took the
unreasonable IP licenses—the "no license, no chip" model.

Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this
illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to
anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision
in *United States v. Microsoft Corp.*, held it sufficient that Qualcomm engaged in
"anticompetitive conduct that reasonably appear[s] capable of making significant contribution to
. . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Qualcomm's "no license, no chip" policy is designed to force sell the unauthorized
patented CPUs of the Plaintiff, that's tied to Qualcomm's cellular modem. Qualcomm's "no
license, no chip" policy is only made possible by Qualcomm's unauthorized use of Plaintiff's
patented CMDC devices (i.e., the alleged infringing smartphones-handsets of the OEM's).

## Evidence Entered into Record of Plaintiff's Ownership of the Patent Rights for the CMDC Device (i.e., Handset; Smartphone)

Plaintiff submitted at Dkt. #1, Exhibit #5 K-1; Exhibit #6 K-2; and, Exhibit #7 K-3 of this
case, an illustrative claim chart of six of Samsung Electronics alleged infringing smartphones
that Plaintiff believes directly infringes at least Ind. claim 1 of Plaintiff's '497 patent; Ind. claim
10 of Plaintiff's '752 patent; Ind. claims 1-9 of Plaintiff's '189 patent; Ind. claims 13-23 of
Plaintiff's '439 patent; and, Ind. claims 4-6 of Plaintiff's '287 patent.

Qualcomm, Inc. Snapdragon Processors: Snapdragon is a suite of system on a chip (SoC)
semiconductor product for mobile devices designed and marketed by Qualcomm Technologies
Inc. Qualcomm's chipsets / CPUs for the alleged infringing Samsung smartphones are:

Samsung Galaxy Note 8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
Samsung Galaxy Note 8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

Samsung Galaxy S8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
Samsung Galaxy 8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

Samsung Galaxy S9 Series Chipset: Qualcomm SDM845 Snapdragon 845 (10 nm) – USA/China
Samsung Galaxy S9 Series CPU: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver)-
USA/China

Samsung Galaxy S10 Series Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm) - USA/China
Samsung Galaxy S10 Series CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz
Kryo 485)-USA/China

Samsung Galaxy S20 Series chipset: Qualcomm SM8250 Snapdragon 865 5G (7 nm+) – USA
Samsung Galaxy S20 Series CPU: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz
Kryo 585)-USA

Samsung Galaxy S21 Series chipset: Qualcomm SM8350 Snapdragon 888 5G (5 nm)
Samsung Galaxy S21 Series CPU: Octa-core (1x2.84 GHz Kryo 680 & 3x2.42 GHz Kryo 680 & 4x1.8 GHz
Kryo 680)-USA

## Antitrust Injury:

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of each

phone sold, i.e., handset; smartphone, etc. The elements of unjust enrichment exist because: 1)

Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged,

accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for

Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff.

The United States District Court Northern District of California; *Federal Trade*

*Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF

LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States

District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its

anticompetitive practices: "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5% running royalty on the price of each handset sold*. These licenses are called Subscriber Unit License Agreements ("SULA") …"

"Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio.

Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition. The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold…

Qualcomm's collusion, exclusive arrangements, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC (handset) devices and Plaintiff's patented CPUs. The OEMs are already paying royalties to Qualcomm on every handset sold; and, the OEMs are already paying an increased royalty rate for Qualcomm's chipsets that include Plaintiff's patented CPUs. This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful.

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of the phone, i.e., Plaintiff's CMDC device; handset; smartphone, etc. Plaintiff has the right to exclude Qualcomm from "using" Plaintiff's CMDC devices—handsets to unjustly enrich itself.

**QUALCOMM's Forward Look and Actual Annual Revenues – *Data retrieved from Macrotrends***

| | |
|---|---|
| 2026 | $33.566B |
| 2025 | $33.566B |
| 2024 | $33.566B |
| 2023 | $33.566B |
| 2022 | $33.566B |
| 2021 | $33.566B |
| 2020 | $23.531B |
| 2019 | $24.273B |
| 2018 | $22.611B |
| 2017 | $22.258B |
| 2016 | $23.554B |
| 2015 | $25.281B |
| 2014 | $26.487B |
| 2013 | $24.866B |
| 2012 | $19.121B |
| 2011 | $14.957B |
| 2010 | $10.982B |
| **Total Revenue** | **$439.317B** |

Qualcomm has had nine (9) years to present a patent(s) that proves Qualcomm has patent rights to exclude others from making, using, selling, or offering for sale, a CMDC device of at least that of a handset, smartphone, or new and improved cell phone.

Qualcomm has had an equal amount of time to pull from its co-conspirators (i.e., OEMs—Apple, Samsung, & LG—all of them own thousands of patents) collection of patents to produce at least one patent that gives Qualcomm and/or co-conspirators Apple, Samsung, LG) the patent rights to exclude others from making, using, selling, or offering for sale, a CMDC device of at least that of a handset, smartphone, or new and improved cell phone. Qualcomm has also failed to produce evidence that Plaintiff's patents as invalid.

Plaintiff is entitled to stop Qualcomm's use of the Plaintiff's inventions to generate revenue (5% royalty) by seeking a legal injunction in Federal court. Qualcomm's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages for any unlicensed use of his inventions. Damages are generally calculated based on lost profits Plaintiff suffered as a result of the use.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to retry the *FTC v. Qualcomm* case; and, no genuine dispute as to who own the patent rights for the handsets Qualcomm is unjustly enriching itself with. Plaintiff is entitled to judgment as a matter of law.

## SUMMARY JUDGEMENT FOR CONTRIBUTORY (INDIRECT) PATENT INFRINGEMENT AGAINST QUALCOMM

*Plaintiff has Satisfied the Requirement of Direct Infringement Under 28 U.S.C. § 1498(A); and, also Satisfied the Requirement of Direct Infringement Under 35 U.S.C. § 271(A) for Plaintiff's CMDC Device (New and Improved Cell Phoned; Smartphone)*

In COFC case no. 13-307C, *Golden v. USA*, Qualcomm, Apple, Samsung, and LG was given nine (9) years to produce a patent(s) that invalidates Plaintiff's patents for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone).

That's all that was needed to end this case in nine (9) months, not nine (9) years. But Qualcomm, Apple, Samsung, and LG; four companies that owns thousands of patents, fail to produce one patent that antedates and invalidates Plaintiff's patents for the CMDC device.

Issued patents are not *frivolous*. "A patent shall be presumed valid." 35 U.S.C. § 282. The courts have interpreted this statutory provision to mean that, in order for a challenger to prove that a patent is invalid for violating one of the provisions of the Patent Act, he must make such proof by the heightened standard of 'clear and convincing' evidence.

The rationale behind this statutory provision is that the PTO is a Federal agency that has already passed on the validity of the claims of issued patents. Patent examiners are presumed to be experts in the subject matter of reviewing patent applications and granting patents. Thus, for the initial Federal review by an expert to have any meaning, a challenger must present evidence that reaches a higher level than merely more likely than not.

**35 U.S.C. § 282(a). In General**. A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., new and improved cell phone; smartphone) is an '*invention of inventions*' that's presumed valid.

## Contributory Infringement

Qualcomm's liability for contributory infringement of Plaintiff's patent(s) is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States ... a material or an apparatus for use in practicing a patented process, constituting a material part of the invention,

knowing the same to be especially made or especially adapted for use in an infringement of such

patent, ... shall be liable as a contributory infringer."

The threshold requirement for a claim of contributory infringement is the existence of

direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972).  There

must also be a showing that the alleged contributory infringer knew of the patent and that his or

her actions would lead to infringement of the patent. *See Aro Mfg. Co. v. Convertible Top*

*Replacement Co.*, 377 U.S. 476 (1964).

Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and

controlling (CMDC) devices. Plaintiff is alleging facts that supports Plaintiff's claim that

Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC

[handset] devices."

- On November 4, 2010, Plaintiff emailed Kate Lane, Strategic IP, Qualcomm

  Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms.

  Lane of certain patented technology (i.e., CMDC—Smartphone—device; central

  processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and

  unmanned electric, autonomous, and driverless vehicles).

- Plaintiff asked if Qualcomm would be interested in entering into a licensing agreement

  with the Patent Owner (Plaintiff). Subject: "Patented Technology for Qualcomm's

  Review (copy available upon request).

- Plaintiff mailed out letters dated December 7, 2010 addressed to the attention of

  Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President

  Derek Aberle, (copies of the letters and return receipts are available upon request)

  informing the Executives of the Patent Owner's (Plaintiff) patented technology and asked

if they would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff).

- After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

- On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

- On October 11, 2011, the Patent Owner (Plaintiff) returned via e-mail, the answered Patent Information Request form to Ms. Lane. The Patent Owner (Plaintiff) made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes actions that contribute (or potentially contribute) to someone else infringing a patent, even if those actions do not directly infringe the patent.

When Qualcomm imports, sells or offers to sell a component or part [Qualcomm's Snapdragon CPU/Chipset/Processor/SoC] that's used exclusively for a patented item [Plaintiff's CMDC device/new and improved Cell Phone/Smartphone/Smartwatch] or process is likely contributorily liable. Qualcomm do not have to be involved in the sale, manufacture or use themselves to be liable.

The supply of Component A (i.e., Qualcomm's Snapdragon chipset that includes Plaintiff's central processing unit (CPU), with instructions to connect it to an available

Component B (i.e., Samsung's smartphone that Plaintiff claims as his patented CMDC device;

smartphone); where A+B (Plaintiff's patented CPU (Qualcomm's Snapdragon) + Plaintiff's

CMDC device (Samsung's smartphone is a patented product).

Plaintiff believes Qualcomm alleged infringement is deliberate and to massive to be

coincidental. Qualcomm "use" Plaintiff's patented CMDC device to generate billions in revenue;

Qualcomm "tied" Plaintiff's patented CPUs to its processors; Qualcomm "use" Plaintiff's

patented Stall, Stop, Vehicle Slowdown systems with its processors; Qualcomm "use" Plaintiff's

patented Smartwatches with its processors. The '*product grouping strategy*' is illustrated below:

I. Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e.,

smartphone) – Claim 23 of the '439 Patent

> a. Central Processing Units for CMDC Device – Claim 5 of the '287 Patent
>
> b. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent
>
> c. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent
>
> d. Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent
>
> e. Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent
>
> f. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent
>
> g. Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent
>
> h. Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent
>
> i. Fingerprint / Face Recognition for CMDC Device – Claim 1 of the '619 Patent
>
> j. Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '891 Patent
>
> k. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent
>
> l. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent
>
> m. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent

## I. Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent



Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween …

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**

**Claim 23 of the '439 Patent**: "A cell phone comprising: a central processing unit (CPU) for executing and carrying out the instructions; … whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems … multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals

Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, …, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, … handhelds;

## a. Central Processing Units (CPUs) for CMDC Device – Claim 5 of the '287 Patent



Example: Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems; Android devices (i.e., Samsung & LG). Also used in cars and wearable devices i.e., Smart Watches

**Central Processing Units (CPUs) for Smartphone**

**Claim 5 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "[T]oday's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

### b. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent





**Camera CBR Sensor(s) for Smartphone**

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor *Rhevision* and UC San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can detect them; the phone's camera watches the chip for color changes.

**Claim 4 of the '189 Patent**: A built-in, embedded multi sensor detection system … sensor array or fixed detection device into the product that detects agents …

### c. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent



Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/

**Smartwatch CBR Detector for Smartphone**

**Claim 19 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a multi-sensor detection device.

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

### d. Embedded CBRN Nanosensors for CMDC Device – Claim 16 of the '439 Patent



**Embedded CBRN Sensors for Smartphone (NASA)**

**Claim 16 of the '439 Patent**: A built-in, embedded multi sensor detection system ... a cell phone, a smart phone

A silicon-based sensing chip, which consists of 64 nanosensors can turn a cell phone into a *portable poison detector*. (NASA). "can turn your cellphone into a *portable "silent killer" detector* https://www. foxnews.com/tech/smartphones-take-on-silent-killers-as-portable-danger-detectors & Nuclear Radiation Nanosensors and Nanosensory Systems https://link.springer.com/book/10.1007/978-94-017-7468-0

### e. Interchangeable Sensor Device for CMDC Device – Claim 20 of the '439 Patent



**Plurality of Interchangeable Sensor Device for Smartphone: (NASA & Subtractor George Yu)**

**Claim 20 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents...

The system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform. A cylinder that transmits data from sensors to smart-phone. The NODE+ is compatible with Android and Apple smart devices.

### f. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent



MIT-- wirelessly detect hazardous gases by using a simple sensor made from near-field communication (NFC) tags that can be read by a smartphone... detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, and other gases... Sensors. Retrieved from: https://phys.org/news/ 2014-12-cheap-sensor-transmit-hazardous-chemicals.html

**Near-Field Communication (NFC) CBR Tag for Smartphone (Safer than RFID tag)**

**Claim 21 of the '439 Patent**: A multi-sensor detection system ... at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication

In November 2007, two Defense Department contractors, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to ... detonated a small amount of explosives in a container a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department and DHS observed the demonstration. https://www.nationaldefense-magazine.org/articles/2011 /2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

### g. Remote/Electrical Lock Disabler for CMDC Device – Claim 125 of the '990 Patent



**Remote/Electrical Lock Disabler for Smartphone (Gov. Contractor iControl's MATTs & mLOCK)**

**Claim 125 of the '990 Patent**: A multi-sensor detection system … whereupon detection causes a signal to be sent to the at least one communication device followed by communicating with the internal or external remote/electrical lock disabler.

Marine Asset Tag Tracking System (MATTS) is a DHS initiative for "Smart Container". MATTS "gateway": a wireless electronic device that communicates with a sensor array; the communication device; and locking mechanism for locking status and GPS location. Internal /external sensors are interconnected to operate with the MATTS device and can detect gas concentrations, radiation, humidity and moisture, atmospheric pressure, etc. The mLOCK communicates bi-directionally using encrypted messages between the lock and the MATTs readers or mobile devices (i.e., smartphone)

### h. Pre-Programmed Lock Disabler for CMDC Device – Claim 1 of the '287 Patent





"Monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock…"

**Pre-Programmed Lock Disabler for Smartphone**

Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android or iOS device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Account Login. On an Android or Apple Phone, multiple attempts (usually five attempts or more) with an unknown or a wrong pin will go either into a delay before further attempts are allowed …

FBI Failed Attempts to Unlock Phone: The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22. The two attackers died four hours after the attack in a shootout with police ... Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-theft measure on smartphones).

**Claim 1 of the '287 Patent**: Monitoring equipment that is at least one … a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

### i. Fingerprint and Face Recognition for CMDC Device – Claim 1 of the '619 Patent



**Fingerprint and Face Recognition for Smartphone**

**Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition

### j. Stall, Stop, or Vehicle Slowdown for CMDC Device – Claim 11 of the '891 Patent



Driverless car smartphones, authorizes the phone to control functions. Smartphones and driverless technology: instant braking for autonomous cars; sensors detect interference, obstacles and oncoming cars; instant breaks to avoid collisions.

**Stall, Stop, or Vehicle Slowdown for Smartphone**

**Claim 11 of the '891 Patent**: A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

Remote Vehicle Shutdown is a system of remotely shutting down the connected vehicle, using radio pulses; intended for police, military and security use. Remotely find and disable stolen vehicles; ability to prevent engine start; prevent movement of a vehicle; stop or slow an operating vehicle; gradually decelerate a vehicle by downshifting, limiting the throttle capability; and, improve security of carriers of high-risk cargo, like hazardous materials. Security features that Remote Vehicle Shutdown provides. https://www.globenewswire.com/en/news-release/2019/12/17/1961557/0/en/Remote-Vehicle-Shutdown

### k. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent



**Autonomous and Driverless Vehicle Monitoring with Smartphone**

**Claim 44 of the '891 Patent**: A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means … (Dep. 55) … 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle … in operation with or without a user, driver or operator inside the vehicle.

**l. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent**

| | |
|---|---|
|  | **Connect Vehicle with Smartphone**<br><br>**Claim 4 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.<br><br>**CarLink™** is a Smartphone interface that allows you to start your vehicle, unlock your doors or pop the trunk from virtually any distance, or help you find your car in a large garage after a sporting event or a trip to the mall. \*Compatible with iPhone, BlackBerry and Android \*Remote Start Compatible \*Door lock and unlock \*Car find feature (horn honk and/or flashing lights) \*Control trunk release or sliding door open) |

**m. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent**

| | |
|---|---|
| <br><br>The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring apps. Also, identity verification, GPS based guidance, position/orientation awareness apps for smartphone-based implementation. | **Internet-of-Things (IoTs) with Smartphone**<br><br>**Claim 11 of the '619 Patent**: A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device<br><br>The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:<br>    Accelerometer, GPS, Gyroscope, Magnetometer, Biometrics, Camera, Barometer, Proximity Sensors, Bluetooth connectivity, Barcode readers, Touchscreen sensors, Heart rate monitor, ECG, Haptic feedback sensors<br><br>The IoTs contain computing hardware, including processors with embedded programming telling them what to do, sensors that gather various sorts of readings (such as temperature, motion, chemical levels, heart rate and body movement) and communication hardware that can send and receive signals. |

Plaintiff is seeking summary judgement against Qualcomm for contributory infringement.

Under Federal Circuit precedent, indirect (induced or contributory) infringement requires a

patent owner [Plaintiff] to show that the alleged infringer [Qualcomm] had the specific intent to cause direct infringement.

The Federal Circuit has essentially broken the statute for contributory infringement down into four elements. More specifically, in order to establish contributory infringement, the court has held that a patent owner [Plaintiff] must show: (1) that there is direct infringement, (2) that the accused infringer knew that the combination for which its components were being made was both patented and infringing, (3) that the component has no substantial noninfringing uses, and (4) that the component is a material part of the invention. *Fujitsu*, 620 F.3d at 1326 and 1330. The second element was essentially reaffirmed by the Supreme Court in Global-Tech, which stated that § 271(c) requires knowledge of the existence of the patent and knowledge that the component infringes. *Global-Tech*, 131 S. Ct. at 2069.

In order to resolve the question concerning the scope of liability for contributory infringement the Federal Circuit focused its inquiry on the interpretation of the Supreme Court's decision in *Metro-Goldwyn-Mayer Studios v. Grokster* (finding infringement where a component adapted for use in a patented process and with no substantial non-infringing use would be "good for nothing else" but infringement of the patented process).

Qualcomm design processors for the OEMs trial use. The OEMs either accepts the processors as is, or design their smartphones, smartwatches, and advanced driver assistance systems around the specific requirements of the Qualcomm processors. This process has no substantial non-infringing use but infringement of the Plaintiff's patented inventions / process.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact, and Plaintiff is entitled to judgment as a matter of law.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 29th day of July, 2022, a true and correct copy of the foregoing "Plaintiff's Response to Qualcomm's Motion to Dismiss and Plaintiff's Cross-Motion for Summary Judgement", was served upon the following Defendant by priority "express" mail:

> PATTERSON + SHERIDAN, LLP
> Attn: Joseph John Stevens
> 50 W. San Fernando Street,
> Suite 250
> San Jose, CA 95113
> Tel: 650-384-4418
> Fax: 650-330-2314
> Email: jstevens@pattersonsheridan.com

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

31

# EXHIBIT A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

LARRY GOLDEN,

     *Pro Se* Plaintiff,

vs.

QUALCOMM INC.,

     Defendant.

Case No.: 4:22-cv-03283-KAW

**DECLARATION OF ELIZABETH ANN CROWE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

| | |
|---|---|
| Date: | October 6, 2022 |
| Time: | 1:30pm |
| Courtroom: | TBD |
| Judge: | Honorable Kandis A. Westmore |

I, Elizabeth Ann Crowe, do hereby declare as follows:

1.      I am an employee of Qualcomm Incorporated.  I am an Administrative Assistant to Vice President/Senior Vice President in the Qualcomm Incorporated Legal Department. My office is located at 5775 Morehouse Dr. San Diego CA 92121.  Among my other duties, I am one of the employees responsible for receiving and processing the service of process of legal documents.

2.      I submit this declaration based on my personal knowledge in support of Defendant's Motion to dismiss, and if called upon, could and would testify completely as to the statements made herein.

3.      On July 7, 2022, I was notified by our receptionist that a process server had entered our reception area.  The female individual had a set of documents including Mr. Golden's Complaint and Summons filed in this action.  I met the female individual in the lobby and received those documents.  I notified our legal team of the service that day. Attached is a true and correct copy of a partially redacted email chain showing that Qualcomm was served July 7, 2022, attached hereto as Exhibit A.

4.      I understand that Mr. Golden has claimed that personal service of these documents occurred on June 28, 2022.  That cannot be the case, as I was not present in the office that day.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 22, 2022 in San Diego, California.

Respectfully submitted,

By: _Elizabeth Ann Crowe_

Elizabeth Ann Crowe

DECLARATION OF ELIZABETH ANN CROWE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

# EXHIBIT A

Partialy Redacted Email Chain



**From:** SharePoint Online Flow <sharepointonlineflow@qualcomm.com>
**Sent:** Thursday, July 7, 2022 5:02 PM
**To:** summons.team <summons.team@qualcomm.com>
**Subject:** Larry Golden v. Qualcomm Incorporated, Action Required - New Legal Document Received - Privileged and Confidential


Qualcomm Legal Team,

A new legal document has been served on Qualcomm Incorporated (see the attached document for details.). Please reply all if you are responsible for this item and I will log the appropriate tracking information in our database.

**Document Information**
 Title: Complaint for Antitrust Law Violations and Patent Infringement
 Type: Summons/Complaint
 Case Name: Larry Golden v. Qualcomm Incorporated
 Case Number: 4:22-cv-03283-KAW
 Court: Dist. - NDCA
 Date Served: 2022-07-07
 Issuing Company: Plaintiff Larry Golden
 Method of Service: Personal svc - dropped

**Privileged and Confidential**

# EXHIBIT B



**ATPG Technology, LLC**

*(Anti-Terrorism Product Grouping)*



**FILED**

MAY   1 2013

U.S. COURT OF
FEDERAL CLAIMS

Larry Golden, CEO

740 Woodruff Road, #1102, Greenville, SC 29607

E-mail: atpg-tech@charter.net

Bus. 864-288-5605 / Mobile: 864-992-7104

13-307  C

April 30, 2013

United States Court of Federal Claims

Howard T. Markey National Courts Bldg

717 Madison Place, N.W.

Washington, DC 20439

Re: Department of Homeland Security -- Infringement

Chief Judge Emily C. Hewitt:

The three solicitations released by the Department of Homeland Security that infringes Golden's [US RE43,990] patent are:

1.  The Department of Homeland Security CELL-ALL Ubiquitous Biological and Chemical Sensing Solicitation Number: BAA07-10 released October 2007 and is referred to throughout this document as "Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors".

2.  The Department Of Homeland Security SBIR / STTR Miniature and Reliable Chemical Sensors for Cell Phones Solicitation No: Reference-Number-DHSSBIRFY081 released December 2007 and is referred to throughout this document as "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors".

3. The Department Of Homeland Security SBIR Phase 12.1 Smart Phone App(s) for Radioisotope Identification Device (RIID) and Spectroscopic Personal Radiation Detector (SPRD) Reachback Solicitation No.HSHQDC-12-R-00052 released May 2012 and is referred to throughout this document as "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors".

The three solicitations of "Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors", "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors", "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" are combined for the purpose of illustrating the development of, the use or manufacture of, the making of, the offer for sale of, and the sale of, a product or parts of a product; a device or parts of a device that infringes Golden's [US RE43,990] patent independent claim 11 (emphasis on the communication device that is the monitoring equipment integrated and interconnected to the cell phone detection device), independent claim 81 (emphasis on the cell phone detection device that is integrated and interconnected to the communication device that is the monitoring equipment and the sensors used for detection), and, independent claim 74 (emphasis on the sensors used for detection that is integrated and interconnected to the cell phone detection device).

The Department Of Homeland Security and the twelve companies (e.g. Samsung, LG, Apple, Qualcomm, Seacoast Science, NASA, Rhevision, Synkera, Boston MicroSystems, QuantaSpec, Spectral Labs, Creative Electron) that received awards and contracts for research and development of a cell phone detection device and the companies that received cooperative agreements from the Department Of Homeland Security in response to the three solicitations of  Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors", "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors", "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" are combined for the purpose of illustrating the development of, the use or manufacture of, the making of, the offer for sale of, and the sale of, a product or parts of a product; a device or parts of a device that infringes Golden's [US RE43,990] patent independent claim 11 (emphasis on the communication device that is the monitoring equipment integrated and interconnected to the cell phone detection device), independent claim 81 (emphasis on the cell phone detection device that is integrated and interconnected to the communication device that is the monitoring equipment and the sensors used for detection), and, independent claim 74 (emphasis on the sensors used for detection that is integrated and interconnected to the cell phone detection device).

The Department Of Homeland Security and the twelve companies (e.g. Samsung, LG, Apple, Qualcomm, Seacoast Science, NASA, Rhevision, Synkera, Boston MicroSystems, QuantaSpec, Spectral Labs, Creative Electron) that received awards and contracts for research and development of a cell phone detection device and the companies that received cooperative agreements from the Department Of Homeland Security in response to the three solicitations of Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors", "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors", "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" are combined for the purpose of illustrating, showing and proving **direct infringement** (occurs when a person without authorization makes, uses, offers to sell or sells any patented invention within the United States or imports into the United States any patented invention during the term of the patent), **infringement by equivalents** (a claim may be infringed under the doctrine of equivalents if some other element of the accused device or process performs substantially the same function, in substantially the same way, to achieve substantially the same result), **contributory infringement** (is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."), **inducement infringement** (covers situations where one actively induces the infringement of a patent by encouraging, aiding, or otherwise causing another person or entity to infringe a patent. A potential inducer must actually be aware of the patent and intend for their actions to result in a third party infringing that patent).

The color coded claims analysis included in this in a document of Golden's [US RE43,990] patent independent claims 11, 81, and 74 are illustrated in a green print color and breaks down each element included in each of the independent claims 11, 81, and 74, (the purple print color represents the dependent claims of independent claim 81).

The color coded claims analysis included in this document has a break-down of each element requested by the Department of Homeland Security in the three solicitations of "Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors", "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors", "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors", illustrated in the rust print color.

The color coded analysis included in this document has also a universal interpretation, explanation, usage or definition of terms of:

- the communication device (system) that is the monitoring equipment of Golden's [US RE43,990] patent independent claim 11 and the DHS request for a communication device (system)
- the cell phone detection device (system) of Golden's [US RE43,990] patent independent claim 81 and the DHS request for a cell phone detection device (system)
- the sensor device (system) of Golden's [US RE43,990] patent independent claim 74 and the DHS request for a sensor device (system), and

is in blue print color and the interpretation, explanation, usage or definition of terms are parallel the like elements of both Golden's [US RE43,990] patent and the DHS solicitations for a cell phone detection device.

Enclosed in this document is a section of articles, product data sheets, agreements, award data sheets and documents with pictures and photographs that validate the "use or manufacture, make, develop, sell or offer for sell a patented product without the consent of the patent owner".

> *On March 14, 2012, in an* en banc *decision, the Court of Appeals for the Federal Circuit reversed both itself and the Court of Federal Claims ("COFC") in holding that the government is subject to liability when a product using a patented process is used in, or imported into the United States by or for the United States government, even when part of the patented process occurred overseas.* Zoltek Corp. v. United *States, No. 2009-5135. The Federal Circuit reinstated the patent holder's 28 U.S.C. § 1498(a) claim against the United States and barred the plaintiff's pursuit of a further patent infringement claim against the contractor in district court. The* Zoltek *decision is good news for government contractors because it precludes separate contractor liability for patent infringement arising out of work performed on behalf of the United States. The decision also confirms that all such infringement claims must be brought for "reasonable and entire compensation" in the COFC against the United States.*

The Department of Homeland Security and the Department of Homeland Security awarded companies are infringing Golden's [US RE43,990] patent. The infringement is defined under **direct infringement** (occurs when a person without authorization makes, uses, offers to sell or sells any patented invention within the United States or imports into the United States any patented invention during the term of the patent), **infringement by equivalents** (a claim may be infringed under the doctrine of equivalents if some other element of the accused device or process performs substantially the same function, in substantially the same way, to achieve substantially the same result) and **contributory infringement** (is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States or imports into

the United States a component of a patented machine, manufacture, combination or composition, or a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."). The supportive documents are:

*Article; Awards; and Cooperative Research and Development Agreements (CRADA):* "Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors" cooperative agreement companies are Qualcomm, LG, Apple, and Samsung. The awarded companies are Qualcomm, Seacoast Science, Rhevision Technology and the Center for Nanotechnology at NASA Ames Research Center. *Article:* "Homeland Security Backs Cell Phone Sensors to 'Crowdsource' Detection of Deadly Chemicals".

*Award Information Sheets:* "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors" awarded companies are Synkera Technologies, Inc., Boston Microsystems, Inc., and QuantaSpec Inc.

*Article; Award Information Sheets; and Product Photo Data Sheets:* "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" awarded companies are Spectral Labs Incorporated and Creative Electron. *Article:* "Apple's nex-gen iPhone power amp; NASA chemical sensor app".

*Article of Product Demonstration:* Demonstration companies are NASA's Center for Nanotechnology at Ames, Qualcomm Inc., and Synkera Technologies Inc. *Article:* "NASA science unveils new chemical detection technology", October 3, 2011 by Cathy Weselby and John Verrico.

*Article of Product Development:* Development companies are NASA's Ames Research Center. *Article:* "NASA brings chemical sensor to iPhone", November 10, 2009 by Michael Cooney, Network World.

*Product Development White Paper of An Integrated Sensing System:* Title; "Nanosensor – Cellphone Integration for Extended Chemical Sensing Network", by Jing Li, Ph.D. and Principal Investigator for the NASA Ames Research Center. The product was developed in partnership with the U.S. Department of Homeland Security Science & Technology Directorate.

*Data Sheet for a Chemical (Temperature) Sensor:* "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors" awarded company Synkera Technologies Inc. data sheet includes a photo picture of the Synkera Ultrakera carbon monoxide (CO) chemical (temperature) sensor.

*Data Sheet; Picture of Product; and Product sale price ($199.00) without the iPhone:* "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" awarded company Creative Electron and the cooperative agreement company Apple Inc. is offering for sale a Radiation/Nuclear Smart Phone Detection Device. The data sheet is titled; "iRad Geiger for Apple iOS Devices".

*Data Sheet; Picture of Product; and Product sale price ($299.00) without the iPhone:* "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" awarded company Creative Electron and the cooperative agreement company Apple Inc. is offering for sale a Radiation/Nuclear Smart Phone Detection Device. The data sheet is titled; "iRad Alpha for Apple iOS Devices".

Enclosed in this document is a section of appendixes of documents that discloses Golden's patent or patent pending "Multi Sensor Detection and Cell Phone Detection" technology and the documents were submitted to the Department of Homeland Security of Golden's developmental capabilities:

*On 31 August, 2012, the United States Court of Appeals for the Federal Circuit released its highly anticipated en banc decision in the case of Akamai Technologies, Inc. v. Limelight Networks, Inc., 692 F.3d 1301 (Fed. Cir. 2012). At issue was whether inducement to infringe a method patent claim under 35 U.S.C. § 271(b) required a single entity to perform all of the steps or whether liability could still be found where multiple actors performed the steps collectively.*

*The Federal Circuit overturned previous case law which required a plaintiff alleging induced infringement to show that the defendant induced a single entity to perform all of the steps of the claimed method. Under Akamai, inducement now includes those who induce multiple parties to infringe different steps of the claimed method so that the infringing conduct is split among more than one entity.*

*Under the new rule, inducement liability exists where the accused infringer (1) knew of the patent; (2) induced performance of the steps of the method; and (3) those steps were actually performed. It follows also that the accused infringer will also be liable if it performs some of the steps of the method and then actively induces performance of the other steps.*

*This decision is important because it closes a major loophole that has allowed some entities to knowingly and intentionally take advantage of a patented invention while avoiding the need to take a license.*

The Department of Homeland Security and the Department of Homeland Security awarded companies are infringing Golden's [US RE43,990] patent. The infringement is defined under **contributory infringement** (is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."), **inducement infringement** (covers situations where one actively induces the infringement of a patent by encouraging, aiding, or otherwise causing another person or entity to infringe a patent. A potential inducer must actually be aware of the patent and intend for their actions to result in a third party infringing that patent). The Appendixes are:

Appendix I: On **09/21/2006**, an e-mail correspondence and a proposal were submitted to the Department of Homeland Security/HSARPA to the attention of the Program Manager, Lisa Sobolewski.

Appendix II: On **09/25/2007**, a "White Paper" was submitted to the DHS S&T Directorate, to the attention of Margo Graves, Team Lead / Contracting Officer; Team Lead / Contracting Officer; Borders and Maritime Division in response to the RFI solicitation; SAFECON.

Appendix III: On **11/28/2007**, a "White Paper" was submitted to the Department of Homeland Security, to the attention of Margo L. "Margo" Graves, Team Lead / Contracting Officer Margaret L. Office of Procurement Operations / Science & Technology Acquisitions Division in response to Broad Agency Announcement CELL-ALL Ubiquitous Biological and Chemical Sensing Solicitation Number: (BAA07-10)

Appendix IV: On **01/18/2008**, a "Read Ahead" document was submitted to the DHS S&T Directorate, and to the attention of Edward Turner; Program Manager. Reference was made to the "General description & Solutions alignment for "Cargo Containers, Cell Phones & Vehicles":

Appendix V: On **05/22/2008**, a "White Paper" that included the capability for the development of a Cell phone detection device was submitted to the DHS; S&T Directorate, to the attention of David Newton,

Acting Division Head, Borders and Maritime, S&T-BordersMaritime@dhs.gov; in response to solicitation
"Long Range Broad Agency Announcement (BAA08-01)".

Appendix VI: On **01/06/2009**, a "White Paper" was submitted to the DHS; S&T Directorate, to the
attention of Emily Graham, Contract Specialist; Office of the Chief Procurement Officer in response to
the TRUST solicitation RFI.

Appendix VII: On **09/03/2009**, an e-mail correspondence and a proposal were submitted to the
attention of Stephen Dennis, Program Manager for the *"Cell-All Project"*, Department of Homeland
Security (DHS); Science and Technology (S&T) Directorate.

Appendix VIII: On **11/07/2009**, a "Full Proposal" was submitted to the DHS; S&T Directorate, to the
attention of the Director of Innovation, in response to the Broad Agency Announcement (BAA) 09-17,
"Time Recorded Ubiquitous Sensor Technologies" (TRUST).

Appendix IX: On **09/01/2010**, a "White Paper" was submitted to the DHS; S&T Directorate, to the
attention of SandT-BordersMaritime@dhs.gov; in response to solicitation "Long Range Broad Agency
Announcement (BAA10-01)"; title of proposal: "Integrated Systems for Border and Maritime Security".

" Section 1498(a) further provides that whenever a patented invention "is used or manufactured by or
for the United States without license of the owner thereof . . . the owner's remedy shall be by action
against the United States in the [CFC] for the recovery of his reasonable and entire compensation for
such use or manufacture."

> *An applicant, his successors, assigns, or legal representatives, whose patent is withheld as herein provided, shall have
> the right, beginning at the date the applicant is notified that, except for such order, his application is otherwise in
> condition for allowance, or February 1, 1952, whichever is later, and ending six years after a patent is issued thereon,
> to apply to the head of any department or agency who caused the order to be issued for compensation for the damage
> caused by the order of secrecy and/or for the use of the invention by the Government, resulting from his disclosure.
> The right to compensation for use shall begin on the date of the first use of the invention by the Government. The head
> of the department or agency is authorized, upon the presentation of a claim, to enter into an agreement with the
> applicant, his successors, assigns, or legal representatives, in full settlement for the damage and/or use. This
> settlement agreement shall be conclusive for all purposes notwithstanding any other provision of law to the contrary.*

*If full settlement of the claim cannot be effected, the head of the department or agency may award and pay to such applicant, his successors, assigns, or legal representatives, a sum not exceeding 75 per centum of the sum which the head of the department or agency considers just compensation for the damage and/or use.*

Below is a quote taken from the "CELL-ALL Ubiquitous Biological and Chemical Sensing Solicitation Number: (BAA07-10)". The information contained will be used as a guide in determining the reasonable and entire compensation:

"If **biological and chemical sensors** could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with **more than 240M sensors....** Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) **and a communication systems concept for large scale multi-sensor networks....** This proof of concept should be capable of detecting hazardous biological and/or chemical materials **with eventual expansion to the detection of explosive and eventually radiological materials...."**

Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors
    120 million chemical sensors
    120 million biological sensors

Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors
    120 million chemical sensors

Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors
    120 million radiation sensors
    120 million nuclear sensors

Total number of sensors for Sol. 1, Sol. 2, and Sol. 3
    600 million sensors

*Note:* 600 million sensors will be used for calculating reasonable compensation for Independent claims 11, 81, and 74.

Golden's [US RE43,990] patent claim 11: 600 million sensors to come on line for monitoring, servicing, and data transfer. The communication system is handled by the service providers (e.g., Apple, Qualcomm, LG, and Samsung). 600 million sensors @ $1 dollar monthly service fee = $600 million dollars per/mth. $600 million dollars per/mth @ 12 months per/yr = $7.2 billion dollars per/yr. $7.2 billion dollars per/yr. for 10 of the remaining years of the patent = **$72 billion dollars over 10 years**.

Golden's [US RE43,990] patent claim 81: 600 million cell/smart phones that includes the software application (the support for the software application is in the 2nd item of claim 74 but is not being used here as a separate calculation for compensation) for integrating the detection capability. The average high-end smart phone is $250 dollars. $250 dollars @ 2% = $5 dollars. 600 million cell/smart phones that includes the software application @ $5 dollars each = **$3 billion dollars**.

Golden's [US RE43,990] patent claim 74: 600 million sensors/detectors. Creative Electron is selling two smart phone sensor/detector devices for radiation and nuclear detection that's priced @ $299 dollars and $199 dollars (the smart phone is not included in the price). The average price is $250 rounded. $250 dollars @ 10% royalty = $25 dollars. (the 10% royalty is used because Golden's ATPG TECHNOLOGY, LLC had an opportunity to be the lead company in developing the sensor/detector for sell). 600 million sensors/detectors @ $25 dollars each in royalties = **$15 billion dollars in royalties**.

$72 billion dollars plus $3 billion dollars plus $15 billion dollars = **$90 billion dollars total**

Apple announces Q1 2013 earnings: record $54.5 billion in revenue, 47.8 million iPhones and 22.9 million iPads sold **(estimated $200 billion for 2013).**

Qualcomm Inc., the wireless technology giant said 2013 first quarter revenue increased 24 percent to $6.12 billion **(estimated $24 billion for 2013).**

LG Electronics 2013 revenues in the first quarter rose 6.8 percent year-over-year 13.01 billion mainly due to the improved performance of the mobile business **(estimated $52 billion for 2013).**

Samsung Electronics, the world's No.1 smart phone vendor. Samsung's hot streak continues in 2013 Q1: Record $7.7B profit on $45.9B in sales **(estimated $180 billion for 2013).**

## CONCLUSION

Below is an article that supports Golden's [US RE43,990] patent independent claim 11 of; "A communication device of at least one of a cell phone.... or a computer terminal at a monitoring site for monitoring products, interconnected to a product for communication therebetween". The cell phone, and the monitoring site, and the product for communication therebetween, all work as a functional unit. The cell phone detection system must include all of the above components. The "product for communication therebetween" (e.g. cell tower, cell site or base station) is defined in the items of claim 11. If the Department of Homeland Security wants to argue the merits of claim 11, they should be mindful of the fact that the cell tower, cell site or base station can be considered a "tag-along" to recover damages for the loss profits.

> *"The patentee may also seek to recover damages for the lost profits he would have made on accessory items that typically are purchased with the patented item. For these tag-along or convoyed sales, the Rite-Hite court held that those damages may also be recoverable. For such recovery, however, all of the components (patented item and the tag-along items) must work as a functional unit. If the tag-along items and the patented item can function as stand-alone products, then this type of damages may not be recoverable" Wikibooks.org*

### How do Cell Phone Towers Work?

Cell phone towers are also known as **cell site or base stations**, and are made up of radios, computerized switching equipment, and antennas for receiving and transmitting radio frequency (RF) signals. They are usually mounted atop or on the side of tall buildings, water tanks, etc.

A signal cell phone tower will host single or multiple mobile operators, serving different air interface technology, such as CDMA or GSM. Part of the electromagnetic spectrum, cell phones and cell phone towers operate at the radio frequency, and emit non-ionizing radiation, similar to the one's used by microwave, AM and FM radio waves, and are too low on energy, to enter DNA tissues.

The operating mechanics of a cell phone are quite simple. When a call is made through a cellular phone, a signal is sent out from the cell phone's antenna to the base station antenna. It radios the nearest cell phone tower, <u>which is particular to your service provider or a collaborator of your service provider.</u>

GS FIRMLY TO SEAL



PRESS

...L MAIL EXPRESS



U.S. POSTAGE PAID
PME 1-Day
GREENVILLE, SC
29606
JUL 29, 22
AMOUNT
**$26.95**
R2303S102300-09

1007    94612

B/C

# PRIORITY
# MAIL
# PRESS®

## FOR DOMESTIC AND INTERNATIONAL USE



**UNITED STATES POSTAL SERVICE** ®    PRIORITY MAIL EXPRESS®



EI 187 759 829 US

T RATE
ELOPE
E ■ ANY WEIGHT

...ule free Package Pickup,
...can the QR code.



...PS.COM/PICKUP



...PS10001000006

EP13F
OD: 12 1/2 x 9 1/2

▷ **PEEL FROM THIS CORNER**

**CUSTOMER USE ONLY**
FROM: (PLEASE PRINT)    PHONE ( 864 ) 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**
☑ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)    PHONE ( )

U.S. DISTRICT COURT - NDC - OAKLAND
CASE NO: 4:22-CV-03283-HSG
1301 CLAY STREET, SUITE 400S
OAKLAND, CA

ZIP + 4® (U.S. ADDRESSES ONLY)

9 4 6 1 2 - ___ ___ ___ ___

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 Insurance included.

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.    Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☑ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|

PO ZIP Code: 29606    Scheduled Delivery Date (MM/DD/YY): 073022    Postage: $26.95

Date Accepted (MM/DD/YY): 072922    Scheduled Delivery Time ☑ 6:00 PM    Insurance Fee: $    COD Fee:

Time Accepted: 938 ☑ AM ☐ PM    Return Receipt Fee: $    Live Animal Transportation Fee:

Special Handling/Fragile $    Sunday/Holiday Premium Fee $    Total Postage & Fees $ 26.95

Weight ☑ Flat Rate    Acceptance Employee Initials MJT    $ 26.95
___ lbs. ___ ozs.

**DELIVERY (POSTAL SERVICE USE ONLY)**
Delivery Attempt (MM/DD/YY) Time ☐ AM ☐ PM    Employee Signature

Delivery Attempt (MM/DD/YY) Time ☐ AM ☐ PM    Employee Signature

LABEL 11-B, MAY 2021    PSN 7690-02-000-9996

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; May 2020; All rights reserved.