# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**FILED**

AUG 2 3 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



|  |  |
|---|---|
| LARRY GOLDEN<br><br>*Pro Se* Plaintiff,<br><br>V.<br><br>QUALCOMM INC.<br><br>Defendant. | CASE NO: <u>4:22-cv-03283-HSG</u><br><br>**(JURY TRIAL DEMANDED)**<br><br>**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**<br><br>August 22, 2022 |

## PLAINTIFF'S MOTION FOR PERMANENT INJUNCTIVE RELIEF

Pursuant to 15 U.S.C. § 26, Plaintiff is filing this "Motion for Injunctive Relief" as a private party; [A]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws…"

*A permanent injunction is a court order requiring a person to do or cease doing a specific action that is issued as a final judgment in a case. A court will issue a permanent injunction only where money damages will not suffice. Failure to comply with an injunction may result in being held in contempt of court, which in turn may result in either criminal or civil liability.*

## CONVERSATION BETWEEN THE PARTIES

On August 16, 2022, the Defense Attorney for Qualcomm (Defendant "Qualcomm") and Plaintiff in case no. 4:22-cv-03283-HSG, Golden v. Qualcomm, entered into a conversation of what was supposed to be a discussion about filing a "joint" Case Management Statement, but, turned out to be a seasoned Attorney educating a Pro Se litigant on law definitions on the topics of interrogatories, deposing witnesses, allowing and securing e-mail documents, protective documents, initial disclosures, electronically stored information, Federal Rule of Evidence 408, and the Defense schedule for submitting its patent invalidity contentions.

Plaintiff repeatedly stated to the Defense Attorney that all of the above topics was premature for the following reasons 1) There's a motion before the Court for "default judgement" against the Defendant; and, 2) Defendant filed a motion under 12(b)(1) for "lack of jurisdiction", and 12(b)(6) for "failure to state a claim". The above topics are only relevant and ripe for discussion should the Court waived the Defendant's "default"; the case has jurisdiction; and, the Plaintiff has stated a claim for relief.

The one comment that triggered this "Motion for Injunctive Relief" at this time was when the Defense Attorney twice stated the Defendant is not interested in settlement. Taking that position is an indication to Plaintiff that the Defendant's intention is to continue riding this case out, in hope that the Court dismiss this case on a procedural misstate made by the Plaintiff.

## PLAINTIFF BELIEVES QUALCOMM IS ACTING IN "BAD FAITH"

Upon information and belief, Qualcomm acted in bad faith by consciously disregarding its duty to address its misconduct. Plaintiff may adequately plead bad faith by alleging that Qualcomm's leadership intentionally directed the corporation to violate the law. "[I]f the court believes the defendant is acting in bad faith, the court should show little sympathy and rule in favor of permanent injunction. See, *e.g., Penland v. Redwood Sanitary Sewer Serv. Dist.*, 965 P.2d 433, 440 (Or. Ct. App.1998); *Holubec v. Brandenburger,* 58 S.W.3d 201, 213-14 (Tex. App. 2001), rev'd on other grounds, 111 S.W.3d 32 (Tex. 2003).

Plaintiff is seeking an injunction to prevent and restrain Qualcomm's antitrust violations, See, *e.g., Duplex Printing Press Co. v. Deering*, 254 U.S. 443 (1921); *American Crystal Sugar Co. v. Cuban-American Sugar Co.*, -259 F.2d 524 (2d Cir. 1958); *Bigelow v. RKO Radio*

2

*Pictures, Inc.*, 162 F.2d 520, (7th Cir.), cert. denied, 332 U.S. 817 (1947); *McKesson & Robbins, Inc. v. Charles Pfizer & Co.*, 235 F. Supp. 743 (E.D. Pa. 1964), where the Government in *FTC v. Qualcomm*; case no. 17-cv-00220-LHK, has failed to do so and where the relief obtained by the Government is insufficient to supply Plaintiff with adequate protection.

The right of a federal court to grant injunctive relief in a private antitrust action is derived from section 16 of the Clayton Act, which provides in-part that "any person ... shall be entitled to sue for and have injunctive relief against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief ... is granted by courts of equity..."

The *FTC v. Qualcomm* ("Finding of Facts and Conclusions" filed as Exhibit A in this Case 4:22-cv-03283-HSG Document 1-3 Filed 06/06/22) "[Q]ualcomm's failure to alter its unlawful licensing practices despite years of foreign government investigations, findings, and fines suggests an obstinance ..."

## QUALCOMM'S FAILURE TO ALTER ITS UNLAWFUL LICENSING PRACTICES

Twelve (12) years from the date of notice given Defendant by Plaintiff—**Exhibit A**. Qualcomm continues to collect a 5% royalty on the price of each handset (i.e., new and improved cell phone) by blackmailing the OEMs with the threat of "no license, no chip"; and, is still "tying" CPUs that allegedly infringes Plaintiff's patents, to its SoCs, and blackmailing the OEMs with the threat of "no license, no chip".

Nine (9) years from the date Qualcomm was entered as third-party defendant in a related case—**Exhibit B**—entered in this Case 4:22-cv-03283-HSG Document 22 Filed 08/01/22 Page 37-49 of 49 as Exhibit B; Qualcomm is still abusing the patent rights of the Plaintiff, while demanding the OEMs in the relative industry respect and honor their patents or they will not receive the chips they need.

Three (3) years after the Government in the related case issued a notice for Qualcomm to appear to protect its interest against the alleged infringement claims of the Plaintiff—**Exhibit C**—entered in this Case 4:22-cv-03283-HSG Document 1-4 Filed 06/06/22 Page 199-206 of 229 as Exhibit L. Qualcomm is collecting a 5% running royalty on each of Plaintiff's patented new

and improved cell phones' sold; and, Qualcomm is collecting an enhanced royalty because Qualcomm "ties" Plaintiff's patented central processing units (CPUs) to its SoCs that includes Qualcomm's patented cellular modems.

Qualcomm waived its right to litigate infringement in this case, because Qualcomm fail to appear in the related case—**Exhibit D**—entered in this Case 4:22-cv-03283-HSG Document 1-8 Filed 06/06/22 as Exhibit J. Qualcomm is attempting having this case re-litigated for anti-trust violations.

Plaintiff is asking the Court for permanent injunctive relief that enjoins Qualcomm from collecting any royalty on each new and improved cell phone (i.e., handset) sold; and, permanent injunctive relief that enjoins Qualcomm from selling and/or receiving a royalty on the CPUs designed for the new and improved cell phone (i.e., handset).

## **PLAINTIFF'S CONCEPTION OF THE NEW AND IMPROVED CELL PHONE QUALCOMM ILLEGALLY COLLECTS A ROYALTY ON**

I can remember September 11, 2001 (9/11) is the day my life was changed forever. I was traveling through downtown Columbia, SC when I noticed the police and other authorities scrambling to protect vulnerable buildings and sites from what may be another terrorist attack.

When I return home to Mauldin, SC I watched the attacks over and over again all day long, thinking to myself, I have to do something. I can remember watching the explosions when the airplane hit the towers, thinking there must be a way to detect for CBRNE agents that's being carried on or in a moving vehicle. That's the concept behind my SafeRack & V-Tection projects.

I decided to separate the two projects for the moment to develop a strategy of using the technical rational behind the SafeRack project (detection devices for CBRNE-H detection), and the technical rational behind the V-Tection project (stall, stop, vehicle slowdown); to create economic stimulus packages for restoring our Nation's economy (new businesses and jobs).

But, before campaigning to generate the demand for the technology, I knew, I needed a device that's capable of communicating, monitoring, detecting, and controlling (CMDC), that can be used to not only connect or integrate the technology for the SafeRack and V-Tection projects, but that can also be used by both the Government and the American consumer. I decided to call this project the Anti-Terrorism Product Grouping (ATPG) project.

4

For consumer use, I knew, I had to include some safety features such as using NFC instead of RFID (DHS demonstrated how RFID can be used to detonate bombs); biometric authentication (i.e., fingerprint, facial, etc.); advanced tracking and location; and, a lock disabling mechanism that locks the CMDC device after multiple failed attempts to unlock.

I began my campaign by sending the "Economic Stimulus and Terrorism Prevention Packages" to three U.S. Senators from South Carolina. They in turn sent me letters, notifying me that they had sent the packages over to the Department of Homeland Security (DHS).

Next, I sent the "Economic Stimulus and Terrorism Prevention Packages" to the President and Vice-President of the United States. Both their offices sent me a letter, notifying me that they had sent the packages over to the Department of Homeland Security (DHS). I also sent the packages to the President's Council of Economic Advisors.

When I call the President's Council of Economic Advisors, they informed me that they had the packages but could not move on them until the President say so.

I designed a "product grouping" strategy to outline the advantages of grouping products of common features and design similarities for mass producing to reduce cost. The "demand" had to be generated for the new products. That's where the Government agencies comes in.

I must admit, the Government did its part in creating the demand. I have attached as **Exhibit E** a small sample listing of Government solicitations that covers the technical rational behind each of Plaintiff's stimulus packages.

I was invited to the DHS to discuss my "product grouping" strategy and the technical rational behind each of the packages, three times. On one occasion, my lead engineer traveled with me. I was asked to send a read-ahead document before the meeting that describes my work.

The first solicitation for the assembly and development of my CMDC device was issued in 2007, DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing* **Exhibit F** DHS was seeking proposals for a new cell phone capable of biological and chemical sensing.

For the program's initial phase in 2007, DHS released a call for proposals inviting the *private sector* to develop a proof of concept for the "*Cell-All Ubiquitous Biological and Chemical Sensing*" project (U.S. Department of Homeland Security, 2007). Cell-All Ubiquitous Biological and Chemical Sensing. <https://http://www.fbo.gov/index?s=opportunity&mode=form&id =f292c1fdbd46777a3ff8ca64ef96658f&tab=core&_cview=1> (accessed 17.09.12).

DHS S&T secured Cooperative Research and Development Agreements **Exhibit G** with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" *Cell-All: Super Smartphones Sniff Out Suspicious Substances* http://www.dhs.gov /cell-all-super-smartphones-sniff-out-suspicious-substances "[t]hree teams from Qualcomm... are perfecting their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market"

After years (2002-2008) of educating the Government on how to stimulate the economy with my new and innovative technology, only to have the DHS give it all away to Qualcomm, Apple, Samsung, and LG. **Exhibit G** *Cell-All: Super Smartphones Sniff Out Suspicious Substances* http://www.dhs.gov/cell-all-super-smartphones-sniff-out-suspicious-substances "[S]imilarly, S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes ... the first of which will sniff out carbon monoxide and fire... [t]he goal seems imminently achievable: Just as Bill Gates once envisioned a computer on every desk in every home, so Stephen Dennis envisions a chemical sensor in every cell phone in every pocket, purse, or belt holster"

## PLAINTIFF HAS SUFFERED AN IRREPARABLE INJURY

### Antitrust Injury

Qualcomm fail to defend against Plaintiff's claim that Qualcomm is collecting a 5% running royalty on the price of each handset (i.e., new and improved cell phone; smartphone) that Plaintiff alleges is his patented communicating, monitoring, detecting, and controlling (CMDC) device (i.e., new and improved cell phone; smartphone). Plaintiff alleged "Qualcomm engaged in 'anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power'." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Plaintiff alleges he has suffered an antitrust injury because Plaintiff owns the patent(s), and patent rights to collect a royalty on the price of each handset sold (i.e., new and improved cell phone; smartphone).

In the opinion of the U. S. District Court for the District of Northern California; "Qualcomm leveraged its monopoly position in chips to secure unreasonably high rates for its SEPs. Qualcomm, for example, refused to provide must-have chips unless customers took the unreasonable IP licenses—the "no license, no chip" model.

Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision in *United States v. Microsoft Corp.*, held it sufficient that Qualcomm engaged in "anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Qualcomm's "no license, no chip" policy is designed to force sell CPUs Plaintiff believe infringes his patented CPUs, that's tied to Qualcomm's cellular modem. Qualcomm's "no license, no chip" policy is only made possible by Qualcomm's unauthorized use of allegedly infringing CPUs of Plaintiff's patented CMDC devices (i.e., smartphones; handsets of OEM's).

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of each phone sold, i.e., handset; smartphone, etc. The elements of unjust enrichment exist because: 1) Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff.

The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices: "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5% running royalty on the price of each handset sold*. These licenses are called Subscriber Unit License Agreements ("SULA") ..."

"Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio. Qualcomm's 5% royalty rate on the price of each phone

sold is a species of unfair competition. The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold...

Qualcomm's anticompetitive practices has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC (handset) devices and Plaintiff's patented CPUs. The OEMs are already paying royalties to Qualcomm on every handset sold; and, the OEMs are already paying an increased royalty rate for Qualcomm's chipsets that include Plaintiff's patented CPUs. This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful.

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of the phone, i.e., Plaintiff's CMDC device; handset; smartphone, etc. Plaintiff has the right to exclude Qualcomm from "using" Plaintiff's CMDC devices—handsets to unjustly enrich itself.

Plaintiff is entitled to stop Qualcomm's use of the Plaintiff's inventions to generate revenue (5% royalty on each handset sold) by seeking a legal injunction in Federal Court.

Qualcomm's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages from Qualcomm for any unlicensed use of his inventions. Damages are generally calculated based on lost profits Plaintiff suffered as a result of the antitrust injury.

The Federal Trade Commission and U. S. District Court for the District of Northern California has already determined Qualcomm's anticompetitive practices include collecting royalties on the price of each handset sold. This issue was not overturned by the Ninth Circuit and Qualcomm has not corrected the matter.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to retry the *FTC v. Qualcomm* case; and, no genuine dispute as to who

own the patent rights for the handsets Qualcomm is unjustly enriching itself with. Plaintiff is entitled to judgment as a matter of law.

## THE REMEDIES AVAILABLE AT LAW, SUCH AS MONETARY DAMAGES, ARE INADEQUATE TO COMPENSATE FOR PLAINTIFF'S INJURY

If Qualcomm is allowed to keep collecting royalties on products, they do not have patents for (Plaintiff's patented new and improved cell phones and central processing units), it will not only continue to hurt Qualcomm's competitors in the relative market, and Plaintiff; it has the potential of destroying the entire patent grant system.

What would be the purpose of spending thousands of dollars to prosecute a patent application at the USPTO and waiting years for a patent to issue, when companies such as Qualcomm is allowed to collect royalties on inventions that belong to someone else?

Anticompetitive conduct is conduct that "harm[s] the competitive process and thereby harm[s] consumers." *Microsoft*, 253 F.3d at 58 (emphasis in original). Put another way, "anticompetitive conduct is behavior that tends to ***impair the opportunities of rivals*** and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); see also *Spectrum Sports*, 506 U.S. at 458 (holding that the Sherman Act "directs itself . . . against conduct which unfairly tends to destroy competition itself").

Qualcomm's conduct "unfairly tends to destroy competition itself." *Spectrum Sports*, 506 U.S. at 458. Qualcomm's licensing practices are an unreasonable restraint of trade under § 1 of the Sherman Act and exclusionary conduct under § 2 of the Sherman Act. *Microsoft*, 253 F.3d at 58–59 (holding that where conduct causes anticompetitive harm not justified by procompetitive business reasons, the monopolist violates both § 1 and § 2).

Qualcomm's practices violate § 1 and § 2 of the Sherman Act, and Qualcomm is liable under the FTC Act for practicing "unfair methods of competition". The FTC Act include "violations of the Sherman Act." Cement Inst., 333 U.S. at 693–94.

Qualcomm brags and boast about how they are able to unlawfully utilize the technology of Plaintiff to generate billions, "[T]oday, our foundational technologies enable the mobile ecosystem and are found in every 3G, 4G and 5G smartphone. We bring the benefits of mobile to

9

new industries, including automotive, the internet of things, and computing, and are leading the way to a world where everything and everyone can communicate and interact seamlessly. https://www.qualcomm.com/news/releases/2022/08/globalfoundries-and-qualcomm-announce-extension-of-long-term-agr.

Which means Qualcomm has collected 5% running royalty rate on every 3G, 4G and 5G smartphone sold, without a patent, a license, or authorization to do so. It also means Qualcomm has collected a royalty on 3G, 4G and 5G smartphone that has a Qualcomm SoC, that "ties" Plaintiff's patented CPU to its cellular modem.

Qualcomm will continue these unlawful practices unless Qualcomm is enjoined to cease receiving any amount of royalties on the sell of the smartphone and CPU. The *FTC v. Qualcomm* ("Finding of Facts and Conclusions" filed as Exhibit A in this Case 4:22-cv-03283-HSG Document 1-3 Filed 06/06/22) case has shown that the basic headline rate Qualcomm has historically charged for a license to its entire patent portfolio is 5% of the price of the entire device to which the license applies, with a recently imposed cap of $400 (implying a maximum royalty of 5% x $400 = $20 per device). **Exhibit H** - Summary of *FTC v. Qualcomm*

## **REMEDY IN EQUITY IS WARRANTED UPON CONSIDERATION OF THE BALANCE OF HARDSHIPS BETWEEN THE PLAINTIFF AND DEFENDANT**

If Qualcomm is allowed to continue collecting royalties on Plaintiff's patented inventions, Plaintiff could lose all licensing opportunities for his CMDC devices and CPUs. The Plaintiff could forever lose the following:

**Plaintiff's CMDC device is an Invention-of-Inventions**

I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., new and improved cell phone; smartphone, etc.) – Claim 23 of the '439 Patent

   a) Central Processing Units for CMDC Device – Claim 5 of the '287 Patent
   b) Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent
   c) Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent
   d) Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent
   e) Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent
   f) NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent

g) Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent

h) Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent

i) Fingerprint / Face Recognition for CMDC Device – Claim 1 of the '619 Patent

j) Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '891 Patent

k) Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent

l) Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent

m) Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent

Plaintiff claims Qualcomm is using the allegedly infringing OEMs new and improved cell phone (i.e., smartphones); to generate tens of billions of dollars in revenue. Claim 23 of Plaintiff's '439 patent demonstrates how Plaintiff's new and improved cell phone (i.e., smartphone) is capable of communicating, monitoring, detecting, and controlling. Plaintiff's new and improved cell phone (i.e., smartphone) comprises "a central processing unit (CPU) for executing and carrying out the instructions…"

| Claim 23 of Plaintiff's '439 Patent | |
|---|---|
| **PREAMBLE** | ***A cell phone comprising:*** <br><br> a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |
| **COMMUNICATING** | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range … (RF) connection, short … frequency (RF) connection, or GPS connection; |
| **MONITORING** | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked … biometric lock disabler to prevent unauthorized use; |
| **DETECTING** | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; |
| **CONTROLLING** | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone … device; |

Plaintiff claims Qualcomm and Intel is using the allegedly infringing central processing units CPUs that's designed to be used with Plaintiff's communication devices of at least a computer terminal, a personal computer (PC), a laptop, a desktop, a notebook, a handheld, a cell phone, a PDA or a smart phone; to generate tens of billions of dollars in revenue. Claim 4 of Plaintiff's '287 patent demonstrates how each limitation describes what operational and functional instructions Plaintiff's CPUs are expected to perform. The CPU is the "brain" of the CMDC device and is therefore essential.

| Claim 4 of Plaintiff's '287 Patent | |
|---|---|
| **PREAMBLE** | ***A communication device comprising***: <br><br> at least one central processing unit (CPU); |
| <u>C</u>OMMUNICATING | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU |
| <u>M</u>ONITORING | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device |
| <u>D</u>ETECTING | at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; |
| <u>C</u>ONTROLLING | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent … |
| <u>C</u> <u>M</u> <u>D</u> <u>C</u> | … such that the communication device is capable of ***communicating, monitoring, detecting, and controlling*** |

| Claim 2 of Plaintiff's '189 Patent | |
|---|---|
| **PREAMBLE** <br> *(Product Grouping)* | ***Monitoring equipment*** of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, ***personal computer (PC), laptop, desktop***, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: |

| COMMUNICATING (*Product Grouping*) | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection |
|---|---|
| MONITORING (*Product Grouping*) | a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user |
| DETECTING (*Product Grouping*) | a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device |
| CONTROLLING (*Product Grouping*) | whereupon the monitoring equipment, is interconnected to a product equipped to receive signals or send signals to the lock disabling mechanism that is able to engage and disengage or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| PRODUCT GROUPING | wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity |

## THE PERMANENT INJUNCTION BEING SOUGHT WOULD NOT HURT PUBLIC INTEREST

In terms of the scope of any injunction, the United States Supreme Court instructs "that a remedies decree in an antitrust case must seek to 'unfetter a market from anticompetitive conduct,' to 'terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *Microsoft*, 253 F.3d at 103 (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972), and *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)). "[A]dequate relief in a monopolization case should put an end to the combination and deprive the defendants of any of the benefits of the illegal conduct, and break up or render impotent the monopoly power found to be in violation of the Act." *Grinnell*, 384 U.S. at 577. Thus, it is "entirely appropriate" for a court to order an injunction "beyond a simple proscription against the precise conduct previously pursued." *Nat'l Soc'y of Prof'l Eng'rs,* 435 U.S. at 698.

# IT HAS ALWAYS BEEN THE GOAL OF QUALCOMM TO UNFAIRLY AND ILLEGALLY DESTROY COMPETITION

HSARPA conducted a national search for ideas that was intended to leverage existing technological expertise in the public and private sectors, which led to the creation of six workable first-generation prototypes, including a "form factor phone" developed by Qualcomm and a chemical nanosensor device developed by NASA (U.S. Department of Homeland Security, 2011a). U.S. Department of Homeland Security, 2011a. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. (accessed 17.09.12).

"[A]s a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011) Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. (accessed 17.09.12). **Exhibit J**

Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from Google Play and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android or Apple's iPhone operating systems. When the application is installed, it will ask the user for permission to share sensor readings and location information over the network; then, whenever abnormal chemical levels are detected, the phone will send those data to a network gateway.

According to Doug Hoffman, program manager at Qualcomm, the gateway will authenticate the sensor and phone to determine whether they are authorized to be on the network, scrub personal information from the data, assign a temporary identification number to the phone, and then send data to the network operations center (NOC) (Hoffman, 2011). Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. (accessed 17.09.12).

Qualcomm's development of a "form factor phone" was only used to get funding from the DHS for the *Cell-All* project, and to get DHS to appoint Qualcomm as the prime contractor of the Cell-All project. Qualcomm does not manufacture phones.

The way Qualcomm has "take[n] advantage of the 300 million cell phones that are out there today", is by charging a 5% running royalty on the sale of each phone—while the OEMs past that cost on to the consumer.

14

The way Qualcomm has fulfilled its "role as a develop[er] of a smartphone app and the associated network software for processing data" for the Cell-All initiative, is by "tying" Plaintiff's patented central processing units to its cellular modems and selling them as 'systems on a chip' (SoC).

Qualcomm's "network gateway" simply duplicates Plaintiff's patent claims limitations that includes Plaintiff's central processing units (CPUs):

*Claim 1 of Plaintiff's '189 patent*; "at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices"

*Claim 1 of Plaintiff's '189 patent*; "a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom"

Everyday Qualcomm is allowed to continue its anticompetitive illegal conduct, jeopardizes the USPTO patent system and patent owners. Below are examples of what we can expect in the future if Qualcomm is allowed to continue its anticompetitive practices:

Plaintiff owns the patent rights for a Multi-Sensor Detection Device/System capable of detecting for chemical, biological, radiological, nuclear, or explosive agents, compounds, or weapons of mass destruction that can be placed in a ship or airplane. Plaintiff will license the technology only if Plaintiff is allowed to charge a 5% running royalty rate on the price of every ship or airplane sold, regardless of whether Plaintiff owns the patent rights for the ship or airplane.

Plaintiff owns the patent rights for a Stall, Stop, Vehicle Slow-down System (i.e., Advanced Driver Assistance System (ADAS)) that is used with driver, driverless, autonomous, and self-drive cars. Plaintiff will license the technology only if Plaintiff is allowed to charge a 5% running royalty rate on the price of every car, regardless of whether Plaintiff owns the patent rights for the car.

Plaintiff owns the patent rights for a Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., new and improved cell phone; smartphone) that is used with the house to open and close the garage doors; activate and deactivate the security system; view the inside and outside of the house from a remote location; control the temperature for the house and the pool; control the lights, etc. Plaintiff will license the technology only if Plaintiff is allowed to charge a 5% running royalty rate on the price of the house, regardless of whether Plaintiff owns the design patent rights for the house.

Plaintiff is asking this Court to terminate Qualcomm's illegal monopoly, and deny Qualcomm the fruits of its statutory violations [at the expense of others] *Microsoft*, 253 F.3d at 103.

This Court has the authority to enjoin Qualcomm to stop collecting any amount of royalties on the sale of each handset (smartphone) sold; the authority to enjoin Qualcomm to stop "tying" all CPUs to its cellular modems and selling the unit as systems-on-a-chip; and, the authority to award damages to Plaintiff for all antitrust injuries Qualcomm has cause Plaintiff.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22st day of August, 2022, a true and correct copy of the foregoing "Plaintiff's Motion for Permanent Injunctive Relief", was served upon the following Defendant by priority "express" mail:

> John A. Yates
> PATTERSON & SHERIDAN, LLP
> 24 Greenway Plaza,
> Suite 1600
> Houston, Texas 77030
> Phone: 713-577-4817
> Email: jyates@pattersonsheridan.com

> Larry Golden, Pro Se
> 740 Woodruff Rd., #1102
> Greenville, South Carolina 29607
> atpg-tech@charter.net
> 864-288-5605

# EXHIBIT A

### ATPG Technology, LLC
*(Anti-Terrorism Product Grouping)*

**522 Peach Grove Place, Mauldin, SC 29662**
**E-mail: atpg-tech@charter.net**
**Bus. 864-288-5605 / Mobile: 864-992-7104**

December 15, 2010

Qualcomm Incorporated
Attn: Dr. Paul E. Jacobs, Chairman & CEO
5775 Morehouse Dr., Bldg. N
San Diego, California 92121

Dear Sir:

My name is Larry Golden, CEO of ATPG Technology, LLC. I want to introduce/present technology that I feel will be beneficial for projects being researched and developed within the divisions of your company.

I'm interested in speaking with you about the possibility of a licensing agreement(s) on the technology covered in my Patents and applications I have patent pending. My claims cover controlling vehicles, monitoring sensors, locking devices and cell phone RFID.

I have been granted two (2) patents: 7,385,497 (16 claims for detection systems) and 7,636,033 (10 claims for mobile control and monitoring a vehicle's operational equipment).

I have two (2) continuation applications that are patent pending; published application 12/657,356 (44 claims for cell phone detection system and locking systems [*I have received a verbal from the Examiner of allowance*]) and a non-published application 12/802,001 (20 claims for embedded sensors in cargo containers and UAVs, pre-programmed functions for a vehicle's operational equipment and product grouping network of security systems).

From the technology covered in the patents and applications that are patent pending, I introduced to the Department of Homeland Security (DHS) in a "white paper" proposal on September 1, 2010, six (6) systems for cargo container security.

1. A "Multi Sensor Detection System"
2. An "Internal Lock Disabling System"
3. An "External Interface Lock Disabling System"
4. A "Cell Phone Detection System"
5. A "Stall-to-Stop and Vehicle Slowdown System"
6. A "Built-In; Embedded Multi Sensor Detection and Lock Disabling System"

All have cell phone and/or handheld mobile communication capabilities; all can be grouped to form a single network or handled individually as part of multiple networks; all can be used with a maritime cargo container for cargo container security, and all have locating and tracking technology capabilities.

*Disclosure*: To overcome some prior art for the granted patent 7,636,033 and the published application 12/657,356 a "Swear Back" was accepted by the USPTO that establishes a priority date of March, 2001.

**Preview of patented and patent pending claims:**

Vehicles:
- The stall-to-stop and lock disabling system of claim 7 wherein the portable communication device is a cell phone.
- The stall-to-stop and lock disabling system of claim 8 wherein the portable communication device is a laptop computer.
- The stall-to-stop and lock disabling system of claim 9 wherein the portable communication device is a desktop PC.

Cell Phone Cases:
- Wherein the cell phone detector case is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals.
- The multi-sensor detection and automatic/mechanical lock disabler system of claim 14 wherein the cell phone detector case has monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween.
- The multi-sensor detection and automatic/mechanical lock disabler system of claim 15 wherein the cell phone detector case having a basic monitoring terminal can be adapted and incorporated to include desktop PC's, notebook, PC's, laptops, cell phones, LCD monitors, and satellite monitoring.
- The multi-sensor detection and automatic/mechanical lock disabler system of claim 16 wherein the cell phone detector case can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases and briefcases.

Internal and External Locks:
- The automatic/mechanical lock disabler system of claim 34 wherein the automatic/mechanical lock disabler of claim 34 includes a Blue tooth connection, a Wi-Fi connection, a radio frequency connection, an Internet connection, a Cellular connection, a Satellite connection, all of which are interconnected to the central processing unit (cpu).
- The automatic/mechanical lock disabler system of claim 37 wherein the automatic/mechanical lock disabler can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors to and from a cell phone and any of the products listed in the product groupings.

Detection System:
- a multi sensor detection system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, human, contraband; camera, light and video sensors allow the user to access, review and respond to network multi sensor detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site;

Built-in Detection System:
- a built-in multi sensor detection system for monitoring products with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, human, contraband; camera, light and video sensors allow the user to access, review and respond to network multi sensor detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site; sensors for motion, locks, perimeter, temperature, tampering and breach for the prevention of terrorist activity and theft.

Biometrics and Authentication
- a fingerprint biometric lock with disabler... for disabling and locking of the product and capable of being reset by the confirmation of an authorized fingerprint.
- wherein the disabling and slowdown means is designed to be used with or without biometrics for authentication.
- wherein the cell phone detector case is designed to be used with or without biometrics for authentication.
- a built-in biometric reader for authentication.

*Disclosure*: I filed a petition to get a prior filing date for application 12/657,356. If the petition office decides against it, I will file a reissue of the parent patent (7,636,033) and add all the claims of the two pending applications.

Thanking you in Advance,


Larry Golden, CEO
ATPG Technology, LLC

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®
SAN DIEGO CA 92121

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.44 | 0273 |
| Certified Fee | $2.80 | 11 |
| Return Receipt Fee (Endorsement Required) | $2.30 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.54 | 12/16/2010 |

Sent To Qualcomm Incorporated
Attn: Dr. Paul E. Jacobs, Chairman + CEO
Street, Apt. No.;
or PO Box No. 5775 Morehouse Dr., Bldg. N
City, State, ZIP+4 San Diego, CA 92121

7010 1870 0002 0193 0551

PS Form 3800, August 2006            See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

QUALCOMM INCORPORATED
ATTN: DR. PAUL E. JACOBS,
   CHAIRMAN & CEO
5775 MOREHOUSE DR., BLDG. N
SAN DIEGO, CA   92121

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature]         ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Doug Sullivan          12-20-10

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)        7010 1870 0002 0193 0551

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®
SAN DIEGO CA 92121

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.44 | 0273 |
| Certified Fee | $2.80 | 11 |
| Return Receipt Fee (Endorsement Required) | $2.30 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.54 | 12/16/2010 |

Sent To Qualcomm Incorporated
Attn: Derek Aberle, EVP + President
Street, Apt. No.;
or PO Box No. 5775 Morehouse Dr., Bldg. N
City, State, ZIP+4 San Diego, CA 92121

7010 1870 0002 0193 0544

PS Form 3800, August 2006            See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

QUALCOMM INCORPORATED
ATTN: DEREK ABERLE, EVP + PRESIDENT
5775 MOREHOUSE DR., BLDG. N.
SAN DIEGO, CA   92121

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature]         ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Doug Sullivan          12-20-10

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)        7010 1870 0002 0193 0544

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

**Sent:** Thursday, September 29, 2011 1:33 PM
**To:** Lane, Kate
**Subject:** RE: Patented Technology for Qualcomm Review

Yes. Please let me know if you are interested in entering into discussions.

Larry

On Thu, Sep 29, 2011 at 3:58 PM, Lane, Kate wrote:

Hi Larry,

I'm just checking in to see if this portfolio is still available for purchase. Please let me know.

Thank you,
Kate

Kate Lane
Strategic IP
Qualcomm Incorporated
Direct: (858) 658-2047
E-mail: clane@qualcomm.com
**CONFIDENTIAL AND PRIVILEGED COMMUNICATION: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. Interception of e-mail is a crime under the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and 2107-2709.**
**From:** atpg-tech@charter.net [mailto:atpg-tech@charter.net]
**Sent:** Thursday, November 04, 2010 11:01 AM
**To:** Lane, Kate
**Cc:** atpg-tech@charter.net
**Subject:** Patented Technology for Qualcomm Review

To: The Qualcomm Corporation

My name is Larry Golden, CEO ATPG Technology, LLC. Thanks for allowing me the opportunity to present technology that is beneficial for projects being researched and developed within the sections of The Qualcomm Corporation: Mobile Communication Systems; Network Systems; Global Connectivity; Global Tracking; Software Applications and Development. Please inform me if I need to also submit this proposal directly to The Qualcomm Corporation Legal Department.

I'm interested in speaking with you about the possibility of a licensing agreement(s) on the technology covered in my Patents (world-wide connectivity, mobile communication

for intermodal transportation and cargo container security, CBRNE detection systems for cargo container security, and CBRNE detection systems for UAVs and UGVs).

I have been granted two (2) patents: 7,385,497 (16 claims for detection systems) and 7,636,033 (10 claims for mobile control and monitoring a vehicle's operational equipment).

I have two (2) continuation applications that are patent pending; published application 12/657,356 (44 claims for cell phone detection system and locking systems) and a non-published application 12/802,001 (20 claims for embedded sensors in cargo containers and UAVs, pre-programmed functions for a vehicle's operational equipment and product grouping network of security systems).

I know and understand the technology needed to remotely slow and stop a vehicle is vital to the vehicle's operational success and more importantly the safety to the general public. I have patented and patent pending technology that covers the ability to remotely slow and stop a vehicle (any vehicle) by controlling the vehicle's equipment systems (computer, fuel, air, electric and computer). I can remotely slow and stop the vehicles by use of a cell phone or laptop. The non-published application 12/802,001 covers technology pre-programmed for controlling the vehicle without the help of a driver to include unmanned aerial and ground vehicles.

My technology covers vehicles equipped with sensors (chem/bio/rad/nuc/exp) that can be used for Military, Law Enforcement, the Department of Defense and/or the Department of Homeland Security. The technology can be used also as a means of security and management for the supply chain.

I am assuming The Qualcomm Corporation has an interest in securing cargo containers being transported by trucks because of The Qualcomm Corporation's tracking, satellite and mobile capabilities.

From the technology covered in the patents and applications that are patent pending, I introduced to the Department of Homeland Security (DHS) in a "white paper" proposal on September 1, 2010, six (6) systems for cargo container security.

1- A "Multi Sensor Detection System"

2- An "Internal Lock Disabling System"

3- An "External Interface Lock Disabling System"

4- A "Cell Phone Detection System"

5- A "Stall-to-Stop and Vehicle Slowdown System"

6- A "Built-In; Embedded Multi Sensor Detection and Lock Disabling System"

The one system that may attract your attention more than the others is the "Cell Phone Detection System". All of the systems have cell phone and/or handheld mobile communication capabilities; all can be grouped to form a single network or handled

individually as part of multiple networks; all can be used with a maritime cargo container for cargo container security, and all have locating and tracking technology capabilities.

Disclosure: I introduced my "Stall-to-Stop and Vehicle Slowdown System" to General Motors/OnStar in the early months of year 2007 in an effort to get them to collaborate with me in responding to a DHS solicitation. After e-mailing and conversating with General Motors/OnStar about my strategy, they decided to introduce their "stolen vehicle slowdown" in October, 2007. I do plan to revisit GM/OnStar after the published application 12/657,356 is granted as a patent.

Disclosure: Talked with the PTO examiner on today, November 4, 2010 at 12:35pm (E), and was told by the examiner the 44 claims of the published application 12/657,356 have been allowed. To overcome some prior art for the granted patent 7,636,033 a "Swear Back" was accepted by the USPTO. I entered a "Swear Back" as a response to the first office action of published application 12/657,356 that goes back to March, 2001.

Please reply back as soon as possible with your interest. I don't know if the DHS will allow or permit ATPG to submit a "full proposal", but if so, and we can come to some type of licensing agreement, I can enter The Qualcomm Corporation in the proposal for R&D funding. The deadline for submission is December 31, 2010.


Larry Golden, CEO
ATPG Technology, LLC
522 Peach Grove Place
Mauldin, SC 29662
864-288-5605 / 864-992-7104
Atpg-tech@charter.net

(Date:) Oct 11, 2011
(New)

(Complete Legal Name:) Larry Golden
(Address, State, Zip:) 522 Peach Grove Place., Mauldin, SC 29662
(Contact Name:) Larry Golden
(Contact Phone:) 864-288-5605 / cell: 864-992-7104
(Contact E-Mail:) atpg-tech@charter.net
(Contact Fax:)

(Desired Price/Price Range for portfolio:)
see attachment

(Have these patents been offered for sale before?)
(Yes) Checked
(If yes, please describe:) I sent out 50 e-mails during the month of December, 2010

(Are there any deadlines associated with this transaction?)
(Yes) Checked
(If yes, please describe:) If Qualcomm is interest, I will discontinue marketing efforts until an
agreement is reached.

(Have any of these patents been the subject of a license or in any other way encumbered?)
(No) Checked

(Number of Issued U.S. Patents)       2
(Number of Issued Foreign Patents)    0
(Number of Pending U.S. Patents)      4
(Number of Pending Foreign Patents)   1
(Number of U.S. Provisional Apps.)    0

(Have any federal, state, local governments, assistance groups, standards
bodies, universities or other non-profit organizations been involved with any of these patents?)
(Yes) Checked
(If yes, please describe:) I submitted to the DHS proposals for the SafeCon, Cell-All, and TRUST
projects.

(Will the seller retain any rights to these patents?)
(Negotiable) Checked

(Are there any technical standards of technology-related consortiums or other organizations that
your company or individuals in the IP owner's company have been in any way associated with in the
last 10 years?)
(No) Checked

(Are there any existing or potential security interests or secured or unsecured claims of ownership
for any of the patents?)
(No) Checked

(Are any of the patents declared to any standards body?)
(No) Checked

(Are any of the patents being offered impacted by the terms of an open source license?)
(No) Checked

Patent Detail Information
Patent/App. No.: 11/397,118
Description of Invention: Detection / Stopping Vehicles / Locking
Status: Issued
Published? Yes
Fees Current? Yes
Family Members: CIP 12/155,573
Comments:

Patent Detail Information
Patent/App. No.: 12/155,573
Description of Invention: Detection / Stopping Vehicles / Locking
Status: Issued
Published? Yes
Fees Current? Yes
Family Members: RI 13/065,837; Divisional RI 13/199,853; PCT PCT/US09/46489
Comments:

Patent Detail Information
Patent/App. No.: 12/657,356
Description of Invention: Detection / Stopping Vehicles / Locking
Status: Notice of Allowance
Published? Yes
Fees Current? Yes
Family Members: 12/802,001
Comments:

(Reason patents are being sold:)
Opportunity exist

(Have any of the patents been abandoned? If so, were they revived?)
No

(Please outline all ownership interests in these patents (Sole, Joint, etc.)
Sole

(Please indentify all parties that must approve the sale or could otherwise attempt
to prevent the sale of these patents including but not limited to: creditors, investors, trustees or
directors:)
None

(Have any of the patents been asserted or the subject of litigation? If so, please provide details:)
No

(Please describe any known or expected usage of or infringement of the patents by any 3rd party:)
GM; Home Office (UK); Cadec Global Inc.; iControl Inc.; Boeing; Samsung; LG; Apple; Qualcomm;
MachineTalker Inc.;
L-3 Communications

(Please list all due diligence available:)
Consulted with a number of Patent Attorneys to discuss my claims, drawings and specifications

(Please describe any additional information including studies, reports or opinions
including prior art searches that relate to the ownership, validity, enforceability, infringement or
value of the patents:) See attachments: currently I am requesting opinions of my Reissue Patent
Application 13/065,837 and my Divisional Reissue Patent Application 13/199,853
See attachments: currently requesting an opinion on Reissue Patent Application 13/065,837 and
Divisional Reisse Patent Application 13/199,853

From: atpg-tech@charter.net
To: clane@qualcomm.com
Cc: atpg-tech@charter.net
Date: Thursday October 27 2011 4:09:10PM

# FW: RE: Patented Technology for Qualcomm Review

Ms. Lane,

This is a follow-up e-mail contact. I responded to and returned the "Patent Information Request Form" on 10/11/2011.

ATPG was asked to participate as a subcontractor on a proposal submission in an effort to secure Government funding.

I plan to sign the "Government Teaming Agreement (TA)", and the "Non-disclosure Agreement (NDA) on Monday, October 31, 2011.

The  Prime stated they are more interested in executing an exclusive contract if awarded. If awarded it limits or terminates the possibility of patent licensing or purchasing negotiations with another Corporation.

Please e-mail me back to express your interest or lack there of.

Thanks,
Larry


-------- Begin forwarded message --------
Subject: RE: Patented Technology for Qualcomm Review
Date: 10/11/11 8:03:21 PM
From: atpg-tech@charter.net
To: "Lane, Kate"
Cc: atpg-tech@charter.net



I had problems with the "portfolio information request. doc"

Please let me know if the attached documents are acceptable.

Larry


On Wed, Oct 5, 2011 at 12:42 PM, Lane, Kate wrote:

  Thanks, Larry.

Can you please take a few moments to fill out the attached Patent Information Request form for this?

Please let me know if you have any questions.

Best regards,
Kate

*SENT MESSAGE TO V. ... clane @ qualcomm. com on 11/4/10 @ 2:05 pm*

*QUALCOMM Talked to clane again at 2:45 PM. She said she received my e-mail and I should receive a two-page document to fill out.*

News and Media
Press Releases
OnQ Blog
Video Center
Document Center
Events Calendar
Twitter Feeds
Awards and Recognition
Press Resources
Press Kits
Press Contacts
Subscribe (RSS)

Search...

Document Center

back to all documents

# Qualcomm Corporate Overview

| | |
|---|---|
| **Created:** | February 5, 2010 |
| **Description:** | A high level overview that describes how Qualcomm is empowering, accelerating and transforming the future of wireless. |
| **File Format:** | PDF |
| **File Size:** | 1.13 MB |

Recently Viewed

You haven't viewed any documents

Share          Like

Connect With Us

Legal   Privacy Policy   Contact Us   Corporate Information   Worldwide Locations   Mobile   Subscribe (RSS)          Change Your Country

©2010 QUALCOMM Incorporated. All Rights Reserved

http://www.qualcomm.com/documents/qualcomm-corporate-overview          11/4/2010

# EXHIBIT B



**ATPG Technology, LLC**

*(Anti-Terrorism Product Grouping)*

FILED

MAY  1 2013

U.S. COURT OF
FEDERAL CLAIMS

13-307  C

Larry Golden, CEO

740 Woodruff Road, #1102, Greenville, SC 29607

E-mail: atpg-tech@charter.net

Bus. 864-288-5605 / Mobile: 864-992-7104

April 30, 2013

United States Court of Federal Claims

Howard T. Markey National Courts Bldg

717 Madison Place, N.W.

Washington, DC 20439

Re: Department of Homeland Security -- Infringement

Chief Judge Emily C. Hewitt:

The three solicitations released by the Department of Homeland Security that infringes Golden's [US RE43,990] patent are:

1. The Department of Homeland Security CELL-ALL Ubiquitous Biological and Chemical Sensing Solicitation Number: BAA07-10 released October 2007 and is referred to throughout this document as "Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors".

2. The Department Of Homeland Security SBIR / STTR Miniature and Reliable Chemical Sensors for Cell Phones Solicitation No: Reference-Number-DHSSBIRFY081 released December 2007 and is referred to throughout this document as "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors".

3. The Department Of Homeland Security SBIR Phase 12.1 Smart Phone App(s) for Radioisotope Identification Device (RIID) and Spectroscopic Personal Radiation Detector (SPRD) Reachback Solicitation No.HSHQDC-12-R-00052 released May 2012 and is referred to throughout this document as "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors".

The three solicitations of "Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors", "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors", "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" are combined for the purpose of illustrating the development of, the use or manufacture of, the making of, the offer for sale of, and the sale of, a product or parts of a product; a device or parts of a device that infringes Golden's [US RE43,990] patent independent claim 11 (emphasis on the communication device that is the monitoring equipment integrated and interconnected to the cell phone detection device), independent claim 81 (emphasis on the cell phone detection device that is integrated and interconnected to the communication device that is the monitoring equipment and the sensors used for detection), and, independent claim 74 (emphasis on the sensors used for detection that is integrated and interconnected to the cell phone detection device).

The Department Of Homeland Security and the twelve companies (e.g. Samsung, LG, Apple, Qualcomm, Seacoast Science, NASA, Rhevision, Synkera, Boston MicroSystems, QuantaSpec, Spectral Labs, Creative Electron) that received awards and contracts for research and development of a cell phone detection device and the companies that received cooperative agreements from the Department Of Homeland Security in response to the three solicitations of  Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors", "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors", "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" are combined for the purpose of illustrating the development of, the use or manufacture of, the making of, the offer for sale of, and the sale of, a product or parts of a product; a device or parts of a device that infringes Golden's [US RE43,990] patent independent claim 11 (emphasis on the communication device that is the monitoring equipment integrated and interconnected to the cell phone detection device), independent claim 81 (emphasis on the cell phone detection device that is integrated and interconnected to the communication device that is the monitoring equipment and the sensors used for detection), and, independent claim 74 (emphasis on the sensors used for detection that is integrated and interconnected to the cell phone detection device).

The Department Of Homeland Security and the twelve companies (e.g. Samsung, LG, Apple, Qualcomm, Seacoast Science, NASA, Rhevision, Synkera, Boston MicroSystems, QuantaSpec, Spectral Labs, Creative Electron) that received awards and contracts for research and development of a cell phone detection device and the companies that received cooperative agreements from the Department Of Homeland Security in response to the three solicitations of Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors", "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors", "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" are combined for the purpose of illustrating, showing and proving **direct infringement** (occurs when a person without authorization makes, uses, offers to sell or sells any patented invention within the United States or imports into the United States any patented invention during the term of the patent), **infringement by equivalents** (a claim may be infringed under the doctrine of equivalents if some other element of the accused device or process performs substantially the same function, in substantially the same way, to achieve substantially the same result), **contributory infringement** (is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."), **inducement infringement** (covers situations where one actively induces the infringement of a patent by encouraging, aiding, or otherwise causing another person or entity to infringe a patent. A potential inducer must actually be aware of the patent and intend for their actions to result in a third party infringing that patent).

The color coded claims analysis included in this in a document of Golden's [US RE43,990] patent independent claims 11, 81, and 74 are illustrated in a green print color and breaks down each element included in each of the independent claims 11, 81, and 74, (the purple print color represents the dependent claims of independent claim 81).

The color coded claims analysis included in this document has a break-down of each element requested by the Department of Homeland Security in the three solicitations of "Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors", "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors", "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors", illustrated in the rust print color.

The color coded analysis included in this document has also a universal interpretation, explanation, usage or definition of terms of:

- the communication device (system) that is the monitoring equipment of Golden's [US RE43,990] patent independent claim 11 and the DHS request for a communication device (system)
- the cell phone detection device (system) of Golden's [US RE43,990] patent independent claim 81 and the DHS request for a cell phone detection device (system)
- the sensor device (system) of Golden's [US RE43,990] patent independent claim 74 and the DHS request for a sensor device (system), and

is in blue print color and the interpretation, explanation, usage or definition of terms are parallel the like elements of both Golden's [US RE43,990] patent and the DHS solicitations for a cell phone detection device.

Enclosed in this document is a section of articles, product data sheets, agreements, award data sheets and documents with pictures and photographs that validate the "use or manufacture, make, develop, sell or offer for sell a patented product without the consent of the patent owner".

*On March 14, 2012, in an* en banc *decision, the Court of Appeals for the Federal Circuit reversed both itself and the Court of Federal Claims ("COFC") in holding that the government is subject to liability when a product using a patented process is used in, or imported into the United States by or for the United States government, even when part of the patented process occurred overseas. Zoltek Corp. v. United States, No. 2009-5135. The Federal Circuit reinstated the patent holder's 28 U.S.C. § 1498(a) claim against the United States and barred the plaintiff's pursuit of a further patent infringement claim against the contractor in district court. The Zoltek decision is good news for government contractors because it precludes separate contractor liability for patent infringement arising out of work performed on behalf of the United States. The decision also confirms that all such infringement claims must be brought for "reasonable and entire compensation" in the COFC against the United States.*

The Department of Homeland Security and the Department of Homeland Security awarded companies are infringing Golden's [US RE43,990] patent. The infringement is defined under **direct infringement** (occurs when a person without authorization makes, uses, offers to sell or sells any patented invention within the United States or imports into the United States any patented invention during the term of the patent), **infringement by equivalents** (a claim may be infringed under the doctrine of equivalents if some other element of the accused device or process performs substantially the same function, in substantially the same way, to achieve substantially the same result) and **contributory infringement** (is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States or imports into

the United States a component of a patented machine, manufacture, combination or composition, or a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."). The supportive documents are:

*Article; Awards; and Cooperative Research and Development Agreements (CRADA):* "Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors" cooperative agreement companies are Qualcomm, LG, Apple, and Samsung. The awarded companies are Qualcomm, Seacoast Science, Rhevision Technology and the Center for Nanotechnology at NASA Ames Research Center. *Article:* "Homeland Security Backs Cell Phone Sensors to 'Crowdsource' Detection of Deadly Chemicals".

*Award Information Sheets:* "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors" awarded companies are Synkera Technologies, Inc., Boston Microsystems, Inc., and QuantaSpec Inc.

*Article; Award Information Sheets; and Product Photo Data Sheets:* "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" awarded companies are Spectral Labs Incorporated and Creative Electron. *Article:* "Apple's nex-gen iPhone power amp; NASA chemical sensor app".

*Article of Product Demonstration:* Demonstration companies are NASA's Center for Nanotechnology at Ames, Qualcomm Inc., and Synkera Technologies Inc. *Article:* "NASA science unveils new chemical detection technology", October 3, 2011 by Cathy Weselby and John Verrico.

*Article of Product Development:* Development companies are NASA's Ames Research Center. *Article:* "NASA brings chemical sensor to iPhone", November 10, 2009 by Michael Cooney, Network World.

*Product Development White Paper of An Integrated Sensing System:* Title; "Nanosensor – Cellphone Integration for Extended Chemical Sensing Network", by Jing Li, Ph.D. and Principal Investigator for the NASA Ames Research Center. The product was developed in partnership with the U.S. Department of Homeland Security Science & Technology Directorate.

_Data Sheet for a Chemical (Temperature) Sensor:_ "Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors" awarded company Synkera Technologies Inc. data sheet includes a photo picture of the Synkera Ultrakera carbon monoxide (CO) chemical (temperature) sensor.

_Data Sheet; Picture of Product; and Product sale price ($199.00) without the iPhone:_ "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" awarded company Creative Electron and the cooperative agreement company Apple Inc. is offering for sale a Radiation/Nuclear Smart Phone Detection Device. The data sheet is titled; "iRad Geiger for Apple iOS Devices".

_Data Sheet; Picture of Product; and Product sale price ($299.00) without the iPhone:_ "Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors" awarded company Creative Electron and the cooperative agreement company Apple Inc. is offering for sale a Radiation/Nuclear Smart Phone Detection Device. The data sheet is titled; "iRad Alpha for Apple iOS Devices".

Enclosed in this document is a section of appendixes of documents that discloses Golden's patent or patent pending "Multi Sensor Detection and Cell Phone Detection" technology and the documents were submitted to the Department of Homeland Security of Golden's developmental capabilities:

> On 31 August, 2012, the United States Court of Appeals for the Federal Circuit released its highly anticipated en banc decision in the case of Akamai Technologies, Inc. v. Limelight Networks, Inc., 692 F.3d 1301 (Fed. Cir. 2012). At issue was whether inducement to infringe a method patent claim under 35 U.S.C. § 271(b) required a single entity to perform all of the steps or whether liability could still be found where multiple actors performed the steps collectively.

> The Federal Circuit overturned previous case law which required a plaintiff alleging induced infringement to show that the defendant induced a single entity to perform all of the steps of the claimed method. Under Akamai, inducement now includes those who induce multiple parties to infringe different steps of the claimed method so that the infringing conduct is split among more than one entity.

> Under the new rule, inducement liability exists where the accused infringer (1) knew of the patent; (2) induced performance of the steps of the method; and (3) those steps were actually performed. It follows also that the accused infringer will also be liable if it performs some of the steps of the method and then actively induces performance of the other steps.

> This decision is important because it closes a major loophole that has allowed some entities to knowingly and intentionally take advantage of a patented invention while avoiding the need to take a license.

The Department of Homeland Security and the Department of Homeland Security awarded companies are infringing Golden's [US RE43,990] patent. The infringement is defined under **contributory infringement** (is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."), **inducement infringement** (covers situations where one actively induces the infringement of a patent by encouraging, aiding, or otherwise causing another person or entity to infringe a patent. A potential inducer must actually be aware of the patent and intend for their actions to result in a third party infringing that patent). The Appendixes are:

.

Appendix I: On **09/21/2006**, an e-mail correspondence and a proposal were submitted to the Department of Homeland Security/HSARPA to the attention of the Program Manager, Lisa Sobolewski.

Appendix II: On **09/25/2007**, a "White Paper" was submitted to the DHS S&T Directorate, to the attention of Margo Graves, Team Lead / Contracting Officer; Team Lead / Contracting Officer; Borders and Maritime Division in response to the RFI solicitation; SAFECON.

Appendix III: On **11/28/2007**, a "White Paper" was submitted to the Department of Homeland Security, to the attention of Margo L. "Margo" Graves, Team Lead / Contracting Officer Margaret L. Office of Procurement Operations / Science & Technology Acquisitions Division in response to Broad Agency Announcement CELL-ALL Ubiquitous Biological and Chemical Sensing Solicitation Number: (BAA07-10)

Appendix IV: On **01/18/2008**, a "Read Ahead" document was submitted to the DHS S&T Directorate, and to the attention of Edward Turner; Program Manager. Reference was made to the "General description & Solutions alignment for "Cargo Containers, Cell Phones & Vehicles":

Appendix V: On **05/22/2008**, a "White Paper" that included the capability for the development of a Cell phone detection device was submitted to the DHS; S&T Directorate, to the attention of David Newton,

Acting Division Head, Borders and Maritime, S&T-BordersMaritime@dhs.gov; in response to solicitation "Long Range Broad Agency Announcement (BAA08-01)".

Appendix VI: On **01/06/2009**, a "White Paper" was submitted to the DHS; S&T Directorate, to the attention of Emily Graham, Contract Specialist; Office of the Chief Procurement Officer in response to the TRUST solicitation RFI.

Appendix VII: On **09/03/2009**, an e-mail correspondence and a proposal were submitted to the attention of Stephen Dennis, Program Manager for the *"Cell-All Project"*, Department of Homeland Security (DHS); Science and Technology (S&T) Directorate.

Appendix VIII: On **11/07/2009**, a "Full Proposal" was submitted to the DHS; S&T Directorate, to the attention of the Director of Innovation, in response to the Broad Agency Announcement (BAA) 09-17, "Time Recorded Ubiquitous Sensor Technologies" (TRUST).

Appendix IX: On **09/01/2010**, a "White Paper" was submitted to the DHS; S&T Directorate, to the attention of SandT-BordersMaritime@dhs.gov; in response to solicitation "Long Range Broad Agency Announcement (BAA10-01)"; title of proposal: "Integrated Systems for Border and Maritime Security".

" Section 1498(a) further provides that whenever a patented invention "is used or manufactured by or for the United States without license of the owner thereof . . . the owner's remedy shall be by action against the United States in the [CFC] for the recovery of his reasonable and entire compensation for such use or manufacture."

*An applicant, his successors, assigns, or legal representatives, whose patent is withheld as herein provided, shall have the right, beginning at the date the applicant is notified that, except for such order, his application is otherwise in condition for allowance, or February 1, 1952, whichever is later, and ending six years after a patent is issued thereon, to apply to the head of any department or agency who caused the order to be issued for compensation for the damage caused by the order of secrecy and/or for the use of the invention by the Government, resulting from his disclosure. The right to compensation for use shall begin on the date of the first use of the invention by the Government. The head of the department or agency is authorized, upon the presentation of a claim, to enter into an agreement with the applicant, his successors, assigns, or legal representatives, in full settlement for the damage and/or use. This settlement agreement shall be conclusive for all purposes notwithstanding any other provision of law to the contrary.*

*If full settlement of the claim cannot be effected, the head of the department or agency may award and pay to such applicant, his successors, assigns, or legal representatives, a sum not exceeding 75 per centum of the sum which the head of the department or agency considers just compensation for the damage and/or use.*

Below is a quote taken from the "CELL-ALL Ubiquitous Biological and Chemical Sensing Solicitation Number: (BAA07-10)". The information contained will be used as a guide in determining the reasonable and entire compensation:

"If **biological and chemical sensors** could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with **more than 240M sensors....** Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) **and a communication systems concept for large scale multi-sensor networks....** This proof of concept should be capable of detecting hazardous biological and/or chemical materials **with eventual expansion to the detection of explosive and eventually radiological materials....**"

Sol. 1; 2007; BAA; Cell Phone Chem/Bio Sensors

    120 million chemical sensors

    120 million biological sensors

Sol. 2; 2007; SBIR; Cell Phone Chemical Sensors

    120 million chemical sensors

Sol. 3; 2012; SBIR; Smart Phone Rad/Nuc Sensors

    120 million radiation sensors

    120 million nuclear sensors

Total number of sensors for Sol. 1, Sol. 2, and Sol. 3

    600 million sensors

*Note:* 600 million sensors will be used for calculating reasonable compensation for Independent claims 11, 81, and 74.

Golden's [US RE43,990] patent claim 11: 600 million sensors to come on line for monitoring, servicing, and data transfer. The communication system is handled by the service providers (e.g., Apple, Qualcomm, LG, and Samsung). 600 million sensors @ $1 dollar monthly service fee = $600 million dollars per/mth. $600 million dollars per/mth @ 12 months per/yr = $7.2 billion dollars per/yr. $7.2 billion dollars per/yr. for 10 of the remaining years of the patent = **$72 billion dollars over 10 years**.

Golden's [US RE43,990] patent claim 81:  600 million cell/smart phones that includes the software application (the support for the software application is in the 2nd item of claim 74 but is not being used here as a separate calculation for compensation) for integrating the detection capability. The average high-end smart phone is $250 dollars. $250 dollars @ 2% = $5 dollars. 600 million cell/smart phones that includes the software application @ $5 dollars each = **$3 billion dollars**.

Golden's [US RE43,990] patent claim 74: 600 million sensors/detectors. Creative Electron is selling two smart phone sensor/detector devices for radiation and nuclear detection that's priced @ $299 dollars and $199 dollars (the smart phone is not included in the price). The average price is $250 rounded. $250 dollars @ 10% royalty = $25 dollars. (the 10% royalty is used because Golden's ATPG TECHNOLOGY, LLC had an opportunity to be the lead company in developing the sensor/detector for sell). 600 million sensors/detectors @ $25 dollars each in royalties = **$15 billion dollars in royalties**.

$72 billion dollars plus $3 billion dollars plus $15 billion dollars = **$90 billion dollars total**

Apple announces Q1 2013 earnings: record $54.5 billion in revenue, 47.8 million iPhones and 22.9 million iPads sold **(estimated $200 billion for 2013)**.

Qualcomm Inc., the wireless technology giant said 2013 first quarter revenue increased 24 percent to $6.12 billion **(estimated $24 billion for 2013)**.

LG Electronics 2013 revenues in the first quarter rose 6.8 percent year-over-year 13.01 billion mainly due to the improved performance of the mobile business **(estimated $52 billion for 2013)**.

Samsung Electronics, the world's No.1 smart phone vendor. Samsung's hot streak continues in 2013 Q1: Record $7.7B profit on $45.9B in sales **(estimated $180 billion for 2013)**.

## CONCLUSION

Below is an article that supports Golden's [US RE43,990] patent independent claim 11 of; "A communication device of at least one of a cell phone.... or a computer terminal at a monitoring site for monitoring products, interconnected to a product for communication therebetween". The cell phone, and the monitoring site, and the product for communication therebetween, all work as a functional unit. The cell phone detection system must include all of the above components. The "product for communication therebetween" (e.g. cell tower, cell site or base station) is defined in the items of claim 11. If the Department of Homeland Security wants to argue the merits of claim 11, they should be mindful of the fact that the cell tower, cell site or base station can be considered a "tag-along" to recover damages for the loss profits.

> *"The patentee may also seek to recover damages for the lost profits he would have made on accessory items that typically are purchased with the patented item. For these tag-along or convoyed sales, the Rite-Hite court held that those damages may also be recoverable. For such recovery, however, all of the components (patented item and the tag-along items) must work as a functional unit. If the tag-along items and the patented item can function as stand-alone products, then this type of damages may not be recoverable" Wikibooks.org*

**How do Cell Phone Towers Work?**

Cell phone towers are also known as **cell site or base stations**, and are made up of radios, computerized switching equipment, and antennas for receiving and transmitting radio frequency (RF) signals. They are usually mounted atop or on the side of tall buildings, water tanks, etc.

A signal cell phone tower will host single or multiple mobile operators, serving different air interface technology, such as CDMA or GSM. Part of the electromagnetic spectrum, cell phones and cell phone towers operate at the radio frequency, and emit non-ionizing radiation, similar to the one's used by microwave, AM and FM radio waves, and are too low on energy, to enter DNA tissues.

The operating mechanics of a cell phone are quite simple. When a call is made through a cellular phone, a signal is sent out from the cell phone's antenna to the base station antenna. It radios the nearest cell phone tower, **which is particular to your service provider or a collaborator of your service provider.**

# EXHIBIT C

# EXHIBIT L

## PATENT INFRINGEMENT

### *and*

## PATENT VALIDITY

## <u>CANNOT BE RETRIED IN THIS COURT</u>



**Privacy Policy • Site map**

Search!

# UNITED STATES COURT OF FEDERAL CLAIMS

- o
- o **Home**
- o **Courthouse**
- o **About the Court**
- o **Judges**
- o **Special Masters**
- o **Events**
- o **Scheduled Matters**

## Intellectual Property Suits in the United States Court of Federal Claims

**Posted on:**
2017-10-04

Vol. 10 No. 1
By Judge Mary Ellen Coster Williams and Diane E. Ghrist
Published on the American Bar Association's website

Known as "the People's Court," the US Court of Federal Claims (USCFC) was created by Congress as a forum for suits against the government for monetary damages. The USCFC consists of 16 judges appointed by the president and confirmed by the US Senate for terms of 15 years. Appeals from the USCFC are resolved by the US Court of Appeals for the Federal

Circuit. The USCFC is unique in the federal trial court system in that it has nationwide jurisdiction, and hears a variety of claims against the US government for money damages, including patent and copyright infringement, government contract disputes, Fifth Amendment takings, tax refund claims, tribal claims, military and civilian personnel cases, and Vaccine Act appeals.

The government has expressly waived its sovereign immunity and consented to be sued for patent infringement under 28 U.S.C. § 1498(a) and copyright infringement under 28 U.S.C. § 1498(b). With the government's use of intellectual property (IP) steadily increasing, the USCFC has seen a rise in both infringement actions and peripheral IP issues in the contract arena.1 This article outlines the USCFC's jurisdiction in IP cases, tracing its historical and legislative roots, and addresses some unique features of IP litigation in this forum, including jurisdiction, third-party practice, indemnification, and remedies.

### Eminent Domain and Taking Patent Licenses

On June 25, 1910, Congress passed "An Act to provide additional protection for owners of patents of the United States" (1910 Act), stating in pertinent part:

That whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the Court of Claims.2

Prior to the 1910 Act, the Supreme Court considered patent infringement to be a tort claim for which the government had not waived sovereign immunity.3 The Court of Claims4 heard some suits involving allegations of patent infringement on a breach of contract theory if there was proof of a contract obligating the government to pay the patent owner.5 The Supreme Court, however, recognized this situation to be an "injustice . . . as applied to rights of the character of those embraced by patents, because of the frequent possibility of their infringement by the acts of [government] officers under circumstances which would not justify the implication of a contract."6

Dubbed the "Government Use Statute," the 1910 Act created a means for patent owners to obtain money damages for the government's use of patented inventions while at the same time not restricting the government's use.7 Congress styled the 1910 Act under the theory of eminent domain, as the government's taking of a license to use a patented invention would be for the benefit of the public.8 As stated in Calhoun v. United States, "when a patented device or invention is made or used by or for the United States, [the government] ipso facto takes by eminent domain a compulsory compensable license in the patent; the patentee obtains his Fifth Amendment just compensation for that taking through his action [in the USCFC] under § 1498."9

But the 1910 Act proved to be unworkable after the Supreme Court, in William Cramp & Sons Ship & Engine Building Co. v. International Curtis Marine Turbine Co., held that a contractor could be found liable for patent infringement in connection with its performance of work for the government.10 The Court reasoned that a contractor with the United States is "bound to discharge the obligation of his contract without violating the rights of others."11 The Court continued that a mere contract with the United States does not vest a contractor with the "power to take the property of others upon the assumption that as a result of the contract with the United States he enjoys the right to exercise public and governmental powers possessed by the

United States."12 The William Cramp decision opened the door for patent owners to sue federal contractors and subject them to the harsh remedies of injunctions and punitive treble damages available in district court.13

The Supreme Court decided William Cramp on March 4, 1918, in the midst of World War I. The decision immediately deterred contractors from working with the government for fear of protracted litigation, which in turn hampered the government's ability to procure patented inventions.14 These undesirable effects prompted the Acting Secretary of the Navy, Franklin D. Roosevelt, to write a letter to Congress immediately requesting the 1910 Act be amended to protect contractors from litigation. Within four months, Congress passed the 1918 version of the Government Use Statute that clarified the government's assumption of liability for a contractor's unlawful use or manufacture of a patented invention and limited a plaintiff's sole remedy to monetary compensation.15

Section 1498(a) took its present form in 1949, and retains the bedrock principles established in 1910 and 1918 of (1) defining the government's unlawful use or manufacture of patented articles as a Fifth Amendment taking of a license to use a patented invention, (2) providing government contractor immunity from patent infringement litigation, and (3) limiting available remedies to monetary damages.16 Section 1498(a) provides in pertinent part:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . . For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.17

As in the early days of the Government Use Statute, most patent infringement actions under § 1498(a) today center on wartime and national security needs. Other suits involve government-dominated research areas such as outer space exploration.18

The USCFC's patent infringement actions mirror those in district court, but the USCFC exclusively holds bench trials, and government contractors are frequently third-party defendants. Like in district court, the USCFC typically holds a Markman19 hearing on claim construction before hearing infringement and validity.20 However, validity may only be raised as an affirmative defense to infringement and not as a counterclaim.21 Several judges on the USCFC use the local rules of the Northern District of California and modify those rules to comport with § 1498.22 In addition, the USCFC has a user-friendly alternative dispute resolution program that facilitates the settlement of infringement actions before the court.23

### Scope of Section 1498(a)

As § 1498(a) infringement actions are grounded in eminent domain and not defined by statute, the scope of what constitutes the unlawful taking of a license to use a patent is a creature of case law. As such, the basis for the USCFC's jurisdiction over infringement actions must be linked to the government's taking of a patent license through its "use or manufacture" of the patented invention "without license of the owner thereof or lawful right."24 In contrast, the Patent Act—the statutory basis that governs the processes for issuing and enforcing patents before the

United States Patent and Trademark Office (USPTO) and the district courts—defines patent infringement as a statutory tort in 35 U.S.C. § 271.25 Section 271(a) of the Patent Act provides: "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." In contrast, § 1498(a) only references patented inventions "used or manufactured by or for the United States" as potentially infringing acts. The relationship between infringement as a tort under the Patent Act and infringement as a Fifth Amendment taking under § 1498(a) remains a hotly litigated topic before the USCFC.26

In Decca Ltd. v. United States, the Court of Claims interpreted § 1498 to mean that the government consented to be sued for damages stemming from direct infringement by consenting to suits for its "taking of a patent license," because § 1498(a) does not give rise to government liability for activities "which fall short of direct infringement," including induced and contributory infringement, which contain intent requirements.27 In Zoltek III, the Federal Circuit further narrowed § 1498 by holding that direct infringement under § 1498(a) with respect to the United States' use or manufacture of a patented invention was predicated on § 271(a) of the Patent Act.28 Thus, other definitions of infringement under § 271, such as the importation of an infringing product under § 271(g), were not causes of action available for patent owners in suits against the government under § 1498.

However, in the 2012 en banc decision Zoltek V, the Federal Circuit abrogated Zoltek III, holding that establishing conduct falling within the definition of direct infringement codified in 35 U.S.C. § 271(a) is not a predicate to finding infringement under § 1498(a). Instead, the court concluded that the scope of § 1498(a) is "linked to the scope of the patent holder's rights as granted by the patent grant in title 35 U.S.C. section 154(a)(1)."29 In contrast to the statutory definitions of infringement in § 271, § 154(a)(1) defines the patent grant issued by the USPTO as:

the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, . . . the right to exclude others from using, offering for sale or selling throughout the United States, products made by that process, referring to the specification for the particulars thereof.30

The Federal Circuit thus reverted to its pre–Zoltek III position that a § 1498 action is parallel to a title 35 action and not predicated on the statutory definitions of infringement listed in § 271 of the Patent Act.31

In Zoltek V, the appellate court emphasized that § 1498(a) is "its own independent cause of action" with three elements to trigger government liability: (1) the invention must be claimed in a patent; (2) it must be "used or manufactured by or for the United States," meaning each limitation of the claims must be present in the accused product or process; and (3) the "use or manufacture" of the patented invention must be done without license or lawful right—i.e., "use of an invention that, if done by a private party, would directly infringe the patent."32 In applying these three requirements, the Zoltek court found that a government contractor's importation into the United States of a product made by a patented process for use by the government fell within the scope of § 1498(a)'s waiver of sovereign immunity because a private party would be liable for direct infringement for such use of the imported product under 35 U.S.C. §§ 154 and 271(g).33

The Federal Circuit further stated that "[a]s the patent grant has expanded over the years, so too has the coverage of § 1498(a)," suggesting that any statutory changes to the patent grant under 35 U.S.C. § 154(a)(1) will have a corresponding effect on the scope of § 1498(a).34 As such, the Federal Circuit has recognized that § 1498(a) extends to actions "recognized as being defined by § 271(a)"35 as well as the importation of an infringing product or product made by an infringing process under § 271(g). However, the Federal Circuit has not determined whether the other types of infringement defined in 35 U.S.C. § 271(b), (c), and (f) fall within the scope of actions under § 1498.36 Walking back Decca, the Zoltek V court hinted at the possibility that § 1498(a) may extend to acts "recognized as being" defined as induced infringement under § 271(b) and contributory infringement under § 271(c), as well as infringement under § 271(f), which defines an act of infringement to be exportation of product components that, when combined abroad, would infringe a patent if the product were to be combined in the United States.37 In sum, while Zoltek V clarified that § 1498(a) must be tied to the patent grant under 35 U.S.C. § 154, the decision left open questions regarding the full extent of § 1498(a)'s waiver of sovereign immunity.

## Government Contractor Immunity

Underlying the government's assumption of liability for patent infringement under § 1498(a) is the recognition that government contractors are immune from any type of patent infringement claim in district court. Congress amended § 1498(a) in 1918, at the behest of the Secretary of the Navy to expressly provide for government contractor immunity. The statute is clear in providing that "the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."38 The purpose behind this amendment was to enable the government to procure patented inventions without judicial interference, a goal that was achieved by barring infringement actions against contractors. Under the plain language of the statute, there are two elements a contractor must satisfy for the government to assume liability under § 1498(a). First, a contractor's use or manufacture of the invention must be "for the government," and second, the contractor must have the "authorization or consent of the government" for that use or manufacture.

### "For the Government"

In Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis, the Federal Circuit interpreted the term "for the government" to mean that the government derives a benefit from the use or manufacture of the patented technology.39 For example, the patented technology itself must be used "in furtherance and fulfillment of a stated Government policy," which would serve the government's interest, for the government's benefit.40 In contrast, if the government simply has an "interest in the program generally, or funds or reimburses all or part of its costs," that interest is too remote to support a finding of a government benefit.41 In other words, the government's mere funding of an infringing activity does not establish that such activity is "for the government" within the meaning of § 1498(a).

### Authorization or Consent"

The government's authorization of or consent to a contractor's infringing activity may be express or implied.42 Federal Acquisition Regulation (FAR) 52.227-1 contains an express grant of "authorization and consent" for contractors and subcontractors for the use and manufacture of any patented invention (1) embodied in the structure or composition of any article delivered to and accepted by the government related to a government contract; or (2) used in machinery, tools, or methods necessary for a contractor to comply with the specifications of a contract, or if

such use is directed by a contracting officer's specific written instructions.43 The FAR also requires a contractor to report "promptly and in reasonable written detail" to the contracting officer any claim of patent infringement of which the contractor has knowledge based on the performance of a contract.44

To succeed on an implied authorization theory there must be some explicit government action, such as a contracting officer's instruction, or evidence extrinsic to the contract language showing the government's intention to assume liability.45 In Larson v. United States, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement."46 The purpose behind permitting the government's authorization or consent to be implied is tied to the government's need to procure items without disruption,47 and avoid the need for government agencies to perform an exhaustive patent search for products or services they wish to procure.

For example, in TVI Energy, the Federal Circuit found implied authorization or consent where the government required a contractor to demonstrate an allegedly infringing device as part of bidding requirements under a United States military solicitation for disposable thermal targets.48 Following the demonstration, one bidder/patent owner, TVI Energy, sued a competing bidder, Blane, for patent infringement. Blane asserted immunity under § 1498(a), despite having no express letter of consent or authorization from the government to infringe any patent. The Federal Circuit nevertheless found implied authorization, stating that "[t]o limit the scope of § 1498 only to instances where the Government requires by specification that a supplier infringe another's patent would defeat the Congressional intent to allow the Government to procure whatever it wished regardless of possible patent infringement."49 Courts have often found a contractor, through the government's implied authorization, to be immune from suit from the time it offers to supply or begin to manufacture products for the government.50

If these two elements—acting "for the government" with its "authorization or consent"—are met, then a contractor who infringes a patent in the course of its performance of work for the government, under any definition of infringement in § 271 of the Patent Act, is shielded from liability. In this respect, § 1498(a) serves as an affirmative defense available to government contractors in patent infringement actions in district court.51 Correlatively, where the government has assumed a contractor's liability, a patent owner can seek judicial relief by filing suit against the government in the USCFC.52

### Indemnification
The FAR's patent indemnity provision provides that a contractor

shall indemnify the Government and its officers, agents, and employees against liability, including costs, for any infringement of any United States patent . . . arising out of the manufacture or delivery of supplies, the performance of services, or the construction, alteration, modification, or repair of real property . . . or out of the use or disposal by or for the account of the Government of such supplies or construction work.53

Under the FAR, the government must inform the contractor "as soon as practicable" of any action for patent infringement so that the contractor has an opportunity to participate in its defense.54 If the government fails to inform a contractor "as soon as practicable" of the pending action, the government cannot invoke the FAR's patent indemnity provision against a contractor.

To participate in its defense, a contractor may opt to join the § 1498(a) litigation as a third-party defendant. Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), the court "may notify any person with the legal capacity to sue or to be sued who is alleged to have an interest in the subject matter of the suit." Further, a "person served with a notice issued . . . may file an appropriate pleading setting forth the person's interest in the subject matter of the litigation."55 In resolving a petition for mandamus, the Federal Circuit held in In re UUSI, LLC, that a third party's potential obligation to indemnify the government for any patent infringement liability provides "sufficient interest in litigation to offer evidence and advance legal arguments appropriate to protect its own interests."56 The Federal Circuit noted, however, that a third-party defendant cannot assert any counterclaims against a plaintiff, as such claims would result in litigation between private parties and "impermissibly exceed[] the scope of the Court of Federal Claims' limited jurisdiction."57

While a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed. As the USCFC held in Bowser, Inc. v. United States:

We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him.58

### Available Remedies

Under § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire" compensation. Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort.59 In takings jurisprudence, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention.60 As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. In contrast, under the Patent Act, damages are measured as either lost profits or a reasonable royalty, i.e., the amount for which the patent owner would be willing to license the patent, based on a hypothetical licensing negotiation between the patent owner and accused infringer.61

The Court of Claims explained that "reasonable and entire compensation" has two components related to a takings analysis: the first is to determine the value of the license at the time it was taken by the government, and the second involves compensating for the government's delay in paying for that license.62 To calculate the damages related to these two components, the Court of Claims has recognized three methods of valuation of the first component, license value: (1) determination of a reasonable royalty for the license; (2) awarding a percentage of government cost savings arising from governmental use of the patented invention; or (3) awarding lost profits.63 In Decca, the Court of Claims recognized that the determination of a reasonable royalty is the preferred method of valuation, applying the same case law as in district court patent infringement actions. Indeed, where the patent owner has commercially licensed its patent on terms that are the "same or substantially similar to the rights taken by the Government," the USCFC uses "virtually, without exception, the reasonable royalty method to

value the license taken by the Government."64 For the second component of delay compensation, the court multiplies any accrued royalty based on the initial license value by an annual percentage rate determined on a case-by-case basis.65

Injunctive relief is not available as a primary remedy. The prospect of government contractors being subject to an injunction would disrupt the government's ability to procure its needed supplies and services.66 The USCFC may, however, issue equitable relief that is ancillary to monetary damages. For example, the court may set aside the assignment of a patent to the government where the assignment was unlawful in conjunction with a plaintiff's claim for monetary relief under § 1498(a).67 However, the term "entire" in § 1498(a) bars any option for a patent owner to obtain punitive damages against the government.68

Another wrinkle to § 1498 jurisprudence is the option to obtain damages for the government's use of a patent prior to its issuance or prior to its application's publication pursuant to required withholding under the Invention Secrecy Act, 35 U.S.C. §§ 181–188. The Invention Secrecy Act permits the government to notify the commissioner of patents to withhold "publication of the [patent] application or the grant of a patent" if the publication or disclosure of a patent application or patent might be "detrimental to the national security."69 Section 183 of the Invention Secrecy Act provides a right to compensation beginning "on the date of the first use of the invention by the Government." The patent owner can either enter into a settlement agreement with the government to obtain this compensation, seek additional compensation beyond the settlement agreement in the USCFC or district court, or wait until the patent issues and "bring suit in the United States Court of Federal Claims for just compensation for the damage caused by reason of the order of secrecy and/or use by the Government of the invention resulting from his disclosure."70 In such Invention Secrecy Act cases, the USCFC remanded cases to administrative agencies to pursue settlement agreements with patent owners.71 In fiscal year 2016, the USPTO, in response to a Freedom of Information Act request, reported that 5,680 patents and patent applications are subject to secrecy orders, largely requested by the Army, Navy, and Air Force.72

## Copyright: Section 1498(b)
Section 1498(b) governs the government's use of copyrighted works:

Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of [the Copyright Act].73

Under § 1498(b), federal employees may bring actions against the government except where: (1) the employee "was in a position to order, influence, or induce use of the copyrighted work by the Government"; or (2) the copyrighted work "was prepared as a part of the official functions of the employee, or in the preparation of which Government time, material, or facilities were used." In Blueport Co. v. United States, the Federal Circuit held that these first two provisos are jurisdictional requirements and act as a limit on the scope and application of § 1498(b).74 Section 1498(b) also contains a third provision that before filing an action in the USCFC, the head of a government agency or a corporation owned or controlled by the states can enter into

a settlement agreement with the copyright owner and "settle the claim administratively out of available appropriations."

At first blush, there are a number of similarities between copyright infringement actions under § 1498(b) and patent infringement actions under § 1498(a). As with patent infringement, the government can only be subjected to monetary damages in the form of "reasonable and entire compensation."75 Infringement of a copyright by a contractor must be "for the government" with the "authorization or consent" of the government in order to confer jurisdiction on the USCFC. There are also some stark differences between subsections (a) and (b). Unlike § 1498(a), which makes no reference to the term "patent infringement," the cause of action under § 1498(b) is explicitly called "infringement," implicating the definition of infringement under 17 U.S.C. § 106.76

Moreover, unlike patents that are exclusively a federal government property grant, there are two sources of copyright grants: the Copyright Act codified in title 17 of the United States Code and state common law. Under § 1498(b), the government has only waived sovereign immunity with respect to works "protected under the copyright laws of the United States," meaning under the copyright laws codified in title 17.77 A copyright owner is subject to certain restrictions in the Copyright Act, most significantly the requirement that the copyright be registered with the Copyright Office before bringing suit as set forth in 17 U.S.C. § 411(a).78

The USCFC has also seen copyright infringement actions related to software.79 While software can be either patented or copyrighted, the FAR contains mandatory rights that a software license agreement must confer on the government, "[n]otwithstanding any contrary provisions contained in the Contractor's standard commercial license."80 These FAR provisions are sweeping, and may be fatal to a claim of either patent or copyright infringement before the USCFC.81 FAR 52.227-19(b) provides that the "commercial computer software" delivered pursuant to a government contract "may not be used, reproduced, or disclosed by the Government," except that the commercial computer software may be: (1) used or copied for use with the computer(s) for which it was acquired, including use at any government installation to which the computer(s) may be transferred; (2) used or copied for use with a backup computer if any computer for which it was acquired is inoperative; (3) reproduced for safekeeping or backup purposes; (4) modified, adapted, or combined with other computer software; (5) disclosed to and reproduced for use by support service contractors or their subcontractors; and (6) used or copied for use with a replacement computer.82

**Endnotes**

1. See, e.g., Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 436 (2015) (preaward bid protest finding technical data rights clauses in solicitation unduly restrictive); Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 38 (2010) (upholding rejection of the plaintiff's quotation, where the plaintiff conditioned its offer on the government's acceptance of data rights provisions that conflicted with the solicitation); FN Mfg., Inc. v. United States, 44 Fed. Cl. 449, 451–52 (1999) (upholding award of a sole source supply contract, where proprietary data rights precluded competitive procurement); Authentic Apparel Grp., LLC v. United States, No. 15-16C (Fed. Cl. filed Jan. 6, 2015) (claiming breach of a trademark licensing agreement). In an appeal of a USCFC decision on claim construction, Liberty Ammunition, Inc. v. United States, 835 F.3d 1388, 1401–02 (Fed. Cir. 2016), the Federal Circuit found a nondisclosure agreement (NDA) unenforceable because the government official who entered into the NDA lacked the requisite authority to bind the government. Judge Newman dissented.

2. 36 Stat. 851 (1910).

3. Schillinger v. United States, 155 U.S. 163, 169 (1894) ("That this action is one sounding in tort is clear. It is in form one to recover damages. The petition charges a wrongful appropriation by the government, against the protest of the claimants, and prays to recover the damages done by such wrong.").

4. The Court of Claims is the predecessor to the Federal Circuit, and its body of case law prior to 1982 is binding precedent in the USCFC.

5. Crozier v. Fried. Krupp Aktiengesell-schaft, 224 U.S. 290, 304 (1912).

6. Id.

7. W.L. Gore & Assocs., Inc. v. Garlock, Inc., 842 F.2d 1275, 1283 (Fed. Cir. 1988) ("The patentee takes his patent from the United States subject to the government's eminent domain rights to obtain what it needs from manufacturers and to use the same."), abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391–94 (2006).

8. Crozier, 224 U.S. at 305 ("[I]n view of the public nature of the subjects with which the patents in question are concerned and the undoubted authority of the United States as to such subjects to exert the power of eminent domain, the statute, looking at the substance of things, provides for the appropriation of a license to use the invention, the appropriation thus made being sanctioned by the means of compensation for which the statute provides.").

9. 453 F.2d 1385, 1391 (Ct. Cl. 1972). The takings clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

10. 246 U.S. 28, 42–43 (1918).

11. Id. at 43.

12. Id.

13. See Zoltek Corp. v. United States (Zoltek V), 672 F.3d 1309, 1316 (Fed. Cir. 2012) (en banc) ("Now [following William Cramp], however, manufactures are exposed to expensive litigation, involving the possibilities of prohibitive injunction payments of royalties, rending of accounts, and payment of punitive damages, and they are reluctant to take contracts that may bring such severe consequences. The situation promised serious disadvantage to the public interests, and in order that vital activities of this department may not be restricted unduly at this time, and also with a view of enabling dissatisfied patentees to obtain just and adequate compensation in all cases conformably to the declared purpose of said act, I have the honor to request that the act be amended by the insertion of a proper provision therefore in the pending naval appropriation bill." (quoting Roosevelt's April 20, 1918, letter as it appears in Wood v. Atl. Gulf & Pac. Co., 296 F. 718, 720–21 (S.D. Ala. 1924))).

14. Id. (outlining the history of § 1498(a)).

15. Act of July 1, 1918, Pub. L. No. 65-182, 40 Stat. 704, 705; Zoltek V, 672 F.3d at 1316.

16. Act of May 24, 1949, Pub. L. No. 81-72, § 87, 63 Stat. 89, 102.

17. 28 U.S.C. § 1498(a).

18. See, e.g., Bondyopadhyay v. United States, 129 Fed. Cl. 793 (2017) (involving a geodesic sphere phased array antenna system for satellite communications); Ross-Hime Designs, Inc. v. United States, 126 Fed. Cl. 299 (2016) (involving a robotic manipulator used by the National Aeronautics and Space Administration).

19. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996) ("[A patent] infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." (citation omitted)).

20. See, e.g., Sevenson Envtl. Servs., Inc. v. United States, 76 Fed. Cl. 51, 57–58 (2007) ("The Court's analysis in a patent infringement case involves two steps. The first step is to determine the scope and meaning of the patents in a Markman claim construction hearing. 'Claim construction' is a question of law for the Court to decide. A patent's 'claims' define the invention. The claims are the numbered paragraphs 'particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.' 35 U.S.C. § 112. The Court must look to the wording of the claims to determine the scope and meaning of the patent. In the second step, the patent claims as construed by the Court are compared to the accused device or method to determine alleged patent infringement." (citations omitted)).

21. Am. Innotek, Inc. v. United States, 128 Fed. Cl. 135, 152 (2016) (reaching the issue of validity raised as an alternative affirmative defense to infringement).

22. See, e.g., Scheduling Order, Bondyopadhyay, No. 14-147C (Fed. Cl. Feb. 10, 2017), ECF No. 198.

23. See, e.g., Joint ADR Status Report, Tritek Techs., Inc. v. United States, No. 14-451C (Fed. Cl. Dec. 23, 2015).

24. Decca Ltd. v. United States, 640 F.2d 1156, 1166–67 (Ct. Cl. 1980).

25. 35 U.S.C. § 271(a)–(c), (e)–(g); see also Decca, 640 F.2d at 1166 ("Because section 1498 authorizes the Government to take a license in any United States patent, the Government is never 'guilty' of 'direct infringement' of a patent insofar as 'direct infringement' connotes tortious or wrongful conduct."). Before the enactment of § 1498, the government would routinely contest the Court of Claims' jurisdiction to hear patent actions, as such actions traditionally sound in tort. Sean M. O'Connor, Taking, Tort, or Crown Right?: The Confused Early History of Government Patent Policy, 12 J. Marshall Rev. Intell. Prop. L. 145, 165–67 (2012). The Supreme Court also heard some congressional reference cases on the government's patent infringement. See, e.g., James v. Campbell, 104 U.S. 356, 357 (1882).

26. Though not explored in this article, the scope of defenses available to the government is also a source of litigation. As a general rule, the government is permitted to assert "all the

defenses available to a private party" under § 282 of the Patent Act, as well as laches, and the medical immunity defense under § 287(c). Pratt & Whitney Can. Inc. v. United States, 12 Cl. Ct. 221, 222–23 (1987) ("[The government] has allowed all the defenses available to a private party, even though the plaintiff cannot avail itself of all the remedies available to a private party. Although this is indeed an asymmetrical situation, that does not render it unjust. But it should be further noted that a determination as to the wisdom of a statute is not the function of a court."); see also Avocent Redmond Corp. v. United States, 93 Fed. Cl. 399, 403 (2010) (finding laches to be an affirmative defense available to the government); Lamson v. United States, 117 Fed. Cl. 755, 761–63 (2014) (holding the medical immunity defense in § 287(c) of the Patent Act to be an available defense to the government based on Federal Circuit precedent).

27. 640 F.2d at 1167.

28. See Zoltek Corp. v. United States (Zoltek III), 442 F.3d 1345, 1350 (Fed. Cir. 2006), abrogated by Zoltek V, 672 F.3d 1309, 1322–23 (Fed. Cir. 2012) (en banc); see also NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1316 (Fed. Cir. 2005) ("[D]irect infringement under section 271(a) is a necessary predicate for government liability under section 1498."); Motorola, Inc. v. United States, 729 F.2d 765, 768 n.3 (Fed. Cir. 1984).

29. Zoltek V, 672 F.3d at 1323.

30. 35 U.S.C. § 154(a)(1).

31. Motorola, 729 F.2d at 768 ("As occurs frequently in section 1498 patent actions, the parties . . . are presenting and arguing the case as if it were an action brought under Title 35. Although concepts, phrases and words commonly used in the patent field may connote a panoply of rights and remedies under Title 35, the same concepts, phrases and words do not and cannot always connote or denote the same meaning under section 1498. Although a section 1498 action may be similar to a Title 35 action, it is nonetheless only parallel and not identical.").

32. 672 F.3d at 1321, 1323.

33. See 35 U.S.C. § 271(g) ("Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.").

34. Zoltek V, 672 F.3d at 1323.

35. Id. at 1327. The government's sales of and offers to sell a patented invention defined as direct infringement under § 271(a) are not within the scope of § 1498 actions. In de Graffenried v. United States, 25 Cl. Ct. 209, 216 (1992), that court held that the government's sale of or offers to sell a patented invention do not constitute infringement under § 1498(a) because "Section 1498 does not specifically authorize suits against the United States in instances of a sale of a patented device," and "it would violate principles of sovereign immunity to interpret the statute as mandating compensation by the United States for such a sale."

36. Aside from § 271(e), which relates exclusively to the infringement of pharmaceutical products regulated by the Food and Drug Administration that plainly fall outside the scope of § 1498, as § 271(e) is a "highly artificial" act of infringement in which no taking of any license

could have occurred. Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 678 (1990) (noting that § 271(e) is "a highly artificial act of infringement" in which no manufacture, use, or sale has occurred, and only applies to pharmaceutical drugs and no other products).

37. Zoltek V, 672 F.3d at 1327 ("We do not decide the issue of indirect infringement, under §§ 271(b), (c), and (f), which is not before us."); see also Advanced Aerospace Techs., Inc. v. United States, 113 Fed. Cl. 265 (2013) (finding that post–Zoltek V, a cause of action under § 1498(a) that is recognized to be defined under § 271(f) may be viable so long as the exportation claim contains an allegation of use by the government).

38. 28 U.S.C. § 1498(a).

39. 583 F.3d 1371, 1376–77 (Fed. Cir. 2009).

40. IRIS Corp. v. Japan Airlines Corp., 769 F.3d 1359, 1362 (Fed. Cir. 2014) (quoting Madey v. Duke Univ., 413 F. Supp. 2d 601, 607 (M.D.N.C. 2006)).

41. Larson v. United States, 26 Cl. Ct. 365, 369 (1992); see also Sheridan v. United States, 120 Fed. Cl. 127, 131 (2015).

42. TVI Energy Corp. v. Blane, 806 F.2d 1057, 1060 (Fed. Cir. 1986); Hughes Aircraft Co. v. United States, 534 F.2d 889, 901 (Ct. Cl. 1976).

43. 48 C.F.R. § 52.227-1; see also Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc., 477 F.3d 1361, 1367 (Fed. Cir. 2007); TDM Am., LLC v. United States, 83 Fed. Cl. 780, 784–86 (2008).

44. 48 C.F.R. § 52.227-2; see also Va. Panel Corp. v. MAC Panel Co., 133 F.3d 860, 870 (Fed. Cir. 1997) (finding a patent owner did not engage in patent misuse by threatening an injunction lawsuit against a government contractor, despite that remedy being unavailable, because the contractor may be in the best position to report potential infringement to the government).

45. Va. Panel, 133 F.3d at 870; Larson, 26 Cl. Ct. at 370.

46. Larson, 26 Cl. Ct. at 370 (citing Bereslavsky v. Esso Standard Oil Co., 175 F.2d 148, 150 (4th Cir. 1949); Carrier Corp. v. United States, 534 F.2d 244, 247–50 (Ct. Cl. 1976); Hughes, 534 F.2d at 897–901).

47. TVI Energy, 806 F.2d at 1060; Robishaw Eng'g Inc. v. United States, 891 F. Supp. 1134, 1145 (E.D. Va. 1995) ("[T]he policy purpose behind § 1498 is to insulate the government and its private contractors from 'lawsuits disruptive of the procurement process.'" (quoting H.R. Rep. No. 872, 82d Cong., 1st Sess. 1420 (1951), as it appears in Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1041 (9th Cir. 1983))). Similarly, so as not to disturb the procurement process, a subcontractor's use of the subcontractor's own patents in performing a contract creates an implied license for the government to use the patented invention, however, the government is not bound to make direct payments to any subcontractor. See Blais v. United States, 31 Fed. Cl. 422, 427 (1994). In the same vein, inventions made during the course of performing a government contract can result in a royalty-free license between the government and the contractor, if the "invention is so tied to the work to be done under the contract as to contribute significantly to the results anticipated by that agreement." Tech. Dev. Corp. v. United States, 597 F.2d 733, 745–46 (Ct. Cl. 1979).

48. 806 F.2d at 1060–61.

49. Id.

50. See, e.g., Robishaw, 891 F. Supp. at 1141 (citing Trojan, Inc. v. Shat-R-Shield, Inc., 885 F.2d 854, 856–57 (Fed. Cir. 1989); W.L. Gore & Assocs., Inc. v. Garlock, Inc., 842 F.2d 1275, 1282–83 (Fed. Cir. 1988); TVI Energy, 806 F.2d at 1059–60; Stelma, Inc. v. Bridge Elecs. Co., 287 F.2d 163, 164 (3d Cir. 1961)).

51. Advanced Software Design Corp. v. Fed. Reserve Bank of St. Louis, 583 F.3d 1371, 1375 (Fed. Cir. 2009); Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1381–82 (Fed. Cir. 2002).

52. IRIS Corp. v. Japan Airlines Corp., 769 F.3d 1359, 1363 (Fed. Cir. 2014). However, various government agencies have internal processes to hear administrative claims for patent infringement. Christine Hlavka, Contractor Patent Bandits: Preventing the Government from Avoiding 28 U.S.C. § 1498 Liability for Its Contractors' Unauthorized Use of Patented Material by Outsourcing One or More Steps of the Process Abroad, 37 Pub. Cont. L.J. 321, 324–25 (2008). During the pendency of an administrative claim, the USCFC's statute of limitations may be tolled pursuant to 35 U.S.C. § 286. See Bondyopadhyay v. United States, No. 14-147C, 2015 WL 1311726, at *4–5 (Fed. Cl. Mar. 20, 2015).

53. 48 C.F.R. § 52.227-3.

54. Id.

55. RCFC 14(b), (c).

56. 549 F. App'x 964, 968 (Fed. Cir. 2013), aff'g UUSI, LLC v. United States, 110 Fed. Cl. 604 (2013).

57. Id.

58. 420 F.2d 1057, 1060 (Ct. Cl. 1970).

59. Leesona Corp. v. United States, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties. When the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment.").

60. Id. at 969 (citing United States v. Chandler-Dunbar Co., 299 U.S. 53, 76 (1913)).

61. See Ga.-Pac. Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120–21 (S.D.N.Y. 1970) (outlining factors relevant to determining "the amount of a reasonable royalty for a patent license" based on "hypothetical negotiations"), modified sub nom. Ga.-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc., 446 F.2d 295 (2d Cir. 1971).

62. Decca Ltd. v. United States, 640 F.2d 1156, 1167 (Ct. Cl. 1980).

63. Id.

64. Id.

65. Id. at 1168; see also Hitkansut LLC v. United States, 130 Fed. Cl. 353, 391–94 (2017).

66. Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 343 (1928) ("The purpose of the [1918] amendment was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the Government and to limit the owner of the patent and his assigns and all claiming through or under him to suit against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture. The word 'entire' emphasizes the exclusive and comprehensive character of the remedy provided.").

67. Heinemann v. United States, 620 F.2d 874, 877–78 (Ct. Cl. 1980).

68. Motorola, Inc. v. United States, 729 F.2d 765, 768 n.3 (Fed. Cir. 1984).

69. The Invention Secrecy Act provides different procedures based on whether the government has a property interest in the patent. 35 U.S.C. § 181.

70. Id. § 183; Honeywell Int'l, Inc. v. United States, 609 F.3d 1292, 1303 (Fed. Cir. 2010).

71. E.g., Linick v. United States, 96 Fed. Cl. 78, 84 (2011) ("Section 183 provides an administrative remedy to allow a claimant to receive the compensation he seeks without requiring the intervention of the judicial system. The administrative remedy is intended to assist the claimant—not to hinder his application.").

72. Steven Aftergood, Invention Secrecy Increased in 2016, Fed'n of Am. Scientists (Oct. 31, 2016), https://fas.org/blogs/secrecy/2016/10/invention-secrecy-2016/; Joshua Brustein, Congratulations, Your Genius Patent Is Now a Military Secret, Bloomberg (June 8, 2016), https://www.bloomberg.com/news/articles/2016-06-08/congratulations-your-....

73. 28 U.S.C. § 1498(b). In contrast to the USCFC's general six-year statute of limitations under 28 U.S.C. § 2501, § 1498(b) provides for a three-year statute of limitations, stating that "[e]xcept as otherwise provided by law, no recovery shall be had for any infringement of a copyright covered by this subsection committed more than three years prior to the filing of the complaint or counterclaim for infringement in the action."

74. 533 F.3d 1374, 1380–81 (Fed. Cir. 2008).

75. Gaylord v. United States, 678 F.3d 1339, 1343 (Fed. Cir. 2012). Like the Copyright Act, however, § 1498(b) permits a successful copyright owner to collect "minimum statutory damages" per 17 U.S.C. § 504 in lieu of proving actual damages. Cohen v. United States, 105 Fed. Cl. 733, 752 (2012).

76. Steve Altman Photography v. United States, 18 Cl. Ct. 267 (1989) (citing Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct. Cl. 1973), aff'd per curiam, 420 U.S. 376 (1975)); Cohen, 105 Fed. Cl. at 740–41 ("In general, to determine copyright infringement, the Court of

Federal Claims examines the substantive law of copyright." (citing RT Comput. Graphics, Inc. v. United States, 44 Fed. Cl. 747, 754 (1999)).

77. Porter v. United States, 473 F.2d 1329, 1337 (5th Cir. 1973).

78. Walton v. United States, 551 F.3d 1367, 1369 (Fed. Cir. 2009).

79. See, e.g., Efficient Enter. Eng'g v. United States, No. 16-1421C (Fed. Cl. filed Oct. 27, 2016).

80. 48 C.F.R. § 52.227-19(a).

81. See David S. Bloch, "When Two Worlds Collide": Comparing Software License Boilerplate with Government Contracts, 8 Landslide, no. 3, Jan./Feb. 2016.

82. 48 C.F.R. § 52.227-19(b).

**https://www.uscfc.uscourts.gov/node/2927**

# EXHIBIT D

# EXHIBIT J

## RCFC 14(b) NOTICE(s):

*QUALCOMM INC.,*

*APPLE INC.,*

*LG ELECTRONICS U.S.A. INC., &*

*SAMSUNG ELECTRONICS AMERICA INC.,*

Case 4:22-cv-03283-HSG   Document 34   Filed 08/23/22   Page 61 of 166
Case 4:22-cv-03283-HSG   Document 1-4   Filed 06/06/22   Page 200 of 229
Case 1:13-cv-00307-EGB   Document 169   Filed 04/22/19   Page 7 of 11

# In the United States Court of Federal Claims

LARRY GOLDEN,

No. 13-307 C

v.

UNITED STATES

## NOTICE



**To:**   Qualcomm Inc.
c/o The Prentice Hall
Corporation System, Inc.
251 Little Falls Drive
Wilmington, DE 19808
(302) 636-5400

Pursuant to Rule 14 of the Rules of the United States Court of Federal Claims, you are hereby notified of the above-captioned case in which you may have an interest in the subject matter. If you have an interest in the subject matter of this case, within forty-two (42) days after service of this Notice upon you, you may file a complaint or answer herein in accordance with Rule 14. For your information, this Notice is accompanied by copies of the following pleadings that have been filed herein: **Plaintiff's Complaint, Amended Complaint, and Defendant's Motion to Provide Notice to Interested Parties.**

In testimony whereof, I have hereunto set my hand and affixed the Seal of said Court at Washington, DC, this 22nd day of April, 2019.

Lisa L. Reyes
U.S. Court of Federal Claims

By: _Elen M. Ley_
Deputy Clerk

## RETURN OF SERVICE

Service of the above Notice was accomplished by forwarding same to the above named at the address indicated by registered or certified mail, return receipt requested. See return receipt attached showing service on _____.
                                       (Date)

_____
Attorney of Record

Case 4:22-cv-03283-HSG   Document 34   Filed 08/23/22   Page 62 of 166
Case 4:22-cv-03283-HSG   Document 1-4   Filed 06/06/22   Page 201 of 229
Case 1:13-cv-00307-EGB   Document 176   Filed 05/30/19   Page 1 of 6

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LARRY GOLDEN,

           Plaintiff, *pro se*,

    v.

THE UNITED STATES,

           Defendant.

No. 13-307 C

Senior Judge Eric G. Bruggink

### CERTIFICATE OF SERVICE ON QUALCOMM

Pursuant to Rule 14(b) and the Court's April 16, 2019 order (Dkt. 166), the United States ("the Government") files with the Clerk its return of service on Qualcomm Inc., indicating completion of the required service of the Clerk's RCFC 14 Notice (*see* Dkt. 169). With the Notice, the Government also served Plaintiffs' Original Complaint (Dkt. 1), Plaintiff's Final Amended Complaint (Dkt. 120), and Defendant's Motion to Provide Notice to Interested Parties (Dkt. 161). A copy of the return receipt evidencing service of the original copy of the Notice is also filed with this certificate. *See* Exhibit 1.

Received - USCFC

MAY 3 0 2019

—1—

Case 4:22-cv-03283-HSG   Document 34   Filed 08/23/22   Page 63 of 166
Case 4:22-cv-03283-HSG   Document 1-4   Filed 06/06/22   Page 202 of 229
Case 1:13-cv-00307-EGB   Document 176   Filed 05/30/19   Page 2 of 6

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

GARY L. HAUSKEN
Director

May 30, 2019

NICHOLAS J. KIM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
*Nicholas.J.Kim@usdoj.gov*
T: (202) 616-8116
F: (202) 307-0345

*Attorneys for the United States*

–2–

Case 4:22-cv-03283-HSG   Document 34   Filed 08/23/22   Page 64 of 166
Case 4:22-cv-03283-HSG   Document 1-4   Filed 06/06/22   Page 203 of 229
Case 1:13-cv-00307-EGB   Document 176   Filed 05/30/19   Page 3 of 6

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing "CERTIFICATE OF SERVICE ON

QUALCOMM" was deposited with Federal Express on May 30, 2019, postage pre-paid, to:

Larry Golden
740 Woodruff Road
#1102
Greenville, SC 29607

Plaintiff, *pro se*

Nicholas J. Kim
Department of Justice

Case 4:22-cv-03283-HSG   Document 34   Filed 08/23/22   Page 65 of 166
Case 4:22-cv-03283-HSG   Document 1-4   Filed 06/06/22   Page 204 of 229
Case 1:13-cv-00307-EGB   Document 176   Filed 05/30/19   Page 4 of 6

# Exhibit 1

Case 4:22-cv-03283-HSG   Document 34   Filed 08/23/22   Page 66 of 166
Case 4:22-cv-03283-HSG   Document 1-4   Filed 06/06/22   Page 205 of 229
Case 1:13-cv-00307-EGB   Document 176   Filed 05/30/19   Page 5 of 6

# In the United States Court of Federal Claims

LARRY GOLDEN,

No. 13-307 C

v.

UNITED STATES

# NOTICE

**To:**  Qualcomm Inc.
c/o The Prentice Hall
Corporation System, Inc.
251 Little Falls Drive
Wilmington, DE 19808
(302) 636-5400

Pursuant to Rule 14 of the Rules of the United States Court of Federal Claims, you are hereby notified of the above-captioned case in which you may have an interest in the subject matter. If you have an interest in the subject matter of this case, within forty-two (42) days after service of this Notice upon you, you may file a complaint or answer herein in accordance with Rule 14. For your information, this Notice is accompanied by copies of the following pleadings that have been filed herein: **Plaintiff's Complaint, Amended Complaint, and Defendant's Motion to Provide Notice to Interested Parties.**

In testimony whereof, I have hereunto set my hand and affixed the Seal of said Court at Washington, DC, this 22nd day of April, 2019.

**Lisa L. Reyes**
U.S. Court of Federal Claims

By: _Ellen M. Ley_
Deputy Clerk

## RETURN OF SERVICE

Service of the above Notice was accomplished by forwarding same to the above named at the address indicated by registered or certified mail, return receipt requested. See return receipt attached showing service on ___May 13, 2019___
(Date)

_____
Attorney of Record

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Nicholas J. Kim
1100 L St. NW
Washington DC 20005
Room 8508

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

Qualcomm Inc.
c/o The Prentice-Hall Corporation System,
Inc.
251 Little Falls Drive
Wilmington, DE 19808

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X Paul Sisol    □ Agent
                □ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?   □ Yes
   If YES, enter delivery address below:          □ No

3. Service Type
   □ Certified Mail      □ Express Mail
   □ Registered          □ Return Receipt for Merchandise
   □ Insured Mail        □ C.O.D.

4. Restricted Delivery? (Extra Fee)    □ Yes

2. Article Number
   (Transfer from service label)       7014 2870 0000 7276 9833

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

# EXHIBIT E

# CLAIM CHART OUTLINE: LARRY GOLDEN vs.
# THE UNITED STATES (CASE NUMBER: 13-307 C)

## Patent #: 9,589,439; Independent Claim 13

**Page 68 Claim Chart; Page 59 Amended Complaint**

| "TOUGHBOOK 31" Laptop K-Max Self-flying Helicopter | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

**Page 74 Claim Chart; Page 61 Amended Complaint**

| "TOUGHBOOK 31" Laptop Passport Systems Inc. Base Control Unit (BCU) | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

**Page 79 Claim Chart; Page 65 Amended Complaint**

| Apple iPAD Tablet Boeing MH-6 Little Bird Helicopter | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

**Page 84 Claim Chart; Page 67 Amended Complaint**

| Navy Marine Corps Intranet (NMCI) Network - Apple iPad | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

**Page 89 Claim Chart; Page 70 Amended Complaint**

| Smartphone-Based Rapid Diagnostic Tests | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

**Page 94 Claim Chart; Page 72 Amended Complaint**

| Variable's "NODE+Oxa" for the Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

**Page 99 Claim Chart; Page 75 Amended Complaint**

| "COINS" Nano-Embedded Sensors for Smartphones | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

**Page 104 Claim Chart; Page 77 Amended Complaint**

| Samsung Galaxy s6 "BioPhone" | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

**Page 109 Claim Chart; Page 79 Amended Complaint**

| "Biotouch" Samsung Galaxy s6 | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

**Page 114 Claim Chart; Page 82 Amended Complaint**

| PositiveID / "Firefly DX" Samsung Galaxy s6 Smartphone | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

## Patent #: 9,589,439; Independent Claim 14

**Page 119 Claim Chart; Page 84 Amended Complaint**

| "Cell-All": Samsung Galaxy s6 | Patent #: 9,589,439; Independent Claim 14 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (18, 118, 12, 28, 25, 20, 124) |
|---|---|---|

**Page 124 Claim Chart; Page 67 Amended Complaint**

| Navy Marine Corps Intranet (NMCI) Network - Samsung Galaxy s6 | Patent #: 9,589,439; Independent Claim 14 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (18, 118, 12, 28, 25, 20, 124) |
|---|---|---|

**Page 129 Claim Chart; Page 61 Amended Complaint**

| 1"x2" Detection Device (DD) Samsung Galaxy s6 Smartphone | Patent #: 9,589,439; Independent Claim 14 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (18, 118, 12, 28, 25, 20, 124) |
|---|---|---|

**Page 134 Claim Chart; Page 61 Amended Complaint**

| NetS² SmartShield G500 Radiation Detector Samsung Galaxy s6 Smartphone | Patent #: 9,589,439; Independent Claim 14 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (18, 118, 12, 28, 25, 20, 124) |
|---|---|---|

**Page 139 Claim Chart; Page 87 Amended Complaint**

| "Kromek D3S-ID": A Standalone Isotope ID | Patent #: 9,589,439; Independent Claim 14 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (18, 118, 12, 28, 25, 20, 124) |
|---|---|---|

## Patent #: 9,589,439; Independent Claim 15

**Page 144 Claim Chart; Page 90 Amended Complaint**

| MIT: "NFC" Samsung Galaxy s6 Smartphone Sensor | Patent #: 9,589,439; Independent Claim 15 | Patent #: RE 43,990; Dependent Claims (18, 12, 28, 25, 20, 118) |
|---|---|---|

Page 148 Claim Chart; Page 67 Amended Complaint

| Navy Marine Corps Intranet (NMCI) Network - Samsung Galaxy s6 | Patent #: 9,589,439; Independent Claim 15 | Patent #: RE 43,990; Dependent Claims (18, 12, 28, 25, 20, 118) |
|---|---|---|

## Patent #: 9,589,439; Independent Claim 16

Page 152 Claim Chart; Page 93 Amended Complaint

| NRL: SIN-VAPOR / Smartphone System | Patent #: 9,589,439; Independent Claim 16 | Patent #: RE 43,990; Dependent Claims (118, 18, 122, 124, 108) |
|---|---|---|

Page 157 Claim Chart; Page 95 Amended Complaint

| iPhone "Biodetector" Smartphone | Patent #: 9,589,439; Independent Claim 16 | Patent #: RE 43,990; Dependent Claims (118, 18, 122, 124, 108) |
|---|---|---|

Page 162 Claim Chart; Page 97 Amended Complaint

| FLIR: identiFINDER R300 / Smartphone System | Patent #: 9,589,439; Independent Claim 16 | Patent #: RE 43,990; Dependent Claims (118, 18, 122, 124, 108) |
|---|---|---|

## Patent #: 9,589,439; Independent Claim 17

Page 168 Claim Chart; Page 99 Amended Complaint

| "VOCket System" / "Nett Warrior" Smartphone System | Patent #: 9,589,439; Independent Claim 17 | Patent #: RE 43,990; Dependent Claims (119, 17, 18, 124, 108) |
|---|---|---|

Page 172 Claim Chart; Page 101 Amended Complaint

| GammaPix for Android Smartphones | Patent #: 9,589,439; Independent Claim 17 | Patent #: RE 43,990; Dependent Claims (119, 17, 18, 124, 108) |
|---|---|---|

Page 177 Claim Chart; Page 79 Amended Complaint

| "Biotouch System" / "Nett Warrior" Smartphone System | Patent #: 9,589,439; Independent Claim 17 | Patent #: RE 43,990; Dependent Claims (119, 17, 18, 124, 108) |
|---|---|---|

**Page 182 Claim Chart; Page 104 Amended Complaint**

| MultiRae Pro Wireless Portable Multi Threat Radiation and Chemical Detector | Patent #: 9,589,439; Independent Claim 17 | Patent #: RE 43,990; Dependent Claims (119, 79, 124, 78) |
|---|---|---|

## Patent #: 9,589,439; Independent Claim 19

**Page 188 Claim Chart; Page 106 Amended Complaint**

| EAGER: Mobile-Phone Based Single Molecule Imaging for DNA | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 193 Claim Chart; Page 108 Amended Complaint**

| INSPIRE Track 2: Public Health Nanotechnology and Mobility (PHeNoM) | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 198 Claim Chart; Page 110 Amended Complaint**

| PFI:BIC Human-Centered Smart-Integration of Mobile Imaging and Sensing | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 203 Claim Chart; Page 113 Amended Complaint**

| EFRI-BioFlex: Cellphone-Based Digital Immunoassay Platform | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 208 Claim Chart; Page 115 Amended Complaint**

| "Multimode Smartphone Biosensor" | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 213 Claim Chart; Page 117 Amended Complaint**

| EAGER: Lab-in-a-Smartphone | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 218 Claim Chart; Page 119 Amended Complaint**

| PFI-BIC "Pathtracker: Smartphone-based for Mobile Infectious Disease Detection | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

4

**Page 223 Claim Chart; Page 122 Amended Complaint**

| I-Corps: Ultra-Sensitive Lateral Flow Reporters / Lab-on-Phone Platform | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 228 Claim Chart; Page 124 Amended Complaint**

| Smartphone (iPhone) Microscope | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 233 Claim Chart; Page 126 Amended Complaint**

| Smartphone (iPhone) Biosensor "Cradle" | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 238 Claim Chart; Page 128 Amended Complaint**

| AOptix Stratus MX  Peripheral for the Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 244 Claim Chart; Page 131 Amended Complaint**

| PositiveID - Boeing / M-Band Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

**Page 250 Claim Chart; Page 133 Amended Complaint**

| Samsung Galaxy s6 "Microscope" Smartphone | Patent #: 9,589,439; Independent Claim 19 | Patent #: RE 43,990; Dependent Claims 118, 92, 25, 12, 124, 99 |
|---|---|---|

## Patent #: 9,589,439; Independent Claim 20

**Page 255 Claim Chart; Page 84 Amended Complaint**

| "Cell-All": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

**Page 261 Claim Chart; Page 135 Amended Complaint**

| "Kromek D3S-NET": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

**Page 267 Claim Chart; Page 138 Amended Complaint**

| Biomeme "two3" Mobile Thermocycler: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

Page 273 Claim Chart; Page 140 Amended Complaint

| Smartphone-operated "LAMP box": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

Page 279 Claim Chart; Page 143 Amended Complaint

| Alluviam LLC HazMasterG3: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

Page 285 Claim Chart; Page 146 Amended Complaint

| FePhone Point-of-Care: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

Page 291 Claim Chart; Page 148 Amended Complaint

| NutriPhone Lab-on-a-Chip: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

Page 297 Claim Chart; Page 150 Amended Complaint

| FeverPhone: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

Page 303 Claim Chart; Page 153 Amended Complaint

| Solar Thermal PCR Test: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

Page 309 Claim Chart; Page 156 Amended Complaint

| Lab-on-a-Drone: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (118, 18, 92, 25, 124) |
|---|---|---|

## Patent #: RE 43,891; Independent Claim 11

Page 315 Claim Chart; Page 158 Amended Complaint

| Eureka Aerospace High Powered Electromagnetic System, or HPEMS | Patent #: RE 43,891; Independent Claim 11 | Patent #: RE 43,891; Dependent Claims (19, 15, 21) |
|---|---|---|

**Page 320 Claim Chart; Page 160 Amended Complaint**

| Laser Weapons System (LaWS) | Patent #: RE 43,891; Independent Claim 11 | Patent #: RE 43,891; Dependent Claims (19, 15, 21) |
|---|---|---|

**Page 329 Claim Chart; Page 163 Amended Complaint**

| ATHENA (Advanced Test High Energy Asset) | Patent #: RE 43,891; Independent Claim 11 | Patent #: RE 43,891; Dependent Claims (19, 15, 21) |
|---|---|---|

**Page 338 Claim Chart; Page 165 Amended Complaint**

| Counter-Electronics High-Powered Microwave Advanced Missile Project (CHAMP) | Patent #: RE 43,891; Independent Claim 11 | Patent #: RE 43,891; Dependent Claims (19, 15, 21) |
|---|---|---|

**Page 347 Claim Chart; Page 167 Amended Complaint**

| Northrop Grumman X-47B UCAS  X-47B Control Display Unit (CDU) | Patent #: RE 43,891; Independent Claim 11 | Patent #: RE 43,891; Dependent Claims (19, 27, 15, 21) |
|---|---|---|

## Patent #: RE 43,891; Independent Claim 23

**Page 352 Claim Chart; Page 65 Amended Complaint**

| Boeing MH-6 Little Bird Helicopter | Patent #: RE 43,891; Independent Claim 23 | Patent #: RE 43,891; Dependent Claims (55, 27, 31, 30) |
|---|---|---|

## Patent #: RE 43,891; Independent Claim 44

**Page 357 Claim Chart; Page 59 Amended Complaint**

| K-Max Self-flying Helicopter | Patent #: RE 43,891; Independent Claim 44 | Patent #: RE 43,891; Dependent Claims (55, 45, 48, 53, 52) |
|---|---|---|

**Page 360 Claim Chart; Page 169 Amended Complaint**

| Oshkosh Defense Autonomous Unmanned Ground Vehicle (UGV) "TerraMax" | Patent #: RE 43,891; Independent Claim 44 | Patent #: RE 43,891; Dependent Claims (55, 27) |
|---|---|---|

**Page 364 Claim Chart; Page 172 Amended Complaint**

| Dream Hammer's "Ballista" Software for Computer, Tablet or Smartphone | Patent #: RE 43,891; Independent Claim 44 | Patent #: RE 43,891; Dependent Claims (55, 27) |
|---|---|---|

## Patent #: RE 43,990; Independent Claim 125

**Page 368 Claim Chart; Page 174 Amended Complaint**

| iControl Inc. "mLOCK" | Patent #: RE 43'990; Independent Claim 125 | Patents: 8,106,752; RE 43,990; Dependent Claims (36); (148, 135, 35, 39, 44) |
|---|---|---|

## Patent #: 7,385,497; Independent Claim 1

**Page 371 Claim Chart; Page 84 Amended Complaint**

| "Cell-All": Synkera MikroKera Ultra | Patent #: 7,385,497; Independent Claim 1 | Patents: 7,385,497; 8,106,752; & RE 43,990; Dependent Claims (2, 4); (34, 37); (119, 29) |
|---|---|---|

**Page 375 Claim Chart; Page 61 Amended Complaint**

| 2"x2" Detection Device (DD) Samsung Galaxy s6 Smartphone | Patent #: 7,385,497; Independent Claim 1 | Patents: 7,385,497; 8,106,752; & RE 43,990; Dependent Claims (2, 4); (34, 37); (119, 29) |
|---|---|---|

**Page 379 Claim Chart; Page 61 Amended Complaint**

| NetS² SmartShield G300 Radiation Detector Samsung Galaxy s6 Smartphone | Patent #: 7,385,497; Independent Claim 1 | Patents: 7,385,497; 8,106,752; & RE 43,990; Dependent Claims (2, 4); (34, 37); (119, 29) |
|---|---|---|

1. SOUTHWEST BORDER TECHNOLOGY SOLUTIONS; Solicitation Number: HSBP0111RSWBTS; Agency: Department of Homeland Security; Office: Customs and Border Protection; Added: Jan 27, 2011 9:27 pm; FOIA Request: DHS/CBP

2. Department of Homeland Security (DHS); Science & Technology (S&T) Directorate (HSARPA); Broad Agency Announcement (BAA) 07-02A; SAFE Container (SAFECON) Program; Published: 02/01/2007; FOIA Request: DHS/S&T

3. DHS; S&T Directorate; Broad Agency Announcement (BAA) 09-17; "Time Recorded Ubiquitous Sensor Technologies"; (TRUST); Posted: September 23, 2009; FOIA Request: DHS/S&T

4. DHS; S&T Directorate; Broad Agency Announcement (BAA) 07-10; "Cell-All Ubiquitous Biological and Chemical Sensing"; Published: 10/30/2007; FOIA Request: DHS/S&T

5. DHS; S&T Directorate; Long Range Broad Agency Announcement; LRBAA #08-01 Published: 11/08/2007; FOIA Request: DHS/S&T

6. TECHNICAL DIVISIONAL REQUIREMENTS; LONG RANGE BROAD AGENCY ANNOUNCEMENT (LRBAA); BAA 09-05; FOR THE DEPARTMENT OF HOMELAND SECURITY; SCIENCE AND TECHNOLOGY DIRECTORATE; FOIA Request: DHS/S&T

7. Department of Homeland Security; Domestic Nuclear Detection Office (DNDO); BROAD AGENCY ANNOUNCEMENT; BAA 09-102; Published: 03/16/2009; FOIA Request: DNDO

8. Department of Homeland Security; Chemical and Biological Division; BROAD AGENCY ANNOUNCEMENT; BAA 09-09; Published on: 19 May 2009; FOIA Request: Chem/Bio Division

9. The Department of Homeland Security (DHS); Science & Technology (S&T); BROAD AGENCY ANNOUCEMENT BAA 09-15; Low Cost Biological Detector; Published:

11/13/2009; FOIA Request: DHS/S&T

10. TECHNICAL DIVISIONAL REQUIREMENTS; LRBAA (BAA 10-01); THE
DEPARTMENT OF HOMELAND SECURITY (DHS); SCIENCE & TECHNOLOGY
DIRECTORATE (S&T); Published: 1 January 2010; FOIA Request: DHS/S&T

11. Department of Homeland Security (DHS); Science & Technology Directorate (S&T)
Long Range Broad Agency Announcement; BAA 11-03; Published: January 24, 2011; FOIA
Request: DHS/S&T

12. U.S. DEPARTMENT OF HOMELAND SECURITY; Advanced Technology Demonstration
(ATD); Airborne Radiological Enhanced-sensor System (ARES); Broad Agency Announcement
No.: BAA12-102 for Domestic Nuclear Detection Office (DNDO); Posted: Tuesday; 5 June
2012; FOIA Request: DNDO

13. DHS; BioWatch Gen-3; Solicitation Number: HSHQDC-12-R-00001; Solicitation Number:
HSHQDC-13-R-00026; Office of the Chief Procurement Officer; Added: Aug 26, 2011 / Jan 25,
2013; FOIA Request: I Don't Know Which Office

14. Department of Homeland Security (DHS); The Science and Technology (S&T) Directorate;
Solicitation Number: DHS 13-01; "Robotic Aircraft for Public Safety"; Published: 2013; FOIA
Request: DHS/S&T

15. Department of Homeland Security (DHS); The Science and Technology (S&T) Directorate
Solicitation Number: ICBRNE; "Integrated Chemical, Biological, Radiological, Nuclear,
Explosive (ICBRNE) Program"; Published: 2010; FOIA Request: DHS/S&T

16. Department of Homeland Security (DHS); U.S. Coast Guard (USCG); Solicitation Number:
"Biometrics at Sea; Privacy Impact Assessment"; Published: May 14, 2008; FOIA Request:
DHS/U.S. Coast Guard

17. Department of Homeland Security (DHS); U.S. Customs and Border Protection (CBP); Solicitation Number: (TASPO); "Smartphone Scanning Peripheral Devices"; Published: September 26, 2012; FOIA Request: DHS/CBP

18. Department of Homeland Security (DHS); Office of Chief Procurement Officer; Solicitation Number: HSHQDC-13-R-00052; "RFI for Mobile Electronic Biometric/Biographic Data Collection Device"; Posted Date: May 10, 2013; FOIA Request: I Don't Know Which Office

19. Department of Homeland Security (DHS); Office of Chief Procurement Officer Small Business Innovation Research (SBIR) Program; Solicitation No.: Reference-Number-DHSSBIRFY081; Published: 12/03/2007; FOIA Request: I Don't Know Which Office

20. Department of Homeland Security (DHS); Office of Chief Procurement Officer; Small Business Innovation Research (SBIR) Program; SBIR Phase 12.1; Solicitation No.: HSHQDC-12-R-00052; Posted: May 2012; FOIA Request: I Don't Know Which Office

21. Department of Homeland Security (DHS); Science and Technology Directorate (S&T); Small Business Innovation Research (SBIR) Program; SBIR Phase 13.1; Solicitation No.: HSHQDC-13-R-00009; Posted: December 19, 2012; FOIA Request: DHS/S&T

22. Department of Homeland Security (DHS); Office of Chief Procurement Officer; Solicitation Number: HSHQDC-15-R-00017; Small Business Innovation Research (SBIR) Program; Posted Date: December 3, 2015; FOIA Request: I Don't Know Which Office

23. Department of Homeland Security (DHS); Office of Chief Procurement Officer; Small Business Innovation Research (SBIR) Program; SBIR Phase 14.1; Solicitation No.: HSHQDC-14-R-00005; Posted: December 18, 2013; FOIA Request: I Don't Know Which Office

24. U.S. Army Research Laboratory (ARL); ATTN: RDRL-SEE-B; "Smart phones: Platform Enabling Modular, Chemical, Biological, and Explosives Sensing"; Solicitation: ARL Report Number; ARL-RP-0450; Report Date: July, 2013; FOIA Request: DoD/U.S. Army

25. ARMY RESEARCH LABORATORY (ARL); BROAD AGENCY ANNOUNCEMENT (BAA); BASIC AND APPLIED SCIENTIFIC RESEARCH; Solicitation No.: W911NF-12-R-0011; Posted: 15 May 2012 – 31 March 2017; FOIA Request: DoD/U.S. Army

26. Edgewood Chemical Biological Center (ECBC); A U.S. Army RDECOM Laboratory "ABERDEEN PROVING GROUND ADVANCED PLANNING BRIEFINGS TO INDUSTRY" Solicitation: TBD; Report Date: November 2014; FOIA Request: DoD/U.S. Army

27. Edgewood Chemical Biological Center (ECBC); A U.S. Army RDECOM Laboratory "DETECTING HAZARDS WITH A SMARTPHONE"; Solicitation: Dr. Calvin Chue; Report Date: November 27, 2012; FOIA Request: DoD/U.S. Army

28. Edgewood Chemical Biological Center (ECBC); A U.S. Army RDECOM Laboratory "Army smartphone to detect chem/bio threats"; Solicitation: Peter Emanuel; ECBC Division Chief; Report Date: April 16, 2014; FOIA Request: DoD/U.S. Army

29. U.S. Army Research Laboratory (ARL); The U.S. Army Research Office (ARO); Smartphone: "Detecting Gases Wirelessly and Cheaply"; Solicitation: MIT Institute for Soldier Nanotechnologies; Report Date: December 8, 2014; FOIA Request: DoD/U.S. Army

30. Edgewood Chemical Biological Center (ECBC); The U.S. Army RDECOM Laboratory "Smartphone Diagnostic Biological Detection"; Solicitation: Patricia Buckley; ECBC Research Biologist; Report Date: 2013; FOIA Request: DoD/U.S. Army

31. Edgewood Chemical Biological Center (ECBC); The U.S. Army RDECOM Laboratory Solicitation No.: BAA ECBC-11; Report Date: 29 June 2011 (Revised 26 January 2012); FOIA Request: DoD/U.S. Army

32. Department of the Army; Office: Army Contracting Command; "A—Lightweight Biological System"; Solicitation No.: W911SR-15-D-RFI-0010; Posted Date: November 17, 2014; FOIA

Request: DoD/U.S. Army

33. Department of the Army; U.S. Army Tank-Automotive Research, Development and Engineering Center (TARDEC); Solicitation: TARDEC; Bernard Theisen; Posted Date: January 31, 2014; FOIA Request: DoD/U.S. Army

34. Department of the Navy (DON); Office of Naval Research (ONR); FORCEnet Science and Technology (S&T); GWOT Focused Tactical Persistent Surveillance; Solicitation: ONR BAA Number 07-014; Published: 2007; FOIA Request: DoD/DON

35. Department of the Navy (DON); BAA for CTTSO/TSWG Support; Office: Navy; Engineering Logistics Office; Solicitation Number: N41756-14-Q-3272; Posted Date: Mar 19, 2014; FOIA Request: DoD/DON

36. Department of the Navy (DON); Space and Naval Warfare Systems Center (SPAWAR) "Container Security Devices"; Contract Number: N66001-09-D-0034; Posted: Jul-2009; FOIA Request: DoD/DON

37. Department of the Navy (DON); Naval Research Laboratory (NRL); "NRL SiN-VAPOR: Smartphones into Explosives Detectors"; Solicitation: Dr. Christopher Field, NRL Scientist Posted: August – 2013; FOIA Request: DoD/DON

38. Department of the Navy (DON); Naval Air Warfare Center Aircraft Division (NAWCAD) "NAVAIR 4.5 Counter Networks & Illicit Trafficking (CNIT)"; Solicitation: Program Office (4.5CNIT); Posted: 25 January 2011; FOIA Request: DoD/DON

39. Department of the Navy (DON); The Office of Naval Research (ONR); "Smartphones to Steer Unmanned Rotorcraft"; Solicitation: Mike Deitchman, ONR's Naval Air; Posted: 2012; FOIA Request: DoD/DON

40. Department of the Navy (DON); The Office of Naval Research (ONR); "Smartphone

'microscope' detect single virus, nanoparticles"; Solicitation: Aydogan Ozcan, UCLA School of Engineering; Published: 2013; FOIA Request: DoD/DON

41. Department of the Navy (DON); Naval Supply Systems Command; "CBRE Mail Screening Equipment"; Solicitation Number: 1300377257; Posted: September 19, 2013; FOIA Request: DoD/DON

42. Department of the Air Force (AF); The Air Force Research Laboratory (AFRL); Solicitation: Sweat Sensors: Rajesh Naik; AFRL; Posted: 2014; FOIA Request: DoD/AF

43. Department of the Air Force (AF); The Air Force Air Material Command; "Air Force Seeks CBRN Detection Equipment"; Solicitation: ESG_AFCESA_CBRN; Posted: June 30, 2012; FOIA Request: DoD/AF

44. Department of the Air Force (AF); "Point-of-care colorimetric detection with a Smartphone"; Solicitation: Colorimetric detection; Posted: 2012; FOIA Request: DoD/AF

45. Department of the Air Force (AF); The Air Force Air Armament Center (AAC); Solicitation: 687ARSS002; Posted: January 15, 2010; FOIA Request: DoD/AF

46. Department of the Air Force (AF); The Air Force Research Laboratory (AFRL); Solicitation: SBIR 15.1; Posted: 2015; FOIA Request: DoD/AF

47. Defense Advanced Research Projects Agency (DARPA); Strategic Technologies Office (STO); Solicitation: DARPA; BAA 08-10; Posted: 2008; FOIA Request: OSD/JS

48. Defense Advanced Research Projects Agency (DARPA); Microsystems Technology Office; "Low Cost Thermal Imager Manufacturing (LCTI-M)"; Solicitation: DARPA-BAA-11-27 Posted: 01/24/2011; FOIA Request: OSD/JS

49. Defense Advanced Research Projects Agency (DARPA); DARPA's Sigma project; "DARPA

shows off a crowd-sourcing radiation detector"; Solicitation: DARPA Sigma Radiation Detector
Posted: 2015; FOIA Request: OSD/JS

50. Defense Advanced Research Projects Agency (DARPA); DARPA's Adaptable Sensor
System (ADAPT) program; "Smartphone technology to accelerate development of unattended
sensors"; Solicitation: DARPA's Adaptable Sensor System (ADAPT) program; Posted: 2013;
FOIA Request: OSD/JS

51. Defense Advanced Research Projects Agency (DARPA); DANA (Defense Automated
Neurocognitive Assessment); "App to Detect War-Zone PTSD and Brain Injury Expands…"
Sol. #: DARPA: DANA (Defense Automated Neurocognitive Assessment); Posted: 2014; FOIA
Request: OSD/JS

52. Defense Advanced Research Projects Agency (DARPA); "Android device's camera… Geiger
counter with DARPA-funded app"; Solicitation: DARPA: GammaPix Smartphone Radiation
App.; Posted Award: 2010; FOIA Request: OSD/JS

53. Defense Advanced Research Projects Agency (DARPA); "Smartphone; MEMS-Enabled
Electronic Nose"; Solicitation: Vacuum Pump Installation on Micro-Drones; Posted Award:
2013; FOIA Request: OSD/JS

54. Defense Advanced Research Projects Agency (DARPA); DARPA; SIGMA Program
Solicitation: DARPA-BAA-14-11; Posted: December 11, 2013; FOIA Request: OSD/JS

55. Defense Advanced Research Projects Agency (DARPA); "DARPA SIGMA Award to Arktis
Radiation Detectors"; Solicitation: DARPA-BAA-14-11; Posted Award: July 2014; FOIA
Request: OSD/JS

56. Office of the Secretary of Defense; Rapid Reaction Technology Office; "THUNDERSTORM
Technology Demonstration"; Solicitation: RRTO-2014-11-26-RFI-Spiral-15; Posted: October
28, 2014; FOIA Request: OSD/JS

57. Department of Defense (DoD); Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD); Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS); Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC); Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm Item: Joint Biological Point Detection System M31A2 BIDS; FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

58. Department of Defense (DoD); Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD); Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS); Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC); Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm Item: Instantaneous Bio-Analyzer and Collector (IBAC); FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

59. DHS; S&T Directorate; Broad Agency Announcement (BAA) 09-17; "Time Recorded Ubiquitous Sensor Technologies"; (TRUST); Posted: September 23, 2009; Item: iControl Inc. mLOCK; FOIA Request: DHS/S&T

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(a)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Joint Biological Point Detection System M31A2 BIDS

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Biological Integrated Detection System (BIDS) is an early warning and identification capability in response to a large area (theater) Biological Warfare (BW) attack. The system is a detection suite installed in a shelter that is mounted on a dedicated vehicle. The BIDS (P3I) system is equipped with a detection suite to include a chemical/biological mass spectrometer and an antibody based identifier. The shelter may be removed from the vehicle for fixed site application. The objective system is the Army platform for the Joint Biological Point Detection System M31A2 BIDS. The design of the system is through 2018. Users: US Army

57(b)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Improved Chemical Agent Monitor (ICAM)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Improved Chemical Agent Monitor (CAM / ICAM) is a handheld, soldier operated, post attack device used for monitoring chemical agent contamination on people and equipment. It detects vapors of chemical agents by sensing molecular ions of specific mobility (time of flight) and uses timing and microprocessor techniques to reject interferences. The monitor detects and discriminates between vapors of nerve and blister agents. The monitor measures 4in. by 7in. by 15in. and weighs approximately 5 lbs. Mission: Identify nerve and blister agent. Users: US Navy, US Marine Corps, US Army, US Air Force

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 57(c)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: The Chemical Biological Mass Spectrometer (CBMS) Block II<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Chemical Biological Mass Spectrometer (CBMS) Block II is an ion trap mass spectrometer that detects and identifies chemical agents on mobile platforms. It is being produced for inclusion in the Stryker Nuclear, Biological, Chemical Reconnaissance Vehicle (NBCRV). The CBMS Block II can be further enhanced to detect and identify an expanded list of threat agents. Mission: Detect and identify Chemical Warfare Agent (CWA) contamination on the ground (liquid) as a component of the Stryker NBCRV. Integrates with the ground probe and Dual Wheel Sampling System (DWSS) for chemical reconnaissance. Users: US Army |
| 57(d)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: The Advanced Threat (AT) Box<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Advanced Threat (AT) Box is a collection of chemical detectors and a chemical agent identifier with supporting personal protection and decontamination equipment.  The AT Box is designed for use with the Dismounted Reconnaissance Joint Urgent Operational Needs Statement (DR JUONS). The system consist of the following items: Environmental Control Unit (ECU), Ambient Ionization Mass Spectrometer (AIMS), Agentase Chemical Agent Detector Kit, M256A2 Chemical Agent Detector Kit. Mission: Provide the Warfighter with Detection, Protection and Limited Hazard Mitigation. Users: US Army |

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(e)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Domestic Response Capability (DRC)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Domestic Response Capability (DRC) Kit consists of sense, protection, and medical and decontamination equipment and provides an increased Non Traditional Agent (NTA) capability for Weapons of Mass Destruction (WMD) Civil Support Teams (CSTs). The DRC Kit is a modularized configuration of the Advanced Threat (AT) Box equipment set consisting of same or upgraded components for transport inside CST vehicles. The DRC is an urgent need program. Mission: This urgent need fielding solution will provide detection, and medical monitoring against nontraditional agents. Users: National Guard Bureau, Civil Support Teams

57(f)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The DFU 1000 and the DFU 2000

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: Two air sampling devices named the DFU 1000 and the DFU 2000. Both DFUs collects bioparticulates from ambient air for subsequent analysis using Hand Held Assays (HHAs) for microbiological confirmatory. The DFU 1000 is configured in a one-person portable carrying case with AC or DC power. Both DFU models are rated for continuous duty (40,000 hour life). Mission: To collect bioparticulates from ambient air for subsequent analysis to determine the presence of biological warfare agents. Identify 10 biological warfare agents simultaneously when analyzed via HHA. Users: US Navy, US Marine Corps, US Army, US Air Force

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(g)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Joint Biological Point Detection System (JBPDS)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Joint Biological Point Detection System (JBPDS) Acquisition Category II (ACAT II) program is successor to the Army Biological Integrated Detection System (BIDS) and Navy IBAD programs. The suite will be integrated into each Service's platform (e.g. M31A2 BIDS, surface ships, and Stryker). Mission: The JPBDS has12hour continuous detection and identification of 10 BWAs; remote and local monitoring; and, provides automated detection and identification. Users: National Guard Bureau, US Navy, US Army, US Air Force

---

57(h)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Joint Biological Standoff Detection System (JBSDS), Increment 1

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Joint Biological Standoff Detection System (JBSDS), Increment 1 is the first joint standoff early warning biological detection (BD) system. Mission: The JBSDS, Increment 1 used in conjunction with point detectors such as Joint Portal Shield, Joint Biological Point Detection System (JBPDS), and the Biological Integrated Detection System (BIDS); deployed at fixed site locations (e.g. seaports, airfields, logistical centers, staging areas) or operate in a stationary mode on mobile platforms. Users: US Army

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 57(i)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Joint Biological Standoff Detection System (JBSDS), Increment 2<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Joint Biological Standoff Detection System (JBSDS), Increment 2 will provide 24/7 near real time standoff detection (Increment 1 is night operation only), and will network with existing BD systems. Mission: The JBSDS, Increment 2 used in conjunction with point detectors such as Joint Portal Shield, Joint Biological Point Detection System (JBPDS), and the Biological Integrated Detection System (BIDS); deployed at fixed site locations (e.g. seaports, airfields, logistical centers, Air Ports) or operate in a stationary mode on mobile platforms. Users: US Marine Corps, US Army, US Air Force |
| 57(j)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Joint Biological Tactical Detection System Inc. 1<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Joint Biological Tactical Detection System (JBTDS) Acquisition Category III (ACAT III) program is a lightweight biological agent system that will detect, collect, and identify biological aerosol hazards. The JBTDS is comprised of the detector, identifier, and the base station and has a network capability. The JBTDS will be portable and capable of being battery operated. The system will support Joint Forces. Capabilities: Biological Point Detection; CBRN Reconnaissance. Threat Detection: Aerosolized bacteria, bacterial spores, viruses, toxins. Users: USSOCOM, US Navy, US Marine Corps, US Army |

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 57(k)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Joint Chemical, Biological, Radiological Agent Water Monitor (M329)<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The JCBRAWM (M329) will provide the ability to detect, identify, and quantify chemical, biological and radiological (CBR) contamination during three water monitoring missions: source site selection/reconnaissance, treatment verification, and quality assurance of stored and distributed product water. Increment 1 provides the capability to detect two biological agents using immunoassays, and the capability to detect gross alpha and beta radiation using the fielded IM263/PDR77 radiac and component accessory. Mission: To provide the Army. Capabilities: One man portable. Users: US Army |
| 57(l)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Joint Chemical, Biological, Radiological Agent Water Monitor (M330)<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The JCBRAWM (M330) will provide the ability to detect, identify, and quantify chemical, biological and radiological (CBR) contamination during three water monitoring missions: source site selection/reconnaissance, treatment verification, and quality assurance of stored and distributed product water. Increment 1 provides the capability to detect two biological agents using immunoassays, and the capability to detect gross alpha and beta radiation using the fielded DT695/PDR77 radiac and component accessory. Mission: To provide the Navy. Capabilities: One man portable. Users: US Navy |

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(m)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Joint Portal Shield Biological Detection System MARK IV

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Joint Portal Shield (JPS) MARK IV is an automated biological detection and identification system for fixed sites. The system is housed in an International Standards Organization (ISO) container. The JPS sensor suite automates the detection and identification of biological warfare agents, and reports to a centralized command post. Capabilities: JWARN interface via Signal Fire warning and reporting system. Automated detection, collection, and identification of Biological Warfare agents; Detection using the Biological Aerosol Warning Sensor (BAWS); Identification using the Progressive Assay Reader (PAR). Users: US Navy, US Army

---

57(n)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Joint Service Lightweight Standoff Chemical Agent Detector (JSLSCAD)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Joint Service Lightweight Standoff Chemical Agent Detector is a lightweight, standoff, chemical warfare agent (CWA) vapor detector. It is an infrared (IR) detection system that provides coverage while stationary or on the move. The JSLSCAD is integrated within the Army Stryker Nuclear Biological Chemical Reconnaissance Vehicle (NBCRV). Mission: Provide standoff detection from nerve and blister agent vapor clouds. Capabilities: Detects, identifies and reports nerve and blister agent vapor clouds; Mounts on ground platforms; No operator required; Automatic warning and reporting through JWARN. Users: US Army

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(o)  Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The M21 Remote Sensing Chemical Agent Alarm (RSCAAL)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The M21 Remote Sensing Chemical Agent Alarm (RSCAAL) is a standoff chemical agent detector. It is an automatic scanning passive infrared sensor which detects nerve and blister agent vapor clouds based on changes in the background's infrared spectra caused by the presence of agent vapor. The alarm system consists of a detector, tripod and transit case and uses standard power sources. The detector was integrated into the Fox NBCRS Block1 Mod or can be mounted on a tripod. Mission: Identify nerve and blister agent vapors up to a 2 km distance. Users: US Army

57(p)  Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Joint Chemical Agent Detector (JCAD M4)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The JCAD program is to develop a miniaturized, rugged, and portable point chemical agent detector that automatically and simultaneously detects, identifies, and alerts in the presence of nerve, blister, and blood chemical warfare agents. Mission: Protects U.S. forces by detecting identifying, alerting, and reporting the presence of chemical warfare agent and toxic industrial chemical vapor. Users: Department of Homeland Security, Reserves, National Guard Bureau, Civil Support Teams, USSOCOM, US Navy, US Marine Corps, US Coast Guard, US Army, US Air Force

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(q)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Joint Chemical Agent Detector (JCAD M4A1)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The JCAD program miniaturized, portable point chemical agent detector, detects the presence of nerve, blister, and blood chemical warfare agents. The M4 JCAD entered full rate production in September 2008 and was produced through FY13. Production of the M4A1 JCAD will be used for wheeled vehicles, stand alone, and individual soldier applications. M4A1 JCAD with adapter will be fully compatible with the Common CBRN Sensor Interface (CCSI). Users: Department of Homeland Security, Reserves, National Guard Bureau, Civil Support Teams, USSOCOM, US Navy, US Marine Corps, US Coast Guard, US Army, US Air Force

57(r)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Nuclear Biological Chemical Reconnaissance Vehicle (NBCRV) sensor suite

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Nuclear Biological Chemical Reconnaissance Vehicle (NBCRV) sensor suite; nuclear and chemical detection; and biological. The sensor suite is integrated into an armored carrier capable of performing NBC reconnaissance. The NBCRV sensor suite detects and collects chemical and biological contamination in its immediate environment, on the move, through point detection Chemical Biological Mass Spectrometer II (CBMS II), and Joint Biological Point Detection System, (JBPDS), and at a distance through the use of a standoff detector, the Joint Service Lightweight Standoff Chemical Agent Detector (JSLSCAD). Users: US Army

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(s)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Next Generation Chemical Detector (NGCD)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Next Generation Chemical Detector (NGCD) is several detection systems. The three are: Detector Alarm – Provides NTA aerosol detection, (e.g. chemical event warning) AND improved CWA and TIC vapor detection (e.g. naval ship contamination survey): Survey Detector – Provides rapid interrogation of NTA and CWA liquid and solid detection on surfaces, (e.g. dismounted reconnaissance) Sample Analysis – Provides analytical identifier of solids, liquids, aerosols and vapors, (e.g. to support the residual hazard after a chemical event). Users: USSOCOM, US Navy, US Marine Corps, US Army, US Air Force

57(t)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Test Grid

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Test Grid project; networked test capabilities includes remotely controlled dissemination systems: • Chemical Point Detection Systems • Chemical Standoff Detection Systems • Biological Point Detection Systems • Biological Standoff Detection System • NBC Reconnaissance Systems • Joint Effects Model (JEM) • Joint Warning And Reporting Network (JWARN) • Joint Expeditionary Collective Protection (JECP) • Joint Biological Point Detection System (JBPDS) • Joint Biological Tactical Detection System (JBTDS) • Next Generation Chemical Point Detection (NGCPD). Users: US Navy, US Marine Corps, US Army, US Air Force

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(u)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Analytical Laboratory System (ALS)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Analytical Laboratory System (ALS) is a C130 air transportable system that can analyze Chemical Warfare (CW) agents, Toxic Industrial Materials (TIM), Toxic Industrial Chemicals (TIC) and Biological Warfare (BW) agents. The ALS establishes communications through the Unified Command Suite (UCS). Mission: Provides detection/identification capabilities. Capabilities: Self – contained and fully functional and reliable in the range of extreme climates. Provides results from screening of TIC/TIM/CW samples within 30 minutes. Provides results from screening of BW samples within 45 minutes. Users: US Army, US Air Force

57(v)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Automated Installation Entry (AIE)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Automated Installation Entry (AIE). Mission: Provide affordable, and supportable security capabilities integratable into a system/family of systems to tactical forces and installations worldwide. Capabilities: Enhance Installation security (detect, assess and warn) through automated personnel verification and authentication. Utilize databases to continuously vet personnel against terrorist and insider threats. Multilane and remote monitoring and control, in-lane registration, biometric, credential and personnel authentication. Provide a single standardized, interoperable and integrated system. Users: US Army

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(w)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Battlefield Anti Intrusion System

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Battlefield Anti Intrusion System (BAIS) is the tactical sensor system for small units providing a reliable early detection, classification, and warning capability based on proven, fielded seismic/ acoustic sensors and modified commercial off-the-shelf components. Capabilities: Early detection of enemy threats while enhancing time available to determine appropriate tactical response. Modular components provide seismic/acoustic and allow the use of infrared and magnetic detection components available. System is organic to appropriate tactical. Users: US Army

57(x)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Common Analytical Laboratory System (CALS)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Common Analytical Laboratory System (CALS) is a system of systems to support multiple users and missions. CALS capability to detect and identify CBRNe agents and threats will assist field commanders. CALS operated globally by qualified personnel. Mission: Provide robust joint, analytical capabilities, in Chemical, Biological, Radiological, Nuclear and explosives (CBRNe) modules. Capabilities: Transportable CBRNe Hazard Identification; Open Architecture / Plug 'n Play. Users: National Guard Bureau, Civil Support Teams, US Navy, US Marine Corps, US Army, US Air Force

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

57(y)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: FLIR (icx) IdentiFINDER LaBr3

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The FLIR (icx) IdentiFINDER LaBr3 is fielded to Special Purpose CBRN Consequence Management Units. The IdentiFINDER instrument is part of a family of handheld digital gamma spectrometers. The IdentiFINDER LaBr3 (model # id F-UL-LGH) contains a gamma LaBr3 detector and a high dose rate gamma detector in a hand held down range instrument. Mission: Special Purpose CBRNe CM units have a mission for downrange isotope identification and gamma spectroscopy. The IdentiFINDER LaBr3 provides increase in capability to Special Purpose CBRN Units. Users: Civil Support Teams, US Army

---

57(z)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: The Solid Phase Microextraction (SPME) Sampling System

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Solid Phase Microextraction (SPME) Sampling System expands the chemical identification capabilities of the HAPSITE ER Chemical Identification System. Attaches to the HAPSITE ER universal interface for sample analysis utilizing the Gas Chromatograph/Mass Spectrometer (GC/MS) or MS (Mass Spectrometer) only. Mission: The currently fielded HAPSITE ER, expanding its ability to detect and identify chemical threats. Supports the Special Purpose CBRNE CM Units for downrange, handheld, chemical point detection of CWA's, TICs, TIMs and explosive precursors. Users: Civil Support Teams

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

58(a)  Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Instantaneous Bio-Analyzer and Collector (IBAC)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Instantaneous Bio-Analyzer and Collector (IBAC) provides real-time biological agent detection, and the capability of alerting first responders and emergency personnel. The sensor, a compact, lightweight, low power device, provides an indoor and outdoor biological agent discrimination capability. Mission: CBRN CM Units mission requirement for Standoff Biological Detection. CBRN CM Units respond to All-Hazard Response Incidents which requires man portable, scalable, automated collection, and remotely operating identification/detection equipment. Users: National Guard Bureau, Civil Support Teams

---

58(b)  Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Integrated Commercial Intrusion Detection System (ICIDS)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: Integrated Commercial Intrusion Detection System (ICIDS) is a highly secured, standardized intrusion detection system using state-of-the art commercial technology. The system components consist of commercially available interior and exterior sensors, a Primary Monitor Console, and Remote Status Monitors. Mission: The ICIDS provides the means to detect and assess as necessary, the unauthorized intrusion or attempted intrusions of protected areas. Capabilities: 24hour security protection; Incorporates biometric devices in the ECE; Interface capability with existing security systems. Users: US Army

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 58(c)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Mobile Detection Assessment Response System Generation 2 (MDARS Gen 2)<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Mobile Detection Assessment Response System Generation 2 (MDARS Gen 2) is a system consisting of a remote command and control station and mobile, robotic security vehicles (patrol units) hosting a variety of monitoring applications. Designed to operate in storage yards; depots; arms, ammunition, and explosives (AA&E) storage areas; air fields; rail yards; and port facilities. Autonomously conducts: surveillance activities checking for intruders; scanning radar and forward looking infrared for intruder detection; lock interrogations; and assessments of facility barriers (i.e., doors). Users: US Army |
| 58(d)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: ORTEC Micro-Detective HX<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The ORTEC Micro-Detective HX is a handheld, high purity germanium (HPGe) based radioisotope identifier (RID). It is designed to be used in the field by military and civilian personnel. The ORTEC Micro-Detective HX is lightweight and rugged so that it can be used in the field for identification of unknown nuclear materials by soldiers, law enforcement and homeland security personnel. Mission: The mission requirement for the ORTEC Micro-Detective HX is to provide a lightweight, ruggedized, high purity germanium (HPGe) based radioisotope identifier (RID). Users: Civil Support Teams |

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

58(e)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: RAE Systems AreaRAE RDK Kit

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The RAE Systems AreaRAE RDK Kit contains four AreaRAE components including a 1 to 5 sensor gas/gamma detector equipped with a built in wireless, an RF modem that allows the unit to communicate and transmit readings and other information on a real-time basis with a remotely located Host Controller and a host control unit/laptop. Mission: Special Purpose CBRNE CM Units have mission requirements for downrange detection of Chemical Weapons Agents. The advantage is that it allows for placement and monitoring the remote controlled sensors and their 1-5 unique chemical sensors. Users: Civil Support Teams

58(f)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: RAE Systems MultiRAE Pro

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The RAE Systems MultiRAE Pro is a multithread detection tool that combines continuous monitoring capabilities for radiation and combustible gases. The MultiRAE Pro can be configured with 33 intelligent sensors to fully meet the monitoring needs of applications such as HazMat response, CBRN/TIC/TIM detection, EOD, homeland security, and civil defense. Mission: The mission requirement for the MultiRAE Pro is to provide a handheld multi-gas sensor with up to 5 sensor channels that can be used to detect toxic or hazardous vapors and oxygen levels in the parts per million ranges of 0.1 to 2000 ppm. Users: US Marine Corps

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 58(g)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: RAID-M Handheld Chemical Agent Detector<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Bruker Detection Corporation RAID-M Handheld Chemical Agent Detector is a ruggedized, man-portable instrument designed for use in military, civil defense and commercial operations. The RAID-M is a Chemical Agent Detector based on the principle of Ion Mobility Spectrometry (IMS). It detects and identifies a wide range of chemical vapors including CWA, TIC, riot control, and industrial gases. Mission: Detection and identification of Chemical Warfare Agents (CWA's), Toxic Industrial Chemicals (TICs), Toxic Industrial Materials (TIMs) and explosive precursors. Users: Civil Support Teams |
| 58(h)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: The Smart Air Sampler System 3100 (SASS® 3100)<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Smart Air Sampler System 3100 (SASS® 3100) is a Commercial Off The Shelf (COTS) item which is fielded to Special Purpose CBRN Consequence Management Units to meet part of their CBRN Mission. The system is fully portable and accepts both primary and rechargeable batteries. Mission: CBRN CM Units have mission requirements for Biological Standoff Detection. Capabilities: The SASS3100 is a lightweight, battery operated standoff sampler and alarm which fills a Biological Standoff Detection Capability gap. Users: Civil Support Teams |

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 58(i)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Smiths Detection HazMatID 360 Upgrade<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Smiths Detection HazMatID 360 Upgrade; is an upgraded version of previously fielded legacy HazMatID's. The system utilizes Fourier Transform Infrared Spectroscopy (FTIR) to detect and identify solid and liquid threats. Mission: Special Purpose CBRNE Units have currently fielded and authorized legacy HazMatID units which are outdated and require hardware and software updates to remain mission ready. The advantage to upgrading legacy FTIR devices to the HazMatID360 will be a more complete, accurate, and timely detection and identification of chemical threats. Users: Civil Support Teams |
| 58(j)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Thermo (Ahura) First Defender<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Thermo (Ahura) First Defender is a handheld Raman spectroscopy system for the identification of unknown solids and liquids. It is designed to be used by military and civilian first responders. Used for field identification of unknowns by first responders, soldiers, law enforcement and homeland security personnel. Mission: The Mission requirement for the First Defender is to provide a lightweight, small, ruggedized Raman detector. Supports the Special Purpose CBRNE CM Units requirements for downrange, handheld, chemical point detection of CWA's, TICs, TIMs and explosive precursors. Users: Civil Support Teams |

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 58(k)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Thermo (Ahura) First Defender RMX<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Thermo (Ahura) First Defender RMX is a handheld Raman spectroscopy system designed for use by military and civilian first responders. The First Defender RMX is lightweight, rugged, and can be used for in the field identification of unknowns. Mission: The mission is to provide the next generation of lightweight, small, ruggedized Raman detector for the accurate detection and identification of chemical threats. This capability supports the Special Purpose CBRNE CM Units requirements for downrange, handheld, chemical point detection of CWA's, TICs, TIMs and explosive precursors. Users: US Army |
| 58(l)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: The Thermo Scientific (Ahura) TruDefender FT<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Thermo Scientific (Ahura) TruDefender FT is fielded to Special Purpose CBRN Units to meet CBRN Mission. TruDefender FT is a rugged, handheld FTIR system for rapid, in the field identification of unknown chemicals. The TruDefender FT has wireless capabilities. Mission: Special Purpose CBRNE CM Units mission requirements for downrange, handheld, chemical point detection of CWA's, and explosive precursors. The lightweight, small, ruggedized FTIR device has timely detection and identification of chemical threats. Users: National Guard Bureau, Civil Support Teams, USSOCOM, US Army |

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

58(m)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/Factsheets.htm
Item: Joint Warning and Reporting Network (JWARN)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Joint Warning and Reporting Network (JWARN) is a computer based application integrating Chemical, Biological, Radiological, and Nuclear (CBRN) data and facilitates sensor information into Joint and Service C2 systems. Mission: The JWARN mission is to enable an immediate and integrated response to threats of contamination by weapons of mass destruction or CBRN incidents through rapid warning and dissemination of CBRN information. Enables the flow of information from the detector. Users: USSOCOM, US Navy, US Marine Corps, US Army, US Air Force

---

58(n)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Joint Program Executive Office for Chemical and Biological Defense (JPEOCBD)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description:  The Joint Program Executive Office for Chemical and Biological Defense (JPEOCBD) Software Support Activity (SSA) is a service oriented organization from which JPEOCBD Joint Project Managers (JPMs), Directorates, developers, and Warfighters can obtain timely and professional assistance, and consistently interoperable and integrated Chemical, Biological, Radiological, & Nuclear (CBRN) capabilities. Interoperability and integration of CBRN capabilities into the DoD system of systems. Users: USSOCOM, US Navy, US Marine Corps, US Coast Guard, US Army, US Air Force

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

58(o)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Joint Biological Agent Identification and Diagnostic System (JBAIDS)

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Joint Biological Agent Identification and Diagnostic System (JBAIDS) is a reusable, portable, modifiable biological agent identification and diagnostic system capable of rapid, reliable and simultaneous identification of multiple biological agents and other pathogens of operational concern. Sixteen pathogen surveillance assay kits are deployed covering 14 Biological Warfare (BW) agents. Single DoD accepted platform for both identification and diagnostic confirmation of biological agents. Users: National Guard Bureau, US Navy, US Marine Corps, US Army, US Air Force

58(p)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Radiac Set AN/PDR-75

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Radiac Set AN/PDR-75 consists of the CP696 Reader and carrying case. The DT236, Individual Dosimeter, is used with, but not part of the AN/PDR75. It provides the capability to monitor and record the exposure of individual personnel to gamma and neutron radiation. The system measures prompt radiation from nuclear bursts as well as residual radiation from falloff. Mission: Detect and measure nuclear radiation from fallout and nuclear detonations for individual soldiers. Capabilities: Measures prompt neutron and gamma dose; Measures fallout gamma dose. Users: US Army

**Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items**

58(q)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Radiac Set AN/PDR-75A

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Radiac Set AN/PDR-75A consists of a Computer Indicator (CP696A), a carrying case and a power cable that allows the CP696A to operate from a 24 Volt DC vehicular battery. The CP696A is used to read the neutron and gamma doses from the Radiac Detector DT236A. The Radiac Detector DT236A: personal dosimeter; worn on the soldier's wrist: detects neutron and gamma radiation from nuclear detonations and radiological contamination. Mission: Measure accurate dose from gamma and neutron radiation. Users: Reserves, National Guard Bureau, Civil Support Teams, USSOCOM, US Army

58(r)   Department of Defense (DoD)
Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)
Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)
Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)
Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm
Item: Radiac Set AN/PDR-77

FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD

Description: The Radiac Set AN/PDR-77 is used for nuclear weapons environmental level measurement of radiological materials, and monitoring work areas where chemical detectors are stored. It detects and measures alpha and x-ray radiation and also detects beta and gamma radiation. The system incorporates an alpha probe, beta gamma probe, and x-ray probe. The PDR77 has a digital LCD display. Mission: Detect and measure nuclear radiation from nuclear weapons accidents. Capabilities: Radiological Point Detection; Measures alpha, beta, and gamma. Users: Reserves, National Guard Bureau, Civil Support Teams, US Marine Corps, US Army

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 58(s)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Radiac Set AN/UDR-13<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Radiac Set AN/UDR-13 is a compact, handheld or pocket carried tactical dosimeter capable of measuring gamma dose and dose rate from nuclear fallout. A pushbutton pad enables mode selection, functional control and the setting of audio and visual alarm thresholds for both dose rate and mission dose. A "sleep" mode with automatic wake up is provided to enhance battery life. Data readout and warning/mode messages are provided by LCD display. Mission: Detect and measure radiation from nuclear fallout. Capabilities: Radiological Point Detection. Users: US Marine Corps, US Army |
| 58(t)   Department of Defense (DoD)<br>Joint Program Executive Office for Chemical and Biological Defense (JPEO-CBD)<br>Joint Acquisition Chemical Biological Radiological Nuclear Knowledge System (JACKS)<br>Chemical Biological Radiological Nuclear Information Resource Center (CBRN-IRC)<br>Posted: "JACKS Fact Sheets" http://jacks.jpeocbd.osd.mil/mobile/Factsheets.htm<br>Item: Radiac Set AN/VDR2<br><br>FOIA Request: DoD/Chief of Operations Implementation Manager for JPEO-CBD<br><br>Description: The Radiac Set AN/VDR2 is a tactical beta / gamma rate meter that is used for health and safety detection as well as in the battlespace. It is used to perform ground radiological surveys in vehicles or in the dismounted mode by individual soldiers as a handheld instrument. The set includes an audible and/or visual alarm that interfaces with vehicular power systems and intercoms. Mission: Detect and measure nuclear radiation from fallout and radioisotopes. Capabilities: Radiological Point Detection; Users: Reserves, National Guard Bureau, Civil Support Teams, USSOCOM, US Navy, US Army |

**Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items**

59(a) DHS; S&T Directorate
Broad Agency Announcement (BAA) 09-17
"Time Recorded Ubiquitous Sensor Technologies"; (TRUST)
Posted: September 23, 2009
Item: iControl Inc. mLOCK

FOIA Request: DHS/S&T

Description: iControl Incorporated announces, the mLOCK, to its Mobile Asset Tag Tracking System (MATTS®) product suite. The mLOCK is an electronic conveyance lock that integrates security, tracking, and communications into one device. The mLOCK has a padlock design allowing for easy installation onto any conveyance using a latch closing system. Door intrusion detection is achieved using a combination of hasp-integrity sensing, "Trusted Zones", and motion detection. The TRUST "system" Communication Requirements. Locking Seal "M-Lock". 3(f)

59(b)   DHS; S&T Directorate
Broad Agency Announcement (BAA) 09-17
"Time Recorded Ubiquitous Sensor Technologies"; (TRUST)
Posted: September 23, 2009
Item: iControl Inc. MATTS Integration Kit (miKIT) for Sensor Manufacturers

FOIA Request: DHS/S&T

Description: The miKIT provides sensor manufacturers a way to integrate their devices with the MATTS system, providing a bi-directional, secure, intransit, communications path for their sensors. MATTS is the U.S. Department of Homeland Security's program for remote monitoring and tracking of cargo containers. MATTS-compatible devices include the MATTS remote communications and tracking tag (iTAG), the handheld wireless interrogator (miGATE), and the LAN-WAN gateway (iGATE). The remote MATTS database and webserver (iVIEW) collects and displays both sensor and MATTS data.

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

59(c)   DHS; S&T Directorate
Broad Agency Announcement (BAA) 09-17
"Time Recorded Ubiquitous Sensor Technologies"; (TRUST)
Posted: September 23, 2009
Item: iControl Inc. Marine Asset Tag Tracking System (MATTS).

FOIA Request: DHS/S&T

Description: MATTS establishes a system to track containers. Enables global tracking and communication through the use of radio frequency (RF), cellular and satellite technologies. MATTS is the communication link for CSD, Marine Composite, and Air Composite Containers. The TRUST device is envisioned to be packaged as a single "brick". It will be installed inside the container just before it is sealed and is capable of communicating with a physical interface mounted outside the container, such as the Department of Homeland Security's; Marine Asset Tag Tracking System (MATTS).

---

59(d)   DHS; S&T Directorate
Broad Agency Announcement (BAA) 09-17
"Time Recorded Ubiquitous Sensor Technologies"; (TRUST)
Posted: September 23, 2009
Item: iControl Inc. Sensor/iCHIME to MATTS Architecture

FOIA Request: DHS/S&T

Description: Sensor-to-iCHIME Integration: Use the iCHIME Mechanical and Electrical Specifications to integrate the iCHIME Module directly to sensor electronics. The sensor now communicates directly from the iCHIME to the MATTS iTAG via the radio link. The iCHIME has been tested in sensors mounted inside new ISO steel containers and has established communication paths to the Department of Homeland Security's; Marine Asset Tag Tracking System (MATTS) and MATTS-compatible devices on the outside of container. That includes the handheld wireless interrogator (miGATE).

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

59(e)   DHS; S&T Directorate
Broad Agency Announcement (BAA) 07-10
"Cell-All Ubiquitous Biological and Chemical Sensing"
Posted: 10/30/2007
Item: NASA'S Nanosensor/Cell Phone Hybrid Instrument

FOIA Request: DHS/S&T

Description: NASA's Nanosensor/Cell Phone Hybrid Instrument for Detecting Chemicals and Concentrations. The sensor detects which chemicals are present and in what the concentrations and then transmits this information using the cell phone, to a network that delivers it to a chemical reporting module. The sensors work well as radiation detectors for protons and gamma rays. This nanosensor/cell phone hybrid instrument can provide swappable sensor chips for various target applications.Through this CELL-ALL; BAA, HSARPA is seeking miniaturized biological, explosive, radiological, and chemical sensing with integration into a cell phone or smartphone device(s) and a communication systems concept for large scale multi-sensor networks.

59(f)   DHS; S&T Directorate
Broad Agency Announcement (BAA) 07-10
"Cell-All Ubiquitous Biological and Chemical Sensing"
Posted: 10/30/2007
Item: Qualcomm FFA ''form factor phone''

FOIA Request: DHS/S&T

Description: Qualcomm FFA: Systems Design/Integration State-of-the-art miniaturized detection system integrated into Android cell phones. Qualcomm – Using an existing hardware platform to integrate an existing sensor and demonstrate its ability to sense a defined set of chemical agents. Embedded Miniature Sensors: Sample collection; Reusable devices with lifetimes that equal that of the host device; Address sensor sensitivity & selectivity in the environment; Prototype concepts for integrated sensing; Methods for read/report of sensor information. Through this CELL-ALL; BAA, HSARPA is seeking miniaturized biological, explosive, radiological, and chemical sensing with integration into a cell phone or smartphone device(s).

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

59(g)  DHS; S&T Directorate
Broad Agency Announcement (BAA) 07-10
"Cell-All Ubiquitous Biological and Chemical Sensing"
Posted: 10/30/2007
Item: Synkera's MikroKera Ultra Module

FOIA Request: DHS/S&T

Description: Synkera presented the MikroKera Ultra Module at the Department of Homeland Security S&T "Cell-All" demonstration in Los Angeles on September 28, 2011. The aim of the project is to develop sensors that can detect life-threatening gases to be incorporated into cellphones as a crowd-sourced monitoring device. Achieves a greater number of total prototype devices at a reasonable unit cost; Sensor data transmission via 3g and/or Wi-Fi; Multiple sensors network for chemical profiling; Decouple the chemical sensor from the phone; Multiple sensor units per phone are possible; Bluetooth/Proprietary Interfaces; Standardize the sensor platform; Increase opportunities for participation

---

59(h)  DHS; S&T Directorate
Broad Agency Announcement (BAA) 07-10
"Cell-All Ubiquitous Biological and Chemical Sensing"
Posted: 10/30/2007
Item: The Rhevision Article Nose

FOIA Request: DHS/S&T

Description: The Rhevision Article Nose: Cell-All program manager Stephen Dennis says he hopes to have 40 prototypes. One element of the prototype is an artificial nose, developed by a company called Rhevision. The Cell-All chemical sensor's heart is a porous wafer of silicon that changes color when reacted with specific chemicals. A typical cell phone camera detector is built into the sensor to read the color-change patterns, according to Sailor, but a very sophisticated lens is required to properly focus the camera. A flexible, fluid-filled macro lens that mimics an animal's eye by adjusting internal fluid level to achieve fine focus was developed by Yu-Hwa Lo, professor of electrical and computer engineering at UCSD and founder of Rhevision Technologies.

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 59(i)   DHS; Science and Technology Directorate's (S&T) <br> Small Business Innovation Research (SBIR) Program; <br> Phase 12.1 Smart Phone App(s) for Radioisotope Identification Device (RIID); and, <br> Spectroscopic Personal Radiation Detector (SPRD) Reachback <br> Solicitation No.HSHQDC-12-R-00052 <br> Released: May 2012. <br> Item: Creative Electron iRad Alpha <br><br> FOIA Request: DHS/S&T <br><br> Description: Creative Electron iRad Alpha for Apple iOS Devices, Detects Alphas, Betas, Gammas and X-Rays, Radiation Detector, Digital Display. Brand Name: Creative Electron. Part Number iRadAlpha_Apple. Smartphone radiation detector and dosimeter, 18 cps/mR/h Gamma Sensitivity, 100 mR/h Operating Range; Audio jack interface to your iPod Touch, iPhone, or iPad; Powered by energy harvested from audio jack - no battery needed; Cloud mapping, logging, and alarming. Was featured on Amazon. |
| 59(j)   DHS; Science and Technology Directorate's (S&T) <br> Small Business Innovation Research (SBIR) Program; <br> Phase 12.1 Smart Phone App(s) for Radioisotope Identification Device (RIID); and, <br> Spectroscopic Personal Radiation Detector (SPRD) Reachback <br> Solicitation No.HSHQDC-12-R-00052 <br> Released: May 2012. <br> Item: Creative Electron iRadG1 iRad Geiger <br><br> FOIA Request: DHS/S&T <br><br> Description: Creative Electron iRadG1 iRad Geiger for Apple iOS Devices, Detects X-Rays, Gamma and Beta Rays, Radiation Detector, Digital Display Smartphone radiation detector and dosimeter, 22 cps/mR/h Gamma Sensitivity, 0.014 - 100 mR/h Operating Range; Patent Pending audio jack interface to your iPod Touch, iPhone, or iPad; Powered by energy harvested from audio jack - no battery needed; Cloud mapping, logging, and alarming; Easy sharing of radiation dosage data. Was featured on Amazon. |

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

59(k)   The Department of Homeland Security (DHS)
Domestic Nuclear Detection Office's (DNDO) BAA 09-102
Advanced Technology Demonstration (ATD)
Intelligent Radiation Sensor Systems (IRSS),
Published 03/16/2009
Item: Passport Systems Inc. "Detector Augmentation Devices (DAD)".

FOIA Request: DHS/S&T

Description: Passport Systems Inc. Detector Augmentation Device (DAD) comprises: a Standard Interface; an Individual Radiation Detection Device (IRDD); and, a Smart Phone (including GPS). The hardware integration concept: Designing a sensor adjunct (Detector Augmentation Device – DAD) to provide ubiquitous interface to any detector; Sensor (IRDD) performance trade space well understood based on corporate expertise in radiation detection; Implementing standard communication and network protocols; Leveraging "smart phones" for computation and communications; Utilizes integrated differential GPS when possible.

59(l)   Department of Homeland Security (DHS)
Domestic Nuclear Detection Office's (DNDO) BAA 09-102
Advanced Technology Demonstration (ATD)
Intelligent Radiation Sensor Systems (IRSS),
Published 03/16/2009
Item: Passport Systems Inc.: NetS² SmartShield G300 Radiation Detector

FOIA Request: DHS/S&T

Description: Passport Systems Inc. G300 Radiation Detector alarms when radiation levels are detected; used as a standalone device or as part of a network; is the same size, form factor and weight as a smartphone and easily added to the belt of safety personnel; is paired with a smartphone via Bluetooth, and automatically joins a SmartShield Network. The Nets² SmartShield G300 is designed specifically for the DHS Securing-the-Cities initiative and Human Portable Tripwire program. Passport Systems, in response to the US Department of Homeland Security (DHS) needs, developed a compact and scalable radiation detector system, the NetS² SmartShield.

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

59(m)   Department of Homeland Security (DHS)
Domestic Nuclear Detection Office's (DNDO) BAA 09-102
Advanced Technology Demonstration (ATD)
Intelligent Radiation Sensor Systems (IRSS),
Published 03/16/2009
Item: Passport Systems Inc.: NetS² SmartShield Smart Phone with embedded software

FOIA Request: DHS/S&T

Description: Passport Systems Inc.: NetS² SmartShield Smart Phone with embedded software is designed to interface with smartphone technology; support local and wide-area networking. Based on feedback from DHS and many other federal agencies, as well as 3rd party testing of the technology at Savannah River Passport Systems and in response to the US Department of Homeland Security (DHS) needs, has developed a compact and scalable radiation detector system, the NetS² SmartShield. Smartphone: Touchscreen color display when synced with detector. Bluetooth wireless connection to external smartphone. Cellular connection to Reachback server.

---

59(n)   Department of Homeland Security (DHS)
Domestic Nuclear Detection Office's (DNDO) BAA 09-102
Advanced Technology Demonstration (ATD)
Intelligent Radiation Sensor Systems (IRSS),
Published 03/16/2009
Item: Passport Systems Inc. Base Control Unit (BCU) laptop that runs NetS² SmartShield software

FOIA Request: DHS/S&T

Description: Passport Systems Inc. Base Control Unit (BCU) laptop that runs NetS² SmartShield software. Passport shows an image of the Base Control Unit (BCU) and smartphone interfaces, including map overlays, for a recent wide area SmartShield search exercise in the Washington DC area. As can be seen in the image, both the reach back and tactical operators clearly observe the background radiation being collected and displayed automatically during the exercise. Passport Systems, in response to the US Department of Homeland Security (DHS) needs, has developed a compact and scalable radiation detector system, the NetS² SmartShield.

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

59(o)   The Department of Homeland Security (DHS)
Integrated Chemical, Biological, Radiological, Nuclear, and Explosives Program (ICBRNE)
Posted: http://www.icbrne.org/how_icbrne_works.htm
Item: Safe Environment Engineering "Lifeline Interoperable Network Communicators (LINC)".

FOIA Request: DHS/S&T

Description: ICBRNE program's funded by DHS. Safe Environment Engineering in cooperation with the Pacific Northwest National Labs in Richland, Wash., and the Space and Naval Warfare Systems Center in San Diego has developed handheld network communicators: the devices are the "Lifeline Interoperable Network Communicators (LINC)". The Lifeline Interoperable Network Communicator (LINC) is a simple to use wireless WiFi compliant tool that enables remote live viewing of the information gathered from many existing and different type of meters (instruments) and sensors. The LINC interfaces with radiological, chemical, physiological, and other meter/sensor categories.

59(p)   The Department of Homeland Security (DHS)
Integrated Chemical, Biological, Radiological, Nuclear, and Explosives Program (ICBRNE)
Posted: http://www.icbrne.org/how_icbrne_works.htm
Item: Safe Environment Engineering "LINC Modular Radiological System (LINCmrs)".
FOIA Request: DHS/S&T

Description: ICBRNE program's funded by DHS. Brought to you by FLIR and Safe Environment Engineering the LINC Modular Radiological System (LINCmrs) is versatile wireless transportable radiological isotope detector easily configured for different types of monitoring requirements. Examples include mobile vehicle systems, portal applications, fixed facility and grouped for events requiring increased sensitivity detection.

**Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items**

59(q)   The Department of Homeland Security (DHS)
Integrated Chemical, Biological, Radiological, Nuclear, and Explosives Program (ICBRNE)
Posted: http://www.icbrne.org/how_icbrne_works.htm
Item: Safe Environment Engineering "Life•line Gateway".

FOIA Request: DHS/S&T

Description: ICBRNE program's funded by DHS. The Life•line Gateway bridges data acquired from Life•line Interoperable Network Communicator (LINC) through cellular or MESH to any computer having Internet. The Life•line Gateway offers significantly improved (10x) cellular operation as a result of its enterprise class embedded radio. The Life•line Gateway is sealed and operates on fully charged batteries with the optional Power Module. Can operate as a local "Hot Spot" for wireless Wi-Fi equipped computers to gain access to the Internet. Through the Gateway's MESH wireless architecture Gateway-to-Gateway data relaying is possible. SPECS on SEE website.

59(r)   The Department of Homeland Security (DHS)
Science & Technology Directorate (S&T)
BioWatch Gen-3 Phase II, Draft Request for Proposal
Solicitation Number: HSHQDC-13-R-00026
Posted: January 25, 2013
Item: PositiveID's Microfluidics-based Bioagent Networked Detector (M-BAND)

FOIA Request: DHS/S&T

Description: PositiveID's Microfluidics-based Bioagent Networked Detector (M-BAND) system, developed by MicroFluidic Systems (MFS) and developed under contract with the U.S. Department of Homeland Security Science & Technology directorate, is a bio-aerosol monitor with fully integrated systems for sample collection, processing and detection modules that continuously analyze air samples for the detection of bacteria, viruses, and toxins. Results from individual instruments are reported via a secure wireless network in real time and the system can be programmed remotely M-BAND is designed for either outdoor or indoor environments.

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|

59(s)   The Department of Homeland Security (DHS)
Science & Technology Directorate (S&T)
BioWatch Gen-3 Phase II, Draft Request for Proposal
Solicitation Number: HSHQDC-13-R-00026
Posted: January 25, 2013
Item: PositiveID's Firefly Dx

FOIA Request: DHS/S&T

Description: PositiveID's Firefly Dx system is a two-part device consisting of a portable handheld instrument with wireless Bluetooth and Wi-Fi communication, and disposable single-use cartridges containing all necessary analytical elements. Results can be processed in situ via Smartphone. The Firefly Dx system combines a single use sample prep and reagent PCR cartridge with a Bluetooth enabled communication device (e.g. smartphone). The system is capable of processing a variety of sample types, including whole blood, buccal and nasopharyngeal swabs, urine, and environmental field samples

---

59(t)   Department of Homeland Security (DHS)
Science and Technology Directorate (S&T)
Posted: By Patricia Wolfhope, Biometrics Transition Program Manager, Science and
Technology Directorate, U.S. Department of Homeland Security, Washington, D.C.
Item: DHS/S&T Mobile biometric device

FOIA Request: DHS/S&T

Description: Mobile biometric devices are handheld technologies capable of obtaining various biometric modalities (for example, fingerprint, face, and iris). Some mobile devices are capable of obtaining latent fingerprints from crime scenes. These devices can transmit biometric data to databases via personal area networks such as Bluetooth, local area networks such as Wi-Fi, wide area networks such as cellular networks, and mobile satellite communication systems. The DHS is developing a compact, lightweight, four-finger slap fingerprint sensor that will allow the easy and efficient acquisition of 10 prints (4 fingers from the right hand, 4 fingers from the left hand, and both thumbs) in the field. Two contracts were awarded to companies in June 2010 and in July 2010.

| Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items |
|---|
| 59(u)   Department of Homeland Security (DHS)<br>Science and Technology Directorate (S&T); CanScan Program<br>Posted: http://www.homelandsecuritynewswire.com/osi-systems-develop-advanced-cargo-screening-system<br>Item: Rapiscan Systems, Advanced Cargo Screening System<br><br>FOIA Request: DHS/S&T<br><br>Description: Rapiscan Systems, the security division of OSI Systems, Inc., was recently awarded a $29 million contract with DHS' Science and Technology Directorate to develop sophisticated new cargo screening systems; the program is designed to produce the next generation of non-intrusive cargo screening systems that will be capable of automatically detecting and identifying multiple threats and contraband including explosives, narcotics, and chemical weapons in cargo containers entering the United States by air, land, and sea. Ajay Mehra, the president of Rapiscan Systems. Rapiscan will develop two separate systems for the CanScan Program which combines multiple threat detection technologies along with advanced detection software. |
| 59(v)   Department of Homeland Security (DHS)<br>Science and Technology Directorate (S&T);<br>Posted: http://www.gtri.gatech.edu/casestudy/gtri-demonstrates-cargo-security-technologies-dhs<br>Item: Georgia Tech Research Institute (GTRI) Container Security Device (CSD)<br><br>FOIA Request: DHS/S&T<br><br>Description: GTRI's Container Security Device (CSD) - was developed under contract to the Department of Homeland Security's Science and Technology Directorate. The GTRI CSD is integrated with another DHS-funded system, the Marine Asset Tag Tracking System (MATTS) developed by iControl Inc.  MATTS will communicate GTRI CSD alarm data to customs organizations and industry. When the GTRI's CSD is combined with the Composite Container Security System, the resulting container will be approximately 10-15 percent lighter and more durable than current generation steel containers, but with an embedded security and communication system that will detect breaches to any of the container's six sides and communicate security information, via MATTS, to customs organizations or carriers. |

**Government: Solicitations; Contracts; Agreements; Awards; Grants; Work Orders: Items**

59(w)   Department of Homeland Security (DHS)
Science and Technology Directorate (S&T);
Posted: http://www.gtri.gatech.edu/casestudy/gtri-demonstrates-cargo-security-technologies-dhs
Item: Georgia Tech Research Institute (GTRI) Composite Container Security System

FOIA Request: DHS/S&T

Description: GTRI's Composite Container Security System - was developed under contract to the Department of Homeland Security's Science and Technology Directorate. Georgia Tech has also developed a system to secure lightweight composite containers.  Georgia Tech has developed a novel, lightweight sensor grid to incorporate within the composite walls, doors and floors of the composite container developed at the University of Maine. When the GTRI's CSD is combined with the Composite Container Security System, the resulting container will be approximately 10-15 percent lighter and more durable than current generation steel containers, but with an embedded security and communication system that will detect breaches to any of the container's six sides and communicate security information, via MATTS, to customs organizations or carriers.

# EXHIBIT F





Homeland Security
Science and Technology

# HOMELAND SECURITY ADVANCED RESEARCH PROJECTS AGENCY

- Promote revolutionary changes in technology

- Accelerate technology prototyping

- Advance the development, testing, and evaluation

- Deployment of critical home security technologies



# CELL ALL

**SUMMARY:** Widely distributed system of small chemical agent detectors that provide rapid detection, classification, and notification to decision makers

**CUSTOMERS:** Public, Responders, Chemical Facilities Sector & DNDO

**WHAT'S NEXT:** Commercialization Activities in the Mobile and other industries.

Homeland Security
Science and Technology

# Motivations to Improve Detection

- Large, expensive, stationary systems represent state of the art chemical agent detection
- Variety of less-expensive handheld systems available as separate systems for mobile response
- Geographic coverage of these systems limited to specific areas of deployment
- Sampling may not reflect actual environment where people are actually located


Homeland Security
Science and Technology

# Opportunity for Innovation

Large, dynamic sensing system

- Miniaturized, effective sensor capability
- Integrate new low-cost sensing into common devices
  - Move sensing applications to the edge
- Harvest benefits of network effects and crowd sourcing
- Opt-In for monitored systems for Privacy Protection
- Integrate with 300+ million cell phones now used in U.S.
- Leverage billions of dollars spent each year in sensor, carrier network and cell phone development
  - Wireless Industry, Industrial Sensing, Defense Investments

Result: Early indications and warning for hazardous chemical events



Homeland Security
Science and Technology

# Technical Approach

**Revolutionary Technology & Accelerated Prototyping**

## Embeddable Miniature Sensors

- Sample collection
- Reusable devices with lifetimes of at least 18 months
- Functional sensor sensitivity & selectivity in the environment
- Prototype concepts for integrated sensing Devices
- Methods and concepts for disseminating of sensor information

**Accelerated Prototyping**
**& Advance Development, Test and Evaluation**

## Sensing Network to Significantly Expand Coverage

- Investigate Sensor Performance in a Larger Scale Networks
- Operational Evaluation for Responder Environments
- Concepts of Operation for Ubiquitous Sensing



**Homeland Security**
Science and Technology



Science and Technology

Homeland
Security

# CellAll Team

## HSARPA
## Concepts, Architecture & Resources

| NASA | Synkera | Qualcomm Inc. |
|---|---|---|
| Sensor Development and Systems Integration | Sensor and Sensing Module Development | Systems Design/Integration |
| Leveraging years of investment in nanotechnology & sensing platforms to support manned space flight | Leveraging the Innovation Engine of Small Business to create a new class of miniature sensors through SBIR. | Leveraging the worlds largest semiconductor supplier to the wireless industry. |

### NC4
Data consolidation and visualization for 24/7 Information Service

First Responder Advisors

# Revolutionary Technology & Advanced Prototyping

- Established miniature sensor efficacy
- Discovered parameters for cell phone integration
- Developed first generation prototypes
- Proof of concept demonstrations
  - NASA – Leveraging nanosensor work for space missions to further miniaturizing space-qualified integrated sensing system for detection of chemical agents using smartphones.
  - Synkera – Leveraging SBIR funded development of miniature sensors.
  - Qualcomm – Using existing hardware platform to integrate existing sensor & demonstrate ability to sense chemical agents



Homeland Security
Science and Technology

# Phase I Prototypes

Qualcomm FFA



NASA ARC nanosensor module
for iPhone integration




iPhone Specifications






# Phase II Prototype Goals

- Achieve greater number of total prototype devices at reasonable unit cost
- Sensor data transmission via 3g and/or Wi-Fi
- Multiple sensors network for chemical profiling
- Decouple chemical sensor from phone.
- Multiple sensor units per phone are possible
- Bluetooth/Proprietary Interfaces
- Standardize sensor platforms
- Increase opportunities for participation



Homeland
Security
Science and Technology

# Phase II Prototypes

Science and Technology

## Homeland Security





# Commercial Opportunities

- Focus Group Analysis for Cell Phone Based Sensing
    - Personal Protection Applications Sell
    - Privacy is Important
    - Reliance on Local Officials
- Multiple Market Business Models
- Spin-off Sensor Applications
    - Medical Diagnostics
    - Multi-gas Detectors for Firefighter Applications



Homeland Security
Science and Technology

# Demonstrations

- Domestic Preparedness Application
  - Toxic Chemical Agents (Public & Industrial Safety)
  - Hazardous Materials Response Team Scenario
  - Network response
  - Geographic-based visualization

- LAFD, Frank Hotchkins Memorial Training Center
  - Carbon Monoxide (Personal Safety)
  - Personal Protection Scenario - Audio Alarm
  - In Case of Emergency (ICE) Alerts
  - Network Command/Control



Homeland Security
Science and Technology

# Enabling a Spectrum of Applications

Personal Safety



Industrial Safety
(Critical Infrastructure)



Public Safety





# Status

Government Funding has Ended

Cost Shared Commercial Funding Continues

Venture Capital Active

Niche Products Available Now

First Large Scale Commercial Product Launch within 1 Year







# DHS asked, "what if..."

...we wanted to provide high impact ubiquitous technology for CBRNE sensing?

DEVELOPED IN PARTNERSHIP WITH THE U.S. Department of Homeland Security Science & Technology Directorate





Answer: Use commercial cellular phone ecosystem and commercial networks

# DHS asked,"what if…"

# Who are the necessary stakeholders?





How does it work?

DEVELOPED IN PARTNERSHIP WITH THE U.S. Department of Homeland Security Science & Technology Directorate

# What's left to do?

## FIRST RESPONSE COMMUNITY



- Seamless integration to their workflow
- Training in the use of Cell-All

## SYSTEM



- First responder and user trials
- Performance and scalability
- Enhance security for commercial use
- Refine algorithm

## BUSINESS

- How to make it attractive for all stakeholders



## SENSORS

- Manufacturing Volumes
- Reproducibility
- Power
- Integration




QUALCOMM

DEVELOPED IN PARTNERSHIP WITH THE U.S. Department of Homeland Security Science & Technology Directorate

# EXHIBIT G



U.S. Department of Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Cell-All: Super Smartphones Sniff Out Suspicious Substances

Years ago, if you wanted to take a picture, you needed a dedicated camera. You needed to buy batteries for it, keep it charged, learn its controls, and lug it around. Today, chances are your cell phone is called a "smartphone" and came with a three-to-five megapixel lens built-in—not to mention an MP3 player, GPS, or even a bar code scanner.



This Swiss Army knife trend represents the natural progression of technology—as chips become smaller and more advanced, cell phones continue to absorb new functions. Yet, in the future, these new functions may not only make our lives easier, they could also protect us—and maybe even save our lives.

The Cell-All initiative may be one such savior. Spearheaded by the Department of Homeland Security's (DHS) Science and Technology Directorate (S&T), Cell-All aims to equip your cell phone with a sensor capable of detecting deadly chemicals at minimal cost—to the manufacturer (a buck a sensor) and to your phone's battery life. "Our goal is to create a lightweight, cost-effective, power-efficient solution," says Stephen Dennis, Cell-All's program manager.

How would this wizardry work? Just as antivirus software bides its time in the background and springs to life when it spies suspicious activity, so Cell-All regularly sniffs the surrounding air for certain volatile chemical compounds.

When a threat is sensed, a virtual *ah-choo!* ensues in one of two ways. For personal safety issues such as a chlorine gas leak, a warning is sounded; the user can choose a vibration, noise, text message, or phone call. For catastrophes such as a sarin gas attack, details—including time, location, and the compound—are phoned home to an emergency operations center.

While the first warning is beamed to individuals—a grandmother taking a siesta or a teenager hiking through the woods—the second warning works best with crowds. And that's where the genius of Cell-All lies—in crowdsourcing human safety.

Currently, if a person suspects that something is amiss, he *might* dial 9-1-1, though behavioral science tells us that it's easier to do nothing. If he does do something, it may be at a risk to his own life. And as is often the case when someone phones in an emergency, the caller may be frantic and difficult to understand, diminishing the quality of information that's relayed to first responders. An even worse scenario: the person may not even be aware of the danger, like the South Carolina woman who last year drove into a colorless, odorless, and poisonous ammonia cloud.

In contrast, anywhere a chemical threat breaks out—a mall, a bus, subway, or office—Cell-All will alert the authorities automatically. Detection, identification, and notification all take place in less than 60 seconds. Because the data are delivered digitally, Cell-All reduces the chance of human error. And by activating alerts from many people at once, Cell-All cleverly avoids the longstanding problem of false positives. The end result: emergency responders can get to the scene sooner and cover a larger area—essentially anywhere people are—casting a wider net than stationary sensors can.

But what about your privacy? Does this always-on surveillance mean that the government can track your precise whereabouts whenever it wants? To the contrary, Cell-All will operate only on an opt-in basis and will transmit data anonymously. "Privacy is as important as technology," avers Dennis. "After all, for Cell-All to succeed, people must be comfortable enough to turn it on in the first place."

For years, the idea of a handheld weapons of mass destruction detector has engaged engineers. In 2007, S&T called upon the private sector to develop concepts of operations. Today, thanks to increasingly successful prototype demonstrations, the Directorate is actively funding the next step in R&D—a proof of principle—to see if the concept is workable.

To this end, three teams from Qualcomm, the National Aeronautics and Space Administration (NASA), and Rhevision Technology are perfecting their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station. And technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically.

Similarly, S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. As a result, Dennis hopes to have 40 prototypes in about a year, the first of which will sniff out carbon monoxide and fire.

To be sure, Cell-All's commercialization may take several years. Yet the goal seems imminently achievable: Just as Bill Gates once envisioned a computer on every desk in every home, so Stephen Dennis envisions a chemical sensor in every cell phone in every pocket, purse, or belt holster. If it's not already the case, our smartphones may soon be smarter than we are.

To request more information about this story, please e-mail st.snapshots@hq.dhs.gov (mailto:st.snapshots@hq.dhs.gov) .

## Topics

WEAPONS OF MASS DESTRUCTION (/TOPICS/WEAPONS-MASS-DESTRUCTION)

## Keywords

SCIENCE AND TECHNOLOGY (/KEYWORDS/SCIENCE-AND-TECHNOLOGY)

Last Updated: 10/21/2021

skip navigation







- 🏠
- VizCenter
- In the Media
- Projects
- Exercise 24
- Events
- Contributors
- Blog
- 

**Home** / **Blogs** / **S&T Tracker** /

# Cell-All: Super Smartphones Sniff Out Suspicious Substances

- 5 October 2011
- By J Williams



Image credit:
helldesign.net

Jing Li a physical scientist at NASA's Ames Research Center, and associates have developed a tiny gadget that would plug into your iPhone to detect low concentrations of toxic airborne ammonia, chlorine, or methane, autodial the authorities, and automatically transmit the data.

About the size of a postage stamp, is uses a compact, low-cost, low-power, high-speed sensor of chemicals in the air, using a "sample jet."

It has a multiple-channel silicon-based sensing chip with 16 nanosensors, and sends detection data to another phone or computer.

It was developed for the Cell-All program in the U.S. Department of Homeland Security's Science and Technology Directorate.

Because the data is delivered digitally, Cell-All reduces the chance of human error, and by receiving alerts from many people at once, Cell-All avoids false positives. The objective is to get emergency responders to the scene sooner and cover a larger area than stationary sensors can.

http://www.dhs.gov/files/programs/gc_1268073038372.shtm

Tweet

# About the author



More posts by J Williams | Visit the site of J Williams

# Search VizCenter

Search: [          ] [Search]

# Event Calendar

<  **August 2022**  >

| M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |

# Building a Sensor Network of Mobile Phones

Aman Kansal, Michel Goraczko, and Feng Zhao
Microsoft Research
kansal@microsoft.com

## ABSTRACT

Mobile phones have two sensors: a camera and a microphone. The widespread and ubiquitous nature of mobile phones around the world makes it attractive to build a large-scale sensor network using the phones as its sensor nodes. There are several interesting challenges in realizing such a system, such as providing efficient methods for the sensor nodes to make their data available to the network, allowing the sensor network applications to access the data from potentially disconnected and highly mobile devices, ensuring that privacy constraints are met, and allowing application developers to program the sensor network as required to build new applications. We demonstrate an initial system prototype that addresses some of these concerns. **Categories and Subject Descriptors:** C.2.4 Computer Communication Networks: Distributed Systems

**General Terms:** Design, Experimentation

**Keywords:** human sensor network, shared sensors, planetary network

## 1. INTRODUCTION

All mobile phones have a microphone, and most have a camera. Other sensors can be connected to a phone using Bluetooth. Mobile phones are connected to a network. They have a relatively predictable power supply, based on human user initiated charging. They are present in large numbers covering a vast spatial expanse, making them suitable to be used as a large scale sensor network.

Using such mobile devices as sensors has a significant advantage over unattended wireless sensor networks in that deploying the sensing hardware and providing it with network and power is already taken care of. Secondly, mobile phones can provide coverage where static sensors are hard to deploy and maintain. No single entity may have the access rights to place sensors across the complete coverage domain required by an application, such as a combination of subway stations, public parks, and shopping malls. Thirdly, each mobile device is associated with a human user, whose assistance can sometimes be used to enhance application functionality. For instance, a human user may help by pointing the camera appropriately at the target object to be sensed.

Our goal is to enhance the utility of the existing swarm of mobile devices by presenting it as a physical sensing substrate that sensor networking applications may program for their sensing objectives. Several applications can be enabled using sensor networks of mobile phones, such as instant news coverage for an unplanned interesting event, residential area noise mapping, urban mood in-

Copyright is held by the author/owner(s).
*IPSN'07*, April 25-27, 2007, Cambridge, Massachusetts, USA.
ACM 978-1-59593-638-7/07/0004.

ference, trail condition updates after storms, dynamically updated street side imagery overlays for maps, and other enterprize applications that use the audio-visual feeds to compute metrics of interest for various business dashboards. Other works have also considered building sensor networks using mobile phones [1, 2, 3]. Sensor networks where the sensor nodes are mobile and carried by people or vehicles have also been proposed [4, 5].

## 2. SYSTEM DESCRIPTION

We build a sensor network of mobile phones that is used as a shared system, as opposed to a system where a single application owns and uses a dedicated set of mobile devices carried by users or vehicles directly involved with that application. In the shared context, the phones are carried and used by their respective owners as they need. The sensor networking applications use the mobile devices when available. The key advantages of a shared system come from the vast coverage expanse achieved that a single dedicated system may never be able to match, and the re-use of physical resources by multiple applications. The related trade-offs are difficulty in providing performance guarantees and limitations in control of the sensor nodes.



**Figure 1: A shared sensor network of mobile phones.**

The system (Figure 1) consists of the following key entities:

1. Sensors: mobile devices that sense the physical world

2. Network Infrastructure: In our system, this includes: a data repository that stores all the sensor data provided by the mobile devices, a tasking server that enables applications to program the sensor network as per their requirements, and a

sensor proxy that allows disconnected operation for sensors while making their data available to applications.

3. Users: the applications that access our shared sensor network, or human users who access the sensor data through a graphical user interface.

We demonstrate the following aspects of this system.

## 2.1 Sensor Data Sharing

We have developed a data sharing framework that makes the sensor data from mobile devices available to network applications. The mobile devices may be only sporadically connected, or stay behind firewalls. A web-service standard based approach is used to allow many different types of devices to use the network.

The data sharing framework uses three components. The first is a publishing client on the mobile phone that collects samples from the sensors on the phone, applies predefined filters to the data, buffers the data locally, and uploads the data as per network availability using a web service interface. This client runs in parallel with other applications on the phone and can be activated or deactivated as necessary. The client allows the user to configure whether data may be automatically collected or only when the user initiates a sample capture. The client also includes functionality that allows remote applications to program the phones, as described later. We have developed the client software GUI to use only the phone keypad and the small phone screen.

The second component is the data repository which hosts the web service to accept data samples from the phones and uses a database to index the uploaded data.

The third component is a sensor proxy that acts as an online representative for the mobile sensors. This proxy provides a fixed sensor URL that can be used by applications to access a specific sensor device directly. The actual sensor may remain disconnected or not reachable. The sensor that can be reached from remote applications. The proxy is always available and provides the entire sensor data stream up to the most recent data upload from the sensor.

## 2.2 Location Based Indexing

A salient feature of the mobile phone sensor network is that each sensor node is mobile and the motion pattern cannot be easily controlled. Most applications are unlikely to be interested in the data collected by a specific device but rather need data from a specific region and time window. The device identifies of the devices that contributed that data may only be of secondary importance. Thus, it is very important to index the uploaded data by location and time. This also helps applications avoid any overheads in discovering specific mobile phones, tracking their motion, or waiting for the device to be connected to the network.

In our prototype we obtain location information using:

1. Cell-tower triangulation: The cell-phone network typically knows the location of a phone using signal strength measurements from one or more cellular base stations. The location accuracy varies from several meters to over a mile depending on the number of base stations in range. Certain cellular operators such as Sprint in the US, and Teliasonera in Europe already allow non-operator owned applications to access this location data. Our prototype implements the functionality to obtain location from these operators.

2. Phone GPS: Many recently released and forthcoming mobile phones have built in GPS receivers. The GPS based location information is accurate to several meters when the phone has good GPS satellite visibility, such as under open sky. We use GPS location also in our prototype.

There are other methods to obtain location in mobile devices such as using WiFi based location for mobile devices with WiFi capability (based on triangulation or simply the location of connected access point), or using human entered keywords attached to data samples, such as a landmark name entered for an images sample.

## 2.3 Programming

Our system enables sensor network application developers to deploy their applications without ever deploying a physical sensor. Instead, the developers may program our shared mobile phone sensor network to carry out required sensing tasks. This is enabled using the tasking server that is part of the network infrastructure. We allow mobile phone users to share their sensing resources to varying degrees on their resources and involvement in the sensor network application. We also allow the applications to program the network without knowing the identities of any specific devices in their region of interest or the device capabilities.

The tasking server presents the sensor network as a single object to the applications. Applications can call this object's methods to carry out their required sensing tasks, specifying their spatio-temporal region of interest, measurement tolerances, and delay constraints. These methods may also allow requesting human user assistance in capturing data samples to a limited extent as configured by the mobile device user. Web-service based standards are used to make this object interface available to programmers, allowing significant flexibility in terms of programming languages used by the programmers.

The tasking server internally determines the individual devices that must receive the resultant sensing commands and makes those commands available to the sensing devices as per network connectivity. Currently, simple sampling tasks using the phone's camera and microphone are implemented. Ongoing work includes developing more sophisticated programming tasks, involving sampling, data processing, and event based responses to commands while ensuring that the mobile device remains secure and continues to serve its local user without loss of performance.

## 3. CONCLUSIONS

We present a first attempt towards understanding and realizing a programmable sensor network that uses the large deployed base of mobile devices as its sensing infrastructure. Several challenges need to be addressed in building such a system. Our prototype demonstrates initial design choices in addressing some of these challenges and helps reveal related issues.

## 4. REFERENCES

[1] Jeff Burke, Deborah Estrin, Mark Hansen, Andrew Parker, Nithya Ramanathan, Sasank Reddy, and Mani B. Srivastava. Participatory sensing. In ACM Sensys World Sensor Web Workshop, Boulder, Colorado, USA, October 2006.

[2] Sensorplanet. http://www.sensorplanet.org/.

[3] Cenic Nath, Andres Oetvisk, Deepa Huang, and Rudolf Faijer. Mobile landscape: Graz in real time. http://senseable.mit.edu/graz/.

[4] Bret Hull, Vladimir Bychkovsky, Yang Zhang, Kevin Chen, Michel Goraczko, Allen K. Miu, Eugene Shih, Hari Balakrishnan, and Samuel Madden. CarTel: A Distributed Mobile Sensor Computing System. In 4th ACM SenSys, Boulder, CO, November 2006.

[5] Shane B. Eiseman, Nicholas D. Lane, Emiliano Miluzzono Ronald A. Peterson, Gahng-Seop Ahn, and Andrew T. Campbell. Metrosense project: People-centric sensing at scale. In ACM Sensys World Sensor Web Workshop. Boulder, Colorado, USA, October 2006.

# EXHIBIT H

# Another Shoe Drops in the Qualcomm Patent Licensing Saga

By **Michael T. Renaud**, **Bruce D. Sokler**, **Richard G. Gervase, Jr.**

Just when observers thought Qualcomm could celebrate its successful litigation with Apple another decision has come down which could have major implications for Qualcomm's business going forward.

In a much-anticipated 233-page opinion, Judge Lucy Koh of the Northern District of California found that Qualcomm's licensing practices for patents used in the cellular industry violated federal antitrust laws.  *Federal Trade Commission v. Qualcomm, Incorporated*, Case No. 17-CV-00200-LHK (May 21, 2019).  The crux of the case centered on the fact that Qualcomm's patent portfolio contained several standards-essential patents ("SEPs"), which Qualcomm had made commitments to standard setting organizations (SSOs) to license on fair, reasonable, and nondiscriminatory ("FRAND") terms.  However, the effect of Qualcomm's patent licensing practices, coupled with its sales practices regarding its own chips, had been to "create insurmountable barriers for rivals" (Op. at 193).  Judge Koh ordered injunctive relief that would open up Qualcomm's current licenses and change its business model.

Qualcomm has indicated it will seek a stay and pursue an appeal. Given the exceptional length of Judge Koh's determination (233 pages) and the litany of highly specific fact finding and credibility determinations she made, the order appears to be fairly likely to be upheld. However, the same highly fact-intensive analysis suggests that the case may provide only limited guidance to other parties and patentees.

**To summarize the facts that appeared essential to the decision:**

- Qualcomm primarily licenses its patents on a "portfolio basis", which means that a licensee pays for and receives rights to all three categories of Qualcomm patents— cellular SEPs, Non-cellular SEPs, and non-SEPs. (Op. at 6).

- In a practice that Qualcomm conceded was unique, Qualcomm would not sell modem chips to an OEM unless the OEM took a patent license from Qualcomm. (Op. at 44)

- The district court found that Qualcomm had market power in the market for CDMA modem chips and in the submarket for LTE modem chips. (Op. at 22-41).

- The district court then discussed, in minute detail, Qualcomm's anticompetitive conduct in its patent licenses negotiations with 16 OEMs, including LGE, Sony, Samsung, Huawei, Motorola, Lenovo, BlackBerry, Apple, Nokia and others.  (Op. at 41-215, 161). The court found that Qualcomm engaged in anticompetitive conduct by:

  ○ cutting off an OEM's chip supply; (Op. at 44, ,45,80)

  ○ threatening to withdraw technical support; (Op. at 45)

  ○ threatening to require the return of software; (Op. at 45)

  ○ threatening to prevent Qualcomm's rival MediaTek from selling chips to the OEM if the OEM becomes unlicensed with Qualcomm (Op. at 75)

  ○ demanding unreasonably high royalty rates but refusing to provide patent claim charts; (Op. at 62)

  ○ threatening to cut-off an OEM's chip supply after the OEM challenged Qualcomm's use of the handset as a royalty base for its patent portfolio; (OP. at 81)

  ○ requiring the OEM to grant a royalty-free cross license to the OEM's patents; (Op. at 10, 45, 62)

  ○ charging higher patent royalty rates when the OEM used a rival's instead of Qualcomm's chip; (Op. at 45, 50, 113)

  ○ giving the OEM chip incentive funds if it purchased all (or nearly all) of its chips from Qualcomm; (Op. at 45, 56)

  ○ and giving rebates on the price of Qualcomm's chips. (Op. at 45, 51-52)

- Judge Koh found that the testimony of Qualcomm's witnesses rehearsed and not credible.  She noted that Qualcomm's trial presentation ignored its own contemporaneous documents; most of Qualcomm's experts did not even review Qualcomm's own documents. For example, the district court found that Qualcomm's justifications for its refusal to license rivals were pretextual.

- In a previous ruling, Judge Koh had held on summary judgment that Qualcomm's FRAND commitments require Qualcomm to license its SEPs to rivals. (Op. at 134) Here, the court found that outside this specific litigation, Qualcomm and others in the industry had the same understanding of FRAND commitments. (Op. at 124).

- The district court concluded that Qualcomm has an antitrust duty to license its SEP to rivals. While the Supreme Court has held that, in general, "there is no duty to aid competitors." *Trinko*, 540 U.S. at 411, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate [the Sherman Act]. *Id.* Relying on the Supreme Court's *Aspen Skiing* case, where a ski operator's withdrawal of participation from an "all-Aspen ticket" violated the Sherman Act because its purpose was to maintain its monopoly, the court concluded that Qualcomm's voluntary termination a profitable course of dealing—that is, Qualcomm had previously licensed its modem chip SEPs to rivals but had ceased to do so—its motivation in doing so as "anticompetitive malice," and the fact that Qualcomm's conduct affected an existing a retail market for licensing modem chip SEPs meant that all *Aspen Skiing* factors had been met and Qualcomm's conduct constituted and antitrust breach. (Op. at 134-141).

- Judge Koh also found that Qualcomm's exclusive deals with Apple violated that Sherman Act by shrinking rivals' sales and foreclosing its rival from the positive network effects of working with Apple. By so doing, Qualcomm maintained its monopoly power in the CDMA modem chips and in the submarket for LTE modem chips and consequently sustained unreasonably high royalty rates. (Op. at 141).

- The court found that Qualcomm's royalty rates are unreasonably high because the rates are set by its *monopoly chip market share* rather the *value of its patents*. (Op. at 213). The court noted that the modem chip no longer drives the value of cellular handsets, yet Qualcomm continues to charge unreasonably high royalty rates on the sale of the whole handset. The court noted that Qualcomm's use of the handset device as the royalty base is inconsistent with Federal Circuit law on the patent rule of apportionment, citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.* 904 F. 3d 965 (Fed. Cir. 2018) and *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3rd 51 (Fed Cir. 2012). (Op. at 172).



MINTZ



for rivals." (Op. at 193)  The court found that Qualcomm's "own documents show that

**With respect to injunctive relief:**

In an unusual twist, the United States Department of Justice Antitrust Division, the FTC's sister agency, filed a motion recently suggesting that be an additional round of briefing on remedies occur and asking to be heard. Judge Koh decided that none of that was necessary. Instead she ordered the following injunctive relief:

1. Qualcomm must not condition the supply of modem chips on a customer's patent license status and Qualcomm must negotiate or renegotiate license terms with customers in good faith under conditions free from the threat of lack of access to or discriminatory provision of modem chip supply or associated technical support or access to software.

2. Qualcomm must make exhaustive SEP licenses available to modem-chip suppliers on fair, reasonable, and non-discriminatory ("FRAND") terms and to submit, as necessary, to arbitral or judicial dispute resolution to determine such terms.

3. Qualcomm may not enter express or defacto exclusive dealing agreements for the supply of modem chips.

4. Qualcomm may not interfere with the ability of any customer to communicate with a government agency about a potential law enforcement or regulatory matter.

5. In order to ensure Qualcomm's compliance with the above remedies, the Court orders Qualcomm to submit to compliance and monitoring procedures for a period of seven years. Specifically, Qualcomm shall report to the FTC on an annual basis Qualcomm's compliance with the above remedies ordered by the Court.

**Implications for Patent Owners**

For patent owners and participants in standards-setting organizations (SSOs), the predominant implications of Judge Koh's ruling for patent owners is that refusal to license standards-essential patents to competitors—and, especially, ceasing to license such patents to competitors when such licensing was previously done—can in some instances lead to antitrust liability on top of the contractual FRAND licensing obligations already inherent in SSO, participation. In other words, antitrust law, rather than merely contract, may in some instances comprise part of the obligations to license SEPs to competitors—giving would-be licensees a potential tool to assert in FRAND litigation over and above contract dispute.

it is still too early to make such a determination on the basis of the exceptional facts of the *Qualcomm* opinion.

*Qualcomm* is overall such an intensely—indeed, exhaustively—fact-driven case, with such an encyclopedic recitation of anticompetitive actions by Qualcomm, that it is too early to determine whether patentees need to make significant course adjustments to their programs and strategies – the extent to which the case's conclusions of law are upheld on appeal will likely provide firmer guidance as to the applicable legal standards and the extent to which *Qualcomm* is a sign of things to come or merely a punishment meted out to an exceptional actor in the patent space.

SUBSCRIBE TO VIEWPOINTS ⟶

// **PUBLISHED**

May 24, 2019

// **VIEWPOINT TOPICS**                                                                                    —

**Intellectual Property**

**Patent Litigation**

**Antitrust**

// **PROFESSIONALS**

**Michael T. Renaud**

**Bruce D. Sokler**

**Richard G. Gervase, Jr.**

// **SHARE**

# EXHIBIT I

Geoforum 49 (2013) 279–288



Contents lists available at SciVerse ScienceDirect

## Geoforum

journal homepage: www.elsevier.com/locate/geoforum



# Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks



Torin Monahan [a,*], Jennifer T. Mokos [b]

[a] Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA
[b] Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

ARTICLE INFO

*Article history:*
Available online 7 March 2013

*Keywords:*
Surveillance
Crowdsourcing
Mobile phones
Pollution
Outsourcing

ABSTRACT

Mobile systems for detecting environmental threats may radically restructure spatial imaginaries as people learn to see and engage with heretofore largely hidden dimensions of urban spaces. While the design of such technological systems is contingent and currently open to varied outcomes, powerful security and industry players are asserting their influence to set overriding protocols that will ensure widespread ambient data collection, especially for security and commercial applications. This paper critically explores the emergent power geographies of surveillance revealed by one such system: the Department of Homeland Security's Cell-All project. This project, which has been under development at the U.S. Department of Homeland Security (DHS) since 2007, equips mobile phones with chemical-agent detectors and links them to security networks so that threats to urban populations can be automatically detected and rapidly mitigated. In order to assess the politics of crowdsourced sensing systems, first we map the core characteristics of the Cell-All development model: creating a participatory system, building public–private partnerships, and outsourcing responsibility for privacy protections. Second, we describe some alternative designs for mobile, participatory environmental sensing and reflect on their potentials for correcting power inequalities or achieving environmental justice. Finally, we conclude by discussing the implications of these various systems and the conditions that could alter their outcomes.

© 2013 Elsevier Ltd. All rights reserved.

## 1. Introduction

The securitization of urban spaces is a dynamic political process that mutates according to constructions of threat, need, and possibility. In some instances fear of terrorist attacks has motivated the hardening of potential targets, such as monuments or buildings, with video surveillance networks or concrete sacrificial facades intended to block would-be bombers (Boddy, 2007; Coaffee, 2004; Fussey et al., 2011). In other cases, unmanned aerial vehicles are deployed over cities and borders to watch for illegal or suspicious activities and direct authorities to investigate (Finn and Wright, 2012; Graham, 2010; Wall and Monahan, 2011; Weber, 2011). Other articulations come in the form of informatized passage points, such as building entrances, community guard stations, or airports, where biometric identifiers and identity documents can be checked to ascertain whether one should be granted access (Adey, 2006; Klauser, 2010; Lianos and Douglas, 2000; Magnet, 2011; Thrift and French, 2002). Such systems often act in overlapping and reinforcing ways, connecting with larger assemblages of

regulation and control. As geographers and surveillance studies scholars have argued, the modalities of security systems are inflected by an anticipatory rationality that seeks to identify and control risks in advance (Coaffee et al., 2009; Graham and Wood, 2003; Haggerty and Ericson, 2006; Klauser et al., 2008; Lyon, 2003). Rather than being objective or deterministic, however, every step in the process—from risk construction to system implementation to altered practice—betrays a complex politics whereby resources are allocated, populations sorted, and institutions reconfigured.

An important dimension of the securitization process is the creation of compelling narratives to justify the surveillance systems under consideration. This mythical dimension relies on what Mike Crang and Stephen Graham (2007) have called "technological fantasies" that position emergent technological systems as necessary—and effective—responses to dire threats. Some of the genres at work are entertainment media and news reporting; police or government educational campaigns; and industry- and government-produced videos, presentations, and reports that typically describe scenarios of mass destruction, followed by proposed technological fixes to prevent or manage such crises (Altheide, 2006; Barnard-Wills, 2012; Graham, 2010). As has been argued elsewhere, technological fantasies are not simply instrumental narrative devices to achieve desired ends; in addition to this, they actively shape larger security cultures and afford them influence,

* Corresponding author.
*E-mail addresses:* torin.monahan@unc.edu (T. Monahan), jennifer.mokos@vanderbilt.edu (J.T. Mokos).

0016-7185/$ - see front matter © 2013 Elsevier Ltd. All rights reserved.
http://dx.doi.org/10.1016/j.geoforum.2013.02.001

*T. Monahan, J.T. Mokos / Geoforum 49 (2013) 279–288*

such that alternative motivations for personal or institutional action become filtered through a security lens (Monahan, 2010b).

The technological fantasy that is the backdrop for this paper is one where mobile phones are equipped with chemical-agent detectors and linked to security networks so that threats to urban populations can be automatically detected and rapidly dealt with. This project, which has been under development at the U.S. Department of Homeland Security (DHS) since 2007, operates under the name "Cell-All." It draws upon an existing ecology of related sensor networks woven throughout the built environment in many cities, such as Chicago's "Operation Virtual Shield," which includes smart CCTV cameras and hidden chemical and biological agent sensors (Bulkeley, 2009; Murakami Wood, 2009a). The name Cell-All references the ubiquity of mobile phones and perhaps unintentionally signals the data exchange made possible by the public–private partnerships that are at the heart of this enterprise. The DHS Cell-All project is also designed to exploit mobile-phone saturation to enroll everyday users as passive data collectors whose devices communicate silently to the DHS system and its private industry partners. As with U.S. border-control and military efforts to enlist citizens as participants in crowdsourced surveillance (Koskela, 2010; Murakami Wood, 2009b), the success of Cell-All depends upon a mass of participating individuals scanning public spaces.

The ideological underpinning for the Cell-All project is one of neoliberal public–private partnerships, by which industry profits from privileged government contracts and access to data without accepting many financial or symbolic risks. A core component of this arrangement, as will be shown, is in the persuasion of everyday mobile phone users to act as data collectors and distributors. In this sense, to achieve initial success a certain type of participatory surveillance must be cultivated through discursive appeals to individuals—whether patriotic duty to avert mass-casualty disasters, personal interest to save oneself or one's loved ones from carbon monoxide poisoning, or individual desire to be a part of an innovative technological research project. Regardless of the nature of the appeal, the intended outcome is for the responsibilization of individuals to undertake what Mark Andrejevic has referred to as the "work of being watched," an eager involvement in data collection and restricted forms of interactivity that may give one pleasure while simultaneously serving the interests of institutions (Andrejevic, 2002, 2007).

While the Cell-All project may rely upon a technological fantasy, it is certainly not fictional. Prototypes have already been developed, major telecommunications companies have become partners, and mass-marketing strategies are being fine-tuned. Drawing upon insights from the field of science and technology studies, one could say that the "black box" of this technology is rapidly closing and its politics are solidifying; as a result, alternative, perhaps more democratic and empowering possibilities are being foreclosed (Akrich, 1992; Winner, 1986; Woodhouse et al., 2002). Once mobile phone manufacturers routinely include chemical and other sensors in their devices, users can be compelled or coerced to communicate environmental data as such sharing becomes normalized in technical protocol. There is precedent in place to require geolocational data sharing as an "always on" feature of mobile phones for purposes of public safety under the E911 initiative in the U.S. and similar requirements in other countries (Curry et al., 2004), so one can easily envision similar policies mandating the constant relay of environmental readings. This predictable development makes sense in part because of the widespread normalization of surveillance through commonplace media and organizational encounters. As David Murakami Wood and William Webster explain: "Interactions become structured around surveillance relationships and the new forms of social negotiation that emerge are no longer about what information one chooses to give but how that information is to be given (or taken)" (Murakami Wood and Webster, 2011: 157).

In keeping with the goals of this special issue, this paper will critically explore the emergent power geographies of surveillance revealed by DHS's Cell-All project. Environmental sensing with mobile devices represents, on one hand, the possibility for crafting new spatial imaginaries and modes of public engagement that bring about collective empowerment. On the other hand, technological systems must be situated within their current political and ideological contexts, which in the case of Cell-All signifies a tightly constrained trajectory for technology development that promises coerced participation and asymmetrical relationships of visibility. First, we will provide an overview of our methods and sources. Second, we will draw upon DHS documents and presentations to analyze the Cell-All project, paying particular attention to the core characteristics of its development model: creating a participatory system, building public–private partnerships, and outsourcing responsibility for privacy protections. Third, we will describe some alternative designs for mobile, participatory environmental sensing and reflect on their potentials for correcting power inequalities or achieving environmental justice. Finally, we will conclude by discussing the implications of these various systems and the conditions that could alter their outcomes.

## 2. Methods and sources

The primary case study analyzed here—that of the Cell-All system—is based on a review of official and public documents, including press releases, media reports, DHS documents and training materials, and commercial partner marketing products and websites. We conducted a LexisNexis news search to identify news, media, and publicly available materials referencing Cell-All. All articles returned by the search were examined for relevance, and those not directly discussing the Cell-All program were discarded, with 31 documents remaining. These relevant documents were read and coded to identify initial thematic concepts in accordance with grounded theory approaches to data analysis (Charmaz, 2006).

In response to initial thematic coding, additional targeted data collection was focused on DHS and commercial partner documents and websites in order to identify the current development status, the operation and functionality of the system, and marketing strategies. This secondary investigation included a thorough search for pertinent documents on DHS's website, as well as searches on commercial partner websites, to locate original agency and company texts. A 2-hour video webcast of the DHS's live demonstration and training of the Cell-All project held at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center on September 28, 2011 (U.S. Department of Homeland Security, 2011a) was also transcribed and coded. Analysis of primary DHS and commercial partner documents yielded key information on the design of the Cell-All system, from the environmental sensors to the broader support and data communication infrastructures developed to store, analyze, and send alerts.

Many of the media and news articles identified were printed in security trade publications, such as Aviation Today's *Air Safety Week* and the *Terror Response Technology Report* (*TR2*), and they were often published in response to press releases from DHS or other Cell-All partners, such as NASA's Ames Research Center. This dynamic tended to produce clusters of articles with similar headlines and content that often closely reproduced the phrasing and content of the agency press releases. Similarly, the few articles that did appear in the mainstream media seemed to echo statements made in press releases with little or no analysis. This relationship between press releases and media reports suggests that there

*T. Monahan, J.T. Mokos / Geoforum 49 (2013) 279–288*

may be a disproportionate ability afforded to DHS and commercial entities to shape public understanding and uptake of these technological systems.

## 3. Exploring the DHS Cell-All project

### 3.1. Project background and development

Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones.

The Homeland Security Advanced Research Projects Agency (HSARPA) of the DHS Science and Technology (S&T) Directorate refers to the sensors as "a new class of chemical detectors" that are smaller, less expensive, and *in situ* compared to the fairly large, static, and relatively expensive sensors used at existing monitoring stations (U.S. Department of Homeland Security, 2011a). By drawing upon mobile phone saturation, the Cell-All program aims to establish a flexible and dynamic sensor system, with citizens functioning as roving information nodes. As Stephen Dennis, the technical director of HSARPA, states, "Generally people have their smartphone with them. It's representing [through sensor readings] the space that they reside in" (Dennis, 2011).

For the program's initial phase in 2007, DHS released a call for proposals inviting the private sector to develop a proof of concept for the "Cell-All Ubiquitous Biological and Chemical Sensing" project (U.S. Department of Homeland Security, 2007). The goals at this point were to design a range of chemical sensors and refine the GPS functionality of phones to achieve accurate transmission of location data. According to DHS, the first year and a half focused on the question "Could we miniaturize chemical sensors and make them actually fit a cell phone profile?" (Dennis, 2011). Thus, researchers focused on understanding the needs of the equipment, in terms of power and physical profiles, and determining whether the sensors could work within the "ecosystem of the phone." HSARPA conducted a national search for ideas that was intended to leverage existing technological expertise in the public and private sectors, which led to the creation of six workable first-generation prototypes, including a "form factor phone" developed by Qualcomm and a chemical nanosensor developed by NASA (U.S. Department of Homeland Security, 2011a).

The second phase of Cell-All began in 2010 with the goals of creating dozens of competing viable devices and refining the network capabilities of the system (U.S. Department of Homeland Security, 2011a). At this stage, DHS also sought to standardize the data-reporting protocols so that data from different devices could be received and processed by a centralized network operations center. Research contracts were awarded by DHS through HSARPA and the Small Business Innovation Research Portfolio, with some of the primary recipients being Qualcomm, Synkera Technologies, and NASA (U.S. Department of Homeland Security, 2011b). In addition, DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010).

During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available. At a September 2011 live test and demonstration of second-generation prototypes at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center, Synkera's prototype was already on the market and NASA's sensor was awaiting clearance for public release. DHS presentations at this event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a).

### 3.2. Cultivating participation through a personal alerting system

A 2011 report by Fox News begins with the following scenario: "A silent killer threatens a family with a baby in a hotel room. Fortunately, their smartphone wises up, senses the threat and notifies the authorities—and the local fire department charges in to the rescue, saving the day" (Barrie, 2011). The silent killer in this story is that of carbon monoxide, which causes thousands of poisonings and hundreds of deaths each year (King and Bailey, 2007), and the smartphone is equipped with gas sensors and linked directly to DHS's Cell-All system, allowing for automatic communication with first responders. The fictional story continues by escalating the life-saving potential of the systems to mass casualty terrorist attacks:

> Ultimately, Cell-All could be American's secret weapon against public threats at football stadiums or sarin gas-style attacks like the one that killed 13 people in Tokyo's subway system in 1995. Experts are always working hard to find ways to reduce the risk to Americans at large events that could be attractive targets to terrorists. (Barrie, 2011)

As with other surveillance systems deployed under the rubric of counterterrorism, the accompanying narrative implies technological infallibility and nurtures public support through a process of simplification that strips away politics and social difference (Monahan, 2010b). What is especially interesting about this media thread, though, is that it emphasizes personal, commonplace threats (carbon monoxide poisoning of families) over large-scale terrorist attacks. This may indicate a larger shift in security discourses, but it also suggests an intentional crafting of message, on the part of DHS and its partners, to encourage participation of and support by the growing population of smartphone users in the U.S.

Therefore, during the second phase of development outlined above, DHS shifted its marketing strategy to stress the personal protection aspect of the project as an approach intended to persuade consumers to buy the associated products (U.S. Department of Homeland Security, 2011a). So, whereas in 2010 media articles and a DHS press release focused on the homeland security potential of the sensors to detect biological and chemical terrorist agents, for example by calling it a "handheld weapon of mass destruction detector" (U.S. Department of Homeland Security, 2010), in 2011 the technology was instead described as a "personal environmental threat detector system" (U.S. Department of Homeland Security, 2011c: 37) and an "environmental surveillance system" (U.S. Department of Homeland Security, 2011b: 2). By the time of the 2011 Cell-All product demonstration, presenters

concentrated almost exclusively on threats posed by commonplace gas or chemical exposure, such as carbon monoxide in the home or toluene in nail salons. Furthermore, while a range of sensors are available to detect chemicals, such as chlorine, carbon monoxide sensors were the ones first linked to the Cell-All platform and made available for purchase (Li, 2011).

Unlike most state-sponsored security programs, which are implemented without full public knowledge or direct approval, the public–private partnership model adopted by Cell-All requires public buy-in, at least initially. This necessitates the adoption of a market lens to evaluate the need for and potential success of this public safety program. As DHS's Stephen Dennis explained, "We didn't just do the science work here; we actually did look at the market" (Dennis, 2011). With Qualcomm's help, DHS assessed commercial viability through market research, asking what conditions would need to be met for the public to both accept and pay for the system. Based on this market research, DHS concluded:

> What we learned is that the personal protection application will sell the device. People will actually turn in their [current] phone, get a new phone, if it provides them with a magnitude of personal protection, especially for families, people with aging parents, people with young children. (Dennis, 2011)

In order to convince people that the system would assist with personal protection, DHS settled on carbon monoxide poisoning as a much more likely and avoidable threat than terrorism. Mainstream media outlets like Fox News could provide sensationalistic sales-pitch stories about the "silent killer" of families with babies, while DHS could craft an argument drawing upon sober statistics and the expertise of first responders:

> When we asked our nation's first responders to name the deadliest gas for us, in terms of what the American population faces as a threat, carbon monoxide was it...it actually establishes a basis for commercial manifestation of what we've done here. (Dennis, 2011)

Thus, by the time of DHS's live demonstration of their system in 2011, the entire framing had shifted to "infiltrations" of carbon monoxide as an invisible and unpredictable danger to Americans:

> Today's test is going to focus on a common poisonous gas that is responsible for more than 200 deaths in the United States every year. As a matter of fact, just yesterday there were 43 people injured in an incident in Washington D.C. where carbon monoxide gas infiltrated into a building. (Verrico, 2011)

The marketing efforts that follow these threat constructions focus almost exclusively on the individual, positioning the product as a personal alerting system.

As a personal sensing and alerting system, Cell-All promises to protect a diverse and inclusive range of individuals, from "a grandmother taking a siesta [to] a teenager hiking through the woods..." (U.S. Department of Homeland Security, 2010). When set to personal safety mode, an auditory alarm will sound directly on the phone when the sensor detects an abnormal chemical level, and the app can also be configured to send a text message to specific emergency contacts designated by the user. While the sensing data ostensibly remain within the sphere of users and their designated contacts, in order to take advantage of these data for other purposes, such as ensuring public safety, the program includes plans for automatically reporting personal alerts to an independent monitoring service (U.S. Department of Homeland Security, 2011a). By expanding the data network in this way, DHS hopes to harness the collective potential of mobile phones as public environmental sensing devices for "crowdsourcing human safety" (U.S. Department of Homeland Security, 2010).

As a starting point, users will be given the choice of opting-in to wider sharing of their sensing data:

> We're asking the public if they would like to opt-in to a network, an anonymous network, an anonymous report, of what is it that their phone has seen to an operations center that can then understand what it is that that sensor and the collection of sensors around them actually means in terms of response. (Dennis, 2011)

One can note in this articulation the incipient unfolding of an argument for access to—and control of—data by organizations that can "understand" what an alert "actually means." Beyond the personal alert functionality, the larger goals are to aggregate data from multiple cell phones located within crowded public areas, such as sports arenas, subway stations, or office buildings. Then in addition to sending an individual alert, each phone on the network could send abnormalities detected by the sensors directly to a centralized network operations center (NOC). The idea is that the NOC will be equipped to analyze the reports within the context of each other (as well as other available data) and the aggregation of sensors in crowded public places will minimize false positives. One phone reporting an abnormal chemical level could be an error; a hundred phones reporting the same levels would be more likely to indicate a situation in need of intervention. When the NOC identifies that a threat is likely, it could then contact local agencies and first responders.

In order for Cell-All to succeed as it moves along a path from personal protection to centralized data collection, it must both compel and automate participation in data-sharing schemes. DHS rationalizes this as placing trust in objective technological systems instead of supposedly unreliable and error-prone individuals:

> Currently, if a person suspects that something is amiss, he *might* dial 9-1-1, though behavioral science tells us that it's easier to do nothing. If he does do something, it may be at a risk to his own life...the caller may be frantic and difficult to understand, diminishing the quality of information...An even worse scenario: the person may not even be aware of the danger, like the South Carolina woman who last year drove into a colorless, odorless, and poisonous ammonia cloud. (U.S. Department of Homeland Security, 2010)

In this example, it is not obvious how a cell-phone sensor would have helped, and according to other sources the woman, who died, left her vehicle because she was aware of the gas (Associated Press, 2009). Still, the example hints at scenarios where an automated Cell-All system might save lives, such as if multiple sensor readings prompted a rapid evacuation and quarantine of contaminated areas. Automated data sharing, a fully functional infrastructure, and tight coordination with first responders would be necessary components for this to be effective.

In the marketing of Cell-All, personal protection serves as the initial hook, allowing for data sharing to be expanded gradually. First this will take the form of opting-in to sharing data with a network operations center, with assurances that personal identifiers will be scrubbed from the data. Next, if precedent holds, wider data sharing will occur and participation will become compulsory. A neoliberal ideological context shapes the Cell-All project as a whole, as we will discuss further in the next section, but it also motivates government agencies to formulate problems in such a way that market-based solutions become logical responses to them.[1] Therefore, rather than tackle the health dangers posed by

---

[1] The neoliberal context signifies, in part, a market rationality of privatization of public goods and institutions, deregulation of industry, and responsibilization of individuals for the provision of human security and social reproduction (Monahan, 2010a, 2010b).

cumulative exposure to contaminants or impose tighter regulations upon chemical and other polluting industries, DHS focuses on individual responsibility for mitigating threats as a gateway to supposed wider public protection from catastrophic events. Just as individuals are being charged with maintaining the integrity of their digital identities online (Whitson and Haggerty, 2008), Cell-All hints at new articulations of responsibility where individuals will be enlisted symbolically as data collectors of environmental threats, fulfilling their biochemical duty to keep themselves and their families uncontaminated.

Enrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011). Widespread participation is needed, with members of the public serving as passive data-collection nodes, but the program's goals do not include promoting environmental expertise among everyday users. The model for achieving such protection depends on centralized data collection so that experts and authorities can act to minimize or respond to threats. Although public protection may never actually be achieved by this system, it nonetheless advances public–private partnerships that further normalize the collection of sensitive, personal data for purposes of profit and control.

### 3.3. Forging public–private partnerships

The Cell-All program is funded and managed by HSARPA, whose mission is to facilitate the rapid development *and* deployment of new security technologies, mainly through partnerships and contracts with the private sector (U.S. Department of Homeland Security, 2011a). As DHS representatives explain it:

> The most important component of all is delivering the technology into the hands of those who need it so that we're not one of those government R&D labs that's happy to throw something over the wall or end it with a paper. We're actually trying to take this technology all the way to the end. (Dennis, 2011)

HSARPA accelerates this process through direct commercial partnerships, where it funds researchers from both the public and the private sector to develop products that can then be brought to market, even if the only buyers are government agencies.

The resulting neoliberal arrangements mirror those in other industries—such as pharmaceutical research and development, where in the U.S. the vast majority of research is paid for by public funds and conducted in university labs, after which time pharmaceutical companies acquire those research findings to develop profitable drugs without distributing revenue back to the public sector (Angell, 2004; Fisher, 2009). More than simply being pro-business, such arrangements seek to privatize government functions through partnerships and reconstruct the public good as that which benefits industry. Public subsidization of private companies, whether in the domains of homeland security or pharmaceuticals, is rationalized through discourses of efficiency. In the example of Cell-All, DHS justifies such partnerships by saying:

> We believe that technology transfer directly to the commercial [sector] is an efficient way to go. We know that there are a number of commercial opportunities that have been provided to our sensor manufacturers and to the folks who are involved in this program, so we're looking forward to taking advantage of those [opportunities] directly. (Dennis, 2011)

Therefore, although Cell-All is managed and funded by HSARPA, the technologies and infrastructures are being developed by third party contractors who received funding from DHS for those purposes and who can then profit further from the sale of any resulting systems or services (U.S. Department of Homeland Security, 2011a,c). Currently, the primary contractors working on the project are Synkera Technologies, Qualcomm, NC4, and NASA's Ames Research Center, which is the only public agency receiving a contract.

Each of the organizational entities involved in the project are working on separate system components that will be integrated as the project progresses. The exception is the NASA research center, which appears to be on a parallel development track to the industry partner Synkera, although it is not clear how much intellectual property is being transferred from NASA to Synkera or the other companies. In order for the Cell-All public safety sensing and alerting system to be complete, four links must be forged and joined together: the sensor and computing hardware, the sensing application for mobile phones, a centralized server and network operations center, and the end consumer, whether individuals, emergency operations centers, first responders, government agencies, or private companies. Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded "sleeve" for phones—that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011).

Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from Google Play and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android or Apple's iPhone operating systems. When the application is installed it will ask the user for permission to share sensor readings and location information over the network; then, whenever abnormal chemical levels are detected, the phone will send those data to a network gateway. According to Doug Hoffman, program manager at Qualcomm, the gateway will authenticate the sensor and phone to determine whether they are authorized to be on the network, scrub personal information from the data, assign a temporary identification number to the phone, and then send data to the network operations center (NOC) (Hoffman, 2011).

The NOC acts as a data-clustering algorithm that combines and analyzes data from multiple phones in terms of geographical location, time, and chemical level in order to determine whether there is an abnormal public safety event. The NOC servers also have the ability to communicate directly with phones to change the frequency with which the phone is reporting data. For example, if there is a major risk-event involving many cell phones, the NOC can request less frequent reporting so that the network is not overloaded.

If the NOC algorithms determine that there is a potentially dangerous situation, an alert is transmitted to a "risk center" run by the California-based security company NC4. Established in 2001 after the attacks of 9/11, NC4 specializes in "situational readiness," which it aspires to obtain by bridging "the communication gap in a post-9/11 environment between the public sector and the private sector" (Needs, 2011). NC4's customers include both private and public sector organizations oriented toward security, risk management, and emergency response. The company operates two "risk centers," one on each U.S. coast, where analysts receive and vet data from NOCs and other sources before communicating threats to others or assisting with responses. Essentially, NC4 risk centers function as private-sector "fusion centers," much like DHS data fusion centers that are intended to identify threats in advance, assist

law-enforcement investigations, and coordinate responses (Monahan and Palmer, 2009).

According to Chris Needs, product and content manager at NC4, the risk centers perform a "human-in-the-loop" function of looking at raw data from the sensors, comparing them with data from other sources, and translating them into alerts that can be sent, for a fee, to end users, whether first responders, government agencies, individual consumers, or private-sector commercial entities.[2] For example, during the Cell-All live demonstration in 2011, alerts were sent to the Los Angeles emergency operations center, which could have then dispatched first responders or managed the threat were it real. The service provided by NC4's risk centers is marketed as generating "value-added" alerts that can include maps of locations with spikes in sensor readings, "so if you're not familiar with the area you can see how far is this incident from my sensitive assets" (Needs, 2011).

There is certainly a great deal of coordination required by DHS to bring the program components together for Cell-All to even approach operational status. From the start, though, the program has fostered public–private partnerships under the assumption that government agencies are too slow or lack the expertise to develop such a system on their own. This position is neatly articulated by HSARPA:

The acceleration of integrated environmental sensing and the utilization of mobile computing platforms for homeland security establishes a leading edge capability instead of a traditional trailing edge capability that government sometimes has, taking advantage of the latest in new chemical sensor innovation. Delivering these capabilities to the extended homeland security enterprise as a commercial capability makes government technology transfer easier and far more efficient than trying to nurse it along inside of government, so I'm very excited that we have commercial opportunities to take advantage of the technology that's been created here. (Dennis, 2011)

NC4's CEO and president Jim Montagnino puts it a bit more bluntly, actually implying that government bureaucracies invite security threats: "Bureaucratic red tape impedes critical information sharing across organizational boundaries, which leaves the door open to national security threats" (Montagnino, 2012).

Framed in this way, the expedient solution is neither to concentrate on problems that government is equipped to solve, such as passing and enforcing environmental regulations, nor is it to streamline government agencies, although that option certainly exists as an imperative within neoliberal cultures. Rather, the task is seen as finding ways to entice industry to "partner" with government agencies, mainly by ensuring profitability for private companies (Monahan, 2010b). This orientation is evinced by Cell-All's early-stage market research, paid for by HSARPA and administered by Qualcomm. After finding a viable market, industry partners were further persuaded by government contracts to develop systems and services and by the high probability of sustained profits from a range of customers after product development. Clearly, having privileged access to consumer data, even in de-identified, aggregate form, would be of great interest to partnering companies.

### 3.4. Outsourcing privacy protections

During the research and development phase of projects like Cell-All, privacy risks are the responsibility of DHS's S&T Directorate, which conducts privacy impact assessments (PIAs) for

laboratory- and field-testing. However, once S&T raises a technology to operational status, the responsibility for evaluating emerging privacy risks typically falls upon the privacy offices of the respective entities involved, such as Immigration and Customs Enforcement, the Transportation Security Administration, the Coast Guard, or others (U.S. Department of Homeland Security, 2011c). This separation between research and operational responsibilities for privacy protection may have particular implications for Cell-All because the final deployment of the technology will also have a commercial component. When government entities constitute the end-user community, the DHS Privacy Officer may require that privacy impact assessments be incorporated into the implementation process (Clarke, 2009); however, the private companies that will be managing core components of Cell-All are under no such obligations.

While one might expect that the early-stage PIA conducted by DHS would nonetheless anticipate real-world operational deployments of Cell-All, this is not the case. Instead the focus is on ensuring privacy protections for the development and pilot-testing phases (U.S. Department of Homeland Security, 2011b). To accomplish this, DHS adopted what is akin to institutional review board (IRB) review for human subjects research, including obtaining informed consent from participants. Thus, for a 2011 personal safety demonstration of Cell-All at the Los Angeles Fire Department test facilities, first responders participating in the demonstration consented to the transfer of geolocational data over the network but not personally identifiable information, such as mobile phone numbers (U.S. Department of Homeland Security, 2011a). As is standard with informed consent for research, "users participating in the test [were told that they] may turn off their cell phone and stop participating in this test at any time" (U.S. Department of Homeland Security, 2011c: 38). After testing is complete, however, the system "will be transitioned to the private sector and marketed by commercial vendors" (U.S. Department of Homeland Security, 2011c: 39), such that responsibility for privacy protections will be handed off to those companies.

The model of outsourcing privacy protections to private companies engenders some interesting discursive moves on the part of DHS representatives, who say things like: "While Cell All was designed with privacy protections in mind, the end user community must continue to consider privacy when deploying the system for operational use" (U.S. Department of Homeland Security, 2011b: 7). After deployment, those managing the system will determine whether they want to collect cell phone numbers, users' locations and movement, or all chemical readings, rather than only ones deemed "significant." This position is made clear by a DHS privacy impact assessment that states:

Decisions regarding the capture and transmission of additional information (e.g., phone numbers, names of cell phone owner) will also be decided by the end user community, with input from the first responder community, and public health organizations, among others. (U.S. Department of Homeland Security, 2011b: 6)

DHS dismisses any future privacy concerns by implying that individual users will always be able to opt-out of the system if they feel uncomfortable: "Privacy is as important as technology... After all, for Cell-All to succeed, people must be comfortable enough to turn it on in the first place" (U.S. Department of Homeland Security, 2010). For DHS, operational risks are narrowly defined in terms of market failure, not potential problematic uses of personal data, lack of transparency about data being collected and shared, or the coercive effect of technological protocols that may resist easy rejection.

As has been demonstrated with other dimensions of surveillance societies, private companies have an interest in amassing

---

[2] The NC4 analysts continually monitor multiple government and media information streams, including social media.

T. Monahan, J.T. Mokos / Geoforum 49 (2013) 279–288

as much personal data as possible in order to profit, whether by selling convenient products and services to users, providing data for a fee to government agencies, or minimizing risk more generally (Andrejevic, 2007; Lyon, 2001; O'Harrow, 2005). Without specific prohibitions against the collection and use of personal data, projects like Cell-All possess a strong valence toward applications that exceed the original scope of the project. The data produced from the system can also be funneled back to government agencies, just like DHS fusion centers pay to tap the repositories of private data aggregators to assist with investigations, even if such data would be illegal for fusion centers to collect on their own (Monahan and Palmer, 2009). In such situations, the systems can effectively evade public accountability because private companies, who maintain the databases, are shielded from open-records requests.

Privacy threats extend beyond the coercive collection and storage of personal information. Control over who has access to such information is also tenuous, as can be seen, for example, with the numerous cases of hundreds of thousands of electronic records of personal information being hacked, lost, or stolen—from private companies and government agencies alike (Gilliom and Monahan, 2013). Furthermore, even if accessed in aggregate form, data mining and big data analytics can produce startlingly accurate profiles, which could be used to further sort, discriminate against, or commercially target users (Andrejevic, 2011). Data analytics of commercial systems have also revealed the ease with which individual users can be reidentified, even when anonymity has been ensured (Gilliom and Monahan, 2013). Thus, Cell-All and similar systems further the process by which individuals become sensing nodes themselves, communicating valuable data to private companies, government authorities, and peers.

With Cell-All, there is also strong potential for mission creep because of organizational arrangements that make robust privacy protection voluntary and mobile technologies that afford the collection of highly granular data. As Katie Shilton has observed, "At the extreme, mobile phones could become the most widespread embedded surveillance tools in history" (Shilton, 2009: 48). When coupled with environmental sensors, the capacity of mobile phones to identify individuals and track their movements could lead to many kinds of social control and discrimination well beyond the disclosure of personal information. For instance, insurance companies could use such data to cancel an individual's medical coverage or increase premiums because one is routinely exposed to high levels of air pollution because of where he or she lives, works, or commutes. This is not that far fetched as there are existing corollaries with companies charging higher rates for property insurance when people live in high-crime areas, or with companies offering "lifestyle discounts" for people who can prove that they exercise regularly and eat healthy foods (Gilliom and Monahan, 2013). Other scenarios could include companies using sensor data from individuals' phones to make decisions about whom to hire or which employees to discipline; just like organizations currently can demand drug testing, sensor-embedded phones could reveal who is exposed to marijuana or tobacco smoke and therefore who might be deemed to be a risk to the company. The same might hold true for landlords requesting sensor data as a condition for considering tenants' applications, just as many landlords presently require credit checks when considering applications (Neighborhood Link, 2010). This list of examples could easily be expanded, but the point is that based on precedent such systems will lend themselves to coerced participation and sorting of populations based on perceived risk levels, so these outcomes should be anticipated in advance of system deployment.

## 4. Toward empowering participatory sensing

Cell-All serves as an influential case study, particularly because the program shapes technological designs and organizational models that will guide future endeavors in the area of mobile environmental sensing. It advances a dominant paradigm of surveillance predicated upon asymmetrical relations of visibility and control, on one hand, and industry profits, on the other. Additionally, as a case study, Cell-All is emblematic of wider trends in the development of restrictive spatial protocols for locational tracking and sensing. As socially constructed systems, though, such spatial and technological protocols need not be so restrictive, extractive, or controlling. A variety of alternative, more open and participatory designs are circulating, even as DHS and its industry partners are moving toward technological closure on mobile sensing systems.

Several scholars have been actively involved in theorizing such alternative surveillance trajectories, often in conversation with artists, engineers, and activists. For instance, David Murakami Wood has described the possibility of shared surveillance protocols that might build upon the inclusive ideals of universal design and open source movements to enrich people's lives and produce relationships of sociality (Murakami Wood, 2007). Katie Shilton, working through a number of persuasive case studies, refers to participatory sensing as an activity that "is meant to enable (and encourage) anyone to gather and investigate previously invisible data. It tries to avoid surveillance or coercive sensing by emphasizing individuals' participation in the sensing process" (Shilton, 2009: 50). Dana Cuff, Mark Hansen, Jerry Kang argue for embedded-network-sensing applications that advance social empowerment through the creation of a "data commons" that functions as "a data repository generated through decentralized collection, shared freely, and amenable to distributed sense-making not only for the pursuit of science but also advocacy, art, play, and politics" (Cuff et al., 2008: 29).

Many of the projects being developed by UCLA's Center for Embedded Networked Sensing (CENS) attempt to catalyze empowering participatory sensing. For example, the Personal Environmental Impact Report (PEIR) project encourages individuals to use their mobile phones as self-surveillance devices to track their daily exposure to air pollution and calculate their own carbon footprints (Shilton, 2009, 2012). By reading locational data against air-quality alerts and maps, the system determines the amount of pollution one is exposed to over a given time period. Also, by drawing upon the GPS and accelerometer sensors in most mobile phones, PEIR can surmise what mode of transportation one uses for commutes and estimate one's carbon footprint based on those data. The overall aim is clearly one of cultivating public awareness of pollution problems and motivating individuals to change their own behavior to minimize both exposure and contributions to air pollution. Beyond this, CENS seeks to push participatory sensing toward democratic and environmental justice outcomes, encouraging mobile phone users to document egregious pollution conditions, share those data with others, and mobilize findings—in consultation with scientific experts—to influence policymakers (Center for Embedded Networked Sensing, 2008). Although the vision does problematically imply that one could uncover indisputable truths that would necessarily lead to progressive policy changes, the power of this model of participatory sensing is in its semi-open protocol that foments new spatial imaginaries about pollution in urban environments and invites participants to use data for their own ends, whether for changing individual behaviors or organizing for social change.

Another provocative example is the Safecast system, which originated as a collective of individuals using mobile phones and

Geiger counters to map radiation levels in Japan during the nuclear crises precipitated by an earthquake and tsunami in 2011. During this period, many people purchased radiation detectors and shared "readings" through websites and social media as a mechanism by which to achieve collective knowledge about dangers when official information was seen as being insufficient or untrustworthy (**Safecast, 2012**). The Safecast network, which received some institutional support from the MIT Media Lab, embodied a hacker ethos of constructing do-it-yourself sensing technologies and openly sharing information to ensure public safety and achieve political aims (**PBS NewsHour, 2011**). In many respects, Safecast operated through shared protocols to actualize a robust data commons, showing the empowering potential of participatory surveillance. At the same time, the practices of this network may signal an almost complete decline of trust in public institutions, such that the primary purposes may be ensuring self-protection through disaster preparedness and response, not necessarily dismantling risky infrastructures or challenging government truth claims about safety.

The project known as Crowd (Soft) Control offers another foray into empowering possibilities for participatory sensing. Based out of Northwestern University's AquaLab, researchers are designing mobile-phone applications to collect visual and sound data that are currently absent in databases because they exist at sites that are less frequently traversed by mobile phone users (**Rula and Bustamante, 2012**). For instance, urban sound maps that document sound-pollution hotspots may be skewed because they are populated primarily with data along main travel corridors, leaving less traveled routes underrepresented. Similarly, while personal and public image databases are replete with pictures of the front of buildings, there is a dearth of photographs of the side or rear of buildings, where exhaust fumes may be entering through air intake vents. In both of these situations, voids are left in the empirical record such that environmental problems may be unrecorded and therefore invisible within existing systems, making the likelihood of remediation slim. Crowd (Soft) Control seeks to build upon user familiarity with existing smartphone platforms, such as FourSquare or Facebook Places, to incentivize, through virtual rewards, the collection of missing visual and sound data. For instance, AquaLab researchers have devised a prototype for a game called "Ghost Hunter," wherein players must use their mobile phones to take photographs of supposed ghosts, who happen to be in locations where images are currently missing in existing databases (**Rula and Bustamante, 2012**). The intention of the researchers is to collect data that could assist with planning for urban sustainability, while drawing attention to environmental problems. User involvement is highly structured and constrained, so this would not necessarily constitute a democratic or truly participatory sensing system, but it does point to the possibility of progressive outcomes emerging from such projects.

Each of these alternative participatory sensing systems, as well as others like them (e.g., **Chang, 2012; Monahan, 2010a; Ottinger, 2010; The Impact Project, 2012**), offers a strong counterpoint to the controlling tone of security projects like Cell-All. Rather than rely on constructions of threats that invite restrictions of rights, neoliberal outsourcing, and the hardening of urban spaces, such alternatives operate in a register of "cosmopolitan security," which, as Stephen Graham has elaborated, is a mode of security that seeks to "address the real risks and threats that humankind faces in a rapidly urbanizing world prone to resource exhaustion, spiraling food, energy and water insecurity, biodiversity collapse, hyper-automobilisation, financial crises, and global warming…" (**Graham, 2012**: 326). That said, participatory sensing applications oriented toward cosmopolitan security still exist within states of extreme social inequality, so rather than being empowering in any universal way, they may instead highlight conditions of unequal exposure and invite conversations about persistent environmental racism and injustice (**Monahan and Mokos, 2010**). As with other forms of interactive surveillance, such systems also run the risk of being captured by commercial or security interests such that the data could be used for purposes that were not initially intended (**Ellerbrok, 2011**); thus, a certain amount of vigilance will be necessary to keep protocols open and directed toward social justice ends.

## 5. Conclusion

Crowdsourced sensing systems may drastically restructure spatial imaginaries as people learn to see and engage with heretofore largely hidden dimensions of urban spaces. While the design of these technological systems is contingent and currently open to varied outcomes, powerful security and industry players are asserting their influence to set overriding protocols that will ensure widespread ambient data collection, especially for security and commercial applications. In order to assess the politics of these emerging systems, this paper has mapped some of the institutional arrangements guiding technological development and analyzed the logics behind design decisions.

With DHS's Cell-All project, the vision for participation is one where members of the public act as passive data collectors for an almost completely closed system, where participants do not have access to data or environmental alerts beyond the individual level and where there are no opportunities for defining outcomes. The public, in this model, will be enticed or coerced to engage in the labor of being watched. This may happen through promises of protection from gas or chemical poisoning, through patriotic goals of averting mass casualties from terrorist attacks, or simply through invisible protocols that opt users in to data collection and sharing. At the same time, information systems are always embodied (**Blanchette, 2012; Kitchin and Dodge, 2011**), so as this version of participatory sensing grows, spatial protocols may emerge to sort and direct flows of individuals, perhaps giving priority access at security checkpoints or commercial venues to people voluntarily participating in the system—or singling out non-participants for added scrutiny or exclusion.

The Cell-All system also seeks to produce innovative organizational arrangements that advance research and development through public–private partnerships. DHS programs like Cell-All identify a narrow set of statistically unlikely scenarios, such as chemical attacks of public places or carbon monoxide poisoning, then frame problems in such a way that private-sector solutions are seen as the most reasonable and expedient. Viability for commercial success is measured through market research, and financial risks to participating companies are offset through DHS grants and assurances of a guaranteed market of government agencies and first responders upon project deployment. The program will produce data, which are viewed as being inherently positive. Industry partners stand to profit as well from vast repositories of personal data collected from millions of mobile phones, even if the uses of such sensor data are not yet defined.

Finally, by outsourcing privacy protections to companies and agencies implementing them, DHS both sidesteps responsibility for ensuring adequate protection of personal data and opens the field for industry partners to discover profitable uses for data. Privacy impact assessments, which may be required of security systems implemented by government agencies, are conducted only for the relatively innocuous development and testing phases of the project. In actual use, companies can collect data freely as long as they receive consent from users, such as in the form of license agreements that people routinely accept without reading (**Böhme and Köpsell, 2010**). The mission creep potentials of such surveillance systems are high. More than simply being a threat to privacy,

sensor data could lead to discrimination against individuals or groups who are perceived as living in risky environments or possessing risky lifestyles; precedents are already in place for such institutionalized forms of discrimination based on credit checks, drug tests, or health history, so sensor data from phones—were they readily available—could easily contribute to such practices. Alternative participatory sensing systems offer templates for how environmental data could be collected in ways that are more democratic, encouraging of the development of user expertise, and dedicated to social and environmental justice. In short, the potential is there to harness such surveillance systems in the pursuit of cosmopolitan security and social equality (Graham, 2012). Because environmental threats are not distributed evenly, in order to achieve the progressive goals of their designers, such alternative systems must foster collective understandings of and responsibility for toxic exposure so that mitigation of risk will not be further individualized without altering the systems producing threats. If encoded in sociotechnical systems and practices, the cultivation of shared risk-recognition or environmental threats could serve as a powerful corrective to Cell-All's emphasis on individual responsibility, centralized control, and industry profits. That said, while some of these alternatives, like Safecast, are much more robust and functional at present than DHS's Cell-All, the restrictive technological protocols being established by DHS and its partners are creating a data enclosure that threatens to defer, perhaps indefinitely, the more laudable vision of a data commons.

## References

Adey, P., 2006. Divided we move: the rhizomics of airport security and surveillance. In: Monahan, T. (Ed.), Surveillance and Security: Technological Politics and Power in Everyday Life. Routledge, New York, pp. 195–208.

Akrich, M., 1992. The de-scription of technological objects. In: Bijker, W.E., Law, John (Eds.), Shaping Technology/Building Society: Studies in Sociotechnical Change. The MIT Press, Cambridge, MA, pp. 205–224.

Altheide, D., 2006. Terrorism and the Politics of Fear. Altamira Press, Lanham, MD.

Andrejevic, M., 2002. The work of being watched: interactive media and the exploitation of self-disclosure. Critical Studies in Media Communication 19 (2), 230–248.

Andrejevic, M., 2007. iSpy: Surveillance and Power in the Interactive Era. University Press of Kansas, Lawrence, Kan.

Angell, M., 2004. The Truth about the Drug Companies: How They Deceive Us and What to Do About It. Random House, New York.

Associated Press, 2009. South Carolina: Ammonia Cloud Kills Woman. New York Times. <http://www.nytimes.com/2009/07/16/us/16brfs-AMMONIACLOUD...>

Barnard-Wills, D., 2012. Surveillance and Identity: Discourse, Subjectivity and the State. Ashgate, Burlington, VT.

Barrie, A., 2011. Smartphones take on Silent Killers as Portable Danger Detectors. Fox News, September 29. <http://www.foxnews.com/tech/2011/09/28/cell-phones-take-on-silent-killers/> (accessed 17.09.12).

Blanchette, J.-F., 2012. Computing as if infrastructure matered. Communications of the ACM 55 (10), 32–34.

Boddy, J., 2007. Alternative embodiment: hardened sites and softened symbols. In: Sorkin, M. (Ed.), Indefensible Space: The Architecture of the National Insecurity State. Routledge, New York, pp. 277–301.

Böhme, A., Koperll, S., 2010. Trained to accept?: A field experiment on consent to facial recognition. In: Proceedings of the 28th International Conference on Human Factors in Computing Systems, Atlanta, GA, pp. 2403–2406.

Charmaz, K., 2006. Constructing Grounded Theory: A Practical Guide through Qualitative Analysis. second ed. Sage Publications, Thousand Oaks.

Clarke, R., 2009. Privacy impact assessment: its origins and development. Computer Law and Security Review 25 (2), 123–135.

Coaffee, J., 2004. Rings of steel, rings of concrete and rings of confidence: designing out terrorism in central London pre and post September 11th. International Journal of Urban and Regional Research 28 (1), 201–211.

Coaffee, J., Murakami Wood, D., Rogers, P., 2009. The Everyday Resilience of the City: How Cities Respond to Terrorism and Disaster. Palgrave Macmillan, Basingstoke, England.

Crang, M., Graham, S., 2007. Sentient cities: ambient intelligence and the politics of urban space. Information, Communication and Society 10 (6), 789–817.

Curry, M.R., Phillips, D.J., Regan, P.M., 2004. Emergency response systems and the creeping legibility of people and places. The Information Society 20, 357–369.

Elterich, A., 2011. Playful biometrics: controversial technology through the lens of play. The Sociological Quarterly 52 (4), 528–547.

Finn, M.A., Wright, D., 2012. Unmanned aircraft systems: surveillance, ethics and privacy in our public spaces. Computer Law and Security Review 28 (2), 184–194.

Gilliom, J., Monahan, T., 2012. SuperVision: An Introduction to the Surveillance Society. University of Chicago Press, Chicago.

Graham, S., 2010. Cities Under Siege: The New Military Urbanism. Verso, London.

Graham, S., 2012. Digital medieval: surveillance and society 9 (3), 321–327.

Graham, S., Wood, D., 2003. Digitizing surveillance: categorization, space, inequality. Critical Social Policy 23 (2), 227–248.

Haggerty, K.D., Ericson, R.V., 2006. The new politics of surveillance and visibility. In: Haggerty, K.D., Ericson, R.V. (Eds.), The New Politics of Surveillance and Visibility. University of Toronto Press, Toronto, pp. 3–25.

Hoffman, P., 2011. Qualcomm Project Presentation: Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcast.es.nv/home/homepage.php> (accessed 17.09.12).

King, M., Bailey, C., 2009. Carbon monoxide – related deaths in the United States, 1999–2004. Morbidity and Mortality Weekly Report (CDC) 58 (50), 1309–1312.

Kitchin, R., Dodge, M., 2011. Code/Space: Software and Everyday Life. The MIT Press, Cambridge, MA.

Klauser, F.R., 2010. Splintering spheres of security: Peter Sloterdijk and the contemporary fortress city. Environment and Planning D: Society and Space 28 (2), 326–340.

Klauser, F.R., Ruegg, J., November 3., 2004. Airport surveillance between public and private interests: CCTV at Geneva International Airport. In: Salter, M.B. (Ed.), Politics at the Airport. University of Minnesota Press, Minneapolis, pp. 105–126.

Koskela, H., 2000. 'The gaze without eyes': video-surveillance and the changing nature of urban space. Progress in Human Geography 24 (2), 243–265.

Li, J., 2011. Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcast.es.nv/home/homepage.php> (accessed 17.09.12).

Lianos, M., Douglas, M., 2000. Dangerization and the end of deviance. British Journal of Criminology 40 (2), 261–278.

Lyon, D., 2001. Surveillance Society: Monitoring Everyday Life. Open University Press, Buckingham, England; Philadelphia.

Lyon, D., 2003. Surveillance as Social Sorting: Privacy, Risk, and Digital Discrimination. Routledge, New York. <http://www.loc.gov/catdir/enhancements/fy0650/2002075104-d.html>.

Magnet, S., 2011. When Biometrics Fail: Gender, Race, and the Technology of Identity. Duke University Press, Durham.

Monahan, T., 2010b. Surveillance in the Time of Insecurity. Rutgers University Press, New Brunswick.

Monahan, T., 2010. Sensing environmental danger in the city. New Media. International Review of Information Ethics 13, 21–27.

Monahan, T., Palmer, N.A., 2009. The emerging politics of DHS fusion centers. Security Dialogue 40 (6), 617–636.

Monahan, T., 2012. NC4 Situational Readiness solutions to Manage Risks. <http://www.nc4.us> (accessed 06.03.12).

Murakami Wood, D., 2007. Persistent Surveillance: Enabling Environments of Embedding Inequalities. Workshop on Surveillance and Inequality, Arizona State University.

Murakami Wood, D., 2009a. Chicago: The Future of US CCTV? Notes from the Ubiquitous Surveillance Society. <http://ubisurv.wordpress.com/2009/02/21/chicago-the-future-of-us-cctv/> (accessed 17.09.12).

Murakami Wood, D., 2009b. Where Will the Big Red Balloons be Next? Notes from the Ubiquitous Surveillance Networked Society. <http://ubisurv.wordpress.com/2009/12/04/big-red-balloon/> (accessed 16.09.12).

Murakami Wood, D., Webster, C.W.R., 2011. The normative of living in surveillance societies. Information Government 3 (2), 151–164.

Neighborhood Link, 2010. How Landlords Can Use Credit Scoring to Make Rental Decisions. <http://www.neighborhoodlink.com/article/Homeowner/Credit_Scoring_Rentals> (accessed 18.07.11).

Woodhouse, E. Hess, D., Breyman, S., Martin, B., 2002. Science studies and activism: possibilities and problems for reconstructivist agendas. Social Studies of Science 32 (2), 297–319.

Winner, L. 1986. The Whale and the Reactor: A Search for Limits in an Age of High Technology. University of Chicago Press, Chicago.

Whitson, J.R., Haggerty, K.D., 2008. Identity theft and the care of the virtual self. Economy and Society 37 (4), 572–594.

Weber, J., 2011. Techno-security, risk and the militarization of everyday life. In: Conference on "The Computational Turn: Past, Present, Futures?". Aarhus University, pp. 168–173.

Wall, T., Monahan, T., 2011. Surveillance and violence from afar: the politics of drones and liminal security-scapes. Theoretical Criminology 15 (3), 239–254.

Verrico, J.S., 2011. Welcome and Opening Remarks. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcast.on.tv/home/homepage.php> (accessed 17.09.12).

U.S. Department of Homeland Security, 2011a. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcast.on.tv/home/homepage.php> (accessed 17.09.12).

U.S. Department of Homeland Security, 2011b. Privacy Impact Assessment for the Cell All Demonstration. <http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_st_cell_all.pdf> (accessed 19.09.12).

U.S. Department of Homeland Security, 2011c. Transcript of the Meeting of the Data Privacy and Integrity Advisory Committee, May 19. <http://www.dhs.gov/xlibrary/assets/privacy/dhsprivacy_dpiactranscript_may19201 1mtg.pdf> (accessed 17.09.12).

O'Harrow, R., 2005. No Place to Hide. Free Press, New York.

Ozlinger, G., 2010. Constructing empowerment through interpretations of environmental surveillance data. Surveillance and Society 8 (2), 221–234.

PBS Newshour, 2011. Safecast Draws on Power of the Crowd to Map Japan's Radiation, November 10. <http://www.pbs.org/newshour/bb/science/july-dec11/japanradiation_11-10.html> (accessed 17.09.12).

Rula, J., Bustamante, F.E., 2012. Crowd (soft) control: moving beyond the opportunistic. In: Proc. of the Thirteenth Workshop on Mobile Computing Systems and Applications (HotMobile), San Diego, CA.

Safecast, 2012. Safecast. <http://blog.safecast.org/> (accessed 17.09.12).

Shilton, K., 2009. Four billion little brothers?: privacy, mobile phones, and ubiquitous data collection. Communications of the ACM 52 (11), 48–53.

Shilton, K., 2012. Participatory personal data: an emerging research challenge for the information sciences. Journal of the American Society for Information Science and Technology 63 (10), 1905–1915.

Syntrex Technologies, 2011. Chemical Sensors for Mobile Devices. <http://www.syntrex.com/sensors/chemical-sensors-for-mobile-devices.html> (accessed 10.09.12).

The Impact Project, 2012. Trade, Health and Environment Impact Project. <http://theimpactproject.org/index.html> (accessed 17.09.12).

Thrift, N., French, S., 2002. The automatic production of space. Transactions of the Institute of British Geographers 27 (4), 309–335.

U.S. Department of Homeland Security, 2007. Cell-All Ubiquitous Biological and Chemical Sensing. <https://http://www.fbo.gov/index?s=opportunity&mode=form&id=7292c71db4b6777a3ff8ca64ef56658f8&tab=core&_cview=1> (accessed 17.09.12).

U.S. Department of Homeland Security, 2010. Cell-All: Super Smartphones Sniff Out Suspicious Substances. <http://www.dhs.gov/cell-all-super-smartphones-sniff-out-suspicious-substances> (accessed 17.09.12).



PRIORITY MAIL EXPRESS®

UNITED STATES POSTAL SERVICE®

EI 393 697 257 US

FROM: (PLEASE PRINT) PHONE 864 288-5605

LARRY GOLDEN
710 WOODRUFF RD.
#2102
GREENVILLE SC 39607

FOR PICKUP OR TRACKING CALL 1-800-222-18
Para recolección o localización, llame al 1-800-222-18

U.S. POSTAGE PAID
PME 1-DAY
GREENVILLE, SC
29616
AUG 22 22
AMOUNT
$26.95
R2305KI 42754-13

DESTINATARIO
El remitente ha requerido notificación
inmediata contra entrega. Por favor llame.
Nombre:
Teléfono: (      )

www.usps.com