UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**FILED**

SEP 12 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN<br><br>*Pro Se* Plaintiff,<br><br>V.<br><br>QUALCOMM INC.<br><br>Defendant. | CASE NO: 4:22-cv-03283-HSG<br><br>**(JURY TRIAL DEMANDED)**<br><br>**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**<br><br>September 10, 2022 |

## PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PERMANENT INJUNCTIVE RELIEF

Defendant has based its entire defense on "Plaintiff is a serial filer of *frivolous* complaints". Evidence of Defendant's defense can be found at:

- Dkt. 6 Filed 07/22/2022 MOTION to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim filed by Qualcomm, Inc. Plaintiff's case as "frivolous" is referenced 66 times throughout Qualcomm's MOTION to Dismiss. The "frivolity" of

Plaintiff's case is referenced 10 times throughout Qualcomm's MOTION to Dismiss. Google is referenced 7 times throughout Qualcomm's MOTION to Dismiss.

- Dkt. 24 Filed 08/08/2022 OPPOSITION/RESPONSE (re 15 MOTION for Default Judgment by the Court as to) filed by QUALCOMM, Inc. Plaintiff's case as "frivolous" is referenced 20 times throughout Qualcomm's OPPOSITION/RESPONSE. The "frivolity" of Plaintiff's case is referenced 1 times throughout Qualcomm's OPPOSITION/RESPONSE. Google is referenced 7 times throughout Qualcomm's MOTION to Dismiss.

- Dkt. 38 Filed 09/06/2022 OPPOSITION/RESPONSE (re 34 MOTION for Permanent Injunction) filed by QUALCOMM, Inc. Plaintiff's case as "frivolous" is referenced 22 times throughout Qualcomm's OPPOSITION/RESPONSE. The "frivolity" of Plaintiff's case is referenced 5 times throughout Qualcomm's OPPOSITION/RESPONSE.

In the related CAFC Case No. 22-1267, *Larry Golden v. Google LLC*, OPINION and JUDGEMENT; filed 09/08/2022, the Federal Circuit rejects the lower court's opinion that Plaintiff's claims of patent infringement are facially frivolous: **Exhibit A**

"In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189. The district court discounted this claim chart because it "contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far-left column instead of Apple." Dist. Ct. Op. at 4. But to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to. The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner."

"We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. Our decision does not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment. We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

## THE FEDERAL CIRCUIT'S DECISION RENDERED QUALCOMM'S DEFENSE AS "MOOT" AND SHOULD BE STRICKEN FROM THE RECORD

In Plaintiff's "Complaint for Patent Infringement"; filed 01/26/2021, as Dkt. 1, in the U.S. District Court for the District of South Carolina – Greenville; *Larry Golden v. Google LLC.*, Case No. 6:21-cv-00244-JD: **Exhibit B**. Qualcomm is referenced 27 times throughout the Complaint. Qualcomm's "Snapdragon" chipset(s) are referenced 17 times throughout the Complaint.

In Exhibit B there's a full section that describes Plaintiff's alleged "Google's Joint Infringement with Qualcomm" ¶¶ 27 – 38; Plaintiff describes with enough factual details Plaintiff's "joint infringement" claim between Google and Qualcomm. See the related CAFC case No. 22-1267, *Larry Golden v. Google LLC*, OPINION and JUDGEMENT:

> "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

## QUALCOMM'S FAILED DEFENSE FOR FRIVOLOUSNESS MAKES THIS CASE "RIPE" FOR INJUNCTIVE RELIEF

Qualcomm "extorts", through its anticompetitive licensing practices, at least a 5% running royalty rate on the price of each handset sold. The handset is regularly referred to as Plaintiff's patented new and improved cell phone, smartphone, or CMDC device];

Qualcomm "ties" Plaintiff's patented central processing units (CPUs) to its cellular modems to form what is commonly referred to as systems-on-a-chip or chipsets and force its customers to purchase the chipsets by threatening "no license, no chips"; then,

Qualcomm, after receiving knowledge in 2010 of Plaintiff's CPUs and CMDC devices; "forcibly supplied" ["no license, no chip"] the OEMs with the chipsets that includes Plaintiff's CPUs; thereby contributing [contributory infringement] to the OEMs infringement of Plaintiff's patented new and improved cell phone, smartphone, or CMDC device.

3

Qualcomm's anticompetitive practices in this active case are consistent with Qualcomm's anticompetitive practices of the past. *See*, United States District Court Southern District of California: *APPLE INC.*, Plaintiff, vs. *QUALCOMM INCORPORATED*, Defendant. Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 **Exhibit C**

**Qualcomm's Extortion**

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.8 Page 8 of 104
"11. For years, Qualcomm has abused its business relationships with Apple and blocked competitors from selling chipsets. Qualcomm's recent effort to cover its tracks—by punishing Apple for providing truthful testimony at the request of government regulators—underscores the lengths to which Qualcomm will go to protect its extortion scheme. Accordingly, Apple seeks this Court's intervention, bringing breach of contract claims, patent claims, and antitrust claims, as the basis for declaratory relief, injunctive relief, and damages."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.14 Page 14 of 104
"36. To address the economic effects of standardization that would artificially inflate royalties for SEPs, SSOs require participants claiming to own SEPs to identify and disclose those patents publicly and to promise to offer licenses for those patents to all implementers of the standard either royalty-free or on FRAND terms. If a patent holder does not choose to make this promise, SSOs generally design the standard without using the patented technology. Qualcomm's failure to stick to its end of the FRAND bargain is an essential element of its scheme of relentless extortion. Qualcomm induced SSOs to adopt Qualcomm technology within the standard and then knowingly repudiated its obligation to license its SEPs on reasonable terms."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 Pages 17-18 of 104
"51. Qualcomm's breach of its FRAND commitments, described in significant detail below, is a foundation of its scheme to acquire and abuse monopoly power in the cellular industry. By refusing to license its SEPs to competing chipset manufacturers, and by refusing to sell its chipsets to customers unless they first license Qualcomm's SEPs, Qualcomm forced purchasers of its chipsets to take a license to its SEPs at extortion-level royalties. By threatening "disloyal" chipset customers with even less-favorable royalties and license terms if they purchased chipsets from Qualcomm's competitors, discriminating between potential licensees by refusing to license its SEPs to competitors, and offering only "rebates" rather than a direct FRAND license, Qualcomm excluded competition in the chipset market. And by foreclosing competitors from

dealing with Apple, a key purchaser of chipsets, Qualcomm facilitated the marginalization and exit of many of those competitors, enhancing its own monopoly power."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.24 Page 24 of 104
"75. The following diagram illustrates the complex web of contracts, some of them secret contracts, that underlie Qualcomm's scheme of relentless extortion and govern the two companies' business relationship:"

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.54 Page 54 of 104
"185. All of Apple's statements to government agencies investigating Qualcomm's anticompetitive and extortionist licensing practices were true, to the best of Apple's knowledge and understanding at the time the statements were made. Qualcomm has identified only a handful of statements that it contends were inaccurate, none of which was inaccurate."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.89 Page 89 of 104
"355. Second, paragraph 2 of Section 7 of the BCPA violates Section 2 of the Sherman Act by shielding Qualcomm's non-FRAND licensing scheme from scrutiny by the judiciary and by government enforcement agencies. The BCPA's gag clause prevented Qualcomm's illegal and extortionate scheme from coming to light for years, and thereby enhanced and extended Qualcomm's monopoly power in the relevant chipset markets."

**Qualcomm's Threats**

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.8 Page 8 of 104
"10. Qualcomm has recently demonstrated that it will file lawsuits following **threats** to assert its patents. The asserted patents in this case include patents that are U.S. counterparts of Chinese patents that Qualcomm has asserted in litigation against Meizu Technology Co., Ltd. ("Meizu") and that Qualcomm has declared as essential to the 3G/UMTS and/or 4G/LTE standard. These patents are not, in fact, essential to 3G/UMTS or 4G/LTE ... Moreover, if any of these patents were essential, Qualcomm's licensing demands violate patent law and its FRAND obligations."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 Pages 12-13 of 104
"32. Where standardized technologies are covered by patents, called standard-essential patents ("SEPs"), companies that choose to implement a standard are often required to practice those patents. Without safeguards, patent holders could demand inflated or discriminatory royalties from product companies who have no choice but to use the technology, threaten to block a

targeted company from implementing or practicing the standard, and demand and obtain royalty payments based not on the market value of their patents over alternative technologies, but on the costs and impossibility of switching away from standardized technology. This abuse is called "patent hold-up" and occurs "when the holder of a standard-essential patent ('SEP') demands excessive royalties after companies are locked into using a standard." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014); see also U.S. Dep't of Justice & U.S. Dep't of Commerce, Patent & Trademark Office, Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments (Jan. 8, 2013), https://www.justice.gov/sites/default/files/atr/legacy/2014/09/18/290994.pdf. Higher royalties eliminate choice and may be passed on in the form of higher prices, harming consumers. The **threat** of hold-up also tends to reduce the value of standard setting, leading firms to rely less on the standard-setting process and depriving consumers of the substantial procompetitive benefits of standard setting."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 Pages 17-18 of 104
"51. Qualcomm's breach of its FRAND commitments, described in significant detail below, is a foundation of its scheme to acquire and abuse monopoly power in the cellular industry. By refusing to license its SEPs to competing chipset manufacturers, and by refusing to sell its chipsets to customers unless they first license Qualcomm's SEPs, Qualcomm forced purchasers of its chipsets to take a license to its SEPs at extortion-level royalties. By threatening "disloyal" chipset customers with even less-favorable royalties and license terms if they purchased chipsets from Qualcomm's competitors, discriminating between potential licensees by refusing to license its SEPs to competitors, and offering only "rebates" rather than a direct FRAND license, Qualcomm excluded competition in the chipset market. And by foreclosing competitors from dealing with Apple, a key purchaser of chipsets, Qualcomm facilitated the marginalization and exit of many of those competitors, enhancing its own monopoly power."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.47 Page 47 of 104
"158. A patent non-assert agreement or other contractual arrangement short of an exhaustive license is not a substitute for an exhaustive license because it gives Qualcomm the ability and incentive to interfere with its competitors' relationships with their customers. By contrast, a FRAND license would give competing chipset manufacturers the right to market authorized, patent-exhaustive sales of chipsets to Apple and other mobile device suppliers. Qualcomm's failure to license on FRAND terms eliminates the ability of Apple and other mobile device

suppliers to purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm, and thus exposes Apple and other mobile device suppliers to the threat of exorbitant non-FRAND **royalties based on the price of their mobile devices**, a threat which Qualcomm has used to force Apple to deal exclusively with Qualcomm on the purchase of chipsets."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.60 Page 60 of 104

"216. As a result of Qualcomm's contractual breach, Apple has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.62 Page 62 of 104

"227. As a result of Qualcomm's breach of the implied covenant of good faith and fair dealing, Apple has been injured in its business or property, and is threatened by imminent loss of profits, loss of actual and potential customers, and loss of goodwill and product image."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.87 Page 87 of 104

"351. **Since at least 2007**, Qualcomm has engaged in systematic, continuous conduct to exclude competition in the relevant chipset markets. Qualcomm's anticompetitive and exclusionary conduct is a multi-faceted but synergistic whole, with each of the parts making possible and reinforcing the effects of the others. Qualcomm's anticompetitive conduct is based on the breach of its FRAND commitments for its SEPs, which in turn gives Qualcomm the power to force purchasers of its chipsets to first take a license to its SEPs, threaten disloyal chipset customers with exorbitant SEP royalties, and to tie access to lower (but still far above FRAND) royalties to exclusivity or near-exclusivity in the purchase of Qualcomm chipsets. This conduct has foreclosed Qualcomm's competitors from dealing with Apple, a key purchaser of chipsets, leading to the marginalization and exit of many of those competitors, and to the acquisition and maintenance by Qualcomm of monopoly power. But-for Qualcomm's conduct as alleged herein, rival chipset manufacturers would have become stronger competitors to Qualcomm."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.88 Page 88 of 104

"353. First, Qualcomm's refusal to offer SEP licenses on FRAND terms to its competitors, as alleged above, is an unlawful refusal to deal with competitors and an act of monopolization under Section 2 of the Sherman Act. A FRAND license would give competing chipset manufacturers the right to market authorized, patent exhaustive sales of chipsets to Apple and other mobile device suppliers. Qualcomm's failure to license on FRAND terms eliminates the

ability of Apple and other mobile device suppliers to purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm, and thus exposes Apple and other mobile device suppliers to the **threat** of exorbitant non-FRAND **royalties based on the price of their mobile devices**, a **threat** which Qualcomm uses to force Apple and others to deal exclusively or near-exclusively with Qualcomm on the purchase of chipsets. In this way, Qualcomm's refusal to offer a FRAND license to competitors has a close causal connection with the acquisition and maintenance of monopoly power in the LTE chipset market. But-for Qualcomm's FRAND evasion, Qualcomm would have been forced to offer exhaustive patent licenses to its cellular SEPs on FRAND terms to Intel, Broadcom, and others."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 Pages 91-92 of 104

"365. Competition agencies around the world have found similar restraints to be anticompetitive. For example, the European Commission found it anticompetitive that a SEP owner insisted, under the threat of the enforcement of an injunction, that Apple give up its rights to challenge the validity or infringement by Apple's mobile devices of those SEPs. Similarly, the NDRC in 2015 fined Qualcomm nearly $1 billion for anticompetitive conduct that included the imposition of contract terms on device manufacturers that penalized, but did not expressly prevent, them from challenging Qualcomm's SEP licensing. The FTC recently alleged that Qualcomm's anticompetitive business model was premised on just such a practice of coercing customers into abandoning FRAND determinations by the courts or neutral third parties, and filed suit to permanently enjoin the scheme."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.93 Page 93 of 104

"368. Qualcomm's high nominal royalty rates for its SEPs give handset manufacturers powerful incentives to seek discounts off those rates, particularly manufacturers of feature-rich smartphones and tablets such as Apple, who are disproportionately burdened by Qualcomm's royalty structure. Qualcomm uses the threat of its high nominal royalty rates for its SEPs to force Apple and other device manufacturers to purchase substantial quantities of its baseband processor chipsets, offering in exchange to reduce the royalty for its SEPs to levels closer to, although still far above, the range required by FRAND."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.93 Page 93 of 104

"369. Through threatening to impose non-FRAND royalties for its SEPs, and then conditioning discounts off of those confiscatory royalty rates on chipset loyalty, Qualcomm exercises

substantial market power. In particular, Qualcomm exercises this power directly, by charging SEP royalties far in excess of FRAND rates, and indirectly, by forcing the purchase of substantial quantities of a second product—baseband processor chipsets—… Qualcomm's ability to impose a burdensome tie of a license to its SEPs and its baseband processor chipsets is direct evidence of the exercise of monopoly power."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.98 Page 98 of 104
"385. In addition, as alleged above, Qualcomm has unlawfully monopolized the markets for CDMA chipsets and premium LTE chipsets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. This action "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co., 973 P.2d 527, 544 (Cal. 1999)."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 Pages 98- 99 of 104
"387. Qualcomm's unlawful business acts and practices significantly threaten and harm competition in the market for mobile wireless handsets, tablets, and other CDMA- and LTE-compliant products, in California and elsewhere, thereby causing injury to consumers. These threatened injuries include the inevitable passing on to consumers of improper royalties demanded by Qualcomm."

Case 3:17-cv-00108-GPC-MDD Document 1 Filed 01/20/17 PageID.99 Page 99 of 104
"388. Qualcomm's unlawful and deceptive business acts and practices are a direct and proximate cause of injury to Apple. Apple has suffered harm in California and elsewhere as a supplier of handsets, tablets, and other CDMA- and LTE-compatible products. Further, Apple has suffered or faces the threat of loss of profits, loss of customers and potential customers, and loss of goodwill and product image in the market for CDMA- and LTE-compatible products."

**Qualcomm's "non-FRAND"**
- "Qualcomm's demand violates the law governing patent royalties, as well as Qualcomm's FRAND promises to ETSI and others. Qualcomm repeated such non-FRAND terms in a draft "rest of the world" 3G/4G SEP license." (Page 34)
- "Qualcomm's failure to license on FRAND terms eliminates the ability of Apple and other mobile device suppliers to purchase chipsets from Qualcomm's competitors without

also paying royalties to Qualcomm, and thus exposes Apple and other mobile device suppliers to the threat of exorbitant non-FRAND **royalties based on the price of their mobile devices**, a threat which Qualcomm has used to force Apple to deal exclusively with Qualcomm on the purchase of chipsets." (Page 47)

- "As a condition of even partial relief from its non-FRAND royalties, Qualcomm sought to gag Apple and prevent it from bringing its concerns to law enforcement or challenging Qualcomm's compliance with FRAND commitments." (Page 48)

- "The FTC recently alleged that Qualcomm's ongoing anticompetitive scheme is premised on avoiding governmental scrutiny of its non-FRAND licensing scheme, including by deterring device manufacturers from seeking FRAND determinations by withholding supply of Qualcomm's monopoly chipsets. According to the FTC, Qualcomm's "no license-no chip" policy effectively denies OEMs the opportunity to challenge Qualcomm's royalty demands" by "dramatically increasing OEMs' costs of going to court." FTC Compl. ¶ 78, Qualcomm, No. 5:17-cv-00220." (Page 48)

- "Qualcomm's exclusionary conduct includes (i) refusing to deal with competitors, in contravention of its FRAND commitments, (ii) gagging Apple's ability to challenge Qualcomm's non-FRAND licensing scheme, through paragraph 2 of Section 7 of the BCPA; (iii) tying the purchase of its chipsets to the licensing of its SEPs; and (iv) requiring exclusivity from Apple as a condition of partial relief from Qualcomm's exorbitant and non-FRAND royalties." (Page 88)

- "Qualcomm's failure to license on FRAND terms eliminates the ability of Apple and other mobile device suppliers to purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm, and thus exposes Apple and other mobile device suppliers to the threat of exorbitant non-FRAND **royalties based on the price of their mobile devices**, a threat which Qualcomm uses to force Apple and others to deal exclusively or near-exclusively with Qualcomm on the purchase of chipsets." (Page 88)

- "Second, paragraph 2 of Section 7 of the BCPA violates Section 2 of the Sherman Act by shielding Qualcomm's non-FRAND licensing scheme from scrutiny by the judiciary and by government enforcement agencies. The BCPA's gag clause prevented Qualcomm's illegal and extortionate scheme from coming to light for years, and thereby enhanced and extended Qualcomm's monopoly power in the relevant chipset markets." (Page 89)

- "No other device manufacturer likely would have benefitted as much as Apple from the introduction of additional competition in the chipset market, and for these reasons muzzling Apple through … the BCPA contributed significantly to the maintenance of Qualcomm's non-FRAND licensing and the monopoly power it made possible." (Pg. 91)
- "By limiting Apple's ability and incentive to challenge Qualcomm's compliance with FRAND, Section 7, paragraph 2 of the BCPA harmed competition and consumers. Specifically, Section 7, paragraph 2 allowed Qualcomm to continue to charge non-FRAND royalties at the expense of consumers …" (Page 91)
- "By ensuring that all chipset purchasers must negotiate a license to Qualcomm's SEPs, regardless of where those chipsets are purchased, Qualcomm gains the ability to levy a tax—in the form of non-FRAND royalties—on the chipsets sold by Qualcomm's competitors. By giving Qualcomm the ability to levy a tax on the chipsets sold by its competitors, the Authorized Purchaser requirement gives Qualcomm the ability to raise its rivals' costs and make them less effective competitors. In this way, the Authorized Purchaser requirement is exclusionary, giving Qualcomm the power to exclude competition and harm device manufacturers, including Apple, through the imposition of non-FRAND royalties and monopoly overcharges on chipsets." (Pages 92-93)
- "Through threatening to impose non-FRAND royalties for its SEPs, and then conditioning discounts off of those confiscatory royalty rates on chipset loyalty, Qualcomm exercises substantial market power. In particular, Qualcomm exercises this power directly, by charging SEP royalties far in excess of FRAND rates, and indirectly, by forcing the purchase of substantial quantities of a second product—baseband processor chipsets—that Apple and other customers would prefer to purchase from Qualcomm's rivals, and by seeking to impose other burdensome terms, including cross-licenses to non-SEPs." (Page 93)
- "Order Qualcomm to disgorge non-FRAND royalties that Qualcomm previously extracted from Apple, including royalties paid through Apple's CMs, and pay such unjust gain to Apple;" (Page 100)
- "Enjoin Qualcomm from imposing or enforcing any unlawful and/or non-FRAND terms and conditions relating to Apple's iPhones and iPads;" (Page 101)

**Qualcomm's "tie-in"**

- "By tying together, the markets for chipsets and licenses to technology in cellular standards, Qualcomm illegally enhances and strengthens its monopoly in each market and eliminates competition." (Page 7)
- "Downstream consumers purchase cell phones that include chipsets configured to operate using the standards chosen for a particular network, inextricably tying those consumers to that standard." (Page 20)
- "Further, the royalty rates that Qualcomm demands, a simple percentage of the final price of the finished device, have no apparent tie to the merits of Qualcomm's cellular SEP portfolio. "Qualcomm's demand violates the law governing patent royalties, as well as Qualcomm's" (Page 40)
- "In addition, Qualcomm's exorbitant royalty demands lay the foundation for the exclusive dealing and tying arrangements that it uses to exclude chipset competitors, giving Qualcomm leverage to foreclose its competitors from accessing chipset customers." (Page 45)
- "Qualcomm's anticompetitive conduct is based on the breach of its FRAND commitments for its SEPs, which in turn gives Qualcomm the power to force purchasers of its chipsets to first take a license to its SEPs, threaten disloyal chipset customers with exorbitant SEP royalties, and to tie access to lower (but still far above FRAND) royalties to exclusivity or near-exclusivity in the purchase of Qualcomm chipsets." (Page 87)
- "Qualcomm's exclusionary conduct includes (i) refusing to deal with competitors, in contravention of its FRAND commitments, (ii) gagging Apple's ability to challenge Qualcomm's non-FRAND licensing scheme, through paragraph 2 of Section 7 of the BCPA; (iii) tying the purchase of its chipsets to the licensing of its SEPs; and (iv) requiring exclusivity from Apple as a condition of partial relief from Qualcomm's exorbitant and non-FRAND royalties." (Pages 87-88)
- "Qualcomm's ability to impose a burdensome tie of a license to its SEPs and its baseband processor chipsets is direct evidence of the exercise of monopoly power." (Page 93)
- "Qualcomm's tie of licenses to its SEPs and baseband processor chipsets forecloses substantial portions of the baseband processor chipset market to Qualcomm's

competitors, particularly the sale of premium LTE chipsets for use in … smartphones and tablets disproportionately burdened by Qualcomm's royalty structure." (Page 94)

- "Due to the importance of scale economies in the manufacture and sale of baseband processor chipsets, and the significant commercial validation and learning-by-doing that would be available to rivals but for Qualcomm's foreclosure of sales to Apple, the foreclosure attributable to Qualcomm's tie of baseband processor chipsets and licenses to its SEPs is substantial and significantly contributes to the creation and maintenance of Qualcomm's monopoly power." (Page 94)

**Damages**

"J. Order Qualcomm to disgorge non-FRAND royalties that Qualcomm previously extracted from Apple, including royalties paid through Apple's CMs, and pay such unjust gain to Apple;"

**Injunctive Relief**

"11. … Accordingly, Apple seeks this Court's intervention, bringing breach of contract claims, patent claims, and antitrust claims, as the basis for declaratory relief, injunctive relief, and damages."

"389. Apple thus seeks an injunction pursuant to Section 17203 of the California Business and Professions Code prohibiting Qualcomm from engaging in these unlawful and deceptive business practices in the future including an injunction preventing Qualcomm from retaliating … and other remedies available at law and equity for the harm caused by Qualcomm's conduct."

"K. Adjudge and decree that Qualcomm cannot seek injunctive relief or exclusion orders against Apple based on the Patents-in-Suit, but rather is limited to (at most) FRAND royalties as described above;"

## QUALCOMM'S FALSE AND MISLEADING STATEMENTS ABOUT THE 9TH CIRCUIT

Defendant is attempting to mislead this Court that Plaintiff claims are directed at Qualcomm's right to collect royalties on the products Qualcomm has patents for. To the

contrary, Plaintiff believes Qualcomm has all the right to collect royalties on the products Qualcomm has patents for; Plaintiff's claims are: Qualcomm does not have the right to collect royalties on the products Plaintiff has patented and until Qualcomm presents a patent(s) that allows Qualcomm, or gives Qualcomm the right to collect royalties on Plaintiff's patented CMDC (handset) devices, and Plaintiff's patented central processing units designed for the Plaintiff's CMDC (handset) devices, Qualcomm needs to stop.

**Qualcomm Misleading Statements**

"The 9th Circuit found that "Qualcomm's patent-licensing royalties and 'no license, no chips' policy do not impose an anticompetitive surcharge on rivals' modem chip sales." *FTC*, 969 F.3d at 1005. It is unclear how Plaintiff believes that he can establish antitrust violations based on factual findings of a vacated judgment when the 9th Circuit held that Qualcomm did not violate antitrust law."

"Plaintiff also seems to be confused about Qualcomm's royalty. Qualcomm is entitled to receive a royalty on products that practice its patents, and this royalty central to the patent system cannot be unlawful conduct or cause Plaintiff an injury. See *FTC*, 969 F.3d at 1002 ("neither the Sherman Act nor any other law prohibits companies like Qualcomm from (1) licensing their SEPs independently from their chip sales and collecting royalties …)"

## INJUNCTIVE RELIEF

Plaintiff has complied with the 9th Circuit five factor test to determine if the extraordinary remedy of a permanent injunction is appropriate. Plaintiff must show "(1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; ([4]) that the balance of hardships justify a remedy in equity; and ([5]) that the public interest would not be disserved by a permanent injunction." *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1032 (9th Cir. 2013) (citing *eBay Inc. v. MercExchange, L.L.C., LLC*, 547 U.S. 388, 391 (2006), *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12, (1987)). "Injunctive relief is a remedy, not a cause of action." *Welsh v. Am. Home Mortg. Assets, LLC*, No. 4:13-CV-04750-CW, 2014 U.S. Dist. LEXIS 139337, *41 (N.D. Cal. Sept. 30, 2014).

Everyday Qualcomm is allowed to continue its anticompetitive illegal conduct, jeopardizes the USPTO patent system and patent owners. Below are examples of what we can expect in the future if Qualcomm is allowed to continue its anticompetitive practices:

    Plaintiff owns the patent rights for a Multi-Sensor Detection Device/System capable of detecting for chemical, biological, radiological, nuclear, or explosive agents, compounds, or weapons of mass destruction that can be placed in a ship or airplane. Plaintiff will license the technology only if Plaintiff is allowed to charge a 5% running royalty rate on the price of every ship or airplane sold, regardless of whether Plaintiff owns the patent rights for the ship or airplane.

    Plaintiff owns the patent rights for a Stall, Stop, Vehicle Slow-down System (i.e., Advanced Driver Assistance System (ADAS)) that is used with driver, driverless, autonomous, and self-drive cars. Plaintiff will license the technology only if Plaintiff is allowed to charge a 5% running royalty rate on the price of every car, regardless of whether Plaintiff owns the patent rights for the car.

    Plaintiff owns the patent rights for a Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., new and improved cell phone; smartphone) that is used with the house to open and close the garage doors; activate and deactivate the security system; view the inside and outside of the house from a remote location; control the temperature for the house and the pool; control the lights, etc. Plaintiff will license the technology only if Plaintiff is allowed to charge a 5% running royalty rate on the price of the house, regardless of whether Plaintiff owns the design patent rights for the house.

Plaintiff is asking this Court to terminate Qualcomm's illegal monopoly, and deny Qualcomm the fruits of its statutory violations [at others expense] *Microsoft*, 253 F.3d at 103.

This Court has the authority to enjoin Qualcomm to stop collecting any amount of royalties on the sale of each handset (smartphone) sold; the authority to enjoin Qualcomm to stop "tying" all CPUs to its cellular modems and selling the unit as systems-on-a-chip; and, the authority to award damages to Plaintiff for all antitrust injuries Qualcomm has cause Plaintiff.

This Court also has the authority to enjoin Qualcomm to stop collecting any amount of royalties on the sale of each Google handset (smartphone) sold ; the authority to enjoin Qualcomm to stop "tying" all CPUs to its cellular modems and selling the unit as systems-on-a-

chip to Google; the authority to enjoin Qualcomm to cease any and all contracts, or agreements that allows Qualcomm and Google to "jointly" infringement Plaintiff's patents and patent claims; and, the authority to award damages to Plaintiff for all antitrust injuries Qualcomm has cause Plaintiff.

Sincerely,

*Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 10th day of September, 2022, a true and correct copy of the foregoing "Plaintiff's Reply in Support of Plaintiff's Motion for Permanent Injunctive Relief", was served upon the following Defendant by priority "express" mail:

>John A. Yates
>PATTERSON & SHERIDAN, LLP
>24 Greenway Plaza,
>Suite 1600
>Houston, Texas 77030
>Phone: 713-577-4817
>Email: jyates@pattersonsheridan.com

*[signature: Larry Golden]*
Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605