# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**FILED**

**SEP 27 2022**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

---

CASE NO: <u>4:22-cv-03283-HSG</u>

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

September 26, 2022

## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGEMENT

In *Golden v. Google LLC*, No. 2022-1267

The Federal Circuit ***"Vacated and Remanded"*** Plaintiff's case against Google for the following reason:

"LARRY GOLDEN, Plaintiff-Appellant v. GOOGLE LLC, Defendant, Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III." … "On January 26, 2021, in Case No. 22-1267, Mr. Golden separately sued Google LLC for patent infringement ("the Google case"). "In the Google

case, the district court dismissed the complaint with prejudice and without the issuance of service of process… We have jurisdiction under 28 U.S.C. § 1295(a)(1). On appeal, Mr. Golden has filed briefs, while the defendants have not filed responsive briefs." … "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189. The district court discounted this claim chart because it "contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far-left column instead of Apple." Dist. Ct. Op. at 4. But to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to. The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner." … "We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. … We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous." … "For the foregoing reasons, we … vacate the dismissal in Case No. 22-1267, and remand for further proceedings consistent with this opinion. **Exhibit A**

The Federal Circuit acknowledge the sufficiency of Plaintiff's charts, which validates Plaintiff's patented rights for a CMDC device [claim 5 of the '287 patent]; a new and improved cell phone [claim 23 of the '439 patent]; and, a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop… [claim 1 of the '189 patent].

The three patent claims above represent only 3 of the 23 patent claims asserted in this case for Plaintiff's '287, '439, and '189 patents. The Federal Circuit stated: "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google

Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "[w]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims …."

Qualcomm has failed to show any significant differences between the Apple, Samsung, LG, and Google smartphones that separates any one brand of smartphones from any other brand of smartphone and illegally collects a 5% royalty on the each of each smartphone sold.

Therefore, the same opinion the Federal Circuit provided for the Google smartphones applies to Qualcomm's alleged infringing "use" of smartphones covered under Plaintiff's patents [Plaintiff has a right to exclude Qualcomm's "use" of his patented invention(s) to generate hundreds of billions of dollars in revenue]. There's only a few, if any, smartphones that are not covered by Plaintiff's patents.

Further, Qualcomm is named in the *Larry Golden v. Google LLC* case (USDC-SC Case No. 6:21-cv-00244-JD) as a joint infringer with Google **Exhibit B.** The dismissal of this allegation by the USDC-SC was also "vacated and remanded" back to the District Court.

## In *Golden v. US*, No. 2022-1196

The Federal Circuit affirmed dismissal of Plaintiff's case against the United States for the following reason:

"We review the Claims Court's dismissal of a case pursuant to RCFC 41(b) for an abuse of discretion. *Claude E. Atkins Enters., Inc. v. United States*, 899 F.2d 1180, 1183 (Fed. Cir. 1990). "[T]he trial court's exercise of discretion will not be disturbed on appeal unless upon a weighing of relevant factors we are left with a definite and firm conviction that the court below committed a clear error of judgment." Id. "[I]n turn, Patent Rule 4 required Mr. Golden to prepare 'a chart identifying where each element of each asserted claim is found within each accused product, process, or method.'" "[M]r. Golden failed to identify in the accused products at least two key elements claimed in his patents: the sensor and locking limitations" *Golden v. US*, No. 2022-1196 **Exhibit C**

The Claims Court dismissed Plaintiff's case under RCFC Rule 41(b) for various reasons unsupported by facts. The case was not dismissed for non-infringement and/or patent invalidity.

See Plaintiff's "***Informal Petition for Rehearing En Banc***", filed in the case of *Golden v. US*, No. 2022-1196 for a list of "clear errors of judgement committed by the Claims Court. A copy is attached hereto as **Exhibit D**

## In *Golden v. Apple*, No. 2022-1229

The Federal Circuit affirmed dismissal of Plaintiff's case against Apple, where Qualcomm is also named as a Defendant, for the following reason:

> "Mr. Golden does not argue that the docketed complaint contains factual allegations beyond those contained in his original complaint [the original complaint here refers to the original complaint file in the U.S. District Court for the District of South Carolina-Greenville in 2019] or that the allegations in the docketed complaint do anything beyond listing the alleged infringed-upon patent claims and the alleged infringing devices. This is plainly insufficient. We see no error in the district court without prejudice dismissal of the Apple case." *Golden v. Apple*, No. 2022-1229 **Exhibit E**

As noted above, the Federal Circuit affirmed that the Apple case [No. 2022-1229], where Qualcomm is also named as a Defendant, is "dismissed without prejudice". In this present case, Plaintiff informed the Court in his Complaint docketed at 1, that the related case *Larry Golden vs. Apple Inc. et al*; Case No.: 6:20-cv-04353-JD-KFM Date Filed 11/02/21 Entry No. 26 was dismissed without prejudice.

Dismissed without prejudice is when a court dismisses a claim but leaves the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim. *In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the main features of dismissal without prejudice is that it does not prevent refiling of the claim...

> "a case that is dismissed "without prejudice" is only dismissed temporarily. This temporary dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to another court."

Plaintiff believe the Northern District of California is the proper venue to refile his claims against Qualcomm because on May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision

reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit, which had held for 27 years that a domestic corporation can be sued for patent infringement anywhere that corporation was subject to personal jurisdiction.

The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

Qualcomm based its entire defense on Qualcomm's belief that "Plaintiff is a serial filer of *frivolous* complaints". The three authorities issued on 09/08/2022 from the Federal Circuit in Golden's cases, are presented here as evidence this case is not frivolous.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 26th day of September, 2022, a true and correct copy of the foregoing "Plaintiff's Notice of Supplemental Authority in Support of Plaintiff's Cross-Motion for Summary Judgement", was served upon the following Defendant by priority "express" mail:

>   John A. Yates
>   PATTERSON & SHERIDAN, LLP
>   24 Greenway Plaza,
>   Suite 1600
>   Houston, Texas 77046
>   Phone: 713-577-4817
>   Email: jyates@pattersonsheridan.com

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

EXHIBIT A

# United States Court of Appeals
# for the Federal Circuit

---

**LARRY GOLDEN,**

*Plaintiff-Appellant*

v.

**GOOGLE LLC,**

*Defendant*

---

2022-1267

---

Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III.

---

**JUDGMENT**

---

THIS CAUSE having been considered, it is

ORDERED AND ADJUDGED:

**VACATED AND REMANDED**

FOR THE COURT

September 8, 2022
Date

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**LARRY GOLDEN,**
*Plaintiff-Appellant*

v.

**APPLE INC., SAMSUNG ELECTRONICS USA, LG
ELECTRONICS USA, INC., QUALCOMM
INCORPORATED, MOTOROLA SOLUTIONS, INC.,
PANASONIC CORPORATION, AT&T INC.,
VERIZON CORPORATION SERVICE GROUP,
SPRINT CORPORATION, T-MOBILE USA, INC.,
FORD GLOBAL TECHNOLOGIES, LLC, FAIRWAY
FORD LINCOLN OF GREENVILLE, GENERAL
MOTORS COMPANY, KEVIN WHITAKER
CHEVROLET, FCA US LLC, BIG O DODGE
CHRYSLER JEEP RAM,**
*Defendants*

---

2022-1229

---

Appeal from the United States District Court for the
District of South Carolina in No. 6:20-cv-04353-JD, Judge
Joseph Dawson, III.

-------------------------------------------------

**LARRY GOLDEN,**
*Plaintiff-Appellant*

Case: 23-283   Document: 41   Page: 2   Filed: 09/08/2022

2                                  GOLDEN v. APPLE INC.

v.

**GOOGLE LLC,**
*Defendant*

_____

2022-1267

_____

Appeal from the United States District Court for the
District of South Carolina in No. 6:21-cv-00244-JD, Judge
Joseph Dawson, III.

_____

Decided:  September 8, 2022

_____

LARRY GOLDEN, Greenville, SC, pro se.

_____

Before DYK, TARANTO, and STOLL, *Circuit Judges.*

PER CURIAM

    Larry Golden appeals two orders of the United States
District Court for the District of South Carolina ("district
court") dismissing his patent infringement claims against
various defendants.  We *affirm* the dismissal in Case
No. 22-1229 but *vacate* the dismissal in Case No. 22-1267
and *remand* for further proceedings consistent with this
opinion.

BACKGROUND

    Mr. Golden owns a family of patents concerning a sys-
tem for locking, unlocking, or disabling a lock upon the

GOLDEN v. APPLE INC.                                                3

detection of chemical, radiological, and biological hazards.[1]
In 2019, he sued sixteen defendants in the district court,
alleging patent infringement by their development and
manufacturing of certain devices.  The district court dis-
missed the suit without prejudice, and this court affirmed
the dismissal "on the ground of frivolousness" because Mr.
Golden's complaint "offer[ed] only vague generalities and
block quotes of statutes, cases and treatises, but nowhere
point[ed] us to any nonfrivolous allegations of infringement
of any claim by any actual product made, used, or sold by
any defendant." *Golden v. Apple Inc.*, 819 F. App'x 930, 931
(Fed. Cir. 2020).

On January 5, 2021, in Case No. 22-1229, Mr. Golden
again sued the same sixteen defendants from the 2019 case
for patent infringement ("the Apple case").  He initially
filed the same over-300-page complaint held to be frivolous
in the 2019 case.  After the magistrate judge imposed a 35
page limit on the complaint, Mr. Golden filed a shortened
complaint complying with the restriction.  On January 26,
2021, in Case No. 22-1267, Mr. Golden separately sued
Google LLC for patent infringement ("the Google case").
The magistrate judge reviewed the complaints in both
cases and recommended summary dismissal with prejudice
without issuance of service of process or leave to amend
and monetary sanctions for the filing of frivolous litigation.

In both cases, the district court adopted the magistrate
judge's recommendations in part.  In the Apple case, the
district court dismissed the complaint as frivolous without
the issuance of service of process but declined to dismiss
with prejudice.  Additionally, the district court lifted the
page restriction for an amended complaint.  In the Google
case, the district court dismissed the complaint with

---

[1]    The patents at issue in these cases are U.S. Patent
Nos. 7,385,497; 9,096,189; 9,589,439; 10,163,287 and Reis-
sue Patent Nos. RE43,891 and RE43,990.

prejudice and without the issuance of service of process.
Mr. Golden appeals the district court decisions in both
cases. We have jurisdiction under 28 U.S.C. § 1295(a)(1).
On appeal, Mr. Golden has filed briefs, while the defend-
ants have not filed responsive briefs.

## DISCUSSION

Under the pleading standards set forth in *Bell Atlantic
Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iq-
bal*, 556 U.S. 662 (2009), a court must dismiss a complaint
if it fails to allege "enough facts to state a claim to relief
that is plausible on its face." *Twombly*, 550 U.S. at 570.
This standard "requires more than labels and conclusions,
and a formulaic recitation of the elements of a cause of ac-
tion will not do." *Id.* at 555 (citation omitted). A plaintiff
must allege facts that give rise to "more than a sheer pos-
sibility that a defendant has acted unlawfully." *Iqbal*, 556
U.S. at 678 (citation omitted). In the patent context, this
court has explained that a plaintiff need not "plead facts
establishing that each element of an asserted claim is met,"
*In re Bill of Lading Transmission and Processing Sys. Pat.
Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal
v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir.
2007)), but must plead "'enough fact[s] to raise a reasona-
ble expectation that discovery will reveal' that the defend-
ant is liable for the misconduct alleged." *Id.* at 1341
(alteration in original) (quoting *Twombly*, 550 U.S. at 556).
We review the district court's dismissal of the complaint de
novo. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195,
198 (4th Cir. 2014).

In the Apple case, the district court dismissed the dock-
eted complaint as frivolous after finding that Mr. Golden
"failed to include factual allegations beyond the identities
of the Defendants, reference to the alleged infringing de-
vices, and the alleged infringed-upon patents." Dist. Ct.
Op. at 4–5. We agree with the district court: the docketed
complaint is nothing more than a list of patent claims and

accused products manufactured by each defendant for each asserted patent.  Mr. Golden contends that his original complaint contained sufficient factual allegations to support his claims.  However, he concedes that the rejected original complaint was identical to the one that this court deemed frivolous in the 2019 case.  His effort to relitigate the sufficiency of the original complaint is precluded under the doctrine of res judicata.  *See Arizona v. California*, 530 U.S. 392, 412 (2000) ("[I]f a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte*, even though [a preclusion] defense has not been raised.").  Mr. Golden does not argue that the docketed complaint contains factual allegations beyond those contained in his original complaint or that the allegations in the docketed complaint do anything beyond listing the alleged infringed-upon patent claims and the alleged infringing devices.  This is plainly insufficient. We see no error in the district court's without prejudice dismissal of the Apple case.

In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous.  Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189.  The district court discounted this claim chart because it "contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far left column instead of Apple." Dist. Ct. Op. at 4.  But to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to.  The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case.  It attempts—whether successfully or not—to map claim

Case: 22-1229   Document: 19   Page: 6   Filed: 09/08/2022

6                                       GOLDEN v. APPLE INC.

limitations to infringing product features, and it does so in
a relatively straightforward manner.

We conclude that the district court's decision in the
Google case is not correct with respect to at least the three
claims mapped out in the claim chart.  Mr. Golden has
made efforts to identify exactly how the accused products
meet the limitations of his claims in this chart.  On remand,
the district court should allow the complaint to be filed and
request service of process.  Our decision does not preclude
subsequent motions to dismiss by the defendant for failure
to state a claim or for summary judgment.  We express no
opinion as to the adequacy of the complaint or claim chart
except that it is not facially frivolous.

CONCLUSION

For the foregoing reasons, we affirm the district court's
dismissal in Case No. 22-1229, vacate the dismissal in
Case No. 22-1267, and remand for further proceedings con-
sistent with this opinion.

**CASE NO. 22-1229 AFFIRMED**

**CASE NO. 22-1267 VACATED AND REMANDED**

COSTS

No costs.

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF SOUTH CAROLINA – GREENVILLE

RECEIVED
USDC CLERK, GREENVILLE, SC

2021 JAN 26 AM 10: 13

LARRY GOLDEN,

                    Plaintiff,

          V.

GOOGLE LLC

                    Defendants.

CIVIL CASE NO: _____

**JURY TRIAL DEMANDED**

January 25, 2021

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit": attached hereto as Exhibits A-C respectively) against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, "[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. 35 U.S. Code § 282 - Presumption of validity; (a)

In General" is Plaintiff's evidence that the Plaintiff is the inventor of the Communicating,
Monitoring, Detecting, and Controlling (CMDC) device(s) i.e., products grouped and
commercialized today as smartphones, laptops, tablets, smartwatches, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past
and continues to do so, makes, uses, offer to sell, or sells Google Pixel smartphones 3, 3XL, 3a,
3aXL, 4a, 4a(5G), and 5, that Plaintiff believes infringes at least one of the claims in the patents-
in-suit under 35 U.S.C. § 271, "anyone who makes, uses, offers to sell, or sells any patented
invention domestically, or imports a patented invention into the United States during the term of
the patent, is infringing the patent. Anyone who actively induces someone else
to infringe the patent is also liable as an infringer."

Similarly, under 35 U.S.C. § 271, "anyone who offers to sell, sells, or imports a material
component of something that is patented, knowing that the component was especially made for
use in an infringement and is not a commodity suitable for a substantial non-infringing use, is
also liable as a contributory infringer" Plaintiff is alleging that the defendant Google, has in the
past and continues to do so, offer to sell, sells (i.e., to other smartphone and mobile device
manufacturers; "Google Search", "Google Fi", "Google Android Operating Systems", "Google
Cloud", etc.) or imports a material component of something that is patented (i.e., Plaintiff's
CMDC devices). For example, "market.us" has published the following information on Google:
2018?

- On January 2018, Alphabet, Inc. acquired Redux – smartphone technology, which is
  specialized in turning smartphone screens into speakers.
- In October 2018, Google LLC to shut down Google+ after failing to disclose user data
  leak
- In November 2018, Google LLC acquired Workbench, which is a US-based company,
  that offers an online library of projects and lessons.

- Under this acquisition, the company focuses on integrating the Workbench tool with Google Classroom. In addition, currently, Google Classroom is one of the most widely used online educational tools, which lets parents, teachers, and students manage class discussions, assignments, and quizzes.
- In 2018, Google Search and Advertising tools helped generating **$335 billion** in economic activity for **more than 1.3 billion millions** of businesses, website publishers, and nonprofits across the United States.
- Many website publishers, non-profit organizations and 40,000 companies in the country benefited from the use of Google Ads and AdSense advertising tools.
- In 2018, Google had sent more than 14 billion dollars to music publishers around the world.
- As of November, 2018, in US, Google connects people to businesses nearby more than 9 **billion times**, including over 1 billion phone calls and 3 billion direction requests to stores every month.

Usage Statistics

- In a minute on the Internet in 2020, there are **4.1 million search queries, 230 million per hour** and 6 Billion per day that is **more than 2.5 Trillion searches per year** worldwide.
- Till July 2020, Google has 95.6% share of worldwide mobile search traffic.
- In April 2020, Google processed **12.7 billion** search queries in US, accounting **62.3 percent** of the US total desktop search queries and leading mobile search provider in the US with 95.04% market share
- Daily visitors to Google are **approximately 620 Mn.**
- According to the Datareportal, in June 2020, the top 10 search queries on Google were: Google, Facebook, Youtube, You, Weather, News, Amazon, Coronavirus, Translate and Instagram.
- In July 2019, Google accounted for **95 percent** of US mobile search visits and **93 percent** of overall U.S. organic search engine visits.
- As of May 2019, Gmail is a product that **1.5 billion users** rely on, to get things done every day.
- As of September 2019, People have already asked **Google Lens more than a billion questions** about things they see.

3

- Google sends **10 billion+ clicks per month** to news publishers' websites.
- As of May 2019, **2.5 million** web publishers use AdSense to make money through their content on the web.
- According to a survey, in Europe the news content linked through Google were **clicked more than 8 billion times a month** that is **3,000 clicks per second** to the publishers' websites in Europe resulting to each click between 4-6 euro cents.
- In the US, Google helps drive over **1 billion direct connections**, like calls and online reservations, for businesses nationwide every month.
- Google owns its **own common misspellings domains** such as www.gooogle.com, www.googlr.com, and www.gogle.com
- Google runs over **1 Mn computer servers** in data centers around the world.
- Last year, Google **rejected more than 10 million ads** that we suspected of copyright infringement.
- Around **35% of clicks** for U.S. businesses, advertising on Google, came from outside the country.
- As of May 2019, about **80% of traffic** from Google's Showcase Shopping ads to retailer sites are from new visitors discovering the brands.
- Till date, Google has over **2 billion store** offers mapped to physical store locations globally, discoverable by their current local ad formats like local inventory ads.
- Google Station serves more than **10 million people in 1,300 locations** across India, Indonesia, Mexico, Nigeria, the Philippines, Thailand, Vietnam and Brazil.
- Google Assistant is now on **more than one billion devices**, available in more than 30 languages across 80 countries.
- As of 2019, **more than 20 million people visit Google Account every day** to review their settings, using Privacy Checkup.
- As of 2019, **90 million** teachers and students are using G Suite for Education worldwide.
- Google has a database of over 4 billion credentials that have been compromised through various data breaches
- According to a 2018 Survey, around **72% of consumers in Indonesia** see Google Search as the online gateway for personal loan information and the second most helpful source for Financial Services information, after the bank branches

4

## THE PARTIES

1.      Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

2.      On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3.      Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones and Google Android Operating Systems.

## STANDARD FOR REVIEW

4.      Pursuant to the order of Magistrate Judge Kevin McDonald in United States District Court for the District of South Carolina; filed 12/17/2020; Case No. 6:20-cv-04353-BHH-KFM, Plaintiff was ordered to file "a short and plain statement of the claim showing that the pleader [Plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a).

5.      Plaintiff has attached a copy of the asserted patents as **Exhibits A, B, & C**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.*, No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted

patent, identified the accused products by name, and generally compared the technology

disclosed in the patents to the accused products. The complaint *did not identify any specific*

*asserted claim*, but the court found that: "Plaintiff has stated a plausible claim for direct

infringement by specifically identifying the Defendant's products and alleging that they perform

the same unique function as Plaintiff's patented system." The Defendant in this case is allegedly

liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

     6.    Plaintiff maintains he has additional factual allegations to support his claim in the

form claim charts readily available by order of this Court.

# JURISDICTION AND VENUE

     7.    This is a civil action for patent infringement arising under the patent laws of the

United States, Title 35 of the United States Code. This Court has subject matter jurisdiction

pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

     8.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and

1400(b). On information and belief, the defendant has purposely transacted business in this

judicial district and has committed acts of joint, direct and/or indirect infringement in this

judicial district.

     9.    On information and belief, the defendant is subject to this Court's specific and

general personal jurisdiction, due at least to the defendant's substantial business in this forum,

including: (A) at least part of the defendant's infringing activities alleged herein, and (B)

regularly doing or soliciting business, engaging in others persistent causes of conduct, and/or

deriving substantial revenue from goods and services provided to persons and other entities in

South Carolina and this judicial district. The defendant has allegedly used, sold, and/or offered products for sale in South Carolina and is licensed to do business in this state.

10.    This Court has specific jurisdiction over the defendant because the defendant has committed acts giving rise to this action and has established minimum contacts within this judicial district such that the exercise of jurisdiction over the defendant would not offend traditional notions of fair play and justice.

## RELATED CASES

11.    Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O").

12.    Plaintiff has filed an action of Antitrust Law violations *Larry Golden v. Apple, Inc. et al* on June 16, 2020, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc.

7

("Qualcomm"), Ford Global Technologies, LLC ("Ford"), General Motors Company ("GM"), and, FCA US LLC ("FCA").

## GOOGLE SMARTPHONE SPECIFICATIONS / ANDROID PLATFORM

13.    Upon information and belief, Google is directly infringing Plaintiff's patented CMDC devices by making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents. to unjustly enrich itself.

14.    Upon information and belief, Google is jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Google's smartphones, and other Android smartphone devices i.e., Samsung, LG, Motorola, etc., that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents. Android smartphones have permanent default Google-owned apps like Google search, Google Play, YouTube, Maps etc. The main Android framework is signed in through a Google account too. So, you need to have a Google account to use Android.

15.    The smartphone has come a long way since the first iPhone launched in 2007. While Apple's iOS is arguably the world's first smartphone operating system, Google's Android is by far the most popular. Android has evolved significantly since first being released on an HTC-made T-Mobile device in 2008.

16.    It wasn't until 2005 that Google purchased Android, Inc., and while there wasn't much info about Android at the time, many took it as a signal that Google would use the platform to enter the phone business. Eventually, Google did enter the smartphone business — but not as a hardware manufacturer. Instead, it marketed Android to other manufacturers, first

catching the eye of HTC, which used the platform for the first Android phone, the HTC Dream, in 2008.

17.    Upon information and belief, Google has copied the "product grouping" strategy of the Plaintiff (Golden) for a communicating, monitoring, detecting, and controlling (CMDC) device, i.e., Google's smartphone products are grouped together by "common features of design similarities". As illustrated below, Google's smartphones are basically the same.

18.    Therefore, when analyzing the specifications, features, and functionality of Google's smartphones as a complete product, and not merely identifying the individual infringing processes; there is a strong likelihood that if one of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device; it can be perceived that all of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device as a 'whole' product.

## GOOGLE PIXEL 5 VS. PIXEL 4A WITH 5G VS. PIXEL 4

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| Network | 5G | 5G | 4G |
| Screen | 6-inch flexible OLED display at 432 ppi | 6.2-inch OLED display at 413 ppi | 5.8-inch OLED display at 443 ppi |
| Refresh Rate | 90 Hz | 60 Hz | 60 Hz |
| Resolution | 1080 x 2340 | 1080 x 2340 | 1080 x 2340 |
| Battery | 4080 mAh | 3885 mAh | 3140 mAh |
| Front Camera | 8 megapixels | 8 megapixels | 8 megapixels |
| Rear Camera | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel |
| Camera Features | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Live HDR+ |
| RAM | 8GB | 6GB | 6GB |

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| Processor | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 730G |
| Storage | 128GB | 128GB | 128GB |
| Audio | Stereo speakers, USB-C audio | Stereo speakers, USB-C audio, 3.5mm headphone jack | USB-C audio, 3.5mm headphone jack |
| Price | $699 | $499 | $349 |
| Wireless Charging | Yes | No | No |
| Water Resistant | Yes | No | No |
| Colors | Green, Black | White, Black | Black |
| Operating System | Pre-loaded with Android 11 | Pre-loaded with Android 11 | Pre-loaded with Android 10 |

## GOOGLE PIXEL 3 SERIES SPEC COMPARISON

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| Display | 5.6 inches | 6.0 inches | 5.5 inches | 6.3 inches |
| Resolution | 2220 x 1080 | 2160 x 1080 | 2160 x 1080 | 2960 x 1440 |
| Processor | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) |
| RAM | 4GB | 4GB | 4GB | 4GB |
| Storage | 64GB | 64GB | 64GB, 128GB | 64GB, 128GB |
| Rear camera | 12 megapixels | 12 megapixels | 12 megapixels | 12 megapixels |
| Front camera | 8 megapixels | 8 megapixels | 8 megapixels, 8 megapixels(wide) | 8 megapixels, 8 megapixels(wide) |

10

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| Battery | 3,000mAh | 3,700mAh | 2,915mAh | 3,430mAh |
| Water protection | N/A | N/A | IPX8 | IPX8 |
| Wireless charging? | No | No | Yes | Yes |
| Ports? | USB-C, 3.5mm headphone jack | USB-C, 3.5mm headphone jack | USB-C | USB-C |
| Weight | 0.32 pounds | 0.37 pounds | 0.33 pounds | 0.4 pounds |
| Dimensions (in.) | 6.0 x 2.80 x 0.30 | 6.30 x 3.00 x 0.30 | 5.70 x 2.70 x 0.30 | 6.20 x 3.00 x 0.30 |
| Starting price | $399.00 | $479.00 | $799.00 | $899.00 |
| Operating System | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android |

SENSOR TYPES SUPPORTED BY THE "*ANDROID*" PLATFORM

| Type Accelerometer | Hardware | Measures the acceleration force in $m/s^2$ that is applied to a device on all three physical axes (x, y, and z), including the force of gravity. | Motion detection (shake, tilt, etc.). |
|---|---|---|---|
| Type Ambient Temperature | Hardware | Measures the ambient room temperature in degrees Celsius (°C). See note below. | Monitoring air temperatures. |
| Type Gravity | Software or Hardware | Measures the force of gravity in $m/s^2$ that is applied to a device on all three physical axes (x, y, z). | Motion detection (shake, tilt, etc.). |
| Type Gyroscope | Hardware | Measures a device's rate of rotation in rad/s around each of the three physical axes (x, y, and z). | Rotation detection (spin, turn, etc.). |
| Type Light | Hardware | Measures the ambient light level (illumination) in lx. | Controlling screen brightness. |

11

| Type Linear Acceleration | Software or Hardware | Measures the acceleration force in m/s² that is applied to a device on all three physical axes (x, y, and z), excluding the force of gravity. | Monitoring acceleration along a single axis. |
|---|---|---|---|
| Type Magnetic Field | Hardware | Measures the ambient geomagnetic field for all three physical axes (x, y, z) in µT. | Creating a compass. |
| Type Orientation | Software | Measures degrees of rotation that a device makes around all three physical axes (x, y, z). As of API level 3 you can obtain the inclination matrix and rotation matrix for a device by using the gravity sensor and the geomagnetic field sensor in conjunction with the get Rotation Matric () method. | Determining device position. |
| Type Pressure | Hardware | Measures the ambient air pressure in hPa or mbar. | Monitoring air pressure changes. |
| Type Proximity | Hardware | Measures the proximity of an object in cm relative to the view screen of a device. This sensor is typically used to determine whether a handset is being held up to a person's ear. | Phone position during a call. |
| Type Relative Humidity | Hardware | Measures the relative ambient humidity in percent (%). | Monitoring dewpoint, absolute, and relative humidity. |
| Type Rotation Vector | Software or Hardware | Measures the orientation of a device by providing the three elements of the device's rotation vector. | Motion detection and rotation detection. |
| Type Temperature | Hardware | Measures the temperature of the device in degrees Celsius (°C). This sensor implementation varies across devices and this sensor was replaced with the **Type— Ambient Temperature** sensor in API Level 14 | Monitoring temperatures. |

❖ BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).

❖ DISABLING LOCK MECHANISM: Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. When setting the pattern, you must drag your finger along lines on the screen between different nodes. Afterward, to unlock the phone, you'll need to replicate the pattern drawn. If you fail to solve the

12

pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. If you can't log in, you'll have to employ some other methods to restore control of your phone.

❖ CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN) DETECTION: Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK)*. ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

❖ HEART RATE: *Android Team Awareness Kit, ATAK* provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

❖ NEAR FIELD COMMUNICATION (NFC): Pixel™, Phone by Google - Turn NFC on/off. Near Field Communication (NFC) allows the transfer of data between devices that are a few centimeters apart, typically back-to-back. NFC must be turned on for NFC-based apps (e.g., Tap to Pay) to function correctly. NFC is a set of short-range wireless technologies, typically requiring a distance of 4cm or less to initiate a connection. NFC allows you to share small payloads of data between an NFC tag and an Android-powered device, or between two Android-powered devices. Tags can range in complexity.

❖ WARFIGHTERS: The U.S. armed forces and their interagency and coalition partners value *Android Team Awareness Kit, ATAK* and the common operating picture it provides. DTRA continues to develop CBRN-specific plug-in capabilities to support warfighters on the battlefield.

## GOOGLE'S JOINT INFRINGEMENT WITH APPLE INC.

19.    According to Gurman, 2020, "The U.S. government's antitrust assault against Google reveals new details about a secretive, multibillion-dollar deal between the internet giant and Apple Inc., the world's largest technology company. The Justice Department's lawsuit, filed Tuesday, targets paid deals Google negotiates to get its search engine to be the default on browsers, phones and other devices. The biggest of these is an agreement that makes Google search the default on iPhones and other Apple devices."

20.    The U.S. government said Apple Chief Executive Officer Tim Cook and Google CEO Sundar Pichai met in 2018 to discuss the deal. After that, an unidentified senior Apple employee wrote to a Google counterpart that "our vision is that we work as if we are one company."

21.    The DOJ also cited internal Google documents that call the Apple search deal a "significant revenue channel" for the search giant and one that, if lost, would result in a "Code Red" scenario. That's because nearly half of Google search traffic in 2019 came from Apple products, according to the lawsuit.

22.    Google pays Apple billions of dollars a year to make its search product the default option, according to analyst estimates. That means when a user buys a new iPhone or other Apple device, the built-in search engine in the Safari browser is Google.

23.    The DOJ suit cited estimates that Apple gets $8 billion to $12 billion annually from Google through the agreement. Apple's income from the search deal is believed to be part of the company's growing Services segment, a key metric Apple has highlighted to investors and analysts in recent years.

> Gurman, Mark (2020, Oct. 20). *Apple, Google worked as 'one company' on search deal, U.S. says*. https://www.bloomberg.com/news/articles/2020-10-20/apple-google-worked-as-one-company-on-search-deal-u-s-says

Joint Infringement

24.    Upon information and belief, Google and Apple are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Search for use with Google and Apple smartphones, that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

14

25.     Plaintiff has alleged that Apple is infringing Plaintiff's communicating,

monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple,*

*Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South

Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. et al.

26.     Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at

the United States District Court for the District of South Carolina; Greenville Division (Case No.

6:20-cv-02270) against defendants, Apple Inc. et al. for Antitrust Law Violations.


## GOOGLE'S JOINT INFRINGEMENT WITH QUALCOMM INC.

27.     According to a Qualcomm press release (2020), "Qualcomm Technologies, Inc.

and Google announced their collaboration to enhance and extend Project Treble with the goal of

enabling more devices with Qualcomm® Snapdragon™ mobile platforms to run the latest

Android OS. The enhancements are intended to enable Original Equipment Manufacturers

(OEMs) to upgrade their Snapdragon based devices to the latest Android OS without modifying

Qualcomm Technologies' chipset-specific software and to use a common Android software

branch to upgrade devices based on a wide range of Snapdragon mobile platforms across

Qualcomm Technologies' portfolio. These enhancements are designed to reduce the time and

resources required to upgrade Snapdragon based devices to the latest Android OS version."

28.     As part of this collaboration with Google, Qualcomm Technologies will now

support four Android OS versions and four years of security updates for all Snapdragon

platforms utilizing the Project Treble enhancements, starting with the new Snapdragon 888

Mobile Platform. These initiatives are designed to enable faster Android OS upgrades with fewer

resources and a predictable software lifecycle for Snapdragon based devices, which together are

expected to result in more consumers with Snapdragon based devices running the latest Android OS version.

29.    "Google continues to work closely with our technology partners to increase the freshness of the Android ecosystem. Through this collaboration with Qualcomm Technologies, we expect that Android users will have the latest OS upgrades and greater security on their devices," said David Burke, vice president of Android engineering, Google.

30.    "We are excited to work with Google to extend our support for Android OS and security updates on future Snapdragon mobile platforms utilizing the Project Treble enhancements," said Kedar Kondap, vice president, product management, Qualcomm Technologies, Inc.

Terminology

- Google's android operating system; same as "operating system".
- Google's android operating system; same as "computer program".
- Google's android operating system; same as "software".
- Qualcomm's chipset; used interchangeably as "processor".
- Qualcomm's chipset; used interchangeably as "central processing unit".
- Qualcomm's chipset; used interchangeably as "wireless technology" (WiFi, 3G, 4G, 5G, LTE, and so on).

31.    An operating system is a computer program, works as interface between user and hardware and provides common services for computer programs. The entire process or functionality of computer system depends on the operating system. An operating system is a computer program that controls the execution of application programs and acts as an interface between the user of a computer and the computer hardware. The purpose of an operating system

16

is to provide an environment in which a user can execute programs in a convenient and efficient manner. https://www.geeksforgeeks.org/introduction-of-operating-system-set-1/

32.    A Central Processing Unit (CPU) is a machine that can execute computer programs. This broad definition can easily be applied to many early computers that existed long before the term "CPU" ever came into widespread usage. The term itself and its initialism have been in use in the computer industry at least since the early 1960s (Weik 1961). The form, design and implementation of CPUs have changed dramatically since the earliest examples, but their fundamental operation has remained much the same.

33.    An Operating System is the core software that allows applications to interface with the hardware. Operating Systems control the specific details of your system, presenting a more manageable interface for applications (and the user) to make use of. To use an analogy, the CPU is the brain, the OS is the mind. The mind cannot exist without a brain to store it, and the brain is just a useless lump without a mind to control it.
https://answers.yahoo.com/question/index?qid= 20090927101607AAiAJ42

34.    An SoC, or system-on-a-chip to give its full name, integrates almost all of these components into a single silicon chip. Along with a CPU, an SoC usually contains a GPU (a graphics processor), memory, USB controller, power management circuits, and wireless radios (WiFi, 3G, 4G LTE, and so on). Whereas a CPU cannot function without dozens of other chips, it's possible to build complete computers with just a single SoC. The number one advantage of an SoC is its size: An SoC is only a little bit larger than a CPU, and yet it contains a lot more functionality. If you use a CPU, it's very hard to make a computer that's smaller than 10cm (4 inches) squared, purely because of the number of individual chips that you need to squeeze in. Using SoCs, we can put complete computers in smartphones and tablets, and still have plenty of

space for batteries. https://www.extremetech.com/computing/126235-soc-vs-cpu-the-battle-for-the-future-of-computing.

Joint Infringement

35.    Upon information and belief, Google and Qualcomm are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Qualcomm's SoCs, CPUs, etc. for smartphones that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

36.    Google developing its own phone processor would mean dumping the Qualcomm SoCs it usually uses. Of course, you can never truly be rid of Qualcomm: Google would presumably still need to use Qualcomm modems, something that even Apple still needs to do. There are other modem manufacturers out there—Samsung, Huawei, Mediatek—but Qualcomm's combination of patents and strong-arm licensing techniques has effectively locked its competitors out of the US and other markets.

37.    Plaintiff has alleged that Qualcomm is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al.* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, *Apple Inc. et al.*

38.    Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, *Apple Inc. et al.* for Antitrust Law Violations.

## CLAIM CONSTRUCTION

"*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015. "In the 'Decision to Institute', we construed certain claim terms. Those constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11-16

    39.    "No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them… [w]e further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10-11. Based on the record adduces during trial, we see no need to construe any other terms…"

    40.    "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of *a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site* for monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product grouping category of design similarity (e.g., computer terminal, personal computer (PC)) …" Patent Owner contends that this new language is consistent with

19

words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further

contends that this new language is broad enough to include the removed items, such as cell

phones and smart phones, because those items are "species terms" that are "included in the genus

'monitoring equipment' and 'communication device' when the clause 'products grouped together

by common features in the product groupings category of design similarity' is included." *Id*.

Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart

phones would be recognized by one of ordinary skill in the art as a type of communication

device or monitoring equipment because cell phones and smartphones are devices that are

capable of communication and are capable of receiving signals." *"Inter Partes Review* (IPR):

*Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent

RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015.


# COUNT I

### (Infringement of the '287 Patent)

41.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-

40.

42.    On information and belief, Google is jointly, directly, indirectly and/or under the

'doctrine of equivalents', infringing at least independent claims 4, 5, and 6 of the '287 patent.

The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G),

and 5.

43.    As set forth in Golden's preliminary infringement contentions that Google is

making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a

minimum directly infringed the '287 patent and Google is thereby liable for infringement of the

20

'287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

44.    The alleged infringement of Golden identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT II

### (Infringement of the '439 Patent)

45.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-44.

46.    On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 13, 14, 15, and 23 of the '439 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

47.    As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '439 patent and Google is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

48.    The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

21

## COUNT III

### (Infringement of the '189 Patent)

49.     Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-48.

50.     On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

51.     As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '189 patent and Google is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

52.     The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## CLAIM CHART

53.     The following Claim Chart is an illustration of literal infringement. At least one of the alleged infringing products of Google (i.e., Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), or 5) is representative of all the alleged infringing products of Google asserted in this complaint. At least one of the alleged infringing products of Google (Google Pixel 5) is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

22

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |

23

| | | | |
|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 – 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 – 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of... WiFi connection, internet connection, radio frequency (RF) connection, cellular connection... capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group... of satellite, Bluetooth, WiFi... |

24

| | | | |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 ÷ 5.0 GHz, Bluetooth 5.0 ÷ LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a... Bluetooth connection, WiFi connection, internet connection... cellular connection... short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |

| | | | |
|---|---|---|---|
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat —on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

27

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.     A judgment in favor of Golden that the defendant has infringed at least one or more claims of the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid;

B.     A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

C.     A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D.     As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned

alleged infringing devices that have at a minimum, directly infringed the '287, '439, and '189

patents. The Defendant is thereby liable for infringement of the '287, '439, and '189 patents

pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement

and damage will continue unless and until the Defendant is enjoined.

     E.     Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

     Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P.

38. A right guaranteed under the Seventh Amendment of the Constitution.

Respectfully submitted,

S/ *Larry Golden*     Date: 01 /25 /2021

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# EXHIBIT C

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**LARRY GOLDEN, DBA ATPG TECHNOLOGY, LLC,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

---

2022-1196

---

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00307-EGB, Senior Judge Eric G. Bruggink.

---

Decided: September 8, 2022

---

LARRY GOLDEN, Greenville, SC, pro se.

GRANT DREWS JOHNSON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by BRIAN M. BOYNTON, GARY LEE HAUSKEN.

---

Before DYK, TARANTO, and STOLL, *Circuit Judges.*

PER CURIAM

2                                                    GOLDEN v. US

Larry Golden appeals an order of the United States
Court of Federal Claims ("Claims Court") dismissing his
patent infringement claims against the United States
("government"). We *affirm*.

BACKGROUND

Mr. Golden owns a family of patents concerning a sys-
tem for locking, unlocking, or disabling a lock upon the de-
tection of chemical, radiological, and biological hazards.[1]
In May 2013, Mr. Golden brought suit against the govern-
ment under 28 U.S.C. § 1498(a), alleging that the Depart-
ment of Homeland Security infringed his patents by
soliciting proposals for the development of cellular devices
through its "Cell-All" initiative.  Mr. Golden claims that he
responded to the solicitation along with cell phone manu-
facturers such as Apple and Samsung.  The Claims Court
interpreted Mr. Golden's complaint to allege that the gov-
ernment "continues to fund development of these devices
to this day," and that through its efforts, it has "caused
other manufacturers to develop, produce, and commercial-
ize devices, such as cell phones, that infringe on [Mr.
Golden's] patents." *Golden v. United States*, No. 13-307C,
at 2 (Fed. Cl. Nov. 10, 2021).  Over the next eight years,
Mr. Golden repeatedly amended his complaint to include
additional patent claims and to accuse additional devices
manufactured by third parties, allegedly at the govern-
ment's behest.

On March 29, 2021, the Claims Court issued a sched-
uling order directing the parties to proceed with claim con-
struction based on Mr. Goldin's sixth amended complaint.
The scheduling order directed Mr. Golden to "file [his]

---

[1]    The patents and claims now at issue in this case
are U.S. Patent Nos. 7,385,497 (claim 1); 8,106,752 (claim
10); 9,096,189 (claim 1); 9,589,439 (claim 23); and
10,163,287 (claim 5).

GOLDEN v. US                                                                                        3

preliminary disclosure of infringement contentions (via e-
mail, not by filing with the court) (Patent Rule 4) on or be-
fore May 7, 2021." Supp. App'x 1181. The Claims Court's
rules require:

> (c) <u>a chart identifying where each element of each
> asserted claim is found within each accused prod-
> uct, process, or method</u>, including the name and
> model number, if known;

Fed. Cl. Pat. R. 4 (emphasis added).

Mr. Golden timely filed his preliminary infringement
contentions. The government moved to strike these con-
tentions as deficient and to dismiss the case in its entirety,
arguing that Mr. Golden failed to identify where at least
two claimed elements were found in the accused devices as
required under the Claims Court's patent rules: sensors for
hazardous materials and locking mechanisms. The Claims
Court agreed with the government that Mr. Golden's con-
tentions failed to identify where these claim limitations
were found in the accused products. The Claims Court
granted the government's motion to strike but gave Mr.
Golden an opportunity to resubmit infringement conten-
tions that would comply with the court's rules.

Mr. Golden filed revised contentions in August 2021.
The government again moved to strike and dismiss, argu-
ing that Mr. Golden failed to correct the previously-identi-
fied deficiencies. The Claims Court agreed and dismissed
the complaint pursuant to Rule 41(b) of the Rules of the
Claims Court ("RCFC") for failure to comply with a court
order. Mr. Golden appeals. We have jurisdiction under 28
U.S.C. § 1295(a)(3).

DISCUSSION

We review the Claims Court's dismissal of a case pur-
suant to RCFC 41(b) for an abuse of discretion. *Claude E.
Atkins Enters., Inc. v. United States*, 899 F.2d 1180, 1183
(Fed. Cir. 1990). "[T]he trial court's exercise of discretion

will not be disturbed on appeal unless upon a weighing of
relevant factors we are left with a definite and firm convic-
tion that the court below committed a clear error of judg-
ment." *Id.* (internal quotations and citations omitted).

The court's scheduling order required Mr. Golden to file
his preliminary disclosure of infringement contentions in
compliance with Patent Rule 4 of the Claims Court.  In
turn, Patent Rule 4 required Mr. Golden to prepare "a chart
identifying where each element of each asserted claim is
found within each accused product, process, or method."
Supp. App'x 1004.  Despite having eight years to develop
his case and two chances to provide infringement conten-
tions compliant with Patent Rule 4, Mr. Golden failed to
identify in the accused products at least two key elements
claimed in his patents: the sensor and locking limitations.[2]

On appeal, Mr. Golden does not argue that the accused
Apple and Google devices themselves include the sensor
and locking limitations.  Instead, he argues that the Claims
Court overlooked other devices—"the sensors and detectors
of the Cell-All third-party contractors (NASA, Qualcomm,
Seacoast, Rhevision, and Synkera)"—and that the Claims
Court erred in "[f]ail[ing] to consider sensors and detectors

─────────────────

[2]     The Claims Court expressly identified deficiencies
regarding both the sensor and locking limitations in Mr.
Golden's contentions for claim 1 of the '497 patent, claim
10 of the '752 patent, claim 23 of the '439 patent, and claim
5 of the '287 patent. *Golden v. United States*, No. 13-307C,
at 7-11 (Fed. Cl. Nov. 10, 2021).  The only other asserted
claim remaining in the case is claim 1 of the '189 patent.
While the Claims Court did not address that claim ex-
pressly, the Claims Court identified deficiencies in the in-
fringement contentions with respect to the locking
limitation for claim 2 of the '189 patent, *id.* at 9–10, and
Mr. Golden has not argued to us that claim 1 is materially
different from claim 2 regarding those deficiencies.

GOLDEN v. US                                                    5

that are not 'native' to the manufacture of Apple and Sam-
sung products."  Appellant's Br. 2.  Mr. Golden failed to
even mention some of these other devices in his infringe-
ment contentions, and more importantly, he does not allege
that these devices have actually been combined by the gov-
ernment (or contractors acting on its behalf) with the ac-
cused devices into a device or system that would infringe
his asserted patent claims.  Thus, Mr. Golden has not
shown that the Claims Court erred in its decision.  We have
considered Mr. Golden's remaining arguments and find
them unpersuasive.

**AFFIRMED**

EXHIBIT D

No: 22-1196

RECEIVED

2022 SEP 22  AM 11: 33

US COURT OF APPEALS
FEDERAL CIRCUIT

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LARRY GOLDEN
*Petitioner*

v.

THE UNITED STATES
*Defendant*

ON APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN 1:13-cv-00307-EGB (13-307C)
JUDGE ERIC G. BRUGGINK

## INFORMAL PETITION FOR REHEARING *EN BANC*

LARRY GOLDEN
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

Appearing ProSe

September 19, 2022

## THE CLAIMS COURT CLEAR ERRORS OF JUDGEMENT

After waiting eight years for Plaintiff-Appellant to either make a mistake that justifies the dismissal of his case; for Plaintiff-Appellant to give up on his life's work; or, for Plaintiff-Appellant to just simply die, the Claims Court fabricated a series of lies to justify the dismissal of Plaintiff's case, while turning the blame for the dismissal back on the Plaintiff.

The only mistake Plaintiff-Appellant has made, is believing a Judicial system that once believed Blacks are only three-fifth a human being; that Blacks do not have the intelligence to invent; that Blacks cannot own intellectual property because Blacks are property themselves; and, that Blacks are out of their place when they raise issues of civil rights and civil liberties violations, has changed.

Plaintiff's goal after the 9/11 attacks was to help Government restore of Nation's economy and protect against future attacks. Not to fight Government over property rights.

### The Claims Court Clear Error of Judgement: The Claims Court and Government's Deliberate Pattern of *Delay* Resulted in Multiple Amended Complaints for the Plaintiff

The Claims Court stayed Plaintiff's case in 2014 to give the DOJ & DHS (federal agencies), who was not "persons" authorized to petition the Patent Trials and Appeals Board (PTAB) for *Inter Partes Review* (IPR), the opportunity to invalidate Plaintiff's patents. Plaintiff spent 15 months defending his patents against the unauthorized Government Agencies.

> "Golden may argue that, in view of *Return Mail*, the cancellation of the patent claims in an *inter partes review* initiated by the government could be considered an unconstitutional taking under the Fifth Amendment". Court of Appeals (CAFC) Case No. 19-2134 Filed 07/12/2019: Dkt. No. 37; Pgs. 14-15, Filed: 04/10/2020

Case: 22-1196     Document: 35     Page: 3     Filed: 09/21/2022

On 04/08/2016, the Government filed an answer to Plaintiff's complaint. The Government was allowed to come right back on 06/24/2016 and file a Motion to Dismiss under 12(b)(1) and 12(b)(6).

On 11/30/2016, the Claims Court dismissed the Government's Motion to Dismiss under 12(b)(1) and 12(b)(6), stating the modified cell phones, smartphones, tablets, and laptops was developed for the benefit of the Government.

On 12/02/2016, two days after the Claims Court denied the Government's Motion to Dismiss, the Court stated in a telephone conference, it was going to give the Government another chance at having Plaintiff's case dismissed. Delayed the Case another 14 months.

On 03/29/2018, the Claims Court dismissed 61 of the 72 alleged infringement claims. The same alleged infringement the Claims Court accepted as valid on 11/30/2016. This time the Claims Court stated the modified cell phones, smartphones, tablets, and laptops was the private property of the manufacturers and any use by the Government was purely incidental. The Claims Court prolonged the Case by leaving 11 of the 72 alleged infringement claims that included modified cell phones, smartphones, tablets, and laptops in the products' development.

The Claims Court Clear Error of Judgement is using the number of times the Claims Court was mercifully helping Plaintiff by allowing Plaintiff to amend his complaint, was made to justify clearing the Court's docket. The Claims Court should have dismissed the case in 2014 before allowing the unauthorized Government agencies to petition the PTAB for review.

## The Claims Court Clear Error of Judgement: Plaintiff "Improperly Attempted to Enlarge [Expand] the Scope of this Case"

Plaintiff's CPU was not an expansion of the scope of Plaintiff's case, and the Claims Court erred when the Court viewed Plaintiff's identification of the CPU as an enlargement:

3

Case: 22-1196     Document: 35     Page: 4     Filed: 09/21/2022

"Because we agree that the infringement contentions fail to meet the requirements of local patent rule 4 and improperly attempt to enlarge the scope of this case, we grant the motion to strike and to dismiss." *Golden v. US*; Case 1:13-cv-00307-EGB Document 249 Filed 11/10/21 Page 2 of 13

"Defendant also argues that the late included CPUs and chipsets are an improper expansion of the case and, in any event, have no corresponding claim chart to identify where in those devices the patent is infringed." *Golden v. US*; Case 1:13-cv-00307-EGB Document 249 Filed 11/10/21 Page 5 of 13

"Putting the propriety of that aside for the moment, the inclusion of these new chips as independent infringing devices is an improper attempt to again enlarge and materially change the infringement pled in the final amended complaint. We warned that the pleading stage had come to an end. See Order of February 21, 2021 at 7 (ECF No. 215) ("Plaintiff may file no further amended complaints.")." Case 1:13-cv-00307-EGB Document 249 Filed 11/10/21 Page 5 of 13

Plaintiff-Appellant's "Corrected Preliminary Infringement Contentions Claim Charts identifies 13 of the 25 asserted patent claims comprises the "CPU" as an *element* of the CMDC devices (claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1, 2, & 3 of the '189 patent; claims 13, 14, 15, 22, & 23 of the '439 patent; claims 4, 5, & 6 of the '287 patent)

Claims 4, 5, & 6, of the '287 patent has a combined total of forty-two (42) limitations. Three (3) [*the claims preamble*] of the (42) limitations, describes the alleged infringing device that includes the "name and model number" [*local patent rule 4c*] of the central processing units (CPUs) and chipsets. Thirty-six (36) of the (42) limitations identify the central processing unit (CPU) as the element found within each accused product [*local patent rule 4c*]. Within the (36) claim limitations, Plaintiff-Appellant identify the element as the central processing unit.

4

Case: 22-1196    Document: 35    Page: 5    Filed: 09/21/2022

In the "Amended Complaint for Reduced Pleadings", DKT 195 CFC 13-307C *Larry Golden v. The United States*, Plaintiff-Appellant described the functional and operational specifications, requirements and conditions at: CPU: pgs. 3, 4, 100, 109, 118, & 127; CPU for CMDC device (diagrams): pgs. 140, 141, 142, 143, 144, 145, 147, 148, 149, 150, 151, 152, 154, 155, 156, 157, 158, & 159; CPU for detection device (diagrams): pgs. 142, 143, 149, 150, 156, & 157; and, CPU for smartwatch device (diagrams): pgs. 144, 145, 151, 152, 158, & 159. The CPU was not introduced as a new device.

**Central Processing Unit (CPU):** The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.

## The Claims Court Clear Error of Judgement: "Plaintiff Fail to Identify Where the "Sensors" are Located in Each of the Accused Devices as Required Under the Claims Court Patent Rule 4"

During the Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. (Accessed 17.09.12), the DHS made it very clear that the second phase of the *Cell-All* initiative will include sensors/detectors external the host device: "[d]uring the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones" (U.S. Department of Homeland Security, 2011a)

"This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available. At a September 2011 live test and demonstration of second-generation prototypes at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center, Synkera's prototype was already on the market and NASA's sensor was awaiting clearance for public release."

"DHS presentations at this event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones [Rhevision], would soon become standard" (U.S. Department of Homeland Security, 2011a).

In Rhevision's solution [Rhevision is a third-party contractor for the *Cell-All* initiative], the company has replaced the camera lens in a cell phone with a microfluidic lens that still functions as a camera but uses a microscope to focus on the surface of a chemical sensor. Cell Phone Chemical Sensing Program Shows Progress, Official Says https://www.defensedaily.com/cell-phone-chemical-sensing-program-shows-progress-official-says/homeland-security/

A tiny silicon chip that… detect[s] dangerous airborne chemicals and alert emergency responders through the cell phone network. "Cell phones are everywhere people are," said Michael Sailor, professor of chemistry and biochemistry at the University of California, San Diego who heads the research effort. [E]mbedded in many cell phones… the new type of sensor could map … hazards like gas leaks or the deliberate release of a toxin.

A *megapixel* camera smaller than the head of a pencil eraser captures the image from the array of nanopores in Sailor's chip. The lens, developed by Rhevision, uses fluid rather than bulky moving parts to change its shape, and therefore focus.

"The beauty of this technology is that the number of sensors contained in one of our arrays is determined by the *pixel* resolution of the cell phone camera. With the *megapixel* resolution found in cell phone cameras today, we can easily probe a million different spots on our silicon sensor simultaneously. So, we don't need to wire up a million individual sensors," Sailor said. "We only need one.

Yu-Hwa Lo, professor of electrical and computer engineering at UC San Diego's Jacobs School of Engineering and founder of Rhevision developed the lens. The project is funded by the Department of Homeland Security. *Cell Phone Sensors for Toxins Developed at UC San Diego: Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https://www.understandingnano.com/cell-phone-sensors-toxins.html

Rhevision's schematics for a cell phone camera is identified and described ***243 times*** for Apple, Samsung, and LG, in Plaintiff-Appellant's Preliminary Infringement Contentions Charts.

> **CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).

Therefore, as reiterated below, the sensor for CBR detection is the ***megapixel*** camera sensor located inside each of the Defendants' allegedly infringing smartphones:

- Apple iPhone 12; Main camera: Dual - 12 MP [***Megapixel***], f/1.6, 26mm (wide), 1.4µm, dual pixel PDAF, OIS - 12 MP [***Megapixel***]. f/2.4, 13mm, 120° (ultrawide), 1/3.6"

- Apple iPhone 11; Main camera: Dual - 12 MP [***Megapixel***], f/1.8, 26mm (wide), 1/2.55", 1.4µm, dual pixel PDAF, OIS - 12 MP [***Megapixel***], f/2.4, 120°, 13mm (ultrawide), 1/3.6"

- Apple iPhone XS; Main camera: Dual - 12 MP [***Megapixel***], f/1.8, 26mm (wide), 1/2.55", 1.4µm, dual pixel PDAF, OIS - 12 MP [***Megapixel***], f/2.4, 52mm (telephoto). 1/3.4", 1.0µm, PDAF, OIS, 2x optical zoom

- Apple iPhone SE; Main camera: 12 MP [***Megapixel***], f/2.2, 29mm (standard), 1/3". 1.22µm, PDAF. Selfie camera: 1.2 MP [***Megapixel***], f/2.4, 31mm (standard)

- Apple iPhone 8; Main camera: 12 MP [***Megapixel***], f/1.8, 28mm (wide). PDAF, OIS. Selfie camera: 7 MP [***Megapixel***], f/2.2

- Apple iPhone 7; Main camera: 12 MP [***Megapixel***]. f/1.8, 28mm (wide), 1/3", PDAF, OIS. Selfie camera: 7 MP [***Megapixel***], f/2.2, 32mm (standard)

- Samsung Galaxy S21; Main Camera: Triple: 12 MP [***Megapixel***], f/1.8, 26mm (wide), 1/1.76", 1.8µm, Dual Pixel PDAF, OIS. 64 MP [***Megapixel***], f/2.0, 29mm (telephoto), 1/1.72", 0.8µm, PDAF, OIS, 1.1x optical zoom, 3x hybrid zoom. 12 MP [***Megapixel***]. f/2.2, 13mm, 120° (ultrawide), 1/2.55" 1.4µm, Super Steady video.

- Samsung Galaxy S20; Main Camera: Triple: 12 MP [***Megapixel***], f/1.8, 26mm (wide), 1/1.76", 1.8µm, Dual Pixel PDAF, OIS. 64 MP [***Megapixel***], f/2.0, 29mm (telephoto),

Case: 22-1196    Document: 35    Page: 9    Filed: 09/21/2022

1/1.72", 0.8μm, PDAF, OIS, 1.1x optical zoom, 3x hybrid zoom. 12 MP [*Megapixel*], f/2.2, 13mm, 120° (ultrawide), 1/2.55" 1.4μm, Super Steady video

❖ Samsung Galaxy S10; Main Camera: Triple: 12 MP [*Megapixel*], f/1.5-2.4, 26mm (wide), 1/2.55", 1.4μm, Dual Pixel PDAF, OIS. 12 MP [*Megapixel*], f/2.4, 52mm (telephoto), 1/3.6", 1.0μm, AF, OIS, 2x optical zoom. 16 MP [*Megapixel*], f/2.2, 12mm (ultrawide), 1/3.1", 1.0μm, Super Steady video.

❖ Samsung Galaxy S9; Main Camera: 12 MP [*Megapixel*], f/1.5-2.4, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS. Selfie camera: Dual - 8 MP [*Megapixel*], f/1.7, 25mm (wide), 1/3.6", 1.22μm, AF. 2 MP [*Megapixel*] (dedicated iris scanner camera).

❖ Samsung Galaxy S8; Main Camera: 12 MP [*Megapixel*], f/1.7, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS. Selfie camera: Dual - 8 MP [*Megapixel*], f/1.7, 25mm (wide), 1/3.6", 1.22μm, AF. 2 MP [*Megapixel*] (dedicated iris scanner camera).

❖ Samsung Galaxy Note8; Main Camera: Dual - 12 MP [*Megapixel*], f/1.7, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS. 12 MP [*Megapixel*], f/2.4, 52mm (telephoto), 1/3.6", 1.0μm, AF, OIS, 2x optical zoom. Selfie camera: Dual - 8 MP [*Megapixel*], f/1.7, 25mm (wide), 1/3.6", 1.22μm, AF. 2 MP [*Megapixel*] (dedicated iris scanner camera).

❖ LG V60; Main Camera: Triple: 64 MP [*Megapixel*], f/1.8, 27mm (standard), 1/1.72", 0.8μm, Dual pixel PDAF, OIS. 13 MP [*Megapixel*], f/1.9, 12mm (ultrawide), 1/3.4", 1.0μm. 0.3 MP [*Megapixel*], TOF 3D, f/1.4, (depth).

❖ LG V50; Main Camera: Triple: 12 MP [*Megapixel*], 27mm (wide), f/1.5, 1/2.55", 1.4μm, dual pixel PDAF, 3-axis OIS. 12 MP [*Megapixel*], 52mm (telephoto), f/2.4, 1/3.4", 1.0μm, 2x optical zoom, PDAF, OIS. 16 MP [*Megapixel*], 16mm (ultrawide), f/1.9, 1/3.1", 1.0μm, no AF.

❖ LG G8; Main Camera: Dual or Triple: 12 MP [*Megapixel*], f/1.5, 27mm (standard), 1/2.55", 1.4μm, dual pixel PDAF, OIS. 16 MP [*Megapixel*], f/1.9, 16mm (ultrawide), 1/3.1", 1.0μm, no AF. 12 MP [*Megapixel*], 52mm (telephoto), f/2.4, 1.0μm, 2x optical zoom, dual pixel PDAF, OIS

❖ LG G7; Main Camera: Dual: 16 MP [*Megapixel*], f/1.6, 30mm (standard), 1/3.1", 1.0μm, PDAF, Laser AF, OIS. 16 MP [*Megapixel*], f/1.9, 16mm (ultrawide), 1/3.1", no AF

❖ LG G6; Main Camera: Dual: 13 MP [*Megapixel*], f/1.8, 30mm (standard), 1/3.1", 1.12μm, PDAF, 3-axis OIS. 13 MP [*Megapixel*], f/2.4, 12mm (ultrawide), no AF

❖ LG V30; Main Camera: Dual: 16 MP [*Megapixel*], f/1.6, 30mm (standard), 1/3.1", 1.0μm, PDAF, Laser AF, 3-axis OIS. 13 MP [*Megapixel*], f/1.9, 12mm (ultrawide), no AF

Qualcomm's "Built-in Embedded", and NASA's "Nanosensor-Embedded Sleeve", are identified and described *324 times* for Apple, Samsung, and LG in Plaintiff-Appellant's Preliminary Infringement Contentions Charts

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). NASA creating a nanosensor-embedded "sleeve" for phones (picture below); that will detect chemicals ... and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."





Case: 22-1196     Document: 35     Page: 11     Filed: 09/21/2022

NASA's Subcontractor for the NODE+ is identified and described *135 times* for Apple, Samsung, and LG, in Plaintiff-Appellant's Preliminary Infringement Contentions Charts [The Claims Court erred when the Court said a subcontractor's work does not qualify under 28 U.S.C. § 1498(a), and that the NODE+ addition expanded the scope of Plaintiff's infringement claim, thus, violating the Court's order].

**Interchangeable Sensors:** Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or another smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.



The NODE+ platform... outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth technology. *Credits: Variable Inc.*

How is it possible the Claims Court can boldly state, without convection, "Mr. Golden failed to identify where at least two claimed elements were found in the accused devices as required under the Claims Court's patent rules: sensors for hazardous materials and locking mechanisms", when collectively the sensors were identified over seven hundred [702] times throughout Plaintiff's preliminary infringement contentions charts for Apple, Samsung, & LG.

11

Case: 22-1196     Document: 35     Page: 12     Filed: 09/21/2022

**The Claims Court Clear Error of Judgement: Plaintiff Fail to Identify Where the "Locking Mechanism" is Located in Each of the Accused Devices as Required Under the Claims Court Patent Rule 4**

The Federal Circuit's in *Kearns v. General Motors Corporation* 94 F.3d 1553 (Fed. Cir. 1996), noted that: "each patent is, as a matter of law, 'directed to a separate invention' and 'two independent and distinct inventions cannot be claimed in the same patent.' *Id. (citing* 35 U.S.C. §§ 101, 121.) … *Kearns* takes the view that each patent creates a unique set of 'transactional facts'" … The Court continued:

> "[e]ach patent establishes an independent and distinct property right … Each patent asserted raises an independent and distinct cause of action … In the case at bar, it is not possible to show that the identical issue was presented …; for each patent, by law, covers an independent and distinct invention. Further, infringement must be separately proved as to each patent [claim] …"

806.03 Single Embodiment, Claims Defining Same Essential Features [R-08.2012]: "[w]here the claims of an application define the same essential characteristics of a single disclosed embodiment of an invention, restriction therebetween should never be required. This is because the claims are not directed to distinct inventions; rather they are different definitions of the same disclosed subject matter, varying in breadth or scope of definition."

Plaintiff-Appellant's locking mechanism is a single disclosed embodiment of the Communicating, Monitoring, Detecting, and Controlling (CMDC) invention:

In the first instance, the locking function is activated when the "threat" is a detection of at least a chemical, biological, or radiological contamination.

12

In this first instance, the single embodiment of the invention only appears in the asserted claim 1 of the '497 patent, and claim 10 of the '752 patent; identified and described under the "doctrine of equivalents" in each of the six (6) allegedly infringing smartphones of Apple; the six (6) allegedly infringing smartphones of Samsung; and, the six (6) allegedly infringing smartphones of LG. This single embodiment of the invention varies in breadth and scope of definition to the single disclosed embodiment of the invention as described below in the second instance.

In the second instance, the locking function is activated when the "threat" is an unauthorized person who has made several unsuccessful attempts at unlocking the monitoring equipment; the communication device; the new and improved cell phone; or, the Defendants' allegedly infringing smartphones.

In this second instance, the single embodiment of the invention appears in claims 1, 2, 4, 7, & 8 of the '189 patent; claims 13, 14, 16, 19, 20, 22, & 23 of the '439 patent and, claims 4, 5, & 6 of the '287 patent; identified and described under the provisions of "direct infringement" in each of the six (6) allegedly infringing smartphones of Apple; the six (6) allegedly infringing smartphones of Samsung; and, the six (6) allegedly infringing smartphones of LG. This single embodiment of the invention varies in breadth and scope of definition to the single disclosed embodiment of the invention as described above in the first instance.

The Government identified claim 1 of the '497 patent, and claim 10 of the '752 patent [first instance] as being deficient, but applied that claim of deficiency over to claims 1, 2, 4, 7, & 8 of the '189 patent; claims 13, 14, 16, 19, 20, 22, & 23 of the '439 patent and, claims 4, 5, & 6 of the '287 patent [second instance], and even farther, to include the asserted claims 3, 5, 6, & 9 of the '189 patent; and, claims 15, 17, 18, & 21 of the '439 patent that does not include a

Case: 22-1196     Document: 35     Page: 14     Filed: 09/21/2022

"locking mechanism" as a single disclosed embodiment of the invention. The two embodiments "are different definitions of the same disclosed subject matter, varying in breadth or scope of definition." *806.03 Single Embodiment, Claims Defining Same Essential Features [R-08.2012]*

The Claims Court Clear Error of Judgement is assuming, *without discovery*, that the integration of the alleged infringing products of the Defendants; integrated with the DHS T.R.U.S.T. CBR sensing brick, and the DHS MATTS integrator/gateway device [claim 1 of the '497 patent, and claim 10 of the '752 patent], does not directly infringe, or infringe under the "doctrine of equivalents".

The Claims Court Clear Error of Judgement is relying on the Government's interpretation of Plaintiff-Appellant's single embodiment [locking mechanism] of the invention identified in at claim 1 of the '497 patent, and claim 10 of the '752 patent to describe the single embodiment locking mechanism in at claims 1, 2, 4, 7, & 8 of the '189 patent; claims 13, 14, 16, 19, 20, 22, & 23 of the '439 patent and, claims 4, 5, & 6 of the '287 patent. See 806.03, "different definitions of the same disclosed subject matter".

The Claims Court Clear Error of Judgement is tying the asserted claims 3, 5, 6, & 9 of the '189 patent; and, claims 15, 17, 18, & 21 of the '439 patent, that does not include a "locking mechanism" as a single disclosed embodiment of the invention, to claim 1 of the '497 patent, and claim 10 of the '752 patent [first instance] and dismissing the claims for failure to meet the requirements of local patent rule 4. Plaintiff-Appellant's patent claims were dismissed because he fails to identify locking mechanism that certain of his patent claims 3, 5, 6, & 9 of the '189 patent; and, claims 15, 17, 18, & 21 of the '439 patent does not call for.

The Claims Court Clear Error of Judgement is altering the requested DHS S&T BAA07-10; *Cell-All Ubiquitous Biological and Chemical Sensing* initiative to include a request for a

locking mechanism. The material components as outlined in the specifications is the integration of chemical and biological [second phase will include radiological and explosive] sensors with a host device such as a cell phone; to form a *ubiquitous* sensing communications network. All twenty-five (25) asserted patent claims; claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent and, claims 4-6 of the '287 patent, have the three basic requirements [host device; sensors/detectors; communications network] of the *Cell-All* initiative. It was the Claims Court that made Plaintiff's "locking mechanism" a vital component needed to prove direct infringement under 28 U.S.C. § 1498(a) only to falsely claim Plaintiff did not comply with the Court order of identifying the "locking mechanism".

The Claims Court Clear Error of Judgement is ordering Plaintiff to prove direct infringement of a component (i.e., locking mechanism) not requested in the *Cell-All* specs, and therefore does not fall under the jurisdiction of the Claims Court. The Claims Court erred when the Court ordered Plaintiff to prove direct infringement of Plaintiff's "locking mechanism" under 35 U.S.C. § 271(a) as a necessary predicate to proving direct infringement under 28 U.S.C. § 1498(a). *Zoltek III*, [overturned]

## CONCLUSION

Plaintiff-Appellant is not asking the Federal Circuit to do anything special for Plaintiff because Plaintiff is a *Pro Se* litigant. Plaintiff-Appellant is asking the Federal Circuit to not be complicit with the Claims Court in their efforts to destroy all possibilities of Plaintiff being compensated for his contribution toward building our Nation's economy and mitigating terrorism activity.

15

Respectfully submitted,

_____

Larry Golden

Plaintiff-Appellant, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

(Home) 864-288-5605

(Mobile) 864-992-7104

## CERTIFICATE OF COMPLIANCE

I hereby certify that an original version and three (3) copies of the foregoing "INFORMAL PETITION FOR REHEARING *EN BANC*: CASE NUMBER 22-1196" was sent on September 19, 2022 via U.S. Postal service "priority express mail", to: CLERK'S OFFICE, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 MADISON PLACE, N.W., WASHINGTON, D.C. 20439

The petition complics with the 15 typewritten double-spaced pages requirement and an attached copy of the opinion / judgement Plaintiff-Appellant is petitioning the court to review.

Respectfully submitted,

Larry Golden

Larry Golden
Plaintiff-Appellant, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
(Home) 864-288-5605
(Mobile) 864-992-7104

# EXHIBIT E

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

_____

**LARRY GOLDEN,**
*Plaintiff-Appellant*

v.

**APPLE INC., SAMSUNG ELECTRONICS USA, LG
ELECTRONICS USA, INC., QUALCOMM
INCORPORATED, MOTOROLA SOLUTIONS, INC.,
PANASONIC CORPORATION, AT&T INC.,
VERIZON CORPORATION SERVICE GROUP,
SPRINT CORPORATION, T-MOBILE USA, INC.,
FORD GLOBAL TECHNOLOGIES, LLC, FAIRWAY
FORD LINCOLN OF GREENVILLE, GENERAL
MOTORS COMPANY, KEVIN WHITAKER
CHEVROLET, FCA US LLC, BIG O DODGE
CHRYSLER JEEP RAM,**
*Defendants*

_____

2022-1229

_____

Appeal from the United States District Court for the
District of South Carolina in No. 6:20-cv-04353-JD, Judge
Joseph Dawson, III.

-----------------------------------------------

**LARRY GOLDEN,**
*Plaintiff-Appellant*

Case: 22-1229   Document: 16   Page: 2   Filed: 09/08/2022

v.

## GOOGLE LLC,
*Defendant*

———————————

2022-1267

———————————

Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III.

———————————

Decided:  September 8, 2022

———————————

LARRY GOLDEN, Greenville, SC, pro se.

———————————

Before DYK, TARANTO, and STOLL, *Circuit Judges*.

PER CURIAM

Larry Golden appeals two orders of the United States District Court for the District of South Carolina ("district court") dismissing his patent infringement claims against various defendants.  We *affirm* the dismissal in Case No. 22-1229 but *vacate* the dismissal in Case No. 22-1267 and *remand* for further proceedings consistent with this opinion.

### BACKGROUND

Mr. Golden owns a family of patents concerning a system for locking, unlocking, or disabling a lock upon the

GOLDEN v. APPLE INC.                                          3

detection of chemical, radiological, and biological hazards.[1]
In 2019, he sued sixteen defendants in the district court,
alleging patent infringement by their development and
manufacturing of certain devices.  The district court dis-
missed the suit without prejudice, and this court affirmed
the dismissal "on the ground of frivolousness" because Mr.
Golden's complaint "offer[ed] only vague generalities and
block quotes of statutes, cases and treatises, but nowhere
point[ed] us to any nonfrivolous allegations of infringement
of any claim by any actual product made, used, or sold by
any defendant." *Golden v. Apple Inc.*, 819 F. App'x 930, 931
(Fed. Cir. 2020).

On January 5, 2021, in Case No. 22-1229, Mr. Golden
again sued the same sixteen defendants from the 2019 case
for patent infringement ("the Apple case").  He initially
filed the same over-300-page complaint held to be frivolous
in the 2019 case.  After the magistrate judge imposed a 35
page limit on the complaint, Mr. Golden filed a shortened
complaint complying with the restriction.  On January 26,
2021, in Case No. 22-1267, Mr. Golden separately sued
Google LLC for patent infringement ("the Google case").
The magistrate judge reviewed the complaints in both
cases and recommended summary dismissal with prejudice
without issuance of service of process or leave to amend
and monetary sanctions for the filing of frivolous litigation.

In both cases, the district court adopted the magistrate
judge's recommendations in part.  In the Apple case, the
district court dismissed the complaint as frivolous without
the issuance of service of process but declined to dismiss
with prejudice.  Additionally, the district court lifted the
page restriction for an amended complaint.  In the Google
case, the district court dismissed the complaint with

_____

[1]    The patents at issue in these cases are U.S. Patent
Nos. 7,385,497; 9,096,189; 9,589,439; 10,163,287 and Reis-
sue Patent Nos. RE43,891 and RE43,990.

GOLDEN v. APPLE INC.

prejudice and without the issuance of service of process.
Mr. Golden appeals the district court decisions in both
cases.  We have jurisdiction under 28 U.S.C. § 1295(a)(1).
On appeal, Mr. Golden has filed briefs, while the defend-
ants have not filed responsive briefs.

<div align="center">DISCUSSION</div>

Under the pleading standards set forth in *Bell Atlantic
Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iq-
bal*, 556 U.S. 662 (2009), a court must dismiss a complaint
if it fails to allege "enough facts to state a claim to relief
that is plausible on its face."  *Twombly*, 550 U.S. at 570.
This standard "requires more than labels and conclusions,
and a formulaic recitation of the elements of a cause of ac-
tion will not do."  *Id.* at 555 (citation omitted).  A plaintiff
must allege facts that give rise to "more than a sheer pos-
sibility that a defendant has acted unlawfully."  *Iqbal*, 556
U.S. at 678 (citation omitted).  In the patent context, this
court has explained that a plaintiff need not "plead facts
establishing that each element of an asserted claim is met,"
*In re Bill of Lading Transmission and Processing Sys. Pat.
Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal
v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir.
2007)), but must plead "'enough fact[s] to raise a reasona-
ble expectation that discovery will reveal' that the defend-
ant is liable for the misconduct alleged."  *Id.* at 1341
(alteration in original) (quoting *Twombly*, 550 U.S. at 556).
We review the district court's dismissal of the complaint de
novo.  *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195,
198 (4th Cir. 2014).

In the Apple case, the district court dismissed the dock-
eted complaint as frivolous after finding that Mr. Golden
"failed to include factual allegations beyond the identities
of the Defendants, reference to the alleged infringing de-
vices, and the alleged infringed-upon patents."  Dist. Ct.
Op. at 4–5.  We agree with the district court: the docketed
complaint is nothing more than a list of patent claims and

accused products manufactured by each defendant for each
asserted patent.   Mr. Golden contends that his original
complaint contained sufficient factual allegations to sup-
port his claims.   However, he concedes that the rejected
original complaint was identical to the one that this court
deemed frivolous in the 2019 case.   His effort to relitigate
the sufficiency of the original complaint is precluded under
the doctrine of res judicata. *See Arizona v. California*, 530
U.S. 392, 412 (2000) ("[I]f a court is on notice that it has
previously decided the issue presented, the court may dis-
miss the action *sua sponte*, even though [a preclusion] de-
fense has not been raised.").   Mr. Golden does not argue
that the docketed complaint contains factual allegations
beyond those contained in his original complaint or that
the allegations in the docketed complaint do anything be-
yond listing the alleged infringed-upon patent claims and
the alleged infringing devices.   This is plainly insufficient.
We see no error in the district court's without prejudice dis-
missal of the Apple case.

In the Google case, the district court again concluded
that Mr. Golden's complaint was frivolous.   Here, however,
Mr. Golden's complaint includes a detailed claim chart
mapping features of an accused product, the Google Pixel 5
Smartphone, to independent claims from U.S. Patent Nos.
10,163,287, 9,589,439, and 9,069,189.   The district court
discounted this claim chart because it "contains the exact
same language as the claim charts previously rejected by
the Federal Circuit [in the 2019 case], although Google
Pixel 5 Smartphone appears in the far left column instead
of Apple." Dist. Ct. Op. at 4.   But to the extent that the
chart includes the "exact same language" as previously re-
jected charts, it is simply the language of the independent
claims being mapped to.   The key column describing the
infringing nature of the accused products is not the same
as the complaint held frivolous in the 2019 case.   It at-
tempts—whether  successfully  or  not—to  map  claim

limitations to infringing product features, and it does so in a relatively straightforward manner.

We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. Our decision does not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment. We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous.

### CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal in Case No. 22-1229, vacate the dismissal in Case No. 22-1267, and remand for further proceedings consistent with this opinion.

## CASE NO. 22-1229 AFFIRMED

## CASE NO. 22-1267 VACATED AND REMANDED

### COSTS

No costs.