# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net



F I L E D

JAN ~6 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

CASE NO: <u>4:22-cv-03283-HSG</u>

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

January 06, 2023

---

## PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S UNTIMELY CASE MANAGEMENT STATEMENT

The thrust of Plaintiff's motion is that the Court should strike Qualcomm's Case Management Statement. Qualcomm failed to comply with this Court's order to file its Case Management Statement on or before the August 30, 2022 deadline. The Defendant filed the Case Management Statement four (4) months after the scheduled due date of August 30, 2022:

"Notice is hereby given that a Telephonic Case Management Conference has been set for September 6, 2022, before Judge Haywood S. Gilliam, Jr., at 2:00 p.m., in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA. ***Case Management Statement due by August 30th***."
*Golden v. Qualcomm*: Case 4:22-cv-03283-HSG Document 17 Filed 07/28/22

> USDC Local Civil Rules 16-9: Case Management Statement and Proposed Order (a) Joint or Separate Case Management Statement. Unless otherwise ordered, no later than the date specified in Fed. R. Civ. P. 26(f), counsel must file a Joint Case Management Statement addressing all of the topics set forth in the Standing Order for All Judges of the Northern District of California []. If one or more of the parties is not represented by counsel, the parties may file separate case management statements.

Qualcomm failed to inform the Court and Qualcomm failed to seek leave to file the Case Management Statement out of time.

Qualcomm also failed to comply with the California Rules of Court (2022); Rule 3.725. Case Management Statement (a) Timing of statement: "No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case."

Qualcomm filed its Case Management Statement on January 4, 2023. For Qualcomm to be in compliance with the California Rules of Court (2022); Rule 3.725. Case Management Statement (a) Timing of statement, Qualcomm should have filed the Case Management Statement on or prior to December 28, 2022 to meet the 15 calendar days' time limit.

Qualcomm also failed to comply with the California Rules of Court (2022); Rule 3.725. Case Management Statement (c) Contents of statement: Parties must use the mandatory Case Management Statement (form CM-110) **Exhibit A**, or another template allowed by the Court **Exhibit B**.

2

There's no excuse for the scandalous document the Defendant submitted as a Case Management Statement. It is obviously written to add confusion to this case.

## PLAINTIFF'S MOTION FOR PERMANENT INJUNCTIVE RELIEF

### Qualcomm's Alleged Antitrust Law Violations

Upon information retrieved from this Court: The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices:

"Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5%* running royalty on the price of each handset sold. These licenses are called Subscriber Unit License Agreements ("SULA") …"

"Specifically, Qualcomm charges a *5%* running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio… LG Electronics (LGE) paid Qualcomm a *5%* running royalty on handsets containing Qualcomm modem chips and a *5.75%* running royalty on handsets containing non-Qualcomm [] chips… "

"Qualcomm and LG signed … Subscriber Unit License … Steve Altman (Qualcomm President) sent to Irwin Jacobs (Qualcomm Co-Founder and former CEO): "They currently pay *5%* when they use our chip and *5.75%* when they don't. We have agreed to take their rate to *5%* regardless of whose chip they use."

Plaintiff believes Qualcomm's *5%* royalty rate on the price of each phone sold is a species of unfair competition. The Federal Trade Commission Act bans "unfair methods of

3

competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of *5%* on the price of each phone sold…

- [O]n May 3, 2012, Sony and Qualcomm entered into a Subscriber Unit Patent License Agreement, effective February 16, 2012 through September 30, 2012 ("May 2012 Sony Interim License"). ECF No. 1326 at 9. Under the May 2012 Sony Interim License, Sony agreed to provisionally pay Qualcomm a *5%* royalty on CDMA handsets."

- Under the [] SULA amendment, Samsung paid a *5%* running royalty rate on CDMA handsets containing Qualcomm chips, subject to a $20 royalty cap."

- BenQ and Qualcomm signed a new patent license agreement. JX0030. Under the license agreement, BenQ owed Qualcomm's standard *5%* running royalty rate, with the handset as royalty base. See JX0030-007 (defining the royalty base as "the Selling Price charged by LICENSEE for Subscriber Units Sold to such Purchaser."

- Apple does not manufacture handsets itself but instead uses contract manufacturers, including Pegatron and Wistron, to manufacture handsets. ECF No. 1326 at 4. These contract manufacturers pay Qualcomm a *5%* running royalty rate on the manufacturers' handset selling price.

Judge Koh determined, "Qualcomm's anticompetitive conduct is conduct that 'harms the competitive process and thereby harms consumers.'" 6ER1208 (quoting *Microsoft*, 253 F.3d at 58) … "[A]pplying that standard, the district court agreed with the FTC that Qualcomm's practices were anticompetitive."

The Judge's decision severely chastised Qualcomm for basing its royalty on the price of the device (e.g., a handset). Significantly, the Judge framed this criticism based on principles of ***competition law and patent law***, not contract law. Judge Lucy Koh of the US District Court of the Northern District of California in her decision in *Federal Trade Commission v Qualcomm Incorporated* (5:17-cv-0220); determined that charging royalties based on the price of a handset was unreasonable and contrary to US law.

If Qualcomm loses this case, Qualcomm will have to license its patent to competitors and renegotiate its licensing agreements with all its customers. No longer will Qualcomm be able to charge the *5%* royalty rate per the price of the phone.

On Appeal in the United States Court of Appeals for the Ninth Circuit, *Federal Trade Commission, Plaintiff-Appellee, v. Qualcomm Incorporated, Defendant-Appellant*. Case No. 19-16122, the Ninth Circuit never changed the entire patent system and said it was legal for Qualcomm to collect royalties on Plaintiff's patented products without obtaining a license.

Owning a patent gives Plaintiff valuable property rights. Under federal patent law, Plaintiff have the exclusive right to make, use or sell Plaintiff's patented invention(s) throughout the United States and its territories. Plaintiff also have the right to receive royalties from patent licensing agreements that give others permission to make, use or sell your invention.

Qualcomm does not have the right to collect a *5%* running royalty on the price Plaintiff's inventions are sold for. Plaintiff is entitled to permanent injunctive relief as a matter of law.

Upon information and belief, Plaintiff believes Qualcomm has formed or created its monopoly for chipsets by "tying" Plaintiff's CPUs to its wireless cellular modems. A "tying," "tie-in," or "tied sale" arrangement has been defined as "an agreement by a party to sell one product . . . on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that [tied] product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992).

Conditioning the ability of a licensee to license one or more items of intellectual property on the licensee's purchase of another item of intellectual property or a good or a service has been held in some cases to constitute illegal tying. See, e.g., *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156-58 (1948) (copyrights); *Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) (patent and related product), abrogated in part by *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

Qualcomm's anticompetitive practices of its cellular-modem patents harm competitors. Qualcomm's "hold out" strategy of "no license, no chip", was used to force the co-conspirators OEMs to purchase Plaintiff's patented CPU that Qualcomm "tied" to its modem. "Tying" under U.S. law is defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."

Plaintiff also believes the OEMs were misled and misinformed into believing the CPUs tied to Qualcomm's chipsets [3] was not a patented product Qualcomm had received prior knowledge on. Plaintiff believes Qualcomm threaten the OEMs to purchase what was marketed as an unpatented product [CPU], tied to Qualcomm's patented product (wireless cellular modem), in a "no license, no chip[set]", policy contract.

Plaintiff is challenging the tying arrangement because: (1) Qualcomm has market power in the tying product, *Cf.* 35 U.S.C. § 271(d) (2012) (requiring market power in patent misuse cases involving tying). (2) the arrangement has an adverse effect on competition in the relevant market for the tying product or the tied product, and (3) efficiency justifications for the arrangement do not outweigh the anticompetitive effects.

Qualcomm, has a 90% share in the market for chipsets, and by withholding knowledge of "tying" a Plaintiff's patented CPU, coerced cellular telephone manufacturers (OEMs) to purchase only Qualcomm-manufactured chipsets. These actions are alleged to be part of Qualcomm's strategy to maintain a monopoly in the chipset market.

Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision in *United States v. Microsoft Corp.*, held it sufficient that Qualcomm engaged in "anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43 (citations and internal quotation marks omitted)."

According to the Department of Justice, "A tying arrangement occurs when, through a contractual or technological requirement, a seller conditions the sale or lease of one product or service on the customer's agreement to take a second product or service ... the Supreme Court stated in *International Salt Co. v. United States* that "it is unreasonable, per se, to foreclose competitors from any substantial market," and in *Standard Oil Co. v. United States* that "[t]ying agreements serve hardly any purpose beyond the suppression of competition ... Classic "contractual" patent tying occurs when the tying product (such as a mimeograph machine) is

patented, the tied product is an unpatented commodity used as an input for the tying product
(such as ink or paper), and the sale of the patented product is conditioned on the purchase of the
unpatented product. A "technological tie" may be defined as one in which "the tying and tied
products are bundled together physically or produced in such a way that they are compatible only
with each other." The government's tying claim against Microsoft involved both the contractual
and technological bundling of the Internet Explorer web browser (the tied product) with its
Windows operating system (the tying product). https://www.justice.gov/atr/chapter-5-antitrust-
issues-tying-and-bundling-intellectual-property-rights

American courts first encountered "tying arrangements" in the course of patent
infringement litigation. *See, e.g., Heaton-Peninsular Button-Fastening Co. v. Eureka Specialty
Co.*, 77 F. 288 (CA6 1896). Such a case came before the Supreme Court in *Henry v. A. B. Dick
Co.*, 224 U. S. 1 (1912).

On Appeal in the United States Court of Appeals for the Ninth Circuit, *Federal Trade
Commission, Plaintiff-Appellee, v. Qualcomm Incorporated, Defendant-Appellant.* Case No. 19-
16122, the Ninth Circuit never changed the antitrust "anticompetitive" law that governs "tying"
and "tying arrangements" and said it was legal for Qualcomm to "tie" Plaintiff's patented central
processing units CPUs to it Snapdragon SoCs.

Owning a patent gives Plaintiff valuable property rights. Under federal patent law,
Plaintiff have the exclusive right to make, use or sell Plaintiff's patented invention(s) throughout
the United States and its territories. Plaintiff also have the right to receive royalties from patent
licensing agreements that give others permission to make, use or sell your invention.

Qualcomm does not have the right to "tie" Plaintiff's patented central processing units
CPUs to it Snapdragon SoCs. Plaintiff is entitled to permanent injunctive relief as a matter of law

8

**Qualcomm's Alleged Infringement of Plaintiff's Patents**

Plaintiff's patents give Plaintiff the exclusive right to make, ***use***, offer to sell, sell, or import, a specified invention in the United States, for a limited time. Upon inventing Plaintiff's now patented CPUs; CMDC devices; Stall, Stop, & Vehicle Slowdown Systems, Plaintiff has the right to exclude Qualcomm from "***using***" any of Plaintiff's patented handsets i.e., smartphones, to generate billions in annual revenues.

If Qualcomm ***uses*** Plaintiff's patented invention in the United States without authorization – called "infringement" – Plaintiff can enforce the patent(s) in court. Plaintiff can obtain monetary compensation for the unauthorized ***use*** of Plaintiff's invention; or, a court order that prohibits Qualcomm from continuing to ***use*** the inventions.

Plaintiff is alleging Qualcomm willfully contributed to the infringement of Plaintiff's CPUs; CMDC devices; and Stall, Stop, & Vehicle Slowdown Systems.

Qualcomm and ASUS made a phone for Snapdragon Insiders. ASUS and Qualcomm have teamed up to make a smartphone. The "Smartphone for Snapdragon Insiders" harnesses Qualcomm's Snapdragon 888 5G chipset.  https://www.engadget.com/ qualcomm-asus-smartphone-snapdragon-insiders-150023369.html?guccounter...

Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States … a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer."

Plaintiff has alleged Qualcomm's Snapdragon SoCs is the apparatus Qualcomm uses in practicing the patented process; constituting a material part of Plaintiff's inventions; knowing the

Snapdragon SoCs to be especially made or especially adapted for use in an infringement of such patents.

The threshold requirement for a claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972).  There must also be a showing that the alleged contributory infringer knew of the patent and that his or her actions would lead to infringement of the patent. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices.

Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes actions that contribute (or potentially contribute) to someone else infringing a patent, even if those actions do not directly infringe the patent. An example of contributory infringement include:

The supply of Component A (i.e., Qualcomm's Snapdragon chipset that includes Plaintiff's central processing unit (CPU), with instructions to connect it to an available Component B (i.e., Qualcomm/Asus smartphone that Plaintiff claims as his patented CMDC device; smartphone); where A+B (Plaintiff's patented CPU (Qualcomm's Snapdragon) + Plaintiff's CMDC device (Qualcomm/Asus smartphone is a patented product).

*See Ind. claims 4-6 of Plaintiff's '287 patent. See also Ind. claims 1 & 11, Dep. claims 2-10 & 12-20 of Plaintiff's '619 patent that covers Plaintiff's CPU. See Ind. claims 1-9 of Plaintiff's '189 patent; and, Ind. claims 13-23 of Plaintiff's '439 patent that covers Plaintiff's CMDC device.*

Qualcomm has yet to stop allegedly infringing Plaintiff's patents in every way they can. Attached as **Exhibit C** is an excerpt of an article that describes three versions of Qualcomm's Snapdragon processors (Snapdragon Vision SoC; Snapdragon ADAS SoC; and Snapdragon Accelerator), Qualcomm has designed for vehicles. Plaintiff's patent claims are included in the document, which outlines how Plaintiff's patented CPUs are being "used" by Qualcomm.

Qualcomm is also developing Snapdragon processors for the internet of things (IoTs) platform that encumbrances Plaintiff's patented CPUs; CMDC devices; and Stall, Stop, & Vehicle Slowdown Systems. **Exhibit D**

Plaintiff has alleged Qualcomm has willfully infringed Plaintiff's patented CPUs; CMDC devices; and Stall, Stop, & Vehicle Slowdown Systems. The alleged willful infringement begins in year 2010, when Plaintiff submitted to Qualcomm a proposed licensing agreement and cease and desist notice.

Plaintiff is entitled to permanent injunctive relief as a matter of law because Qualcomm has not shown any signs of stopping its infringing actions.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT

### Since Receiving Knowledge of Plaintiff's Intellectual Property Subject Matter, Qualcomm Has Had Plenty Opportunities to Challenge the Validity of Plaintiff's Patents

Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices.

In 2008, Qualcomm, Apple, Samsung, and LG were awarded contracts to perform work for the Government. The Government "authorized and consented" to Qualcomm infringing

Plaintiff's patents. Upon information, Qualcomm chose to protect itself against any patent infringement claims by performing work under a Government contract. With the knowledge of Plaintiff's Intellectual Property Subject Matter [patents], Qualcomm could have challenged my patents at the USPTO.

On November 4, 2010, Plaintiff emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC—Smartphone—device; central processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and unmanned electric, autonomous, and driverless vehicles).

Plaintiff asked if Qualcomm would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff). Subject: "Patented Technology for Qualcomm's Review (copy available upon request).

Plaintiff mailed out letters dated December 7, 2010 addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, (copies of the letters and return receipts are available upon request) informing the Executives of the Patent Owner's (Plaintiff) patented technology and asked if they would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff).

After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

12

On October 11, 2011, the Patent Owner (Plaintiff) returned via e-mail, the answered Patent Information Request form to Ms. Lane. The Patent Owner (Plaintiff) made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

In 2013, Qualcomm was named with Apple, Samsung and LG, as the third-party contractors in the Court of Federal Claims case *Larry Golden v. The United States*; Case No. 13-307C; filed 2013. At that very moment, under RCFC 24, Qualcomm was allowed to proactively intervene, permissively or by right, to defend against patent infringement claims, and to offer

## Qualcomm has had Twelve (12) Years to Challenge the Validity of Plaintiff's Patents in Any of the Following Ways:

**Pre-issuance Submissions:** A pre-issuance submission can be used to challenge a patent publication or patent application that has not been granted or issued a patent. If a patent has not been issued by the United States Patent and Trademark Office ("USPTO"), then you can challenge the patent application by submitting "prior art" to the USPTO before a patent issues. Prior art is evidence that an element of an invention was publicly known before a patent application was filed with the USPTO. After the prior art has been submitted, an examining patent attorney at the USPTO will determine if a patent should be issued in light of the newly submitted prior art.

**Post Grant Review:** A post grant review can be used to challenge an issued patent within nine months after the grant of a patent. A post grant review can be filed by any person who is not the patent owner and has not filed a civil action challenging the validity of a claim of the patent. A post grant review is filed with the Patent Trial and Appeal Board (the "PTAB"). The PTAB will review the patentability of one or more of a patent's claims. In reviewing the patentability during a post grant review, the PTAB will consider if a patent claims are valid in

13

light of 35 U.S.C. § 101 (patentable subject matter issues), 35 U.S.C. § 102 (novelty issues), 35 U.S.C. § 103 (obviousness issues) and 35 U.S.C. § 112 (adequate disclosure/definiteness issues).

**Inter Partes Review:** An inter partes review can be used to challenge an issued patent after nine months after the grant of a patent. The process begins by a third party filing a petition for inter partes review with the PTAB. The patent owner may file a preliminary response to the petition. In reviewing the patentability during an inter partes review, the PTAB will consider if the patent claims are valid in light of 35 U.S.C. § 102 (novelty issues) and 35 U.S.C. § 103 (obviousness issues).

In 2013, Qualcomm was named with Apple, Samsung and LG, as the third-party contractors in the Court of Federal Claims case *Larry Golden v. The United States*; Case No. 13-307C; filed 2013. In 2014, the DHS and DOJ, who was not persons authorized to petition the PTAB, petitioned for an *Inter Partes Review* (IPR) against Plaintiff. Qualcomm, who was considered a person authorized to petition the PTAB for review, and who was being represented by the DOJ, could have filed the petition to challenge Plaintiff's patent claims.

**Ex Parte Reexamination:** An ex parte reexamination can be used to challenge an issued patent during the term of a patent. If the patent has already been issued by the USPTO, then a third party can challenge the patent at the USPTO by filing a request for reexamination of the patent. An ex parte reexamination can be filed by any person. A request for reexamination requests that the patent office reexamine a patent in light of newly submitted prior art that was not considered during the prosecution of the patent, or in light of prior art that was considered, but now is to be considered in a new way. Ex parte reexaminations require documents that include legal arguments drafted according to very specific formats and administrative rules. It is

well advised to seek the help of a registered patent attorney for assistance in preparing and filing a request for reexamination with the USPTO.

**RCFC 14(b):** The Rules of the COFC ("RCFC") provide contractors at least two avenues for being heard at court. First, RCFC 14(b) allows parties to formally notify any interested third-party, such as an indemnitor, of the § 1498(a) complaint. A noticed party "may file an appropriate pleading setting forth the person's interest in the subject matter of the litigation." RCFC 14(c)(1)(a). Second, RCFC 24 allows interested parties to proactively intervene, permissively or by right.

In the COFC case *Larry Golden v. USA*; Case 1:13-cv-00307-EGB Document 169 Filed 04/22/19 Page 7 of 11; Qualcomm, Inc. was provided notice to appear to protect any interest Qualcomm may have in the case. Qualcomm failed to appear to protect its interest. Claiming an interest in this current case is an indication Qualcomm deliberately defaulted on its responsibility to appear and defend any interest Qualcomm may have had in the case. It is a waste of judicial resources to allow Qualcomm the opportunity to defend against Plaintiff's current claims of infringement and to challenge Plaintiff's patents; especially after the Federal Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267.

Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), the court "may notify any person with the legal capacity to sue or to be sued who is alleged to have an interest in the subject matter of the suit." Further, a "person served with a notice issued . . . may file an appropriate pleading setting forth the person's interest in the subject matter of the litigation."

In resolving a petition for mandamus, the Federal Circuit held in *In re* UUSI, LLC, that a third party's potential obligation to indemnify the government for any patent infringement

15

liability provides "sufficient interest in litigation to offer evidence and advance legal arguments appropriate to protect its own interests. As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970).

The DOJ is the Government Agency representing Qualcomm in the case of *Larry Golden v. USA*; Case 1:13-cv-00307-EGB; Filed 2013. The DOJ is also the Government Agency who spent nine (9) years of tax payer's dollars challenging Plaintiff's patents. Plaintiff submitted the same three (3) patent references; the same nineteen (19) publications; and the same Expert declaration used against Plaintiff in the Government's petition for Inter Partes Review, to the USPTO in an IDS for prosecution of Plaintiff's now issued '189 patent; '439 patent; '287 patent; and '619 patent. All patents were issued post the Inter Partes Review.

On June 9, 2011, the Supreme Court handed down a decision in *Microsoft Corp. v. i4i L.P* No. 10-290, 564 U.S. ___, slip op. at 2-3 (2011). that affirmatively ended any debate about the standard an opponent bears for proving a patent invalid. The 8-0 decision holds that the party asserting patent invalidity must always persuade the jury by the clear and convincing standard— the lower preponderance of the evidence standard never applies for patent invalidity, even if the asserted prior art was never before the PTO during examination.

The Court, and Justice Sotomayor in delivering the opinion, relied heavily on Congress' intent in drafting 35 U.S.C. § 282, which provides that "[a] patent shall be presumed valid" and "[t]he burden of establishing invalidity … rest[s] on the party asserting such invalidity." The Court understood Congress' intent in including "a patent shall be presumed valid" as codifying

the common-law presumption of a clear and convincing evidentiary standard for proving invalidity.

If Qualcomm failed to invalidate Plaintiff's patents on the lower standard of "preponderance of the evidence", why are we to believe Qualcomm is prepared to invalidate Plaintiff's patents on the higher standard of "clear and convincing evidence?"

Under Rule 56, Plaintiff is asking the Court to grant Plaintiff summary judgement on the validity of Plaintiff's patents. (Document 22; Filed 08/01/2022; Plaintiff's response and cross-motion for summary judgement).

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 6th day of January, 2023, a true and correct copy of the foregoing "Plaintiff's Motion to Strike Defendant's Untimely Case Management Statement", was served upon the following Defendant by priority "express" mail:

Joseph John Stevens

PATTERSON & SHERIDAN, LLP

50 West San Fernando Street, Suite 250

San Jose, CA 95113

Phone: (650) 384-4418

Fax: (650) 330-2314

Email: jstevens@pattersonsheridan.com


Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# Exhibit A

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | *FOR COURT USE ONLY* |
|---|---|

TELEPHONE NO.:        FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| *(Check one):*  ☐ **UNLIMITED CASE**  ☐ **LIMITED CASE** | |

*(Check one):*  ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000)  ☐ **LIMITED CASE** (Amount demanded is $25,000 or less)

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:        Time:        Dept.:        Div.:        Room:

Address of court *(if different from the address above)*:

☐ **Notice of Intent to Appear by Telephone, by** *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:

      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:

      (3) ☐ have had a default entered against them *(specify names)*:

   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(Describe, including causes of action)*:

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,
rules 3.720–3.730
www.courts.ca.gov

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐  *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial.   *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a. ☐  The trial has been set for *(date):*
b. ☐  No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐  days *(specify number):*
b. ☐  hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  E-mail address:
☐  Additional representation is described in Attachment 8.
f.  Fax number:
g.  Party represented:

9.  **Preference**
☐  This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**

a.  **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.

(1) For parties represented by counsel: Counsel ☐ has ☐ has not  provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2) For self-represented parties: Party ☐ has ☐ has not  reviewed the ADR information package identified in rule 3.221.

b.  **Referral to judicial arbitration or civil action mediation** (if available).

(1) ☐  This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐  Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☐  This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

**CASE MANAGEMENT STATEMENT**

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. c. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date)*:<br>☐ Agreed to complete mediation by *(date)*:<br>☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date)*:<br>☐ Agreed to complete settlement conference by *(date)*:<br>☐ Settlement conference completed on *(date)*: |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date)*:<br>☐ Agreed to complete neutral evaluation by *(date)*:<br>☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date)*:<br>☐ Agreed to complete judicial arbitration by *(date)*:<br>☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date)*:<br>☐ Agreed to complete private arbitration by *(date)*:<br>☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date)*:<br>☐ Agreed to complete ADR session by *(date)*:<br>☐ ADR completed on *(date)*: |

CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Page 3 of 5

| | CM-110 |
|---|---|
| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**13. Related cases, consolidation, and coordination**

a. ☐ There are companion, underlying, or related cases.

(1) Name of case:
(2) Name of court:
(3) Case number:
(4) Status:

☐ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate    will be filed by *(name party):*

**14. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**15. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|

c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*

| | CM-110 |
|---|---|
| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

17. **Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

18. **Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

19. **Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

20. Total number of pages attached *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

# Exhibit B

| | |
|---|---|
| 1 | Your Name: **Larry Golden** |
| 2 | Address: **740 Woodruff Rd 1102 G'ville SC 29** |
| 3 | Phone Number: **864-288-5605** |
| 4 | Fax Number: |
| 5 | E-mail Address: **atpg-tech@charter.net** |
| 6 | Pro Se |

**FILED**

AUG 30 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

7

8 UNITED STATES DISTRICT COURT

9 NORTHERN DISTRICT OF CALIFORNIA

10 Division *[check one]*: ☐ San Francisco  ☑ Oakland  ☐ San Jose  ☐ Eureka

11

| | | |
|---|---|---|
| 12 | | Case Number: **4:22-cv-03283-HSG** |
| 13 | Larry Golden | |
| 14 | Plaintiff, | *[Check box for party submitting statement]:* |
| 15 | vs. | ☑ **Plaintiff's**      ☐ **Defendant's** |
| 16 | Qualcomm, Inc. | **CASE MANAGEMENT STATEMENT** |
| 17 | | DATE: **08/30/2022** |
| 18 | | TIME: |
| 19 | | JUDGE: Hon. **Haywood S. Gilliam, Jr.** |
| 20 | | |
| 21 | Defendant. | |

22
23
24
25
26
27
28 *[See the Instructions for more detailed information about how to complete this template.]*

CASE MANAGEMENT STATEMENT; CASE NO.: **4:22-cv-03283-HSG**
PAGE NO. _1_ OF _8_   *[JDC TEMPLATE – Rev. 05/17]*

## 1. **JURISDICTION**

*Mark the option that applies to your case.*

This Court has subject matter jurisdiction in this case under:

☑ Federal question jurisdiction because it is about federal laws or rights. *[List the laws or rights involved]* Sherman Act, Clayton Act, Contributory Infringement, Unjust Enrichment

☑ Diversity jurisdiction because none of the Plaintiffs live in the same state as any of the Defendants AND the amount of damages is more than $75,000.

## 2. **SERVICE**

*Complete the table to show when each defendant was served with the Complaint and whether any defendant will argue that this Court is not the correct one to decide this case.*

| Defendant's Name | Date Served or Expected to Serve | Does Defendant dispute that the Court has personal jurisdiction? | | Does Defendant dispute that this is the correct venue? | |
|---|---|---|---|---|---|
| Qualcomm, Inc. | 06/28/2022 | ☑ Yes | ☐ No | ☐ Yes | ☑ No |
| | | ☐ Yes | ☐ No | ☐ Yes | ☐ No |

☐ *Check box if there are more defendants, and provide the above information for each defendant on an additional page at the end of this document.*

## 3. **FACTS**

*Give a short description of the important facts in this case including facts that you and the other side disagree about. Add an additional page if needed.*

Qualcomm, Inc.

Improved cell phone. Plaintiff and Qualcomm began licensing conversations in 2010 & 2011. Qualcomm is illegally collecting royalties on Plaintiff's new improved cell phones and central processing units. Qualcomm is contributing to the infringement of Plaintiff's patents with the cell phone manufacturers. Qualcomm was given years and multiple opportunities to challenge Plaintiff's patent validity and alleged infringe claims. They decided not to appear to defend; and decided to file a response in this case out of time Qualcomm's anticompetitive extortionist licensing practices ahve been litigated in FTC v. Qualcomm and Apple v. Qualcomm.

## 4. **LEGAL ISSUES**

*Briefly explain the laws the Plaintiff says the Defendant violated.*

Qualcomm "extorts", through its anticompetitive licensing practices, at least 5% running royalty rate on each handset sold. The handset is referred to as a new improved cell phone/smartphone/ CMDC device. Qualcomm "ties" Plaintiff's central processing units (CPUs) to its modems to form SoCs or chipsets and forces its customers to purchase the chipsets by threatening "no license, no chip". Qualcomm, after receiving knowledge in 2010 of Plaintiff's CPUs and CMDC devices; "forcibly supplied" under its "no license, no chip" policy, the OEMs with the chipsets that includes Plaintiff's CPUs; thereby contributing [contributory infringement] to the OEMs infringement of Plaintiff's patented new and improved cell phoner, smartphone, or CMDC device.

## 5. **MOTIONS**

*Complete the table to list any motions that have been filed or might be filed.*

| Party filing motion | Type of Motion | Date of Ruling (or "pending" or "to be filed") |
|---|---|---|
| Plaintiff | Default (Dkt.15); Summary (Dkt.22) | pending |
| Plaintiff | Related (Dkt.30); Injunction (Dkt.34) | pending |

☐ *Check box if there are more motions and add a page at the end with additional information.*

## 6. **AMENDING THE COMPLAINT, ANSWER, COUNTERCLAIM/CROSSCLAIM**

*Mark one option to tell the Court whether you plan to change your claims or defenses.*

- The submitting party *[name]* ___Larry Golden___

  ☑ does <u>not</u> plan to amend the Complaint.

  ☐ plans to amend the Complaint by *[date]* ___

☐ *Check box if you need to list more parties, and provide the above information for each party on an additional page at the end of this document.*

\\

\\

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. _3_ OF _8_   *[JDC TEMPLATE – Rev. 05/17]*

1

## 7. **EVIDENCE PRESERVATION**

2

*Parties to a lawsuit must make sure that they are protecting and not destroying evidence that might be used in the case. Check the correct box or boxes.*

3

4

• The submitting party *[name]* Larry Golden _____ has

5

□ reviewed the Guidelines for the Discovery of Electronically Stored Information

6

☑ spoken with the opposing parties about preserving evidence relevant to the issues

7

one could reasonably understand to be part of this case

8

□ plans to do the above by *[date]* _____

9

□ *Check if you need to list more parties, and provide the above information for each party on an additional page at the end of this document.*

10

## 8. **INITIAL DISCLOSURES**

11

*Initial Disclosures are lists of information that the parties must send each other at the beginning of a case. Check the box that applies, and provide the agreed date if needed.*

12

13

□ Parties have sent each other Initial Disclosures.

14

☑ Parties have <u>not</u> yet sent each other Initial Disclosures, but agree to exchange

15

them by *[date]* no date agreed upon _____

16

## 9. **DISCOVERY**

17

*Give a short description of what you plan to investigate during discovery and if there are any discovery issues.*

18

Total number of handsets Qualcomm has received royalties on based on the selling

19

price of the handset. Total number of handsets Qualcomm has contributed to adding a

20

CPU. Total dollar amount of settlements; fines and penalties Qualcomm has paid out

21

over the years for its anticompetitive extortionist licensing practices, both domestic and

22

abroad.

23

24

25

26

## 10. **CLASS ACTIONS**

27

Not applicable.

28

1

## 11. <u>RELATED CASES</u>

2
3

*Check the correct box to explain whether you are aware of any cases related to this one. If you check the second box, list the case number and the court, government agency, or other administrative body that will decide that case.*

4

The party submitting this statement

5

☐ is <u>not</u> aware of any related cases.

6

☑ is aware of related cases *[list cases]*:  Northern District - Golden v Intel &

7

Golden v Apple. CAFC - Golden v USA

8

## 12. <u>RELIEF SOUGHT</u>

9
10

*State what the Plaintiff wants from the Defendant, or wants the Court to do, including any amount of money sought and how that amount was calculated. If a Defendant filed a counter or crossclaim, state the same information for the Defendant. Insert a page if needed.*

11

Plaintiff wants the Court to consider triple damages for violation of Antitrust Laws; to

12

consider triple damages for willful infringement; to stop Qualcomm from receiving any

13

royalties based on the price of each handset (new improved cell phone) sold; and, to

14

stop Qualcomm from making chipsets that include Plaintiff's CPU for handset & vehicles

15

Calculation: 2 billion worldwide users of 3G, 4G, and 5G handsets since 2010. Price

16

capped at $400 dollars for each handset equals $800 billion dollars. $800 billion dollars

17

at a 5% running royalty rate equals $40 billion dollars. Plaintiff will settle for 2% = $8

18

billion dollars.

19

## 13. <u>SETTLEMENT AND ALTERNATIVE DISPUTE RESOLUTION ("ADR")</u>

20
21

*Check at least one box in each section. If you need information to help you decide how to resolve the case, explain what that information is.*

The parties:

The submitting party agrees to the following form of

22

☑ have tried to settle the case.

ADR:

23

☐ have not tried to settle the

☑ Settlement conference with a magistrate judge

24

case.

☑ Mediation

25

☑ Other  Jury

26

Information needed:

27
28

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 5   OF 8   *[JDC TEMPLATE – Rev. 05/17]*

**14. CONSENT TO HAVE A MAGISRATE JUDGE HEAR THE CASE**

*Mark one option to let the Court know if you consent to have a magistrate judge hear the case.*

- The submitting party *[name]* __Larry Golden_____

    ☐ does consent to a magistrate judge.

    ☐ does <u>not</u> consent to a magistrate judge.

☐ *Check box if you need to list more parties, and provide the above information for each party on an additional page at the end of this document.*

**15. OTHER REFERENCES**

*In unusual cases, the judge may refer a case to another decision-maker. If this is one of those cases, cross out "Not Applicable," and write in who should hear this case.*

Not applicable.

**16. NARROWING OF ISSUES, CLAIMS, OR DEFENSES**

*Use this section to explain if issues in this case could be resolved by agreement or by written papers submitted by the parties ("motion"). Check the box that applies, and explain.*

☐     Not applicable.

☑     Issues that can be resolved by agreement: __That nine years is enough time for__ __any patent challenges, and any infringement challenges__

☐     Issues that can be resolved by motion:_____

**17. EXPEDITED TRIAL PROCEDURE**

*If you have questions about the Court's Expedited Trial Procedure, contact the Legal Help Center.*

Not applicable.

**18.    SCHEDULING**

*The Court usually fixes the case deadlines. If you want to propose a schedule, you can do so below. Be sure you will be in town and able to meet any deadlines proposed.*

☑     Agree to have Court set deadlines.

☐     Proposed deadlines:

_____

_____

_____

_____

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. _6_ OF _8_   *[JDC TEMPLATE – Rev. 05/17]*

1

### 19.   TRIAL
*Check the box that applies and estimate how long the trial will last.*

2

3   [✔]   This case will be tried by a jury.  The trial is expected to last _____ days.

4   [ ]   This case will be tried by a judge.  The trial is expected to last _____ days.

5   ### 20. DISCLOSURE OF NON-PARTY INTERESTED PERSONS OR ENTITIES

6   *This Section tells the Court if anyone who is not named as a party in the case will be affected by
the outcome. Usually, if you are representing yourself, the answer is "None." If there is an*

7   *"interested party," cross out "None" and write in the names.*

8   None.

9   ### 21. OTHER MATTERS

10   *Use this section to discuss other issues that would assist with the just, speedy, and
inexpensive resolution of this case.*

11

12   12(b)(1) and 12(b)(6) motions to dismiss this case is a waste of tax payers dollars. This

13   case stems for the years of research and discovery made bt the Federal Trade

14   Commission (FTC v. Qualcomm) where the 5% running royalty rate for each handset

15   sold was never disputed by Qualcomm; and, the anticompetitive extortionist licensing

16   practices alleged by Apple (Apple v. Qualcomm) where Qualcomm settled the case.

17   The anticompetitive conduct of Qualcomm resulted in Qualcomm's unjust enrichment

18   Therefore, why would this case be "frivolous" only to an African-American inventor?

19

20   *NOTE: This document should not be longer than ten pages, including any pages you add at the
end. Each party submitting this statement must sign and date below.*

21

22   Date: 08/26/2022          Sign Name:

23                             Print Name:   Larry Golden

24                                           *Pro se*

25

26

27

28

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 7   OF  8    *[JDC TEMPLATE – Rev. 05/17]*

*Use this page if you need additional space for any Section. Be sure to write the Section number.*

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. _8_ OF _8_   *[JDC TEMPLATE – Rev. 05/17]*

Justice & Diversity
C E N T E R
OF THE BAR ASSOCIATION OF SAN FRANCISCO

1

2

## CERTIFICATE OF SERVICE OF DOCUMENT OTHER THAN COMPLAINT
*\* You must serve each document you file by sending or delivering to the opposing side. Complete this form, and include it with the document that you file and serve.\**

3   1.  **Case Name:** Larry Golden                    v.  Qualcomm, Inc.

4   2.  **Case Number:** 4:22-cv-03283-HSG

5   3.  **What documents were served?** Case Management Statement

6   4.  **How was the document served?** *[check one]*

7           ✔  Placed in U.S. Mail

8           ☐  Hand-delivered

9           ☐  Sent for delivery (e.g., FedEx, UPS)

10          ☐  Sent by fax (if the other party has agreed to accept service by fax)

11  5.  **Who did you send the document to?** *[Write the full name and contact information for each person you sent the document.]*

12

13  John A. Yates                            _____

14  Patterson & Sheridan, LLP                _____

15  24 Greenway Plaza, Suite 1600            _____

16  Houston, Texas 77046                     _____

17  6.  **When were the documents sent?** 08/27/2022

18  7.  **Who served the documents?** *[Whoever puts it into the mail, faxes, delivers or sends for delivery should sign, and print their name and address. You can do this yourself.]*

19

20      I declare under penalty of perjury under the laws of the United States that the foregoing

21  is true and correct.

22      Signature:     _____

23      Name:       Larry Golden

24      Address:      740 Woodruff Rd. #1102

25                    Greenville, SC 29607

26

27

28

**CERTIFICATE OF SERVICE** *[JDC TEMPLATE Rev. 05/2017]*

Case 4:22-cv-03283-HSG   Document 35   Filed 08/30/22   Page 10 of 10

PRESS FIRMLY TO SEAL

PRESS FIRST

# PRIORITY MAIL EXPRESS®

## FLAT RATE ENVELOPE
### ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP



EP13F May 2020





UNITED STATES
POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)   PHONE (864) 287-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)   PHONE (   )

U.S. DISTRICT COURT - NDC - OAKLAND
CASE No: 4:22-CV-03283-HSG
1301 CLAY STREET, SUITE 400S
OAKLAND, CA
9 4 6 1 2

☞ PEEL FROM THIS CORNER

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

LABEL 11-B, MAY 2021

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.   Federal Agency Acct. No. or Postal Service™ Acct. No.

EI 393 697 284 US

**ORIGIN (POSTAL SERVICE USE ONLY)**

| PO ZIP Code | Day of Delivery | Scheduled Delivery Date (MM/DD/YY) | Postage |
| --- | --- | --- | --- |
| 29615 | ☐1-Day ☐2-Day ☐Military | 8-29-22 | $ 26.95 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
| --- | --- | --- | --- |
| 8-27-22 | ☐ 12:00 PM ☐ 3:00 PM | $ | $ |

| Time Accepted | ☐ AM ☐ PM | 10% Postage | Return Receipt Fee | Live Animal Transportation Fee |
| --- | --- | --- | --- | --- |
| 8:31 AM | | | $ | $ |

| Weight | Flat Rate | Acceptance Employee Initials | Total Postage & Fees |
| --- | --- | --- | --- |
| 3 lb 20 oz | ☐ | SM | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
| --- | --- | --- |
| $ 26.95 | $ | $ |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | ☐ AM ☐ PM | Employee Signature |
| --- | --- | --- | --- |
| 10.13 | ☐ AM ☐ PM | | |

Delivery Attempt (MM/DD/YY)   Time   ☐ AM ☐ PM   Employee Signature

U.S. POSTAGE PAID
PME 1-DAY
GREENVILLE, SC
AUG 27, 22
AMOUNT
$26.95
R2305K142754

1007

94612

# Exhibit C

# Qualcomm Expands Snapdragon Ride For All ADAS Levels

Jim McGregor Contributor / https://www.forbes.com/sites/tiriasresearch/2022/01/06/qualcomm-expands-snapdragon-ride-for-all-adas-levels/?sh=382157e026e0

"Qualcomm announced major enhancements to its product portfolio for ADAS and Autonomous Drive (AD) systems … Qualcomm is announcing a new generation of its Snapdragon ADAS SoC and an entirely new family of SoC's aimed just at automotive vision applications. Combined with the Snapdragon Accelerator, the three chips form a scalable platform to handle every automotive application, ranging from simple level-one ADAS applications through level 4 and 5 fully autonomous vehicles."



"The Vision SoC is **designed to handle <u>all</u> the sensor processing** from a vehicle's sensor array both inside and outside the vehicle. Inside the vehicle, image sensors are used for driver and passenger monitoring. Outside the vehicle, a variety of sensors, including image sensors, radar, and lidar, are used as a vehicle's perception system …"



1

## Claims for Re-Issue Patent RE43,891
## [Advanced Driver-Assistance System (ADAS)]

44.        A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:

an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor.

45.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a global positioning system (GPS) receiver adapted for communication with at least one satellite.

46.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a cellular communication device adapted for communication with at least one cell phone tower; further including, at least one satellite connection capable of communicating with the pre-programmed automated system; further including, at least one modem connection for short and long range radio frequency transmissions to and from the pre-programmed automated system.

47.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration.

48.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as

a pre-crash system for stopping or slowing a vehicle to prevent a crash.

49.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse.

50.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover.

51.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane.

52.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a remote vehicle slowdown system for stopping or slowing a vehicle by remote means.

53.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash.

54.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a door lock and unlocking system for stopping or slowing the vehicle and locking a terrorist, thief, or user trying to elude the law inside the vehicle.

55.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle for stopping or slowing a vehicle that is in operation with or without a user, driver or operator inside the vehicle.

56.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a chemical, biological, radiological, nuclear and explosives detection system for stopping or slowing a vehicle when a harmful, hazardous, or dangerous compound or agent is detected.

57.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle.

# Claims for Patent Application 17/300,230 / Claims Allowed 12/20/2022

**1.** A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of:

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure;

processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has been reported as stolen;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;

processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,

Wherein, when the central processing unit (CPU) processes instructions to stall, stop, or slow-down a vehicle, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

**2.** A vehicle, that comprises at least one onboard computer system, electronic system, fuel system, air system, braking system, ignition system, transmission system, or PowerDrive system, capable of:

stalling, stopping, or slowing down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

stalling, stopping, or slowing down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);

4

stalling, stopping, or slowing down a vehicle when the vehicle is experiencing unintended acceleration;

stalling, stopping, or slowing down a vehicle when the vehicle is experiencing lane departure; stalling, stopping, or slowing down a vehicle when a pedestrian, obstacle, collision or crash is detected;

stalling, stopping, or slowing down a vehicle when the vehicle has been reported as stolen;

stalling, stopping, or slowing down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;

stalling, stopping, or slowing down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

stalling, stopping, or slowing down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,

Wherein, the vehicle is stalled, stopped, or slowed down, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

## CONCLUSION

As demonstrated above, Qualcomm must be stopped. Qualcomm has not only used Plaintiff's patented CMDC devices [communication devices that are grouped together by common features and design similarities that include, but is not limited to, a new, improved upon, and useful, cell phone, tablet, laptop, desktop PC, or smartphone], Qualcomm has expanded its market by designing Snapdragon SoCs that "ties" Plaintiff's patented central processing units for controlling a vehicle's functional and operational systems.

The only way to stop Qualcomm from allegedly contributing to the infringement of Plaintiff's patented CMDC devices; to stop Qualcomm from allegedly "tying" Plaintiff's patented central processing units (CPUs) to its Snapdragon SoCs; and, the only way to stop Qualcomm from collecting royalties on the price of each of Plaintiff's patented handsets i.e., smartphones, is to grant Plaintiff's motion for permanent injunctive relief.

# Exhibit D

## Qualcomm's Internet of Things



## A guide to IoT CPUs Color-coded Document to Patent Claims

*This is a guest post by Alexandru Voica is a senior marketing manager for Imagination Technologies. You can follow him on Twitter @alexvoica. https://anysilicon.com/guide-iot-cpus/*

"The Internet of Things is a fast-growing industry built on the promise of ubiquitous connectivity that will enable billions of devices to talk to each other and to people. The estimates for the number of IoT devices to ship by 2020 … 200 billion projection provided by Intel.

For the purpose of this blog post, I will therefore refer to IoT to mean any new device that integrates a sensor, a **CPU** and connectivity;

[T]his includes everything from wearables, mobile or home entertainment devices to connected cars, smart farming, energy, healthcare and other M2M applications.

1

By bringing multiple communications standards such as Wi-Fi, Bluetooth or cellular onto the **SoC**, overall … costs … is significantly cut down leading to more affordable devices

Designing an **SoC** for wearables on the other hand is all about minimizing power consumption. Depending on the target market and use case, wearables can be configured as a standalone device or tethered to a smartphone…

Firstly, since a vast majority of IoT devices need some form of wireless connectivity, integrating the radio baseband on chip is becoming a standard practice. … This means reducing the range of wireless standards to a combination of Bluetooth, Wi-Fi … and adopting a **CPU** … configuration optimized for energy efficiency …

IoT promises to be a driving force that will create new business models … [s]calable solutions are designed to target every level of IoT device and system …  High-density compute nodes [that] feature a heterogeneous **CPU** architecture: A typical high-density compute node is defined by a more specialized architecture that integrates a manycore **CPU** alongside other hardware accelerators (e.g., GPUs, DSPs, FPGAs) used for compression, data filtering and other complex algorithms.

[A] particular feature of the manycore **CPU**: hardware multithreading [] allows the compute node *SoC* designer to scale much better in terms of performance by turning on individual threads inside each of the **CPUs** before powering on multiple cores. This heterogeneous **CPU** computing solution leads to significant gains in efficiency, both in terms of area and power."

## COLOR-CODED PATENT CLAIMS IDENTIFYING THE IOT CPU PLATFORM

**Claims 1, of Patent No. 10,984,619 [the '619 patent] claims a "communication device" that comprises a "central processing unit", capable of …**

1.     A communication device that is at least a personal computer (PC), a cellphone, **a smartphone**, a laptop, or a handheld scanner, **comprising at least a *CENTRAL PROCESSING UNIT (CPU)*,** capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a **chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;**

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a **Bluetooth,** a **Wi-Fi,** a satellite, a global positioning system (GPS), or a **cellular** transmission;

processing instructions to connect the communication device to the internet or **internet-of-things (IoTs) platform** to sync, to at least one of a building's computer or security system, a **vehicle's computer or security system**, a lock, a detection device, or another communication device; and,

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2.    The communication device of claim 1, **comprising at least a *CENTRAL PROCESSING UNIT (CPU)*,** capable of processing operational instructions for at least a personal computer (PC), a cellphone, **a smartphone**, a laptop, or a handheld scanner.

3.    The communication device of claim 1, comprising at least a *CENTRAL PROCESSING*

*UNIT (CPU)*, capable of receiving a signal to lock, unlock, or disable the lock of the communication device.

4.    The communication device of claim 1, comprising at least a *CENTRAL PROCESSING UNIT (CPU)*, capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5.    The communication device of claim 1, comprising at least a *CENTRAL PROCESSING UNIT (CPU)*, capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6.    The communication device of claim 1, comprising at least a *CENTRAL PROCESSING UNIT (CPU)*, capable of receiving a signal from at least **chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor**.

7.    The communication device of claim 1, comprising at least a *CENTRAL PROCESSING UNIT (CPU)*, capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8.    The communication device of claim 1, comprising at least a *CENTRAL PROCESSING UNIT (CPU)*, capable of receiving a signal through at least a **Bluetooth,** a **Wi-Fi**, a satellite, a **cellular**, or GPS connection.

9.    The communication device of claim 1, comprising at least a *CENTRAL PROCESSING UNIT (CPU)*, capable of receiving a signal of the communication device connection to the internet or **internet-of-things (IoTs) platform** to sync at least a building's computer or security system, a **vehicle's computer or security system**, a lock, a detection device, or another communication device.

10.    The communication device of claim 1, comprising at least a *CENTRAL PROCESSING UNIT (CPU)*, capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

**Claims 11, of Patent No. 10,984,619 [the '619 patent] claims a "central processing unit" of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of … "processing instructions for operational and functional execution"**

11.    A *CENTRAL PROCESSING UNIT (CPU)* of at least a personal computer (PC), a cellphone, **a smartphone**, a laptop, or a handheld scanner, capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of **a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor**;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a **Bluetooth**, a **Wi-Fi**, a satellite, a global positioning system (GPS), or a **cellular** transmission;

processing instructions to connect the communication device to the internet or **internet-of-things (IoTs) platform** to sync, to at least one of a building's computer or security system, a **vehicle's computer or security system**, a lock, a detection device, or another communication device; and,

whereupon, the ***CENTRAL PROCESSING UNIT (CPU)*** of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.


12.     The ***CENTRAL PROCESSING UNIT (CPU)*** of claim 11, capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, **a smartphone**, a laptop, or a handheld scanner.

13.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions to lock, unlock, or disable the lock of the communication device.

14.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

15.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions from at least **chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor**.

17.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

18.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions through at least a **Bluetooth,** a **Wi-Fi,** a satellite, a **cellular,** or GPS connection.

19.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions of the communication device connection to the internet or **internet-of-things (IoTs) platform** to sync at least a building's computer or security system, a **vehicle's computer or security system**, a lock, a detection device, or another communication device.

20.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.


## CONCLUSION

As demonstrated above, Qualcomm must be stopped. Qualcomm has not only used

Plaintiff's patented CMDC devices [communication devices that are grouped together by

common features and design similarities that include, but is not limited to, a new, improved

upon, and useful, cell phone, tablet, laptop, desktop PC, or smartphone], Qualcomm has

expanded its market by designing Snapdragon SoCs that "ties" Plaintiff's patented central

processing units for controlling an Internet-of-Things (IoTs) platform, that include, but is not limited to: integrated sensors, connected cars, Wi-Fi, Bluetooth or cellular, standalone device / smartphone, short-range wireless connectivity, and IoT *CPUs*,

The only way to stop Qualcomm from allegedly contributing to the infringement of Plaintiff's patented CMDC devices; to stop Qualcomm from allegedly "tying" Plaintiff's patented central processing units (CPUs) to its Snapdragon SoCs; and, the only way to stop Qualcomm from collecting royalties on the price of each of Plaintiff's patented handsets i.e., smartphones, is to grant Plaintiff's motion for permanent injunctive relief.